# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **HTC CORPORATION et al.** | ) | |
| | ) | |
| **Plaintiffs and** | ) | |
| **Counterclaim-Defendants** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:08-cv-01897- RMC** |
| | ) | |
| **IPCOM GMBH & CO., KG,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counterclaim-Plaintiff** | ) | |

## IPCOM'S OPENING CLAIM CONSTRUCTION BRIEF

Stephen E. Baskin
DC Bar Number 456015
Kilpatrick Stockton LLP
Suite 900
607 14th Street, NW
Washington, DC 20005-2018
Telephone: 202.508.5800
Facsimile: 202.508.5858

Mitchell G. Stockwell
Geoffrey K. Gavin
Catherine E. Hart
Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA 30309-4530
Telephone:  404.815.6500
Facsimile:  404.815.6555

*Attorneys for Defendant-Counterclaim*
*Plaintiff IPCom GmbH & Co.,KG*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... v

TABLE OF ABBREVIATIONS ............................................................................ vii

INTRODUCTION ................................................................................................ 1

THE PATENTS IN SUIT ..................................................................................... 2

I.    The Synchronization or 216 Patent. ........................................................ 2

II.    The Access or 751 Patent. ....................................................................... 2

III.    The Handover or 830 Patent. ................................................................. 3

CLAIM CONSTRUCTION PRINCIPLES ........................................................... 3

ARGUMENT AND AUTHORITY ....................................................................... 5

I.    IPCom's Constructions Concerning the Synchronization or 216 Patent. ............... 5

    A.    Synchronizing. ........................................................................... 5

    B.    Conducting an Initial Synchronization by means of a Frequency
        Correction Burst. ....................................................................... 8

        1.    Conducting a Coarse Frequency Synchronization ........................ 10

        2.    Conducting a Coarse Frame Synchronization Over a
            Plurality of Said Time Slots Which Comprise a
            Frame ........................................................................... 13

        3.    Conducting a Fine Frequency Synchronization ............................ 15

        4.    Conducting a Fine Frame Synchronization ................................... 18

    C.    Maintaining Normal Synchronization During Communication by
        means of Interspersed Normal Synchronization Bursts. ........................... 19

        1.    Conducting a Frame Synchronization with Fine
            Frequency Synchronization ......................................................... 21

        2.    Carrying Out Preliminary Data Signal Processing ....................... 23

    D.    Performing Extended Synchronization During Communication as a
        Background Procedure by means of Interspersed Frequency
        Synchronization Bursts. .............................................................. 26

ii

1.    Conducting a Coarse Frame Synchronization................................ 27

2.    Conducting a Fine Frame Synchronization with
      Fine Frequency Synchronization. .................................................. 28

E.    Dependent Claim 2: A. Calculating (Continuous Evaluation of) a
      Phase Angle from Sequences of Pairs of Values each Including an
      In-phase Value (I) and a Quadrature Value (Q) and B. Thereafter
      Performing a Continuous Evaluation........................................................ 29

F.    Dependent Claim 5: The Fine Frequency Synchronization Step
      Comprises Evaluating Said Frequency Correction Burst (12)................. 31

G.    Dependent Claim 6: The Step of Evaluating ... Comprises By
      Producing a Regulation Magnitude Proportional to a Frequency
      Deviation from Phase Difference Values of Neighboring Phase
      Values by Means of a Linear Regression. ................................................. 32

H.    The Remaining Terms................................................................................. 32

II.   IPCom's Constructions Concerning the Access or 751 Patent. ............................. 33

A.    Means for receiving information signals. .................................................. 33

B.    Evaluation unit........................................................................................... 35

C.    The Evaluation Unit Limitations. .............................................................. 39

1.    [Evaluation Unit for Asking] When Information
      Signals with Access Authorization Data Means (65)
      as Authorization Data (45, 50, 55) are Received ... ...................... 39

2.    Access Authorization Data Means (65) as
      Authorization Data (45, 50, 55) ................................................... 40

3.    Access Authorization Data (45, 50, 55) or
      Authorization Data (45, 50, 55) ................................................... 41

4.    [Evaluation Unit for] Asking ... Whether Access
      Authorization Data (45, 50, 55) Include an Access
      Threshold Value (S) for Comparison of the Access
      Threshold Value (S) with a Random Number or a
      Pseudo-Random Number (R)......................................................... 45

5.    [Evaluation Unit ...] for Ascertaining as a Function
      of an Outcome of a Comparison Whether an Access
      of the At Least one Subscriber Station (5, 10, 15,

20) to the At least One Telecommunication Channel is Enabled ................................................................................... 46

D. Random Number or Pseudo-Random Number (R) .................................... 48

E. Access Threshold Value ......................................................................... 50

III. IPCom's Constructions Concerning the Handover or 830 Patent. ....................... 51

A. The Arrangement Terms. ......................................................................... 51

     1. An Arrangement for Reactivating the Link with the First Base Station if the Handover is Unsuccessful. ...................... 54

     2. An Arrangement for Reestablishing the Link with the First Base Station. ................................................................... 55

     3. An Arrangement for Retransmitting Link Data for a Link Between the Mobile Station and a First Base Station of a Network to a Second Base Station of the Network, the Link Data containing Current Parameters of the Link. ................................................................. 56

B. Link Data. ............................................................................................. 57

C. (1) Holding in Reserve and (2) Initially Causing the Resources of the First Base Station to Remain Held. ...................................................... 59

D. Initially Maintaining a Storage. ............................................................... 59

E. (1) At a Later Timepoint Determined by A Fixed Period of Time Predefined at a Beginning of the Handover and (2) At a Later Timepoint Determined Based on a Message from One of the Mobile Station and the Second Base Station ........................................... 60

F. (1) Deleting ... and Freeing Up and  (2) Deleted ... Released .................. 60

G. The Link ... is Re-established. .................................................................. 61

H. The Remaining Terms. ............................................................................ 61

CONCLUSION ............................................................................................................. 63

iv

## TABLE OF AUTHORITIES

**Cases**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed. Cir. 2002) .................................... 40

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003) ...... 46

*Atmel v. Infor. Storage Devices*, 198 F.3d 1374 (Fed. Cir. 1999) ................................................ 51

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) ............................... 16

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006) ........................................................ 9

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002)........................................... 7

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006) ............................... 25

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005) ................................................................................................ 38

*DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342 (Fed. Cir. 2008)................................................... 7

*Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001)............................ 1

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) .............................. 38

*In re Dossel*, 115 F.3d 942 (Fed. Cir. 1997)................................................................................. 51

*K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed.Cir.1999) .......................................................... 40

*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351 (Fed. Cir. 2000).................................... 9, 19

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)........................................... 7

*Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004).............. 38, 39

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003)... 33, 55, 56

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ....................................................... 3

*Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344 (Fed. Cir. 2006) .................................. 39

*Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250 (Fed. Cir. 1999)........................... 34

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005) ....................... 38

**Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..................................................*passim*

v

*Pitney Bowes Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) ................................. 4

*Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294 (Fed. Cir. 1999) ........................................... 55

*Synthon IP, Inc. v. Pfizer, Inc.*, 446 F. Supp. 2d 497 (E.D. Va. 2006) ......................................... 12

*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316 (Fed. Cir. 2008) .................................... 51

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997) .......................................... 33

*V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) ......................... 36, 52

*Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................................... 5, 10

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322 (Fed. Cir. 2006) .... 15, 17

*Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB*, No. 3-05-CV-0289-D,
2007 WL 273568 at *3 (N.D. Tex. Jan. 31, 2007) ...................................................................... 1

*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed.Cir.1999) ...................................... 54

**Statutes**

35 U.S.C. § 112, ¶6 ..............................................................................................................*passim*

## TABLE OF ABBREVIATIONS

| ABBREVIATION | MEANING |
|---|---|
| Joint Appendix | The parties joint appendix, which includes as Exhibits 1-9 certain common exhibits.  IPCom's exhibits are provided as exhibits 100-199 and HTC's exhibits are provided as Exhibits 200, et seq. |
| 216 Patent | U.S. Patent No. 5,390,216, Exhibit 2 |
| 751 Patent | U.S. Patent No. 7,043,751, Exhibit 3 |
| 830 Patent | U.S. Patent No. 6,879,820, Exhibit 4 |
| A/D converter | Analog to Digital converter |
| BCCH | Broadcast Control Channel |
| BS | Base Station |
| C0 | Channel 0 |
| CODEC | Coder-Decoder |
| CPU | Central Processing Unit |
| FCB | Frequency Correction Burst |
| GMSK | Gaussian Minimum Shift Keying |
| GSM | Global System for Mobile Communications |
| Hz | Hertz |
| I | In-phase component |
| ISO | International Organization for Standardization |
| MS | Mobile Station |
| MT | Mobile Terminal |
| OSI | Open System Interconnection Reference Model |
| Ppm | Parts per million |
| Q | Quadrature-phase component |
| TCH | Traffic Channels |
| TDMA | Time Divisional Multiple Access |
| TR | Tolerance Region |
| UMTS | Universal Mobile Telecommunications System |
| Stark Dec. | Declaration of Dr. Wayne E. Stark, Exhibit 102 |
| Madisetti Dec. | Declaration of Dr. V.J. Madisetti, Exhibit 125 |

US2008 954720.4

## INTRODUCTION

Pursuant to the Court's scheduling order, IPCom submits its opening claim construction brief. The parties have identified approximately 50 terms from the three patents in suit for construction. The parties' joint chart sets forth the relevant terms and respective constructions, although several of the terms are phrases as to which IPCom seeks a construction due to the technical subject matter and, as to which, HTC has taken no position. (*See* Ex. 1.)[1]  For the reasons that follow, IPCom respectfully requests that the Court adopt its constructions and reject HTC's efforts to impose improper constructions that do not reflect the ordinary meaning of the claim terms in view of the appropriate intrinsic and extrinsic evidence.

Additionally, IPCom understands that HTC wishes to attack the validity of the patents as part of claim construction. For example, HTC contends that thirty-one claim terms are indefinite. IPCom will further address HTC's indefiniteness arguments in its response brief, but does note that claim terms are considered invalid for indefiniteness "only if reasonable efforts at claim construction prove futile." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). This high standard reflects the statutory presumption of patent validity. Given these standards, courts have found that a patent challenger's presentation of a construction, even if in the alternative to an indefiniteness argument, confirms that a claim term is not indefinite. *E.g., Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB*, No. 3-05-CV-0289-D, 2007 WL 273568 at *3 (N.D. Tex. Jan. 31, 2007) (claim term not indefinite where party had proffered a construction for the term). Because HTC here proffers alternative constructions, the Court should necessarily dismiss HTC's arguments.

---

[1] IPCom files herewith an Appendix containing certain joint exhibits 1-9 and IPCom's exhibits 100-142. Specific portions of the patents in suit are referenced by column and line number (e.g., 5:1-6 means column 5, lines 1-6), and the patents are in the Appendix as Exhibits 2-4 that respectively correlate to the 216, 751, and 830 patents.

**THE PATENTS IN SUIT**

## I.     The Synchronization or 216 Patent.

The 216 patent is entitled "Synchronization method for a mobile radiotelephone." It discloses "synchronization methods for mobile radiotelephones in a cellular, digital mobile radiotelephone system comprising a plurality of fixed stations and a plurality of mobile radiotelephones, for example operating according to what is known as the GSM Recommendation." (Ex. 2 at 1:10-15.) Although the "invention is not necessarily limited to the GSM system ... and is likely to be useful in more or less similar systems" (*id.* at 8:53-55), illustrative embodiments are described by referencing characteristics of a GSM system.

The invention aimed "to provide a synchronization method that fulfills all the requirements of digital information transmission with the least possible technical complication and expense." (*Id.* at 3:5-8.) To "take advantage of that more economical synchronization technique, there is performed for the mobile radiotelephone, first, an initial synchronization, then a normal synchronization and then, an extended synchronization as a background procedure during normal operation." (*Id.* at 3:25-30.) These three main steps include substeps (*id.* at 3:30-43) and "[b]y this procedure it is possible to realize synchronization of higher precision with a relatively small complication and expense." (*Id.* at 3:44-46.) To explain the relevant background of this technology, IPCom has provided a declaration from Dr. Wayne Stark, who explains several principal operations described in the disclosure. (*See* Ex. 102 ("Stark Dec.").)

## II.    The Access or 751 Patent.

The 751 patent (Ex. 3) is entitled "Method of allocating access rights to a telecommunications channel to subscriber stations of a telecommunications network and subscriber station." In a cellular network, authorization to access a common channel must be managed among a large number of individual mobile (or subscriber) stations. The 751 patent

2

describes a subscriber station that receives information signals broadcast on the network via a transceiver and then analyzes certain data within those information signals using an evaluation unit. The evaluation unit, which is connected to the transceiver in the mobile station, analyzes the "access authorization data" and determines whether to authorize the mobile station access to the common channel. As set forth in claim 13, which is the only claim of the 751 patent that IPCom asserts, the evaluation unit examines the access threshold value to identify the access threshold value for comparison with a random (or pseudorandom) number. The evaluation unit then determines, based on the outcome of this comparison, whether to authorize access to the common channel. The 751 patent allows authorization of access rights to be controlled with a minimum amount of transmission overhead, increasing the efficiency and quality of service in the network.

## III.    The Handover or 830 Patent.

The 830 patent is entitled "Method for handover, mobile station for handover and base station for handover." It discloses "a type of handover to be implemented that can be performed without network support," but if "the network is capable of supporting handover, that capability can be utilized." (Ex. 4 at 2:31-35.) Another aspect involves a situation where the base station forces the mobile station to attempt handover, and, if it cannot, "the mobile station can return to the original base station without any problem." (*Id.* at 2:12-24.) Independent claims 1, 12, and 18 discuss aspects of these inventions. To address issues HTC has raised concerning the understanding skilled persons would have of the disclosure of the 830 patent, IPCom submits herewith the declaration of Dr. V.J. Madisetti. (*See* Ex. 125 ("Madisetti Dec.").)

## CLAIM CONSTRUCTION PRINCIPLES

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). "[W]ords of a claim 'are generally given their ordinary and customary

3

meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* The sources for determining the ordinary and customary meaning of a claim term progress from "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quotations omitted). Extrinsic evidence may be considered for the purposes of: (1) providing background on the technology; (2) explaining how an invention works; (3) ensuring that the court's understanding of the technical aspects comports with that of a person skilled in the art; and/or (4) establishing that a particular term in the patent or prior art has a particular meaning in the relevant field. *Id.* at 1318. If admitted, expert testimony must be considered in the context of the patent and the file history. *Id.* at 1319.

Nonetheless, the starting point for claim interpretation must be the claims themselves. *Pitney Bowes Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). *Phillips* noted that there is a "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim," and reaffirmed that claims should not be limited by statements in the specification. 415 F.3d at 1323. "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the

4

art would understand the claim terms." *Id.* Thus, "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Id.*

**ARGUMENT AND AUTHORITY**

I.      **IPCom's Constructions Concerning the Synchronization or 216 Patent.**

      A.      **Synchronizing.**

**IPCOM CONSTRUCTION: Bringing the mobile station's operation in step with the corresponding operation of a base station.**

**HTC Construction: Tuning the frequency and frame timing of the mobile device to be in line with the base station by continuously evaluating phase angles of a received signal.**

Synchronizing appears in the claim preamble, which states: "A method of synchronizing a mobile radiotelephone in a cellular digital mobile radiotelephone network comprising a plurality of fixed radiotelephone stations and a plurality of mobile radio stations operating in accordance with a GSM standard or its equivalent." (Ex. 2 at 8:62-67.) The context of the claim language itself thus indicates that the synchronizing occurs between the mobile station (i.e., the "mobile radiotelephone") and a base station (i.e., one of the "fixed radiotelephone stations"). The ordinary meaning of "synchronization" is simply "the maintenance of one operation in step with another." (Ex. 105 at 1873 (technical dictionary definition of "synchronization").)[2]   Such alignment is necessary to ensure information arriving at and sent by the mobile station can be properly decoded and used. (Stark Dec., ¶35; *see also generally* ¶¶48-79.)

There is no reason to deviate from this ordinary meaning, as the specification confirms that synchronization brings the mobile station and base station's operation into step.   For

---

[2] Dictionaries may be consulted to better understand the technology involved in the case. *Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996). Courts may look to dictionary definitions when construing claim terms, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.; see also Phillips*, 415 F.3d at 1321-22 (cautioning as to use of dictionaries, but approving use of same).

5

example, the background to the invention discusses the "GSM" standard and notes, as to frequency synchronization, that: "A base station sends signals on a broadcast control channel to enable a mobile station to synchronize itself and if necessary to correct its frequency standard so as to put it in line with that of the base station." (Ex. 2 at 2:7-11.) Elsewhere, in describing the fine frame synchronization substep, the specification explains that: "[a]fter a successful determination of the beginning of a frame, the oscillator frequency of the mobile telephone needs to be brought more precisely (0.1 ppm) into step with the frequency of the base station." (*Id.* at 6:62-65.) And, as to frame synchronization, the specification explains the need to determine any "frame shift" resulting from delay in signal reaching the mobile station. (*See, e.g., id.* at 2:33-42; 7:54-55; 8:20-25.) Thus, with respect to both frequency and frame timing, the specification shows that "synchronizing" brings the operation of the mobile station in line or in step with the same operation -- frequency or frame -- of the base station. (*See also* Stark Dec., ¶¶35, 41-42, 51.)

HTC, by contrast, reads "synchronizing" to require "[t]uning the frequency and frame timing of the mobile device to be in line with the base station by continuously evaluating phase angles of a received signal." While HTC agrees with the essential point that the mobile and base station should be in alignment or in step,[3] it reads too much into the word "synchronizing" by specifying a precise mechanism for reaching that state.

HTC's construction ignores the context in which the word "synchronizing" occurs. The word only appears in the preamble, which specifically omits any details of how the method of "synchronizing" occurs. The preamble instead merely sets the context for what is being synchronized by noting that synchronizing occurs between mobile stations and base stations.

---

[3] IPCom is equally content using "in line" as opposed to "in step." They are the same in this context.

6

It is, moreover, improper to read into "synchronizing" a requirement of "tuning" as alignment may be achieved simply through producing parameters, such as frequency correction values used to correct received signals (Ex. 2 at 7:63-66) or the synchronization parameters like frame and frequency shift. (*Id.* at 8:23-25.) The patent explicitly notes that the incoming signals are sampled and digitized, "produc[ing] a serial digital data stream for further processing" (*id.* at 5:9-10) and shows both a synchronization and "digital signal processor." (*Id.* at Fig. 2.) The digital data stream is thus expressly subject to digital manipulation based on the various frame and frequency shift parameters determined.

Similarly, HTC proposes that synchronizing be done based on an analysis of phase angles. But that, again, goes too far. Both *Phillips* and other cases confirm that reading preferred embodiments into a claim term is simply improper. *See, e.g., DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("when claim language is broader than the preferred embodiment, it is well-settled that claims are not to be confined to that embodiment."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope....") (internal citations omitted); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (one may not overcome the presumed ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history."). The Court should thus adopt IPCom's construction.

7

**B.     Conducting an Initial Synchronization by means of a Frequency Correction Burst.**

**IPCOM CONSTRUCTION: Controlling a process to achieve an initial, synchronized connection between a mobile station and a base station through use of one or more frequency correction bursts.**

**HTC Construction: Having selected a carrier frequency, synchronizing during initial connection by performing the claimed steps (1.1), (1.2), (1.3), and (1.4) on frequency correction burst 12.**

The parties essentially agree that initial synchronization results in achieving the initial connection between a mobile station and a base station. That is because the specification teaches: "The initial synchronization ... serves to provide the initial connection between a mobile radiotelephone and a fixed station...." (Ex. 2 at 5:22-24.)

As to the disputed issues, first, IPCom contends that "by means of" has its ordinary, grammatical meaning of "through use of." (*See* Ex. 106 at 839 (dictionary definition of "means" defining "by means of" as "by the agency of; through").) The specification similarly discusses ways of measuring the I and Q components of phase angles so that "a mobile radio station can utilize the frequency burst signals transmitted by a base radio station much more economically to synchronize a mobile radio station with a base station for receiving and transmitting...." (Ex. 2 at 8:43-46.) The specification thus confirms that bursts are simply "utilized" in conducting initial synchronization.

IPCom construes the term "conducting" to generally mean "controlling a process." "Conducting" typically refers to "[t]o direct the course of; manage or control." (Ex. 107 at 393 (dictionary definition of "conduct"); *see also id.* at 188, 284 (other standard dictionary definitions of "conduct").) The specification firmly reflects that "conducting" refers to controlling a process. For example, Figure 2 discloses several structures (e.g., reception portion 21, baseband converter 22, A/D converter 25, and synchronization processor 28) as well as "[a]

8

central control unit 31 [that] is in two-way communication with the" other components shown. (Ex. 2 at 4:63-65.) "The central control unit 31 prescribes to the synchronization processor 28 which synchronization step is to be activated. The control unit reads out the responses of the synchronization processor, interprets them and supplies setting values to the corresponding components." (*Id.* at 5:15-21; *see also* Stark Dec., ¶¶59-61.) Thus, the various steps of "conducting" simply reflect the specification's teaching that the underlying processes are controlled to achieve the stated results.

HTC implies that synchronization must be via a single frequency correction burst. That is incorrect; "by means of a frequency correction burst" simply requires use of one or more bursts. The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (citations omitted). Here, the claim contains the open-ended "comprising" transition and, accordingly, the same rule governs.

HTC also seeks to rewrite the claim to require each substep to utilize the frequency correction burst ("FCB"). But that is plainly not what either the claim says or the specification teaches. The claim language requires merely use of the FCB in conjunction with the overall process of reaching initial synchronization. It does not recite that the FCB is used in each substep. Both other claims and the specification strongly contradict HTC's construction. Thus, dependent claim 5 adds the detail that the fine frequency synchronization step "comprises evaluating said" FCB. (Ex. 2 at 10:7-9.) HTC's construction renders such a claim detail superfluous, yet "claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). Similarly, claim 7

9

expressly recites that fine frame synchronization involves "recognizing and evaluating said training sequence of said frequency synchronization bursts." (Ex. 2 at 10:17-20.) But, under HTC's construction, this claim is rendered inoperable because HTC requires use of the FCB, which is not the synchronization burst and has no training sequence. *See Phillips*, 415 F.3d at 1314 ("[o]ther claims of the patent in question ... can also be valuable sources of enlightenment as to the meaning of a claim term.").

Moreover, the specification makes clear that the disclosed embodiments do not use the FCB for each substep. Coarse frequency synchronization involves selecting and tuning to a carrier frequency. While coarse frame and fine frequency synchronization may use the FCB (Ex. 2 at 5:54-6:66), the specification plainly teaches use of the synchronization burst to conduct the fine frame synchronization process. (*Id.* at 7:18-42). Yet HTC construes the claim in a manner that excludes these disclosed embodiments. That is improper. *See Vitronics*, 90 F.3d at 1583 (an interpretation of a patent claim that renders the disclosed embodiment outside the scope of the claim is "rarely, if ever, correct and would require highly persuasive evidentiary support").

### 1.    Conducting a Coarse Frequency Synchronization

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frequency into at least approximate step with the base station frequency, such as by selecting and tuning to a carrier frequency.**

**HTC Construction: using the selected carrier frequency as a starting point, adjusting the mobile device's frequency to within a tolerance of a reference phase angle.**

Here, the phrase uses the word "conducting" and references synchronization. The same construction of "conducting" described above should apply. *Phillips*, 415 F.3d at 1314 ("claim terms are normally used consistently throughout the patent"). Similarly, "synchronization" simply involves bringing into step the operations of the mobile station and base station. The claim specifies that "frequency" alignment is the type of alignment sought, and that it need only

10

be a "coarse" or approximate alignment. (*E.g.*, Ex. 108 at 219 (dictionary definition of "coarse" discussing "not precise or detailed with respect to adjustment or discrimination").)  The claim language itself thus supports IPCom's construction. *Phillips*, 415 F.3d at 1314 ("'the claims themselves provide substantial guidance as to the meaning of particular claim terms.").  The specification does as well.  It notes the imprecision of oscillators used to tune to a carrier frequency (Ex. 2 at 6:64-65) as well as frequency drift caused by Doppler effect. (*Id.* at 8:1-2). These statements confirm course frequency synchronization achieves only a rough or approximate alignment.

The parties agree that selecting a carrier frequency is one mechanism for achieving a coarse frequency synchronization.  The specification confirms that understanding.  It explains that GSM frequency bands are "organized to provide eight participant channels" which include both "traffic channels (TCH's) and control channels." (*Id.* at 1:38-41.)  It is the control channels that "include frequency correction channels for frequency correction of a mobile station." (*Id.* at 1:45-46.)  Each cell receives "a particular set" or "allocation" of channels. (*Id.* at 1:54-56.)  The signals that "enable a mobile station to synchronize itself to the base station and if necessary correct its frequency standard so as to put it in line with that of the base station" (*id.* at 2:7-11) are known to exist in at least channel "C0" of the cell allocation. (Ex. 5 at HTC1300; Stark Dec. ¶¶53, 64.)  The mobile station thus selects and tunes to the channel, such as C0, with the synchronization signals by using "a high frequency reception portion 21 of a radio receiver" controlled by the "central control unit 31 [that] is in two-way connection" with the receiver. (*Id.* at 4:51-52; 4:63-65).  The specification thus teaches a skilled person that, in operation, a mobile station must select and tune to the carrier frequency that carries the required synchronization signals. (Stark Dec., ¶¶64, 72.)

11

Column 5 of the patent confirms this teaching – it describes two, separate processes a "Coarse Frequency Determination and Coarse Frequency Synchronization." (Ex. 2 at 5:30-31.) The "coarse frequency determination" is an *optional* step that can be performed "after the detection of a carrier frequency by means of the high frequency reception portion 21 of the radio receiver." (*Id.* at 5:34-36.) Selection and tuning to the carrier frequency by the receiver 21 is what skilled persons understand to be a coarse frequency synchronization. Only thereafter does the specification explain that the additional coarse frequency determination may be made to examine any burst, make a "first frequency estimation" and determine "whether the frequency of the discovered carrier lies within or outside of a tolerance region TR," shown in Figure 3. (*Id.* at 5:34-38.) But the coarse frequency determination is optional because "[w]ith sufficient precision of carrier frequency tuning the coarse frequency determination which is burst independent can be dispensed with." (*Id.* at 5:48-50.)

The appropriate construction should thus simply instruct that the step aims to control a process to bring the frequencies into approximate step. It is appropriate to reference one mechanism for doing so – "such as by selecting and tuning to a carrier frequency." But it is error to limit the language of the step to this embodiment. It is even more egregious error to limit, as HTC advocates, this step to the optional, and different, coarse frequency determination process. The specification plainly signals that the optional "coarse frequency determination" is not the same as "coarse frequency synchronization." The optional process simply acts as a check to determine whether the mobile station has, in fact, selected and tuned to the right carrier frequency before performing other synchronization steps. Such an optional, unclaimed step simply cannot limit the claims. *See, e.g., Synthon IP, Inc. v. Pfizer, Inc.*, 446 F. Supp. 2d 497, 510 (E.D. Va. 2006) (recognizing claim could not be narrowed where "[t]he specification is

12

explicit that purification is an optional step that can be performed following isolation, and not a result achieved during or as part of isolation.").

Similarly, HTC incorrectly argues that, as a result of the optional check on carrier frequency, there is an "adjust[ment to] the mobile device's frequency to within a tolerance of a reference phase angle." (Ex. 1 at 1.) Nothing in the claim or specification mandates so adjusting the mobile station's frequency. Indeed, the optional check "produces only information of whether the frequency of the discovered carrier lies within our outside of a" TR. (Ex. 2 at 5:36-38.) Whether the discovered carrier is inside, or outside, the TR, the specification never even discusses an adjustment. In short, a stunning absence of evidence justifies this aspect of HTC's construction, and IPCom's construction should apply.

> **2.     Conducting a Coarse Frame Synchronization Over a Plurality of Said Time Slots Which Comprise a Frame**

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frame timing into at least approximate step with the base station's frame timing, such as by identifying a range within which the beginning of a frame falls.**

**HTC Construction: using the phase angle of a frame of multiple frequency correction bursts to adjust the mobile device's frame timing to within a coarse precision.**

The same construction of "conducting" described above should apply. Here, the claim language specifies the "synchronization" involves "frame" alignment, and that it need only be a "coarse" or approximate alignment. Coarse frame synchronization thus helps to ensure that frames and information therein (sent by the base station) are properly identified by the mobile station. (Stark Dec., ¶¶42, 74.)

IPCom's construction describes one example by which the specification explains that coarse frame synchronization may be conducted. The specification explains one can determine the beginning of a frame. To do so, one can analyze the I/Q components incoming signals, locate through analyzing those components the FCB and determine generally when the FCB

13

burst began.  Thus, the specification discloses that "a simple criterion for the search algorithm for recognition of the beginning of the frequency correction burst 12 is provided, as shown in Fig. 5," which "shows how the corrected phase course of the received frequency correction burst 12 makes possible the determination of the beginning of a frame." (Ex. 2 at 6:8-14.) Figure 5 depicts a "steadily rising line [that] can be calculated back to show that the burst began at the beginning of the interval marked 1 in Fig. 5," with the time region shown below the graph. (*Id.* at 6:36-40.) "From the beginning of the burst, the beginning of a TDMA frame can be determined with reference to the time slot assigned to the mobile telephone, when necessary." (*Id.* at 6:40-43.) Because the FCB burst occurs in a known time slot of a frame (*see* Ex. 5 at HTC1305), knowing the beginning of that burst allows the mobile station to determine when the frame itself began, as well as the next time slot. (*See* Stark Dec., ¶74.)

By contrast, three serious flaws permeate HTC's construction.  Not only does it rely, without justification, on using phase angles for this substep, it then describes "using the phase angle of a frame of multiple frequency correction bursts." It is entirely unclear what a phase angle of a "frame" is; indeed, nothing in the specification (or other evidence) discusses finding a phase angle of a frame. It is similarly unclear what "a frame of multiple" FCBs would be. Both the specification and the GSM standard indicate that an FCB occupies one time slot (Ex. 2 at 5:60-62; Fig. 1) and that a frame consists of multiple, interleaved time slots. (*Id.* at 1:64-65; claim 1 preamble (8:62-67); *see also* Stark Dec., ¶¶49-50.) The GSM standard notes the FCB is repeated in subsequent frames. (Ex. 5 at HTC1305 (noting "repeat length in TDMA frames").) But there is no evidence of a single frame composed of multiple FCBs.

Finally, HTC once again returns to its theme of "adjusting," this time by saying that the process must adjust the mobile's frame timing. But that is not what the specification says.

14

Instead, it merely discloses that estimating the beginning of a frame is one way to implement a coarse frame synchronization. HTC's construction of substep 1.3, though flawed in other respects, acknowledges this point by noting that "having determined the frame beginning...."

In short, HTC's construction is both hopelessly garbled and simultaneously dramatically misunderstands and misstates the technological context of the invention and claim.

### 3.    Conducting a Fine Frequency Synchronization

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frequency in step within a desired operating accuracy with the base station frequency, such as by producing a frequency offset parameter.**

**HTC Construction: having determined the frame beginning, adjusting the mobile device's frequency to within a fine precision of the phase angle of the received signal.**

The same construction of "conducting" described above should apply. Here, the claim language specifies the "synchronization" involves "fine frequency" alignment and IPCom's construction is modified accordingly. "Fine" is a relative term and should be understood with reference to the overall purpose – ensuring sufficient accuracy for the mobile station to reproduce the information sent by the base station. The specification reinforces that ordinary meaning of fine by explaining that "the oscillator frequency of the mobile telephone needs to be brought more precisely (0.1 ppm) into step with the frequency of the base station." (Ex. 2 at 6:63-65.) The "0.1 ppm" is a reference to 0.1 parts per million and is drawn directly from the GSM standard. (Stark Dec., ¶36; Ex 5 at HTC1324.) It thereby refers to the precision necessary to ensure, within the operating environment for which the mobile is designed, that the operations of the mobile and base stations are sufficiently aligned to allow accurate interpretation of signals. (*Id.*) In short, skilled persons would understand that "fine" synchronization aims to synchronize to a point where desired operating accuracy is ensured. *Cf. Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1329 (Fed. Cir. 2006) (noting that "'[r]igid' is a very

15

relative term" and "the specification states only that the insert must be rigid enough for the invention to work.").

IPCom's construction appropriately provides an example of how such a fine frequency synchronization process operates. The specification provides several examples of how to perform this process. In section 1.3, it discusses "minimization of the phase difference" between phase values of the expected ("nominal") frequency and the measured phase values of the actual frequency "by a linear regression [that] produces a magnitude proportional to the frequency shift via the slope of the regression straight line." (Ex. 2 at 7:9-11; *see also* Stark Dec., ¶75.) A similar example is given at 6:29-33 in referencing Figure 5, in which the specification explains that "fluctuations in the rate of change of phase (poor synchronism) ... are quickly corrected to produce the necessary straight line corresponding to the known linear phase progressive characteristic of the burst." And, at 8:23-25, the specification more generally notes that process can produce "necessary synchronization parameters (... frequency shift)."

The same problems noted with HTC's constructions above persist in its construction of this phrase. Additional flaws exist. HTC's reference to "having determined the frame beginning" comes seemingly[4] out of nowhere. It also introduces a new, legally erroneous argument. In essence, HTC's construction requires substep 1.3 to be performed after substep 1.2, which as described above, in the exemplary embodiment locates frame start. But the Federal Circuit has held that "although a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys.,*

---

[4] This is perhaps partially explained by HTC's original (and different) construction of step 1.2, which insisted step 1.2 required "approximat[ing] to a first level of precision the timing of the beginning of a frame transmitted by the base station." (Ex. 101 at 7.) HTC modified that aspect of its construction and thus conceded that finding the beginning of the frame is not a necessary component of step 1.2, but apparently overlooked the inconsistency of introducing this limitation into an entirely different step.

*Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). That is especially true here where, in the section discussing coarse frame synchronization, the specification notes both that the frame beginning can be determined "when necessary" and that "fluctuations in the rate of change of phase (poor synchronism)" can be "quickly corrected to produce the necessary straight line corresponding to the known" phase characteristics of the FCB, as Figure 5 shows. (Ex. 2 at 6:29-33.) This latter phrase plainly relates to using the FCB to produce a frequency correction – indicating that the specification recognizes that the steps are not dependent on a particular order. That understanding is confirmed by the statement that frame beginning need only be determined "when necessary," and not in any particular sequence.

Independently, HTC's construction that one must "adjust[] the mobile device's frequency to within a fine precision of the phase angle of the received signal" is nonsensical. There is no single phase angle of the received signal; in the disclosed embodiment, phase angles are computed based on the I/Q samples and vary over time, as the patent figures make plain. Nor is it at all clear what is meant by stating that the frequency is brought "to within a fine precision of the phase angle." A frequency is not a phase angle; HTC's construction equates to saying the speed of a vehicle must be brought to within a fine precision of a distance. Claim constructions must not only resolve disputes over scope, they must be understandable to skilled persons and helpful to the Court and jury. *See, e.g., Wilson Sporting Goods*, 442 F.3d at 1330 (a "superfluous" or "undefined" construction that is not "clarifying" "adds nothing" and "does not belong" in claim construction). HTC's proposal simply fails those basic tests.

17

4.     **Conducting a Fine Frame Synchronization**

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frame timing into step within a desired operating accuracy with the base station's frame timing, such as by producing bit synchronization setting parameters.**

**HTC Construction: using the phase angle of the frame used in step (1.2) to adjust the mobile device's frame timing to within a fine precision.**

Here, the claim language specifies the type and quality – "fine frame" – synchronization and, thus, the same construction of "conducting" and "fine" described above should apply.  In this instance, IPCom provides an example of a fine frame timing adjustment.  The specification explains "[a] bit accurate frame determination is possible by a pattern correlation procedure," which may be conducted by evaluating "the phase course of the training sequence within the synchronization burst 13." (Ex. 2 at 7:24-26; 7:35-37.)  By matching the measured and expected phase course of the synch burst, a "setting magnitude for bit synchronization" can be provided to "the central control unit 31." (*Id.* at 7:33-34; Figs. 4A-4B.)   As above, at 8:23-25, the specification summarizes these procedures more generally as producing "necessary synchronization parameters (frame … shift)." By determining how much to "shift" bits encoded in the base station signals, the mobile station ensures it can properly decode the information. (*Compare id.* at 7:67 (noting objective of providing "error-free decoding").)

The principal additional flaw with HTC's construction is its effort to suggest this step "us[es] the … frame used in step (1.2)." The genesis of this construction is HTC's last minute[5] addition of a new term for construction – the phrase "over said plurality of time slots which comprise a frame."  HTC apparently wishes to tie this phrase to the similar phrase appearing in step 1.2, and thereby insist that step 1.4 must process the same frame as step 1.2.  The claim

---

[5] Under the Court's Scheduling Order, the parties were to preliminarily identify claim terms, exchange preliminary constructions, confer, and file the Joint Chart.  HTC first identified this additional language around 5:00 p.m. the day of filing the Joint Chart.

language does not support such a reading, however.   It says only that step 1.4 is conducted on said plurality of time slots which "comprise *a*," not "*said*" frame.  The reference to "a frame" presumptively means one or more, not a particular, frame.  *See KCJ Corp.,* 223 F.3d at 1356. Step 1.4 thus provides no signal that the frame analyzed is the same as the frame analyzed in step 1.2.  Nor can HTC point to the reference to "said plurality of time slots" as necessarily referring only to the time slots, and frame, referenced in step 1.2.  That is because the *preamble* also describes "a plurality of time slots together comprising a frame."

Finally, the specification does not teach performing step 1.2 and step 1.4 on the same frame.  But, there is evidence that skilled persons know different frames may be used.  The GSM standard and the specification reveal that frequency correction and synchronization bursts are repeated.  (*See* Ex. 2 at 2:11-13 (noting "bursts" are sent by the base station); Ex. 5 at HTC1305 (noting repeat of bursts).)  Skilled persons would thus understand that the process could be performed on other frames, especially given the generic reference to "a frame."

**C.**   **Maintaining Normal Synchronization During Communication by means of Interspersed Normal Synchronization Bursts.**

**IPCOM CONSTRUCTION: Producing parameters to remain synchronized during communication between the mobile station and the base station through use of interspersed normal synchronization bursts.**

**HTC Construction: during a communication in progress, synchronizing by performing the claimed steps (2.1) and (2.2) on normal burst 14.**

Once again, the claim language guides construction of this phrase.   "Maintaining" typically means "to keep in due condition, operation, or force."  (Ex. 109 at 819 (dictionary definition of "maintain").)  Both the claim's previous description that the mobile station reaches "initial synchronization," as well as the claim language at issue, describes what is being maintained – "normal synchronization" – and when – "during communication."  And, the claim

19

language uses the same "by means of" phrase to describe that interspersed normal synchronization bursts are used to so maintain synchronization.

The specification reinforces these ordinary meanings, noting that "[w]ith continuous monitoring and maintaining of the frame and frequency synchronism by the evaluation of training sequence within the normal burst 14 (FIG. 1 and GSM 05.02 p. 10) an error free decoding is assured." (Ex. 2 at 7:49-52.) The details of the two steps described further indicate that maintaining synchronization involves producing various parameters as a part of the continuous monitoring and maintenance. For example, identifying "encrypted bits designated in Fig. 1 ... identif[ies] the training sequences." (*Id.* at 7:53-54.) Another parameter produced is a "frame shift" that "mark[s] the pattern sequence with bit–accuracy within the data packet or sentence." (*Id.* at 7:54-58.) The specification, however, makes clear that such parameters may not actually be used – what is occurring is "continuous monitoring and maintaining" of synchronism, which may not be lost during any particular communication.

No special significance is accorded to the "during communication" phrase. The Abstract of the patent explains that the "normal burst" is used for "normal maintenance of synchronization during communication." Elsewhere, the specification simply notes that "[t]he normal synchronization during operation of the receiver takes place in two steps." (*Id.* at 7:45-46.) Mobile stations can communicate in a variety of ways – by registering with the network, sending packet data, or engaging in a voice communication. The phrase "during communication" appropriately encompasses all such actions that will require "operation of the receiver."

As to HTC's proposed construction, IPCom is unaware of any support for restricting the communication to one that is "in progress." The point of maintaining synchronization is to do so while the receiver is operating, not to tie normal synchronization to the status of any particular

20

call. By way of example, before a communication – whether data or voice – commences, the

mobile station will need to register with the network and obtain a channel assignment. Such

processes require communication between the mobile and base station. There is no reason to

conclude that normal synchronization cannot be performed during such processes.

Finally, HTC errs by both reading out of the claim limitations concerning the nature of

the burst and reading into the claim other limitations on the characteristics of the burst. There is

no reason to ignore the claim language requiring the burst to be "interspersed"; indeed, HTC's

original construction acknowledged and repeated this language. (Ex. 101 at 7.) Nor, however, is

there reason to limit the burst to a single, or specific, "burst 14," as HTC proposes. That is

simply not what the claim says.

      **1.**    **Conducting a Frame Synchronization with Fine Frequency Synchronization**

**IPCOM CONSTRUCTION: Controlling a process to monitor and maintain the mobile station and base station's frame timing in step while having the mobile station and base station's frequency in step within a desired operating accuracy, such as by producing frame shift and frequency correction parameters.**

**HTC Construction: using the phase angle of the received signal to simultaneously adjust the mobile device's frame timing and frequency.**

This step describes similar processes discussed in prior steps (*e.g.*, 1.3, 1.4), rendering

consistent constructions appropriate. The primary dispute centers around the preposition, "with,"

whose ordinary meaning includes "accompanied by; accompanying." (Ex. 110 at 1530

(dictionary definition of "with").) That is the sense in which "with" is used here, and both the

specification and other claim language confirm that usage.

The specification states:

      The encrypted bits designated in FIG. 1 serve to identify the training sequences. In this procedure any frame shift is first determined. The value produced (timing pulse shift) is a necessary parameter in order to mark the pattern sequence with bit-accuracy within the data packet or sentence. This is assumed

21

for the following correct calculation of the correlation for determining the actual (current) frequency status.

Preliminary Data Processing (2.2)

A frequency correction value produced by the central control unit 31 from the actual (current) frequency measurement is supplied to the synchronization processor 28. By means of this preprocessing of the data signal any impairment of error-free decoding in the case of frequency shifts exceeding 200 Hz is completely eliminated.

(Ex. 2 at 7:53-66.) It thus reveals a sequence to the operations involved: a "frame shift is first determined"; the frame shift so determined is "assumed" for "determining the actual (current) frequency status" and from the current frequency status the frequency correction value produced by the control unit is supplied to the synchronization processor.

None of these operations, contrary to HTC's contention, happen "simultaneously." The point of using "with" was thus to convey not that the operations occurred simultaneously, but that coarse frame synchronization occurred in conjunction with fine frequency synchronization. Other evidence confirms this point. The claim language specifies that the normal synchronization occurs "during communication," and is based on "interspersed" "bursts." As such, when the mobile station may be moving faster or further away from the base station, resulting in additional frequency drift (e.g., as the mobile moves), the "fine frequency synchronization" process can account for that drift by producing a frequency correction value from the various bursts, thereby "maintaining" synchronization. The fact that the frequency correction value may be "supplied to the synchronization processor 28" confirms this understanding. As explained below, such "preprocessing" aimed to account for frequency shifts from "Doppler effect" or "oscillator drift."

Finally, IPCom again takes issue with HTC's effort to require this substep to "us[e] the phase angle of the received signal." In addition to the other defects noted above, the "frame synchronization" described produces a "timing pulse shift," which is simply a timing adjustment

22

based on a review of the training sequence. The specification does not here state that an evaluation of phase angles is the mechanism used to identify the training sequence. It discloses using a pattern correlation procedure to compare a received training sequence to an expected training sequence. (Ex. 2, at 7:24-30.) A simple plot of the time difference between the expected and measured training sequence provides the "timing pulse shift." Thus, this aspect of HTC's construction should be rejected.

### 2.    Carrying Out Preliminary Data Signal Processing

**IPCOM CONSTRUCTION: Preprocessing data signals to account for frequency shifts during communication.**

**HTC Construction: analyzing the actual (current) frequency to supply a frequency correction value to the synchronization processor that, when applied to the mobile device's internal frequency, eliminates any frequency shifts exceeding 200 Hz.**

IPCom's construction is based on the claim language. It first specifies what is being processed – data signals. The specification does not suggest a particular definition for "data signals," and the term is sufficiently straightforward that no further construction is needed. The claim language also explains the operations involved – preliminary processing. The specification explains that the processing is conducted by virtue of a mechanism in which a frequency correction value may be generated by the control unit and supplied to the synchronization processor. (Ex. 2 at 7:62-66.) The specification explains how "[t]he control unit 31 prescribes to the synchronization processor 28 which synchronization step is to be activated ... reads out the responses..., interprets them and supplies the setting values to the corresponding components." (*Id.* at 5:15-21.) When the synchronization processor receives the frequency correction value, it can use that value to account for frequency drift when processing "the serial digital data stream" that has "sampled I, Q pair[s]." (*Id.* at 5:8-10; Stark Dec., ¶¶77-78.)

23

The result of such a mechanism is a "preprocessing of the data signal" to eliminate "any impairment of error-free decoding in the case of frequency shifts." (Ex. 2 at 7:66-68.) Such frequency shifts will occur during the process of the communication and the preprocessing ensures normal synchronization is maintained despite mobile station movement and oscillator drifts. So correcting for frequency drift "during communication" results in better decoding of the signals carried in the normal burst as well as ensuring better data on which to conduct frame synchronization. IPCom's construction thus reflects, as one purpose of the preprocessing, the accounting for frequency shifts during communication.

HTC's construction is both unwarranted and incorrect. It insists that supplying the "frequency correction value to the synchronization processor ... eliminates any frequency shifts exceeding 200 Hz." That is wrong. The example provided in the specification says not that frequency shifts exceeding 200 Hz are eliminated, but that "any impairment of error-free decoding in the case of frequency shifts exceeding 200 Hz is eliminated." (Ex. 2 at 7:67-8:1.) Further, the reference to 200 Hz is a reference to the *combined* frequency drift from both an imprecise oscillator and Doppler effects. (*See id.* at 8:1-2 ("Such frequency shifts are to be expected from the Doppler effect *and* from oscillator drift.") (emphasis added).) But, as Dr. Stark explains, oscillator precision varies and the frequency drift from such oscillators, as well as Doppler effect, are well-known and easily calculated by skilled persons. (Stark Dec., ¶¶36-37.) Skilled persons would thus recognize that the combination of a more precise oscillator and mobile station moving at a lower speed results in smaller frequency drifts and would understand that preprocessing would also account for that drift. (Stark Dec., ¶78.)

It is also wrong to insist that the frequency correction value is "applied to the mobile device's internal frequency." This is more of HTC's improper attempt to read the claims as

24

requiring an oscillator adjustment.  There is no support for such a reading – to the contrary, the specification makes clear that the correction is supplied to the processor that is manipulating the incoming digital data stream, not the oscillator that tunes to the carrier frequency.

It is likewise incorrect to assert this phrase requires "analyzing the actual (current) frequency to supply a frequency correction value to the synchronization processor."  The specification discusses supplying a correction value to the processor as one way of preprocessing the data signals, but the claim language is not so limited.  Mechanisms to improve signal processing, such as feedback and feed forward techniques for example, are well known to skilled persons.  For example, HTC itself cited a technical definition of "preprocessing," which simply means "[a]n operation performed before a primary process; for example in pattern recognition, processing in which patterns are simplified to make classification easier."  (Ex. 111 at 861.)  A skilled person reading the specification would thus understand other preprocessing to improve synchronization can be performed – like preprocessing to improve recognition of the pattern of expected training sequences.

Finally, HTC's construction is entirely inappropriate because it reads into the claim limitations from the specification.  As one example, the requirement to eliminate frequency drift of 200 Hz plainly invites legal error.  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1358 (Fed. Cir. 2006) ("'[W]hen a claim term is expressed in general descriptive words, [the court] will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims.'").  Another egregious example is the requirement that the frequency correction value must be supplied to the synchronization processor.  Claim 1 is a method claim; it does not recite any of the Figure 2 components, much less give any indication that preprocessing must be done by supplying particular values to particular components.

25

### D. Performing Extended Synchronization During Communication as a Background Procedure by means of Interspersed Frequency Synchronization Bursts.

**IPCOM CONSTRUCTION: Preparing for synchronization with one or more neighboring cells during communication with the base station through use of interspersed frequency synchronization bursts.**

**HTC Construction: Synchronizing with a neighboring cell by performing the claimed steps (3.1) and (3.2) on the neighboring cell's synchronization burst 13.**

The parties agree that the "extended" synchronization here involves synchronization with a neighboring cell. That is because the specification teaches: "Extended synchronization is needed to provide synchronization of a mobile radiotelephone to neighboring cells of a cellular mobile radio communication system as a cell boundary is approached and crossed." (Ex. 2 at 8:5-9.) In other words, as a mobile station moves away from coverage of one base station, it needs to prepare to transition to another base station. The reference to approaching and crossing a cell boundary signifies the process occurs during communication with the first base station. This is confirmed by the specification: "In order to insure that synchronization is not lost during a change of a radiotelephone from one radio cell to a neighboring cell, extended synchronization is provided during normal operation as a background process...." (*Id.* at 8:18-25.)

The claim also specifies that the extended synchronization occurs "as a background procedure." The specification explains this concept as follows: "extended synchronization is provided in normal operation as a background procedure (process having lower priority) which produces the necessary synchronization parameters (frame and frequency shift) for the nearby cell in contemplation of a crossing of a cell boundary." (*Id.* at 8:20-25.) The background procedure has a lower priority because what is necessary is that the mobile station prepare for synchronization only when "contemplat[ing] ... a crossing of a cell boundary." (*Id.* at 8:24-25.)

26

HTC seems to insist that one must actually "synchroniz[e] with a neighboring cell," yet its later constructions of steps 3.1 and 3.2 acknowledge that only preparation is required. *See infra.* That is correct. Such preparation for crossing a cell boundary is achieved by "produc[ing] the necessary synchronization parameters (frame and frequency shift)." (Ex. 2 at 8:22-24.) Neither claim language nor the specification requires that the mobile station actually and fully synchronizes with the neighboring cell. To the contrary, the patent makes clear that this process is occurring "in contemplation" of needing to switch to a new base station as one approaches a cell boundary. (*See also id.* at 8:25-28 ("As a result, the control unit 31 can assure that a connection will be preserved in going from one cell to another.").) The claim language requiring that one "perform" extended synchronization "as a background procedure" reinforces this point – the mobile station is principally focused on continuing its normal synchronization with the currently serving base station. It need only perform extended synchronization so as to be able to "handoff" to the next base station, if needed.

### 1. Conducting a Coarse Frame Synchronization.

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frame timing into at least approximate step with the frame timing of a base station in one or more neighboring cells, such as by identifying a range within which the beginning of a frame falls.**

**HTC Construction: using the phase angle of a signal received from a neighboring cell to prepare6 for adjusting the mobile device's frame timing to within a coarse precision.**

IPCom's construction tracks the construction of the similar claim phrase in step 1.2, with appropriate modifications that recognize that this substep is performed during extended synchronization with a base station in a neighboring cell. The specification supports this view,

---

[6] The parties agree that this step and step 3.2 are part of the "preparing" for synchronization with the adjoining cell. IPCom sees no need to repeat the point about preparation in the construction of this claim term given the construction of step 3.

27

as it notes that "[t]he relevant algorithms for the above steps correspond essentially to those designated 1.2, 1.3, 1.4 and 2.1 above." (Ex. 2 at 8:34-35.)

Once again, however, HTC seeks to add additional, unsupported limitations. IPCom addressed the issues concerning use of "phase signals." HTC's proposal that one "prepare for adjusting" frame timing similarly fails to recognize that the synchronization parameters like "frame shift" may be digitally processed and require no adjustment of a physical device, such as a counter. In addition, however, HTC proposes that the simple phrase "coarse frame synchronization" requires "using ... a signal received from a neighboring cell." Nothing in the claim language supports this construction. To the contrary, step 3 specifically defines the characteristics of the synchronization burst that is being used and nothing more is required.

### 2. Conducting a Fine Frame Synchronization with Fine Frequency Synchronization.

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station and neighboring base station's frame timing in step within a desired operating accuracy while bringing the mobile station and neighboring base station's frequency in step within a desired operating accuracy, such as by producing frame shift and frequency correction parameters.**

**HTC Construction: using the phase angle of a signal received from a neighboring cell to simultaneously prepare for adjusting the mobile device's frame timing and frequency to within a fine precision.**

IPCom's construction tracks the construction of the similar claim phrase in step 2.1, with appropriate modifications that recognize that this substep is performed during extended synchronization with a base station in a neighboring cell. IPCom has previously addressed other issues raised by HTC's construction.

28

    **E.**    **Dependent Claim 2: A. Calculating (Continuous Evaluation of) a Phase Angle from Sequences of Pairs of Values each Including an In-phase Value (I) and a Quadrature Value (Q) and B. Thereafter Performing a Continuous Evaluation.**

**IPCOM CONSTRUCTION: A. Repeatedly sampling a signal and determining a phase angle from pairs of in-phase and quadrature values. B. Continuing to evaluate the phase angles determined from sequences of paired in-phase and quadrature values.**

**HTC Construction: A. Calculating a phase difference between in-phase and quadrature components of a signal received from a base station multiple times per bit period. B. None.**

Claim 2 depends from claim 1 and introduces "further steps." The phase angle referenced in claim 2 has a well understood meaning to skilled persons. It is "[t]he difference between the phase of a sinusoidally varying quantity and the phase of a second quantity which varies sinusoidally at the same frequency" and is "[a]lso known as phase difference." (Ex. 112 at 1406 (technical dictionary definition of "phase angle").) Dr. Stark explains these concepts. (Stark Dec., ¶¶18, 62-63.)

The specification explains that GSM modulates a carrier frequency using "Gaussian minimum shift keying (GMSK)." (Ex. 2 at 3:13-14.) As Dr. Stark explains, in GMSK, two components, one called the in-phase component ("I") with phase 0 and one called the quadrature-phase component ("Q") with phase 90°, are modulated onto a carrier. (Stark Dec., ¶¶23-25, 31-34.) These I and Q components carry different symbols or "bit values," and their magnitude changes. (Ex. 2 at 3:21-24; Stark Dec., ¶¶31-32.) Claim 2 specifies that the calculation of the phase angle is based on the "sequences of pairs of values." Those sequences are derived from down converting the received signal into separate I and Q signal voltages (Ex. 2 at 4:53-58) and then sampling the received signal to generate the I/Q values that are "quantized into eight bit digital signals." (*Id.* at 5:2-5.)

The claim requires that the phase angle be determined "from sequences of pairs of values." The specification explains that: "The relative magnitudes of the I and Q components

29

will change when sampled at many times per data bit length. The relative I and Q magnitudes (i.e. the proportion) in each case define a phase angle. Transitions from 0 to 1 and from 1 to 0 of GMSK modulation, as well as synchronization procedures, result in changing phase angles." (*Id.* at 4:30-34; *see also* Stark Dec., ¶32.) If no change in the bit value occurs from one bit to the next (e.g., because the bits conveyed are the same – 0,0 or 1,1), then the phase angle will ideally (i.e., with no frequency offset) increase by pi/2 from one bit to the next.

For example, in the case of a data bit stream of 0, 0, 0, the phase angle computed from the I,Q pair associated with the second 0 will rise pi/2 relative to the phase angle computed from the I,Q pair associated with the first 0, and the phase angle for the I,Q pair associated with the third 0 will rise by another pi/2 relative to the phase angle of the second 0, thus reaching a total phase increase of "pi" relative to the phase angle of the first 0, as Figure 5 of the patent shows at T=3. If, on the other hand, a change in bit value does occur from one bit to the next, then the phase angle will ideally (i.e., with no frequency offset) change by going down by pi/2. (*See* Stark Dec. ¶¶32, 65-67.) Therefore an arbitrary sequence of 0's and 1's results in a progression of phase angles that increase or decrease as a function of the specific data bit transitions, as shown in segment "0" of Figure 5. Figure 5 also shows, however, the start of the frequency correction burst that consists of a constant stream of bits representing bit value "0." Because the bit stream does not change from one bit to the next (i.e., the bits are all "0"), the phase angle constantly increases from one bit to the next. (Ex. 2 at 5:66-6:4.) By evaluating these various calculated phase angles, one can, for example, locate a frequency burst. Thus, the "continuous evaluation" described in claim 2 refers to evaluating the phase angles over time that are derived from the "sequences" of I/Q pairs.

30

HTC's construction misunderstands the nature of the calculations. It suggests calculating "a phase difference *between* in-phase and quadrature components of a signal received from a base station." This is puzzling because the in-phase and quadrature components have a known phase relationship – by definition 90 degrees separate them. (Stark Dec., ¶63.) Thus, by omitting (or ignoring) the claim language specifying that the phase angle calculation is performed on "sequences of pairs of values each including an in-phase value (I) and a quadrature value (Q)," HTC has fundamentally failed to grasp the point of the claim. Skilled persons would not make such a mistake and, instead, would understand IPCom's construction to be correct.

> **F.     Dependent Claim 5: The Fine Frequency Synchronization Step Comprises Evaluating Said Frequency Correction Burst (12).**

**IPCOM CONSTRUCTION: Producing parameters, such as a frequency correction, from an evaluation of the frequency correction burst.**

**HTC Construction: analyzing the phase angle of the frequency correction burst.**

Unlike claim 1, claim 5 specifically requires the fine frequency synchronization step to evaluate the frequency correction burst. By means of that evaluation, the specification teaches that a frequency correction can be produced. (*See* Ex. 2 at 6:62-7:12.) Claim 5, of course, depends upon claim 2, which requires the calculation and continuous evaluation of the phase angles from the sequences of I/Q pairs. For claim 5 to be met, showing that the operations of claim 2 have occurred will be necessary, but that is not justification for HTC's effort to rewrite claim 5 to require evaluating the frequency correction burst be based on phase angles.

31

G.     **Dependent Claim 6: The Step of Evaluating ... Comprises By Producing a Regulation Magnitude Proportional to a Frequency Deviation from Phase Difference Values of Neighboring Phase Values by Means of a Linear Regression.**

**IPCOM CONSTRUCTION: Producing a value proportional to a difference between a detected and a reference frequency via a linear operation on phase values.**

**HTC Construction: Using a linear regression to produce a frequency correction value proportional to a difference between neighboring phase angle values.**

The specification explains that "[t]he algorithm for frequency determination yields the actual phase value from the I,Q sample value pair and provides the difference from the above described reference phase value," that "is calculated in parallel to the actual value determinations." (Ex. 2 at 7:3-9.) By "minimization of the phase difference by a linear regression," "a magnitude proportional to the frequency shift via the slope of the regression straight line" is produced. (*Id.* at 7:10-12.) Claim 6 thus adds the step of producing a value (referenced in the claim as the "regulation magnitude") proportional to the frequency shift. The linear regression that produces the value is a known technique that may involve plotting and fitting a line to data.

H.     **The Remaining Terms.**

As reflected in IPCom's constructions in the Joint Chart, the terms from dependent claims 7-10 incorporate elements construed above. (Ex. 1 at 6-7.) No further construction is appropriate. IPCom has also offered constructions of three phrases as an aid to the jury due to the nature of the material. (Ex. 1 at 4-5.) Each is supported by the specification, as summarized here:

- "Frequency Assignment" Clause: *see* Ex. 2 at 1:54-56 (noting frequency channel allocation); 4:43-45 (describing division of channels into time slots); Fig. 1 (depicting a frame).

32

- Fixed Radiotelephone Station: *see id.* at 6:65; 8:16 (discussing base station).

- Frequency Correction Burst: *see id.* at 2:20-27; 5:62-67; Fig. 1.

HTC has offered neither a contrary construction nor an objection concerning these terms, and

IPCom accordingly requests the Court adopt the indicated constructions.

**II.    IPCom's Constructions Concerning the Access or 751 Patent.**

Before addressing the specific claim construction issues for the 751 patent, IPCom briefly

notes applicable principles governing construction of certain "means plus function" elements.

An element in a patent claim may be expressed as a "means" for performing a specified function

without the recital of the structure that performs that function. 35 U.S.C. § 112, ¶6. These are

known as "means-plus-function" claim elements. The first step in analyzing a claim written in

means-plus-function form is to identify the claimed function. *Lockheed Martin Corp. v. Space*

*Systems/Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). Thereafter, a court must "identify the

structure corresponding to the function" that is disclosed in the patent. *Id.* at 1320.

**A.    Means for Receiving Information Signals.**

**IPCOM CONSTRUCTION: A transceiver, or its equivalents, for receiving information
signals.**

**HTC Construction: Construed function: digitizing a received signal (25) and parsing out
access authorization data (45,50,55) to pass to the evaluation unit (60);   Corresponding
structure: ... insufficient to achieve the claimed function.**

The parties agree that "means for receiving information signals" is a means-plus-function

term. The recited function is "receiving information signals." This simple phrase can be easily

understood by not only those skilled in the art but also laypersons. Claim construction "is not an

obligatory exercise in redundancy," and this function needs no further construction. *U.S.*

*Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Indeed, the functional

language in this means element comes directly from the patent specification: "The first mobile

33

station 5, by means of its transceiver unit 65, *receives the information signals*, which include the access threshold value S, that were transmitted over the BCCH [broadcast control channel] 25." (Ex. 3 at 5:16-19 (emphasis added).) Moreover, the corresponding structure – a transceiver – is clearly linked to the "receiving" function in this same passage, and this forms the basis for IPCom's construction of this term.

HTC's suggestion that there is no corresponding structure for the "means for receiving information signals" is not credible. Notably, HTC initially proposed that the structure for this "means" term was "transceiver unit 65 with one transmitting/receiving antenna 70" and did not construe the function. (Ex. 101 at 5.) HTC now proposes that "receiving information signals" is much more complicated than the phrase would indicate, requiring both "digitizing a received signal" and "parsing out access authorization data to pass to the evaluation unit." (Ex. 1 at 8.)

Just as "[t]he statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim," *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999), it does not permit HTC to redefine the function both to limit the claim and then argue insufficient structure supports the new, rewritten function. Indeed, there is no support in the claim language itself, or even the specification, for the "digitizing" and "parsing out" that HTC proposes to write into the "receiving" function. The word "receiving" means just that and does not require digitizing a received signal or parsing something out of it. The Court should reject HTC's transparent effort to bootstrap itself into an invalidity argument.

34

### B.    Evaluation Unit

**IPCOM CONSTRUCTION: A microprocessor.**

**HTC Construction: Function:  asking and ascertaining (defined below); Corresponding Structure: No linking structure pursuant to 35 U.S.C. § 112 (1st, 2nd, and 6th).**

IPCom construes "evaluation unit" to mean a microprocessor.  HTC contends that this phrase is a means plus function element and, once again, then seeks to argue that it is indefinite.

Fig. 2 of the patent, reproduced here, shows a mobile station (5) as having transceiver (65), an evaluation unit (60), antenna (70), and SIM card (75).  (Ex. 3 at 5:5-10.)  The evaluation unit  connects to the



*Fig. 2*

transceiver and accesses the SIM card.  (*Id.* at 5:8-10; 7:38-43.)  It has memory (*id.* at 6:60; 7:32) and performs the steps shown in Figs. 4a-4c of the patent.  These steps are called "program points" throughout their description and include, for example, determining whether certain data is in the received information signals, obtaining a value from the SIM card or memory, drawing a random number, and comparing different values.  (*Id.* at 8:63-10:10.)  Given these descriptions of the evaluation unit and its interaction with the other components, a person skilled in the art would undoubtedly understand that the evaluation unit is simply a microprocessor.

Dictionary definitions of the constituent words "evaluation" and "unit" confirm this understanding.  Two technical dictionaries define unit as "Any device having a special function, such as the arithmetic-logic unit, central processing unit, or disk unit."  (Ex. 113 at 407, 438 (definitions of "unit" from Computer Dictionary and Webster's New World Dictionary of Computer Terms).)  A third technical dictionary defines "unit" as "An assembly or device capable of independent operation, such as a radio receiver, cathode-ray oscilloscope, or computer

35

subassembly that performs some inclusive operation or function." (Ex. 113 at 2101 (definition from McGraw-Hill Dictionary of Scientific and Technical Terms).) The modifying adjective "evaluation" is defined as "the act of considering or examining something in order to judge its value, quality, importance, extent, or condition." (Ex. 114 at 494; *see also* Ex. 115 at 615, 400 (additional dictionary definitions of "evaluate").) These definitions alone suggest an evaluation unit is a device – like a microprocessor or CPU – capable of independent operation with a special function of considering or examining something in order to judge its value, condition, etc.

Skilled persons reading the claim language and specification understand that the claim is directed to a subscriber or "mobile station" for use in a telecommunications network. Intrinsic evidence, such as prior art before the Patent Office during prosecution of the 751 patent, confirms that mobile stations use microprocessors and transceivers. *See, e.g., V-Formation, Inc. v. Benetton Group SpA,* 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'") (citations omitted). For example, Publication No. WO 97/19525 discloses that mobile station 105 has a microprocessor 106 and a transceiver 107 that communicate with one another. (Ex. 116 (WO 97/19525) at 4-5; Fig. 1.) As the Court can see, the depiction of mobile station 105 in Fig. 1,

(reproduced here) of WO 97/19525 is almost identical to the depiction of mobile station 5 in Fig. 2 of the 751 patent. As this reference helps demonstrate, a transceiver and a microprocessor are the two components that persons skilled in the art of mobile telephony know are required in a subscriber station.



FIG.1

This evidence further supports that one skilled in the art reading the 751 patent and its intrinsic record would understand that the evaluation unit is a microprocessor. Moreover, HTC cannot dispute that skilled persons understand mobile phones have microprocessors connected to transceivers. HTC itself cited other prior art to the Patent Office in its request for reexamination that makes exactly this point. For example, HTC cited U.S. Patent No. 6,400,695 (the "695 patent"), which describes remote, mobile terminals operating in the Universal Mobile Telecommunications System ("UMTS") environment. The 695 patent explains that:

> In addition, it is to be understood that methodologies described herein for use in a remote terminal or a base station are executed by one or more processors respectively associated therewith. The term "processor" as used herein is intended to include any processing device, including a CPU (central processing unit) and associated memory. Accordingly, software instructions or code associated with implementing the methodologies of the present invention may be stored in associated memory and, when ready to be utilized, retrieved and executed by an appropriate CPU.

(Ex. 117 at 6:67-7:10.) The 695 patent explains throughout that the processor associated with the remote terminal (i.e., the mobile station) carries out various process steps. (*See, e.g., id.* at 9:12 et seq.; 10:38 et seq.; 11:36 et seq.; 12:40 et seq.; 13:31 et seq.; 14:46 et seq.).

Moreover, other U.S. patents issued before the 751 patent was filed describe an "evaluation unit" or "evaluator" as a microprocessor. (*See, e.g.,* Ex. 118 (U.S. Patent No. 5,217,692) at 4:51-53 ("electric output signals are directed to an electric evaluation unit 30, preferably consisting of a microprocessor"); Ex. 119 (U.S. Patent No. 5,890,083) at 5:4-8 ("This makes it possible to manage the further processing of the data in the evaluation unit, as well as the differentiating operator function and the nonlinear logic function for data pre-processing by means of a conventional microprocessor system."); Ex. 120 (U.S. Patent No. 5,894,274) at 3:9-11 ("While the drawing functionally depicts the use of a pair of evaluators 4, in actual practice the evaluator can conveniently be in the form of a single microprocessor.") and Fig. 1

37

(identifying evaluator 4 as "e.g. CPU" – a known acronym for central processing unit, a term synonymous with microprocessor).)

Collectively, the intrinsic and extrinsic evidence confirm that "evaluation unit" is properly construed as a microprocessor. But, rather than construing "evaluation unit," HTC seeks to put the "invalidity cart before the claim construction horse" by pressing an indefiniteness argument. *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368-69 (Fed. Cir. 2005). That is improper, especially since, to succeed, HTC must prove indefiniteness by clear and convincing evidence:

> If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. Proof of indefiniteness requires such an exacting standard because claim construction often poses a difficult task over which expert witnesses, trial courts, and even the judges of this court may disagree. Nevertheless, this standard is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area.

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (internal citations and quotation marks omitted). HTC eschews any proper claim construction in favor of its ultimate goal of invalidating claim 13 by asserting (1) that "evaluation unit" is a means-plus-function claim term that is governed by 35 U.S.C. § 112, ¶6 and (2) that the patent specification failed, as required for such claims, to disclose sufficient structure for the evaluation unit. *See Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.,* 412 F.3d 1291, 1302 (Fed. Cir. 2005).

But HTC's position founders on the simple fact that "evaluation unit" is not a means-plus-function term. It is settled that "a claim term that does not use 'means' will trigger the rebuttable presumption that § 112, ¶6 does not apply." *Lighting World, Inc. v. Birchwood*

*Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (citation omitted). This "presumption

flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Id.*

(citations omitted). Indeed, as the Federal Circuit recently reiterated in another case:

> As we stated in *Lighting World*, 382 F.3d at 1362, "[W]e have seldom held that a
> limitation not using the term 'means' must be considered to be in means-plus-
> function form," and "the circumstances must be [unusual] to overcome the
> presumption ...." ... "[i]n considering whether a claim term recites sufficient
> structure to avoid application of section 112 ¶ 6, we have not required the claim
> term to denote a specific structure. Instead, we have held that it is sufficient if the
> claim term is used in common parlance or by persons of skill in the pertinent art
> to designate structure, even if the term covers a broad class of structures and even
> if the term identifies the structures by their function." *Id.* at 1359-60.

*Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed. Cir. 2006).   HTC cannot

overcome the strong presumption here, and thus its indefiniteness argument falls apart.

"Evaluation unit" is not a means-plus-function term and its meaning as a microprocessor

is apparent to skilled persons.

**C.     The Evaluation Unit Limitations.**

The parties have broken the remaining claim elements into several constituent phrases for

construction.

> **1.     [Evaluation Unit for Asking] When Information Signals with Access
> Authorization Data Means (65) as Authorization Data (45, 50, 55) are
> Received ...**

**IPCOM CONSTRUCTION: The microprocessor is programmed to examine, after
information signals having access authorization data have been received by the
transceiver....**

**HTC Construction: Only construable if re-written as: Upon the evaluation unit's receipt of
the access authorization data (45, 50, 55) from the means for receiving information signals
(65), asking whether ....**

The first phrase is "when information signals with access authorization data means (65)

as authorization data (45, 50, 55) are received."     IPCom's construction substitutes

"microprocessor" for "evaluation unit" and uses the word "transceiver" instead of "means for

39

receiving information signals" to be consistent with IPCom's other proposed constructions. The parties' constructions for this phrase are similar in some respects, although HTC seeks to rewrite the claim to require receipt of "access authorization data" from the "means for receiving" so as to bolster its effort to invalidate the claim. (*See* Ex. 1 at 9.) That is improper. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

### 2.   Access Authorization Data Means (65) as Authorization Data (45, 50, 55)

**IPCOM CONSTRUCTION: Information about the rights of the particular subscriber station to access the telecommunications channel.**

**HTC Construction: None.**

Although the phrase "access authorization data means" uses the word "means," it is not a means-plus-function claim term because the claim recites no function for this means. *See, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002) ("a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶6.") (citation omitted).  HTC agrees, as it did not identify the term as governed by 35 U.S.C. § 112, ¶6 in the Joint Chart. (*See* Ex. 1 at 9-10.)  Indeed, "access authorization data means *as* authorization data" is a self-defining term that simply points out the access authorization data means is the access authorization data itself.  Such  access authorization data is generally "information about the rights of the particular subscriber station to access the telecommunications channel." (*See, e.g.*, Ex. 3 at 4:47-50, 4:64-67, 5:36-43.)  Separate construction of the phrase "access authorization data," discussed below, more specifically defines the minimum information that access rights information must include.

40

3.   **Access Authorization Data (45, 50, 55) or Authorization Data (45, 50, 55)**

**IPCOM CONSTRUCTION: Access rights information that must at least include either (1) information indicating whether access is to be authorized based on an access threshold value or access class information, and at least one of an access threshold value or access class information or (2) access threshold value and access class information.**

**HTC Construction: bit patterns (45, 50, 55) which may include an access threshold value or alternatively different information from which the mobile station can determine whether it has access rights.**

As discussed above, access authorization data generally is information about the rights of the particular subscriber station to access the telecommunications channel. HTC proposed construction of these terms, contending they were limited to particular bit patterns. That is incorrect. IPCom's proposed construction thus further defines what access rights information must include in view of the disclosure in the 751 patent.

The specification describes several embodiments of access authorization data, including a first preferred embodiment shown in Figs. 3a and 3b and a second preferred embodiment shown in Fig. 3c. In the first embodiment,



the access authorization data include a bit S4, four bits (S3-S0) that may represent the access threshold value or four bits (Z3-Z0) that may represent access class. (Ex. 3 at 5:36-66; 6:65-8:5.) As explained below, the bit S4, in this embodiment, acts to indicate whether the evaluation unit should grant access based on the access value or access class information that follows. By contrast, the second embodiment includes both access threshold value information (S3-S0) and access class information (Z3-Z0), and indicates that access rights will be granted based on evaluating that information. (*Id.* at 8:6-53.) In all three figures,

41

telecommunications services and priority information is conveyed as represented by bits D2-D0 and P1-P0. (*Id.* at 5:67-6:64; 7:46-65; 8:6-53.) As explained further below, the specification clearly explains that the telecommunication services information and priority information is optional and unnecessary to authorize access, and thus they are not required to be part of the access authorization data.

IPCom's construction for "access authorization data" is consistent with the two preferred embodiments. In the first embodiment, there is information that indicates which path the subscriber station must use to authorize access – in other words, whether access is to be authorized based on an access threshold value or access class information. This information is represented by bit S4 in this embodiment. As shown in Fig. 3a, when S4 is set to 0, the access authorization data includes access threshold value, represented by bits S3-S0. (*Id.* at 5:47-56.) The evaluation unit compares the access threshold value with a random or pseudo-random number to determine whether to authorize access to the common telecommunications channel. As shown in Fig. 3b, when the evaluation bit S4 is set to 1, the access authorization data includes access class information represented by bits Z3-Z0. (*Id.* at 7:1-15.) The access class indicates which classes of subscriber stations are authorized to access the common channel. (*Id.* at 7:9-25.) This forms the basis for the first part of IPCom's construction: "access rights information that must at least include either (1) information indicating whether access is to be authorized based on an access threshold value or access class information, and at least one of an access threshold value or access class information, or . . . ."

The remainder of IPCom's construction for "access authorization data" is "access rights information that must at least include either (1) . . ., or (2) access threshold value and access class information." This second portion of the construction corresponds to the second preferred

42

embodiment of access authorization data shown in Fig. 3c.  In contrast to the first embodiment, this preferred embodiment includes **both** access threshold value and access class information. (*Id.* at 8:6-53.)  The specification describes that a subscriber station can be authorized access rights to the common telecommunications channel based on the subscriber station's class or based on evaluation of the access threshold value. (*See id.*)  Because this embodiment includes both access threshold value and access class information, information indicating whether access is to be authorized based on an access threshold value or access class information, such as bit S4 in the first preferred embodiment, is unnecessary.

IPCom's defines access authorization data as "access rights information that must *at least* include either (1) . . . ," because the access authorization may include other information in addition to the information explicitly required in IPCom's construction.   Such information includes the optional priority and telecommunication services information shown in the two preferred embodiments.  The specification explains, in concluding its description of the first preferred embodiment, that the first five bits in this embodiment are the key information for authorizing access:

> The second, third, fourth and fifth bits of the first bit pattern 45 and second bit pattern 50 represent access authorization ink [sic, information], which in the first bit pattern 45 indicates the access threshold value S and in the second bit pattern 50 indicates the authorization of access for the four user classes.  The first bit determines whether the second through fifth bits will be interpreted in accordance with the first bit pattern 45 or the second bit pattern 50.

(*Id.* at 7:65-8:5.)  Consistent with this statement, the specification makes clear that the priority information (represented by bits P1-P0) and the allowed telecommunications services information (represented by bits D2-D0) may optionally also be used to determine whether a particular subscriber station is authorized to access the common telecommunications channel and what the subscriber may do if it has access.  Indeed, the specification repeatedly points out that

43

the priority information, and any comparison of priority information to another value for authorization, is merely optional. (*See id.* at 8:19-49.) The specification also states that:

> The numbers of bits used for the access threshold value S, the access channel ink Z0, Z1, Z2, Z3, the priority threshold value P and the telecommunications service ink D0, D1, D2 are understood to be merely examples, and they can also be increased, for example for more-extensive signaling, and reduced, for the sake of bandwidth reduction. In this case, the total length of the bit patterns 45, 50, 55 may change as well.

(*Id.* at 8:54-61.) Further, bits D2-D0 merely indicate whether a particular service can be utilized if the subscriber station has access rights to the common telecommunications channel. (*Id.* at 6:1-12; 7:46-64; 8:27-42.) These bits merely determine what the subscriber station can do on the channel if it is authorized access. For example, if the subscriber station is authorized access, the subscriber station may be allowed (or not) to send small data packets or to send requests for larger packet data services or speech/data services depending on the telecommunications services information. (*See, e.g., id.* at 7:59-64, 8:38-42.)

In contrast to IPCom's construction, HTC's construction is unclear and unhelpful to the Court or a jury. HTC's proposed construction for "access authorization data" is "bit patterns (45, 50, 55) which may include an access threshold value or alternatively different information from which the mobile station can determine whether it has access rights." (Ex. 1 at 10-11.) If HTC intends to include the precise bit patterns described in the preferred embodiments, its construction is too narrow and is inconsistent with the complete disclosure concerning access authorization data. Additionally, HTC's construction does not explain what the bit patterns are or provide any insight into the "alternatively different information," leaving the Court or jury to wonder what the different information is.

4.      [Evaluation Unit for] Asking ... Whether Access Authorization Data
        (45, 50, 55) Include an Access Threshold Value (S) for Comparison of
        the Access Threshold Value (S) with a Random Number or a Pseudo-
        Random Number (R)

**IPCOM CONSTRUCTION: The microprocessor is programmed to examine ... the access
authorization data to identify an access threshold value for comparison of the access
threshold value with a random (or pseudo-random) number.**

**HTC Construction: determining whether the access authorization data (45, 50, 50) includes
an access threshold value (S), which is used for comparison with (R), or otherwise includes
a different value.**

IPCom's proposed construction for this phrase closely tracks the claim language.

Consistent with the embodiments described in the patent, the "asking ... whether" phrase means

that the evaluation unit, or microprocessor, is examining the access authorization data to identify

the access threshold value for comparing it to a random (or pseudo-random) number. (*See* Ex. 3

at 9:2-10, 9:44-66.) It is a simple concept, and almost goes without saying, but in order to make

the comparison required by the "ascertaining" phrase, which is discussed further below, the

evaluation unit must examine the access authorization data to identify the access threshold value

if such value is to be compared to the random (or pseudo-random) number.

Like almost every other phrase in claim 13 of the 751 patent, HTC asserts that this phrase

is incapable of construction and therefore that claim 13 is invalid. (*See* Ex. 1 at 9-10.)

Nevertheless, HTC again offers an alternative construction that this phrase means "determining

whether the access authorization data (45, 50, 50) includes an access threshold value (S), which

is used for comparison with (R), or otherwise includes a different value." (*Id.*) IPCom agrees

that the access threshold value is used for comparison with the random (or pseudo-random)

number, but the remainder of HTC's construction is overly simplistic and unacceptably narrow

as it excludes the second preferred embodiment described in the specification.

45

In the second embodiment, the access threshold value is part of the access authorization data (as explained above).  Thus, in asking whether the access authorization data includes an access threshold value for comparison, the evaluation unit cannot merely be examining the data to look for the S4 bit that indicates whether the data contains the access threshold value or a different value.  Such an understanding makes no sense with respect to the second embodiment. The Federal Circuit has repeatedly held "that a claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (internal quotation marks omitted) (citing *Vitronics*, 90 F.3d at 1583).  HTC's construction seeks to exclude the second preferred embodiment, and thus cannot be correct.

> 5. **[Evaluation Unit ...] for Ascertaining as a Function of an Outcome of a Comparison Whether an Access of the At Least one Subscriber Station (5, 10, 15, 20) to the At least One Telecommunication Channel is Enabled**

**IPCOM CONSTRUCTION: The microprocessor is programmed ... to determine, based on an outcome of a comparison of the access threshold value and the random (or pseudo-random) number, whether to authorize the particular subscriber station access rights to the common telecommunications channel.**

**HTC Construction: comparing (S) to (R) to determine whether access to the common channel is allowed, or whether the subscriber station must wait for and check the next access threshold value.**

Similar to the "asking ... whether" phrase, IPCom's construction for the "ascertaining" phrase closely tracks the claim language and is consistent with the preferred embodiments.  The specification describes preferred embodiments of the comparison of the access threshold value and the random (or pseudo-random) number in several places.  (*See, e.g.*, Ex. 3 at 5:20-25, 9:5-15, 10:49-52.)  The specification explains that the evaluation unit is determining, based on an outcome of this comparison, whether to authorize the particular subscriber station access rights to the common telecommunications channel.  (*See, e.g., id.* at 1:58, 2:24, 4:64-67, 5:20-21, 6:38,

46

6:44, 7:59-60, 8:1-2, 8:20-24.) IPCom's construction is consistent with the claim language and the 751 patent specification.

Unlike most other claim terms, HTC does not assert that the "ascertaining ..." phrase is incapable of being construed. (*See* Ex. 1 at 10.) HTC's proffered construction is "comparing (S) to (R) to determine whether access to the common channel is allowed, or whether the subscriber station must wait for and check the next access threshold value." HTC's construction, however, is flawed because it grafts new requirements onto the claim language that read limitations into this phrase that are not supported by the specification.

HTC proposes, if the evaluation unit does not authorize access to the channel, that "the subscriber station must wait for and check the next access threshold value." There is no language in the "ascertaining" phrase that suggests such a determination is included within this claim element or that otherwise suggests that access is allowed based on an additional check. HTC's proposal is additionally contrary to the specification. In describing the exemplary process flow shown in Figs. 4a-4c, the specification explains that:

> In all cases where the program is not exited from program point 250, the evaluation unit 50 [sic] will have found no allowed access to the r30 for the associated mobile station 5. *After the end of the program, the mobile station informs the user that the access to the r30 was not possible, and waits for further inputs from the user.*

(Ex. 3 at 10:1-6 (emphasis added).)   The next sentence in the specification provides an alternative "by means of a waiting loop embodied in the mobile station," where "the program is executed over again, so there is a wait for the next information signal with the next bit pattern," and the information is evaluated again. (*Id*. at 10:6-10). This plainly states two alternatives. But HTC's attempt to require the mobile station to perform a mere alternative disclosed in the specification, but not recited in the claim, should be rejected.

47

### D.   Random Number or Pseudo-Random Number (R)

**IPCOM CONSTRUCTION: A generally random number generated by a microprocessor.**

**HTC Construction: a number drawn with a uniformly distributed probability from an interval of numbers.**

The 751 patent does not define the phrase random number or pseudo-random number. However, the concept of random or pseudorandom numbers is well known to those skilled in the art, and indeed likely generally understood by most laypersons as well. Technical dictionaries provide the following definitions for "random number:"

- A patternless sequence of digits; an unpredictable number, produced by chance, that satisfies one or more of the tests for randomness. See Pseudorandom number.

- A number chosen in such a way that the overall frequency distribution of such numbers is predictable, but each individual number is independent of those that have gone before and is therefore not predictable. Producing random numbers is impossible in practice. When produced by a computer algorithm, they necessarily follow their predecessors; such pseudorandom numbers are adequate for most practical purposes.

(Ex. 121 at 322, 655, 346.)   Similarly, technical dictionary definitions for "pseudorandom number" include:

- A number generated by a computer in a deterministic manner. These numbers have been subjected to many statistical tests of randomness and, for most practical purposes, can be used as a random number.

- Numbers produced by a definite arithmetic process, but satisfying one or more of the standard tests for randomness.

(Ex. 122 at 314, 1600, 339; *see also* Ex. 123 at 939 (standard dictionary defining "pseudorandom" as "being or involving entities (as numbers) that are selected by a definite computational process but that satisfy one or more standard tests for statistical randomness").)

Boiled down to their essence, these definitions basically indicate that a random number or pseudorandom number is a generally random number generated by a microprocessor. Such

48

construction is consistent with the specification, which states that the evaluation unit draws the random (or pseudo-random) number for comparison. (*See, e.g.*, Ex. 3 at 5:21-22, 9:7.)

HTC's construction for this phrase is "a number drawn with a uniformly distributed probability from an interval of numbers." HTC apparently bases its construction on the portion of the specification at 5:25-35. However, this passage does not define what a "random or pseudo-random number" is. Instead, it merely gives one example where *if* the random (or pseudo-random) number is selected using a "uniformly distributed random function," then all subscriber stations will have an equal chance at access to the common telecommunications channel. But the specification does not require that a random or pseudo-random number must necessarily be drawn using a uniformly distributed random function, nor does a number have to be uniformly distributed across an interval to be "random" or "pseudo-random."

For example, if you are rolling a pair of dice (each with numbers 1-6), the interval of results (when adding the value of each die together) ranges from 2 to 12. However, the probability of rolling a 2 is not the same as the probability of rolling a 7, as only one combination of the dice roll results in a 2 (1,1) but numerous combinations result in a 7 (6,1; 5,2; 4,3; 3,4; 2,5; 1,6). The number resulting from the dice roll is random, but the results do not have a uniformly distributed probability within the interval of numbers that may be rolled. HTC's construction for "random number or pseudo-random number" is overly narrow because it excludes certain types of random or pseudo-random numbers such as noted in this example.

49

E.   **Access Threshold Value**

**IPCOM CONSTRUCTION: A value used to determine whether the subscriber station is authorized to access the common telecommunications channel.**

**HTC Construction: a broadcasted numerical value for comparison with the numerical value (R), generated in the subscriber station, to determine access rights**

From the words of the phrase itself and the other language of claim 13, it is readily apparent that the "access threshold value" is relevant to the access rights of the subscriber station. However, the "access threshold value" is more specific than that – it is a value used to determine whether the subscriber station *is authorized to access* the common telecommunications channel. The 751 patent explains this in multiple places, for example:

- "A random distribution of the access authorization on the r30 over some of the mobile stations 5, 10, 15, 20 is attained in that an access threshold value is sent over the BCCH." (Ex. 3 at 5:1-3.)

- "Before each access to the RACH 30 by the first mobile station 5, the evaluation unit 60 draws a random or pseudo-random number R and asks whether the random or pseudo-random number R is at least as great as the access threshold value S. Only then is an access to the r30 allowed." (*Id.* at 5:20-25.)

- "Both mobile stations that belong to a user class whose associated access channel bit is set to 1 and mobile stations that do not belong to any user class must, in order to ascertain their authorization to access the r30, must perform the access threshold value evaluation already described for the first exemplary embodiment—and optionally the priority threshold value evaluation also described in the first exemplary embodiment." (*Id.* at 8:19-27.)

- "In another version, it can also be provided that for an authorization of access, the prerequisite is a random or pseudo-random number R less than the access threshold value S." (*Id.* at 10:49-52.)

Consistent with IPCom's construction here, dictionary definitions of "threshold" support the notion of this value being a boundary or level that must be crossed for the evaluation unit to authorize access. (*See* Ex. 124 at 2026, 1225 (dictionary definitions of "threshold").)

50

**III.    IPCom's Constructions Concerning the Handover or 830 Patent.**

**A.    The Arrangement Terms.**

While the parties agree the three "arrangement" terms in the 830 patent are means-plus-function terms, they disagree on whether structure supports those terms. IPCom contends that structure is disclosed – it is the algorithms disclosed in the call flow diagrams that skilled persons understand the mobile station would implement via the transceiver and processor that every mobile station contains. HTC disagrees, but the critical standard for resolving this dispute is to assess "whether [a skilled] person would understand the written description itself to disclose such a structure," as opposed to "whether one of skill in the art would be capable of implementing a structure to perform the function." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008) (citation omitted).

The 830 patent need not explicitly describe the structure. *Atmel v. Infor. Storage Devices*, 198 F.3d 1374, 1380 (Fed. Cir. 1999). "Disclosure of structure … may be implicit in the written description *if it would have been clear to those skilled in the art* what structure must perform the function recited in the means-plus-function limitation." *Id.* at 1380 (emphasis in original) (quoting PTO Supplemental Examiner Guidelines on Applying 35 U.S.C. § 112, ¶6). For example, in *In re Dossel*, 115 F.3d 942, 946-47 (Fed. Cir. 1997), the Federal Circuit held that the structure corresponding to the "reconstructing" function was adequately described, although the written description only disclosed a device that received digital data, performed mathematical computations and output the results to a display. The structure was determined to be a general-purpose computer, even though the word "computer" was not used in the specification and no computer code was quoted. *Id.*

Here, the patent specification expressly discloses the structure for performing the functions recited. It does so by including Figures 2-6, discussed below, that contain the software

51

steps implemented by a processor. It also expressly discloses a mobile station, which skilled persons understand must necessarily include a transceiver and a processor that carries out the operations required by Figures 2-6.

That skilled persons, in 1999, understood a mobile station includes a transceiver and processor is beyond dispute. Figure 2 from U.S. Patent No. 6,252,860 (Ex. 128) shows that the mobile terminal (MT) includes a microprocessor constructed according to the OSI/ISO layer model. (*See* Madisetti Dec., ¶17.) The same patent indicates "the mobile part MT includes a radio part FKT with an antenna ANT allocated for the transmission and reception of radio signals," and discloses and claims this as a "transceiver." (Ex. 128 at 2:43-48; 12:26-34; *see also* Ex. 134 (U.S. Patent No. 6,278,881) at 7:5-8 (disclosing "[a] mobile communications device ... comprising: a transceiver, for communicating with a designated base station on a designated channel."); Ex. 135 (U.S. Patent No. 5,561,844) at 3:4-5 (disclosing "MSs (200, 201, and 202) are each depicted (10) as having a controller (11) and transceiver (12).").) These are all patents cited during prosecution of the 830 patent and, therefore, constitute intrinsic evidence. *See V-Formation,* 401 F.3d at 1311. Other, extrinsic evidence confirms this point. Indeed, U.S. Patent No. 6,061,718 says it is a fact "well known in the art" that MS have transceivers and processors. (Ex. 127 at 1:56-58; *see also* Madisetti Dec., ¶¶14-22 (discussing extrinsic evidence attached as Exs. 126-133).) The evidence unequivocally confirms that skilled persons understand that the very disclosure of a "mobile station" conveys that the device includes a transceiver and processor.

Nor can there be any debate that the 830 patent discloses use of a transceiver and a processor. As to a transceiver, Figure 1 discloses a base station (BS) 1, BS 2 and mobile station (MS) 3 and illustrates "a radio link between BS 1 and mobile station (MS) 3." (Ex. 4 at 2:62-64;

52

1:20-21 (describing "mobile stations (MS) in radio contact with the base station").) The MS maintains a "radio link" (*id.* at 2:62-3:9) by which it "can exchange information (e.g., speech or data)" and it does so by sending and receiving various messages, as Figures 2-6 illustrate in showing message flow from and to the MS. (*See also id.* at 5:10-13 ("If the handover to new base station BS 2 fails, the MS can reactivate the link to old base station BS 1 by sending a simple message."); 3:67-4:1 ("MS sends a message 106 ..., which contains the current parameters of the link.").) Skilled persons would recognize a transceiver performs the task of sending messages. (Madisetti Dec., ¶23.) And, of course, the claims themselves are part of the disclosure and here state the need to "retransmit[] link data," which necessarily requires the transceiver that is an inherent part of a mobile station. (Madisetti Dec., ¶¶22-23.)

As to a processor, the specification plainly teaches that the MS (and BS) carry out "internal processing procedures." (Ex. 4 at 3:23.) As noted, the specification teaches the MS must send and receive messages that require a processor to generate and decode. It must "look[] for a new base station and synchronize[] with that base station." (*Id.* at 3:36-37). It may optionally "know which BS 2 it wants to register with" because it has "measure[ed] the field intensity of BS 2." (*Id.* at 3:38-40). It must make a number of decisions, including (1) "determining that a handover is required," a "decision ... taken by the MS" (*id.* at 3:29-34); (2) "determin[ing] that the network cannot support the handover," so it can make information available (*id.* at 4:66-67) or, if it "determines that the network can support the handover, it will rely on" that fact and adjust its messages accordingly (*id.* at 5:1-4); and (3) it must decide whether authentication procedures are needed or not (*id.* at 5:45-50). It must undergo authentication where it "swaps" "security-related data" like "key codes and encryption data" (*id.* at 3:60-65), which a processor must evaluate. These are all processes and decisions that, along

53

with other disclosure, results in a skilled person understanding the mobile station uses a processor – in part because the speeds, calculations, and protocols involved demand a processor. (Madisetti Dec., ¶¶24-30.)  Indeed, as Dr. Madisetti explains, the very design of the protocols disclosed in the specification confirm that a skilled person would understand the functionality required implicitly discloses use of a properly programmed processor – as detailed in the disclosed call flow diagrams.  (*Id.*, ¶¶ 25-27.)

In short, the 830 patent discloses to skilled persons the necessary structure for performing the call flow logic shown in the patent figures.  As explained below, it is plain which processing logic must be implemented by the processor to perform the claimed functions.

### 1.    An Arrangement for Reactivating the Link with the First Base Station if the Handover is Unsuccessful.

**IPCOM CONSTRUCTION: The function of the arrangement is to reactivate the link with the first base station if the handover is unsuccessful.  The corresponding structure is a processor connected to a transceiver and programmed to formulate and send messages to reactivate the link, if the handover is unsuccessful.  See Figures 1, 5, steps 406-410; 6:30-44; 7:48-52; 7:65-8:3.  This element covers the identified structure and equivalents thereof.**

The function to be performed by the first means plus function term is exactly what is recited after the "for" in this means-for limitation, namely "reactivating the link with the first base station if the handover is unsuccessful."  This language directly tracks the specification. (*See* Ex. 4 at 5:10-13 ("If the handover to new base station BS2 fails, the MS can reactivate the link to old base station BS1 by sending a simple message.").)  The phrase needs no additional construction beyond construing certain individual terms addressed below such as "link," "handover," and "base station."

Of course, "[t]he structure of a [general computer] programmed to carry out an algorithm is limited by the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed.Cir.1999).  Here, the specification discloses particular algorithms for the processor in

54

the mobile station to perform. Figure 5, in steps 406-410, discloses the algorithm for reactivating the link with the first base station if the handover is unsuccessful. Receiving message 406 indicates that the handover cannot be performed, which causes the internal processing procedure to achieve condition 407 wherein the MS synchronizes again with BS1 by sending message 408 indicating that MS wants to maintain the link with BS1, after which the MS receives acknowledge message 409. (*See id.* at 6:26-44; *see also* 6:30-44; 7:48-52; 7:65-8:3.)

> ### 2. An Arrangement for Reestablishing the Link with the First Base Station.

**IPCOM CONSTRUCTION: The function of the arrangement is to reestablish the link with the first base station. The corresponding structure is a processor connected to a transceiver and programmed to formulate and send messages from the mobile station to the first base station to reestablish the link. See Figures 1, 5, steps 407-409; 6:30-44; 7:48-52; 7:65-8:3. This element covers the identified structure and equivalents thereof.**

Again, the function recited in this term is exactly what follows the "for" in the means-for language, namely "reestablishing the link with the first base station." HTC seems to agree the phrase "reestablish the link with the first base station" is itself sufficiently clear. The dispute is whether the subsequent wherein phrases should also be included within the recited function.

The claim language itself is what properly identifies the function for this term. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1303 (Fed. Cir. 1999). Indeed, in *Lockheed, supra*, the court addressed a similar phrase that signaled the function through use of the word "for," and which was then followed by a "whereby" clause. The Federal Circuit explained that "[t]he function is properly identified as the language after the 'means for' clause and before the 'whereby' clause, because a whereby clause that merely states the result of the limitations in the claim adds nothing to the substance of the claim." 324 F.3d at 1319. The same rule applies here – the wherein phrases are separate claim terms and do not form a part of this means plus function phrase.

The algorithm disclosed for reestablishing the link with the first base station includes the logical flow illustrated in Figure 5, and in particular steps 407-409, wherein the MS synchronizes again with BS 1 by sending a message that it wants to maintain the link and receives an acknowledge message in reply. (*See* Ex. 4 at 6:26-44; *see also* 7:48-52; 7:65-8:3.)

3. **An Arrangement for Retransmitting Link Data for a Link Between the Mobile Station and a First Base Station of a Network to a Second Base Station of the Network, the Link Data containing Current Parameters of the Link.**

**IPCOM CONSTRUCTION: The function of the arrangement is to transmit link data for a link between the mobile station and a first base station to a second base station. The corresponding structure is a processor connected to a transceiver and programmed to either: A. formulate and send a handover request message that contains the address of the first base station, from which the second base station obtains the link data. See Figure 2, message 103; 3:35-48; Figure 3, message 203; 4:28-37 & 4:50-58; 5:1-4; Figure 4, message 310; 5:66-6:10. B. formulate and send a message containing the link data. See Figure 2, message 106; 3:54-4:2. This element covers the identified structure and equivalents thereof.**

The function for this term is "transmitting link data for a link between the mobile station and a first bases station to a second base station." HTC essentially agrees that with this part of the construction (the first part of their construction reads "sending the link data to the second base station..."). The disagreement is whether the function should further include sending the data "for storage inside the base station."

The same rule discussed in *Lockheed, supra*, applies here, where the claim language following the "for" preposition simply requires sending the link data to the second base station. HTC's "storing inside the base station" is not recited in that clause, and appears in an entirely different portion of the claim, as signaled by the "wherein" clause. It thus cannot be imparted to the recited function.

The algorithm disclosed for transmitting the link data to the second base station includes two alternatives. The first includes formulating and sending the handover request message that

56

contains the address of the first base station, from which the second base station obtains the link data. This logical flow is illustrated in Figures 2-4 by messages 103, 203, and 210 respectively. (Ex. 4 at 3:35-48; 4:28-37 & 4:50-58; 5:1-4; 5:66-6:10.)  In these messages, the MS includes "the address of BS 1 and can thus enable BS 2 to exchange data regarding the link with the MS and BS 1 directly." (*Id.* at 3:46-48.)

The second logical sequence for transmitting the link data to the second base station includes formulating and sending a message containing the link data. This sequence is shown in Figure 2 as message 106.  In this situation, after the MS has learned that the network cannot support the handover, it sends message 106 containing "current parameters of the link" to BS 2. (*Id.* at 3:54-4:2.)  Both of these alternatives are, accordingly, the appropriate algorithms to include.

### B.    Link Data.

**IPCOM CONSTRUCTION: Data describing the identity and features of the mobile station and the call in which the mobile station is engaged.**

**HTC Construction: The data required for a link that both the first base station and the mobile station are capable of sending to a second base station to achieve a handover.**

The phrase link data appears in several claims, including claims 1 and 18 ("storing link data in a first base station") and claim 12 ("arrangement for transmitting link data for a link between the mobile station and a first base station").  The claims themselves thus indicate that the link data relates to an ongoing call in which the mobile station is participating.  The construction of link, noted below, further indicates that the data describes the link, which is an active communication session (speech or data) between the mobile station and the base station.

The claims also explain that the link data is stored for reactivating the link or transferred to a second base station as part of the handover.  The specification explains that the "BS 1 and 2 are linked to a switching unit 4" that can "link[] to a further network, e.g., a standard telephone

57

network." (Ex. 4 at 2:64-68.) This allows the "mobile station (MS) 3 [to] exchange information (e.g., speech or data) with the network...." (*Id*. at 2:68-3:2.) Because "MS 3 is mobile," during handoff "the information flow, i.e., the link in switching unit 4, is transferred from BS 1 to BS 2." (*Id*. at 3:3-6.) The specification also notes that, following authentication, either the BS 2 (*id*. at 4:4-8) or "the MS sends a message 106 (Option Information), which contains the current parameters of the link, these being the same as they were for BS 1." (*Id*. at 3:68-4:2; *see also* 4:50-51 (BS 1 sends "the data required for the link to BS 2").) Thus, to effect a handover, the new base station must know, at a minimum, the identity of the mobile station and the call that is being transferred. Otherwise, the second base station will not be able to transfer information received from the mobile station up through the network to the endpoint of the call, nor will it be able to transfer information from the endpoint to the mobile station.

The specification also explains that base stations may be operating on different standards. (*Id*. at 2:12-15.) The "invention prevents a situation in which a mobile station is forced into an HO [handover]" and is "then ... unable to find a base station or find[s] none that can support the traffic of this mobile station." (*Id*. at 7:32-36.) Because of the different standard on which the new base station operates, it may not be able to support the mobile station's particular type of traffic or speech, for example, because the mobile supports different CODECs than the base station offers. Thus, for the handover process to determine whether the new base station can support the mobile station's traffic, the link data must describe the features, or capabilities, of the mobile station.

58

C.    (1) Holding in Reserve and (2) Initially Causing the Resources of the First
Base Station to Remain Held.

**IPCOM CONSTRUCTION: (1) Temporarily keeping back resources of the first base
station. (2) At least temporarily keeping back resources of the first base station.**

**HTC Construction: (1) the base station setting channel resources aside for potential future
use. (2) the base station holding the channel resources in reserve for a predetermined
amount of time T to allow the mobile station time to achieve the handover.**

Claims 1 and 18 recite these limitations. The claim language is straightforward in each

case. The first element simply requires "holding in reserve for the link resources of the first base

station" and the second element requires that, when the link is to be handed over, "initially

causing the resources of the first base station to remain held in reserve." Holding typically

means "an order or indication that something is to be reserved or delayed" (Ex. 136 at 551),

which is reinforced by use of the word "reserve," which is to "set aside for a particular purpose,

use or reason." (Ex. 137 at 993.) The second clause is similar, but specifies that the resources

are to initially "remain" held in reserve "when the link is to be handed over."

The specification reinforces the ordinary meaning. It discusses that "[o]f course the link

data is not stored forever, nor are the resources held in reserve in BS 1 forever" (Ex. 4 at 7:5-6)

and describes situations where timers or messages result in release of the reserved resources.

(*See id.* at 7:9-22.) In short, the claim language and specification each support IPCom's

constructions.

D.    **Initially Maintaining a Storage.**

**IPCOM CONSTRUCTION: At least temporarily maintaining link data in storage at the
first base station.**

**HTC Construction: the base station storing the link data for a predetermined amount of
time in case the mobile station attempts to reestablish communications on the channel.**

Claims 1 and 18 recite this clause. For example, claim 1 recites "initially maintaining a

storage of the link data in the first base station" when the link is to be handed over. The phrase is

straightforward and simply means at least temporarily maintaining storage of the link data. The specification, as noted above, supports this construction.

E.    **(1) At a Later Timepoint Determined by A Fixed Period of Time Predefined at a Beginning of the Handover and (2) At a Later Timepoint Determined Based on a Message from One of the Mobile Station and the Second Base Station.**

**IPCOM CONSTRUCTION: (1) When a timer, which has been preset and initiated before handover, expires. (2) At a later time determined from a message from either of the mobile station or second base station indicating that the handover has been successful.**

**HTC Construction: (1) the base station deleting the link data and freeing up the link resources if a predetermined time T passes after the mobile station began searching for a new base station. (2) None.**

The first phrase appears in claim 1. It plainly defines the start of the "fixed period of time" – which is predefined, or set, at the beginning of the handover. The fixed period of time refers to expiration of a timer, as the specification makes clear. (*See* Ex. 4 at 7:9-21; 7:43-8:5.)

The second phrase appears in claim 18. Here, the time is determined based on a message from either the mobile station or the second base station that relates to "a successful completion of handing over the link." In other words, the time is defined by an indication of a successful handover. The specification confirms this understanding. (*See generally id.* at 6:13-18; 7:60-64.)

F.    **(1) Deleting ... and Freeing Up and (2) Deleted ... Released**

**IPCOM CONSTRUCTION: (1) Removing the link data from the first base station and freeing up the resources of the first base station reserved for the link. (2) Removing the link data from the first base station and releasing the link resource from reserve in the first base station.**

The claim language is straightforward. Claim 1 recites "deleting the link data from the first base station and freeing up the resources of the first base station," which occurs on expiration of the timer. Base stations of course contain computers and memory. Deleting is a well-understood phrase to skilled persons. It simply means "[t]o remove an unwanted item."

(Ex. 138 at 126 (dictionary definition of "delete").)  There is no indication that the patentee used the phrase any differently.  And, in the context of the claim, it is plain that what is being removed is the "link data" and what is being either "free[d] up" or released are the reserved resources. (*See also* Ex. 4 at 7:52-54; 7:60-64.)

      **G.**     **The Link ... is Re-established.**

**IPCOM CONSTRUCTION: The link is established again.**

      HTC originally identified this phrase and proposed that it meant "the link is established again." (*See* Ex. 101 at 5.)  IPCom accepted that construction as it is confirmed by the specification. (*See* Ex. 4 at 6:34-40; 7:48-52.)  The Court should adopt the same construction.

      **H.**     **The Remaining Terms.**

      IPCom offered constructions of five terms that appear in various claims to which HTC neither objected nor proposed any alternative construction.  IPCom accordingly requests the Court adopt its constructions.  A summary of its constructions and the supporting evidence is below.

      *Base Station*: "A device that acts as an access point to a network for a given radio cell." (Ex. 1 at 14.)  The specification supports this construction.  (*See* Ex. 4 at 1:16-20 ("A given access point, referred to below as the base station (BS), forms a given radio cell....").)

      *Handover*: "Passing the mobile station's link for an ongoing communication session from one radio cell to another." (Ex. 1 at 14.)  The specification supports this construction. (*See* Ex. 4 at 1:25-27; 3:3-9.)

      *Link*: "An active communication link between a mobile station and a radio cell by which the mobile station exchanges information with the network, such as for a speech or data session." (Ex. 1 at 14-15.)  The specification and prosecution history support this construction.  (*See* Ex. 4

61

at 2:63-65; Ex. 9 at HTC5696 (August 12, 2004 Response to Office Action at page 6, noting correspondence between the link and ongoing call).)

**Link Resource**: "A resource that supports the link between the mobile station and the base station, including, for example, a radio channel, transmission rate, channelization or scrambling code or an applicable CODEC for speech." (Ex. 1 at 15.) The claim language identifies the resource as related to the link. The examples identify resources known to skilled persons, as indicated by intrinsic evidence. (*See* Ex. 139 (U.S. Patent No. 5,790,528) (describing circuits at 6:39-43 and use of CODECS at 8:6-9); Ex. 140 (U.S. Patent No. 6,230,013) at 1:24-31 (explaining use of spreading codes during radio link transmissions).)

**Resources of the First Base Station**: "Base station resources reserved to support a link, including, for example, radio channels, transmission rates, channelization or scrambling codes or applicable CODECs for speech." (Ex. 1 at 15.) The claim language identifies the resources as belonging to the base station. The examples identify resources known to skilled persons, as indicated by intrinsic evidence, above. (*See also* Ex. 141 (U.S. Patent No. 5,507,006) at 2:58-3:3 (noting "the base site controller (BSC) has functionality which controls the radio resources at detailed level," such as by receiving, transmitting and interpreting messages and performing "necessary transcoding function between the air interface coding algorithm for speech and the 'A' law coding defined for the 'A' interface."); Ex. 142 (U.S. Patent No. 5,794,149) at 12:54-65 (noting base station controller "determines whether the candidate base station has the resources available to execute a soft handoff" and identifies resources such as "an available CDMA channel").)

Finally, as to five additional terms that HTC identified for construction, as reflected in the Joint Chart (*see* Ex. 1 at 15-18), IPCom believes that the phrases use terms whose constituent

elements have been construed and that no further construction is necessary.  Indeed, HTC's principal purpose in identifying most such terms appears to be to suggest that they are indefinite and incapable of construction, an issue IPCom will address in its response brief.

## CONCLUSION

IPCom respectfully requests the Court construe the claim terms and phrases identified above consistent with IPCom's proposed constructions.

Dated:  November 24, 2009

Stephen E. Baskin
DC Bar Number 456015
Kilpatrick Stockton LLP
Suite 900
607 14th Street, NW
Washington , DC 20005-2018
Telephone: 202.508.5800
Facsimile: 202.508.5858

*/s/Mitchell G. Stockwell*
Mitchell G. Stockwell
Geoffrey K. Gavin
Catherine E. Hart
Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA  30309-4530
Telephone:  404.815.6500
Facsimile:  404.815.6555

*Attorneys for Defendant-Counterclaim
Plaintiff IPCom GmbH & Co., KG*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed this day using the Court's CM/ECF system, which caused a copy of the same to be electronically mailed to each counsel of record in this case.

*/s/Mitchell G. Stockwell*

64