# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HTC Corporation and HTC America, Inc., | |
|          Plaintiffs and Counterclaim-Defendants, | Civil Action No. 1:08-cv-01897 (RMC) |
|    v. | |
| IPCom GMBH & Co., KG, | |
|          Defendant and Counterclaim-Plaintiff. | |

## HTC CORPORATION AND HTC AMERICA, INC.'S OPENING CLAIM CONSTRUCTION BRIEF AND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 112, ¶ 2 [CORRECTED]

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

    A.  The Parties ....................................................................................... 1

    B.  The Asserted Patents Are Invalid Because Their Claims Cannot Be Construed ........................................................................................... 2

    C.  Overview Of The Asserted Patents.................................................. 2

II.  RELEVANT LEGAL STANDARDS .................................................... 4

    A.  Claim Construction .......................................................................... 4

    B.  Indefiniteness ................................................................................... 5

    C.  Summary Judgment for Indefiniteness ........................................... 6

III. STATEMENT OF MATERIAL FACTS................................................. 7

IV.  THE ORDINARY LEVEL OF SKILL IN THE ART AT THE TIME OF THE INVENTIONS FOR THE '830, '751 AND '216 PATENTS...................... 7

V.   UNITED STATES PATENT NO. 6,879,830................................................ 7

    A.  Technical Overview ......................................................................... 7

    B.  The Handover Method Disclosed In The '830 Patent ............................. 8

    C.  Claims 1, 12 and 18 Of The '830 Patent Are Invalid Under 35 U.S.C. § 112, ¶ 2 As Indefinite ............................................................... 11

    D.  To The Extent That The '830 Patent Can Be Understood, It Should Be Construed In Context With The Invention Disclosed In The Specification ....................................................................................... 22

VI.  UNITED STATES PATENT NO. 7,043,751 ................................................ 26

    A.  Technical Overview ......................................................................... 26

    B.  The Access Authorization Algorithm Disclosed In The '751 Patent ...... 27

    C.  Claim 13 Of The '751 Patent Is Invalid Under 35 U.S.C. § 112, ¶ 2 As Indefinite........................................................................................ 29

    D.  To The Extent That Claim 13 Can Be Understood, It Should Be Construed In Context With The Invention Disclosed In The Specification ....................................................................................... 36

VII. UNITED STATES PATENT NO. 5,390,216.................................................... 41

    A.  Technical Overview ......................................................................... 41

    B.  Construction of '216 Patent Claim Terms ............................................. 44

    C.  Steps-plus-Function Limitations: (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) ...................................................................................... 46

    D.  Construction of '216 Patent Claim Terms ............................................. 48

VIII. CONCLUSION................................................................................................ 62

# TABLE OF AUTHORITIES

**Page**

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) ............................................................. 37

*Altech Controls Corp. v. E.I.L. Instruments, Inc.*,
No. CIV. A. H-92-3189, 1997 WL 579179 (S.D. Tex. June 6, 1997)..................................... 46

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
Civil Action No. 08-30061-MAP, 2009 WL 3490620 (D. Mass. Oct. 29, 2009) ..................... 6

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ............................................................. 35

*Application of Hammack*,
427 F.2d 1384 (C.C.P.A. 1970) ............................................................. 19

*Ariba, Inc. v. Emptoris, Inc.*,
No. CIV. A. 9:07-CV-90, 2008 WL 3482521 (E.D. Tex. Aug. 7, 2008) ......................... 15, 16

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) ............................................................. 6, 19

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*,
731 F.2d 831 (Fed. Cir. 1984) ............................................................. 6

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007) ............................................. 5, 6, 19, 32, 34

*Chimie v. PPG Indus. Inc.*,
402 F.3d 1371 (Fed. Cir. 2005) ............................................................. 4

*Computer Docking Station Corp. v. Dell Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) ............................................................. 4

*Cummins-Allison Corp. v. Glory Ltd.*,
No. 02 C 7008, 2003 WL 355470 (N.D. Ill. Feb. 12, 2003)............................................. 46, 58

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
412 F.3d 1291 (Fed. Cir. 2005) ............................................................. 32

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
435 F.3d 1366 (Fed. Cir. 2006) ............................................................. 6

*Exxon Research and Eng'g Co. v. U.S.*,
265 F.3d 1371 (Fed. Cir. 2001) ............................................................. 5

*Finisar Corp. v. The DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) ............................................................. 6, 19

## TABLE OF AUTHORITIES
### (continued)

Page

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,*
  383 F.3d 1352 (Fed. Cir. 2004) .................................................................. 30

*Girafa.com, Inc. v. IAC Search & Media, Inc.,*
  No. CIV07-787SLR, 2009 WL 3074712 (D. Del. Sept. 25, 2009) ...................... 36

*Halliburton Energy Servs., Inc. v. M-I LLC,*
  514 F.3d 1244 (Fed. Cir. 2008) ............................................................... 5, 35

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n,*
  341 F.3d 1332 (Fed. Cir. 2003) .................................................................. 55

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
  452 F.3d 1312 (Fed. Cir. 2006) ............................................................... 5, 49

*In re Cygnus Telecommunications Tech., LLC, Patent Litig.,*
  481 F. Supp. 2d 1029 (N.D. Cal. 2007) ......................................................... 6

*Infosint, S.A. v. H. Lundbeck A/S,*
  603 F. Supp. 2d 748 (S.D.N.Y. 2009) .......................................................... 52

*Inpro II Licensing v. T-Mobile USA, Inc.,*
  450 F.3d 1350 (Fed. Cir. 2006) ................................................................... 4

*IPXL, Holdings, L.L.C. v. Amazon.com, Inc.,*
  430 F.3d 1377 (Fed. Cir. 2005) ........................................................ 14, 15, 16

*Kemco Sales, Inc. v. Control Papers Co.,*
  208 F.3d 1352 (Fed. Cir. 2000) .................................................................. 35

*LG Elecs., Inc. v. Quanta Computer Inc.,*
  No. 07CV361bbc, 2008 WL 4613054 (W.D. Wis. Mar. 4, 2008)........................ 32

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) ...................................................................... 4

*Mas-Hamilton Group v. La Gard, Inc.,*
  156 F.3d 1206 (Fed. Cir. 1998) .................................................................. 32

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB,*
  344 F.3d 1205 (Fed. Cir. 2003) .................................................................. 34

*Network Appliance Inc. v. Sun Microsystems Inc.,*
  No. C-07-06053 EDL, 2008 WL 4193049 (N.D. Cal. Sept. 10, 2008) .................. 23

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Nova Measuring Instruments Ltd. v. Nanometrics Inc.*,
    No. C05-0986MMC, 2006 WL 3491010 (N.D. Cal. Dec. 1, 2006) ........................................ 33

*O.I. Corp. v. Tekmar Co.*,
    115 F.3d 1576 (Fed. Cir. 1997) ............................................ 46

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................. 4, 5, 23, 37, 40, 48

*Rembrandt Data Techs., LP v. AOL, LLC*,
    No. 1:08 CV 1009 (GBL), 2009 U.S. Dist. LEXIS 79610 (E.D. Va. Aug. 21, 2009).............. 16

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*,
    172 F.3d 836 (Fed. Cir. 1999) ............................................ 46

*Shire Labs., Inc. v. Corepharma, LLC*,
    No. CIV. A. 06-22666 SRC, 2008 WL 819996 (D.N.J. Mar. 26, 2008) ................................. 52

*Tanabe Seiyaku, Co. v. Int'l Trade Comm'n*,
    109 F.3d 726 (Fed. Cir. 1997) ............................................ 52

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)............................................................ 5

## Regulations and Rules

35 U.S.C. § 112, ¶ 2 ................................................................................ *passim*

35 U.S.C. § 112, ¶ 6 ................................................................................ *passim*

## Other Authorities

Manual of Patent Examination Procedure § 2173.05(p)(II) (1999)............................................. 14

## I. INTRODUCTION

Plaintiff and Counter-Defendants HTC Corporation and HTC America, Inc. (collectively, "HTC") submit this Opening *Markman* Brief in support of its proposed construction of the disputed claim terms of the '830, '751 and '216 patents. HTC also moves for summary judgment that each of the asserted patents is invalid because many of the claim elements in those patents are indefinite.

### A. The Parties

HTC Corporation ("HTC") designs and sells some of the most popular "smart phone" wireless handsets on the market worldwide. Founded in 1997 in Taoyuan, Taiwan, HTC pioneered the integration of full-featured personal digital assistants (PDAs) into conventional cell phones, offering wireless voice and email applications on highly-styled devices featuring innovative, easy-to-use touch-screen user interfaces, large screen displays with high resolution, and large integrated memory storage for running sophisticated applications. Since launching its own brand less than three years ago, HTC has introduced dozens of new, award-winning smart phones around the world, and employs thousands of individuals in Taiwan, the United States, and Europe.

In this lawsuit, IPCom accuses HTC of infringing one or more claims of U.S. Patent Nos. 5,390,216, 7,043,751 and 6,879,830 (the '216, '751, and '830 patents, respectively). IPCom purchased the patents from Robert M. Bosch GmbH ("Bosch") of Stuttgart, Germany after they were issued. Although Bosch was and is still focused primarily on the automotive parts industry (e.g., spark plugs, fuel injectors, etc.), the patents resulted from efforts within a division of Bosch's research and development department to develop wireless protocols for potential future generation wireless networks. There is no indication that Bosch developed any product that operated under these patents, and IPCom does not make or sell any products at all.

**B.     The Asserted Patents Are Invalid Because Their Claims Cannot Be Construed**

In connection with evaluating patent claim scope, the threshold question is whether it is possible to ascribe meaning to the language recited in the claim at all.  For the patents in this lawsuit, numerous inconsistencies, ambiguities, and other claim language and structural errors render the claims of the asserted patents-in-suit invalid for being incapable of being construed. Particularly, the asserted '830 patent claims are invalid *per se* because in each, method steps (i.e., steps for performing a method) were improperly injected into an apparatus claim (i.e., a patent claim for a device having certain structural components).  Additionally, all of the asserted claims in the '830, '751 and '216 patents are replete with terms and phrases that are insolubly ambiguous.  The claims thus fail to particularly point out and distinctly claim the subject matter which the applicant regards as his invention, as is expressly required by 35 U.S.C. § 112, ¶ 2 as a condition for patentability.

To the extent that claimed phrases in the asserted patents can be parsed at all, they should be interpreted from the perspective of one of ordinary skill in the art – taken in the proper context of the invention disclosed in the patent specification.  IPCom's proposed claim constructions take words out of their proper context in an attempt to impermissibly broaden the claims well beyond what one of ordinary skill in the art would understand them to mean.

**C.     Overview Of The Asserted Patents**

The asserted patents all disclose certain techniques by which a mobile phone can use control signals, which are transmitted over a wireless network indiscernable to a mobile phone user.  Whenever a mobile phone is turned on in a wireless network, that mobile phone is "listening" to signals transmitted by neighboring cell towers and is sending back signals in response.  Among other things, mobile phones typically utilize information provided in control signals to adjust the clock timing in the phone, to obtain authorization to access the network to make or receive a voice call, or to measure signal strength of nearby cell towers.

### 1.    The '830 Patent

The '830 patent concerns a specially-devised wireless network in which a mobile phone is capable of accomplishing a transfer (or "handover") from communicating with a first cell tower to a second cell tower.   Unlike conventional mobile phones for which a handover is controlled entirely by the wireless network in which the phone is operating, the '830 patent describes a protocol in which the mobile phone can initiate the process and even send "link data" to the new cell tower to transfer the connection.

As explained by the inventor for the '830 patent at his deposition, the invention of the '830 patent was contemplated for a special type of wireless network that was incapable of facilitating handing over a mobile phone between cell towers.   That network, called "HiperLan2," never materialized.   In direct contrast with the proposed "HiperLan2" network and the '830 patent, the UMTS network (on which HTC's phones operate) do not provide capability for mobile phones to initiate or otherwise control handover.

### 2.    The '751 Patent

The '751 patent is directed to a process for determining whether a mobile phone (called a "mobile station" in the patent) has permission to request access on the wireless network to make or receive a call.   In particular, the mobile station is configured to determine whether a control signal that has been transmitted by the network includes a certain type of information, called an "access threshold value."   If so, the mobile phone directly compares the transmitted value with a random number generated in the mobile phone.   If the internally-generated random number is higher than the value that was received from the network, then the mobile phone has permission to access the network.

On the same day that Bosch filed the patent application in Germany that corresponds with the '751 patent, Bosch proposed this algorithm to the standards body for the UMTS third generation wireless network.   The proposal was rejected.   Accordingly, the UMTS network (on which HTC's phones operate today) does *not* incorporate the technique that Bosch had proposed and described in the '751 patent.

### 3. The '216 Patent

The '216 patent is directed to a particular process by which a mobile phone can "synchronize" with the network during all stages of its operation in the network. To stay in-step with the network, all mobile phones must "listen" to synchronization control signals that are broadcast by cell towers on the network and adjust the clocks internal to the mobile phone accordingly. [*See* Expert Declaration of Christopher Rose ("Rose Decl.") ¶ 37] Because the processing capabilities in mobile phones were somewhat primitive during the time period when the application for the '216 patent was filed in 1991, Bosch's invention concerned a technique for a mobile phone to accomplish synchronization in a manner that required less processing hardware as compared with synchronization techniques that already were known.

The computer chips in modern-day mobile phones (such as HTC's products) benefit from significant advances in processor capabilities from those that prevailed when the '216 patent was filed. As a result, Bosch's complex synchronization technique would not be used in a modern cell phone network.

## II. RELEVANT LEGAL STANDARDS

### A. Claim Construction

Courts are responsible for construing patent claims as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Before a court can assess invalidity or infringement, it must construe the claim terms "in order to assign a fixed, unambiguous, legally operative meaning to the claim." *Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005). Courts consider "intrinsic" evidence, including the claims themselves, the specification, and the prosecution history, to identify the meaning of the claims. *E.g.*, *Computer Docking Station Corp. v. Dell Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008). Claim terms are evaluated from the perspective of "a person of ordinary skill in the art in question at the time of invention." *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

Claims cannot be construed more broadly than what is described in the specification of the invention. *Inpro II Licensing v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir.

2006).   It is entirely appropriate for courts "to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317.   Where a specification consistently describes an alleged invention as having a particular function, feature or scope, broad claim terms must not be construed to exceed those boundaries. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1317-18 (Fed. Cir. 2006).

Pursuant to 35 U.S.C. § 112, ¶ 6, a patentee may generically recite a "means for" accomplishing a particular function, provided that the specified structures corresponding to the means are disclosed in the patent specification. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 28 (1997).   This is referred to as a "means-plus-function limitation." In this instance, the construed scope of the "means" for performing the stated function must be limited to the structure specifically disclosed in the specification, and equivalents thereof.

### B.      Indefiniteness

As part of claim construction, the asserted patent claims must be examined as to whether they "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.   If a skilled artisan cannot discern the boundaries of a claim based on the claim's language, the specification, and the prosecution history, as well as his or her knowledge of the relevant art, a claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-56 (Fed. Cir. 2008).   Such claims are indefinite because they are not amenable to construction or are "insolubly ambiguous." *Exxon Research and Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Even if a patent holder can articulate a definition of claim language supported by the specification, "the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton*, 514 F.3d at 1251.

A claim containing a means-plus-function element pursuant to 35 U.S.C. § 112 ¶ 6 is also indefinite (and, therefore, invalid) if the structure that performs the claimed function is not adequately disclosed in the specification. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).   It is not enough for the party asserting the patent to simply point to *some*

structure in the specification that theoretically *could* perform the function; rather, there must be clear disclosure in the specification itself linking a particular structure to the claimed function. *Id.*   Further, the Court must consider "whether one of skill in the art would understand the *specification itself* to disclose the structure, not simply whether that person would be capable of implementing that structure" based on their own knowledge or skill.   *Id.* at 951 (emphasis added); *see also Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008).   A specification fails to disclose sufficient structure when it merely restates the function recited in the claim.   *Finisar Corp. v. The DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

### C.   Summary Judgment for Indefiniteness

An analysis of claim indefiniteness is "inextricably intertwined" with claim construction, and like claim construction, it is an question of law.   *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1368 (Fed. Cir. 2006).   Therefore, courts often consider motions for summary judgment of indefiniteness when they construe claims.   *See In re Cygnus Telecommunications Tech., LLC, Patent Litig.*, 481 F. Supp. 2d 1029, 1034 (N.D. Cal. 2007) ("Because of the substantial overlap between defendants' claim construction positions and their motion for summary judgment under § 112, the court will address both together."); *Am. Med. Sys., Inc. v. Biolitec, Inc.*, Civil Action No. 08-30061-MAP, 2009 WL 3490620, at *6-*7 (D. Mass. Oct. 29, 2009).   Further, "[s]ummary judgment is as appropriate in a patent case as in any other."   *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).   With regard to means-plus-function claims, summary judgment of invalidity is appropriate where a patentee has failed to disclose sufficient linking structure.   *See, e.g.*, *Aristocrat Techs.*, 521 F.3d at 1338.

Accordingly, HTC moves for summary judgment that several asserted claims in the '830, '751 and '216 patents are invalid as indefinite.   HTC's Statement of Material Facts appears below and a Proposed Order will be filed concurrently with this Brief.

### III.     STATEMENT OF MATERIAL FACTS

**A.**     Claims 1, 12 and 18 of the '830 patent recite limitations that are vague, ambiguous and cannot be discerned by one of ordinary skill in the art at the time of the invention.

**B.**     Claim 13 of the '751 patent recites limitations that are vague, ambiguous and cannot be discerned by one of ordinary skill in the art at the time of the invention.

**C.**     Claim 1 of the '216 patent recites limitations that are vague, ambiguous and cannot be discerned by one of ordinary skill in the art at the time of the invention.

### IV.     THE ORDINARY LEVEL OF SKILL IN THE ART AT THE TIME OF THE INVENTIONS FOR THE '830, '751 AND '216 PATENTS

For each of the asserted patents, both invalidity and claim construction should be evaluated from the perspective of a wireless telecommunications engineer having at least a Bachelors of Science degree in electrical engineering with significant coursework in communications systems and either one year of completed graduate coursework relating to communications systems or at least five years of engineering experience in the wireless communications industry.

### V.     UNITED STATES PATENT NO. 6,879,830

#### A.     Technical Overview

The '830 patent, titled "Method For Handover, Mobile Station For Handover And Base Station For Handover," generally relates to a "handover" algorithm for a wireless communications system.  [Ex. 4 to Appendix to Exhibits to Opening Claim Construction Briefs (hereinafter "'830")]  A handover (also referred to as a "handoff") occurs when a mobile phone's ongoing call or data session is transferred from one base station to another.  [Rose Decl. ¶ 14]  A handover commonly occurs as a mobile phone is moving away from an area covered by one cell and entering the area covered by another cell.  [*Id.* ¶ 14]  In this circumstance, the call is transferred to the second cell in order to avoid call termination when the mobile phone becomes outside the range of the first cell.  [*Id.* ¶ 14]  Another typical trigger for a handover occurs when a cell becomes overloaded, and so calls are transferred to other nearby cells to free-up some capacity in the first cell for other mobile phones that can only be connected to the first cell.  [*Id.* ¶ 15]

Handovers are typically categorized as being one of two types: "hard" or "break before make"; and "soft" or "make before break." In a "hard" handover, the "channel"[1] in the source cell is released and only then the channel in the target cell is engaged. Since the connection to the source is broken before the connection to the target is made, hard handoffs are intended to be instantaneous so as to minimize call disruption. In contrast, in a "soft" handover the channel in the source cell is retained and used for a while in parallel with the channel in the target cell. The connection to the target is established before the connection to the source is broken, such that there is an interval, during which the two connections are used in parallel.

In conventional wireless telephone networks, such as a GSM network (operated in the United States by AT&T and T-Mobile), the handover process is initiated and controlled by the network. [*Id.* ¶ 16] The base station informs the mobile phone that it will be handed over, finds a suitable new base station, and then sends the new base station the relevant information for accomplishing the transfer. Once these arrangements are made, the base station notifies the mobile phone to identify itself to the new base station so as to be handed over. This is defined in the background section of the '830 patent as "base station initiated, network supported backward handover." ['830, 1:47-57]

## B.     The Handover Method Disclosed In The '830 Patent

The '830 patent is directed to a handover method designed for a network in which at least some of the base stations are *incapable of "supporting" the handover.* [*Id.*, 3:46-59; 7:32-36] A base station that cannot provide network support is incapable of exchanging data directly with a nearby base station to control a handover for a mobile phone. The patent contemplates utilizing a method in a "transitional" network in which some base stations operate under differing protocols and as a result, only some handovers can be network-supported. According to the

---

[1] A "channel" in a wireless communication is often analogous to a "TV channel" in which a television program is broadcast over a certain frequency band, and television watchers "tune in" to view the program by setting the television to the channel that corresponds to that frequency band. [Rose Decl. ¶ 13]

invention, a "forward handover" (rather than the conventional "backward handover") technique is utilized that accomplishes network-supported handover whenever possible, but otherwise accomplishes "non-network-supported handover."   Additionally, if a failure occurs during the course of a handover, the algorithm provides capability for a mobile phone to return to the original base station without dropping the call/data transfer.

The patent defines a "forward handover" as one in which "[t]he mobile station seeks its target base station itself and registers there directly."   [*Id.*, 1:37-38]   According to the '830 patent, in a "non-network-supported forward handover," the mobile station itself seeks its target base station, registers there itself, and additionally transmits all of the information that needs to be sent to the target base station to accomplish the handover.   This scenario is described in the '830 patent with reference to Figure 2:[2]



Fig.2

In this figure, after the MS determines in step 100 that a handover is required, the MS informs BS1 in a "handover notify" message 101 that it is now seeking a handover.   "After receiving this message, BS1 stops sending data to the MS via the radio interface" [*Id.*, 3:35-36], and the MS looks for a new base station in step 102.   Accordingly, steps 100, 101 and 102 reflect a "forward

---

[2]   "MS" refers to the "mobile station" or mobile phone, "BS1" is the originating base station with which the MS is already communicating, and "BS2" is the target base station.   ['830, 2:59-3:9; Rose Decl. ¶¶ 12, 14]

handover," because it is the MS that (i) makes the handover determination, (ii) informs the BS, and (iii) looks for a new target base station.

The key aspect of the invention is next described with reference to step 103 – the "query" step. In this step, the mobile phone MS asks the target base station BS2 whether it is capable of accomplishing a network-supported handover. If so (as shown in Figure 3), then BS2 will communicate directly with BS1 to receive the necessary information to accomplish the handover as is performed conventionally. If, however, BS2 sends to MS a message indicating that there is "no net support," as in message 104, then the MS itself must (i) undergo authentication with BS2 (in step 105) and then (ii) transmit to BS2 of the data necessary for accomplishing handover (in step 106).

The '830 patent additionally provides steps for allowing the mobile phone to reconnect with BS1 in some circumstances when its handover to BS2 fails prior to completion, as shown with reference to Figure 5:



Fig. 5

In step 405, the MS sends the "query" as in step 103 described above. In response, BS2 sends a message in 406 rejecting any handover. Since the MS is now in limbo, upon receiving message 406 it (i) synchronizes once again with BS1, (ii) sends a message 408 to BS1 requesting to return to BS1 on the same channel that it was on as before, and (iii) waits for a response message 409 allowing MS to re-establish its communication with BS1. [*Id.*, 6:28-40; Rose Decl. ¶ 17]

In order for BS1 to re-establish communications with the MS as in Figure 5, the BS1 must "hold the resources of the link in reserve" for at least some period of time once it receives the handover notify message 101 and it stops communicating with MS.  Unfortunately, however, "reserving the resource" means that the channel sits idle, which is inherently inefficient.  Therefore, the '830 patent discloses that, at the beginning of the handover when the MS sends the "handover notify" message 103 and the BS1 stops all communications with the MS, a timer is set in the BS1.  MS then can reestablish with BS1 only before the expiration of the timer.  After that time, the resource is no longer held in reserve.

### C.   Claims 1, 12 and 18 Of The '830 Patent Are Invalid Under 35 U.S.C. § 112, ¶ 2 As Indefinite

Each of the asserted claims of the '830 patent is invalid under 35 U.S.C. § 112, ¶ 2 for several reasons.  First, all three claims are "apparatus claims" – that is, they claim "a mobile station" comprised of certain components – but additionally include "method steps" performed by a base station (and other steps to be performed by the mobile station) to accomplish a handover.  This claim structure is improper as being inherently ambiguous.  Second, each of the asserted claims recites to "an arrangement for [performing a function]" in means-plus-function format under 35 U.S.C. § 112, ¶ 6, but there is no corresponding structure disclosed in the specification for the two recited means-plus-function elements.  Finally, the claims recite phrases that cannot be interpreted in a manner that is consistent with other phrases in the same claims.

### 1.   The Asserted Claims Are Indefinite For Improperly Inserting Method Steps Within An Apparatus Claim

#### a.   Claims 1 and 18

Claims 1 and 18 are purported "apparatus claims" that also include method steps.  For reference, claim 1 is set forth below with the apparatus elements bolded and the method steps italicized:

1. A **mobile station** for use with a network including a first base station and a second base station that achieves a handover from the first base station to the second base station by:

> *storing* link data for a link in a first base station,
>
> *holding* in reserve for the link resources of the first base station, and
>
> when the link is to be handed over to the second base station:
>
> > *initially maintaining* a storage of the link data in the first base station,
> >
> > *initially causing* the resources of the first base station to remain held in reserve, and
>
> at a later timepoint determined by a fixed period of time predefined at a beginning of the handover, *deleting* the link data from the first base station and *freeing up* the resources of the first base station, **the mobile station comprising:**
>
> > **an arrangement for reactivating** the link with the first base station if the handover is unsuccessful.

['830, 8:12-32 (emphasis added)]  Claim 18 is identical to claim 1 in structure [*Id.*, 10:61-12:6], different only at the paragraph that begins with "at a later timepoint…" [*Id.*, 11:7-12:4].

Both claims are directed to "a mobile station …, the mobile station comprising:  an arrangement for reactivating the link ….," which is purportedly a structural limitation.  Yet, the same claims also expressly recite a series of steps for accomplishing a handover, including "storing …," "holding …," "initially maintaining …," "initially causing …," "deleting ...," and "freeing up...."   Accordingly, it cannot be discerned whether the claims' scope of coverage pertains to an apparatus or the performance of a method.

Furthermore, the claims are ambiguous as to what device is to perform the recited steps. The claim preamble is insolubly ambiguous because it is unclear which device "achieves" the handover:

> A mobile station for use with a network including a first base station and a second base station that achieves a handover from the first base station to the second base station by:

[*Id.*, 8:12-15]

Reviewing this language, one of ordinary skill in the art could not discern whether (i) the mobile station, (ii) the network, (iii) the first base station or (iv) the second base station is the one that "achieves."  [Rose Decl. ¶ 20]  This ambiguity is compounded by the fact that, as described in the '830 specification, *all* of them bear some responsibility for handover.

- One conceivable construction is that the mobile station "achieves" the handover by seeking the target base station itself and registers there directly. As discussed above, the gist of the purported invention is a protocol for a forward handover that is capable of transpiring whether it is network supported or non-network supported. At least several of the steps for achieving the handover that follow the preamble, however, cannot be performed by the mobile station;

- The language also could be parsed to mean the network achieves the handover. Referring to Figure 1, in some embodiments (at least "network-supported handover"), network switch (4) communicates information between the base stations over fixed lines (5). However, such an interpretation might exclude the preferred embodiment that includes non-network supported handover;

- It is difficult to parse the recited language such that the first base station "achieves" the handover. However, at least some of the steps following the preamble must be performed by the first base station. For example, only the first base station can perform the step of "holding in reserve for the link resources of the first base station"; and

- Finally, the language could be parsed to mean that the second base station achieves the handover. It is the second base station that answers the "query" from the mobile station and ultimately accepts or rejects it. However, merely accepting or rejecting the "query" does not appear to be "achieving" the handover.

Compounding the problem even further, the claims recite a series of method steps for achieving a handover while at the same time reciting a means-plus-function element for reactivating due to a handover that was *not* achieved. Although the claim is purportedly directed to a "mobile station … [for] achiev[ing] a handover," the only structure recited is for performing a function when handover *fails*. [Rose Decl. ¶ 21]

### b.    Claim 12

Claim 12 is also a purported "apparatus claim," as provided below:

12. *A* **mobile station**, comprising:

*an arrangement* for transmitting link data for a link between the mobile station and a first base station of a network to a second base station of the network, the link data containing current parameters of the link; and

*an arrangement* for reestablishing the link with the first base station,

wherein:

*the first base station stores* the link data;

*the first base station reserves* a link resource for the link between the mobile station and the first base station;

> if the network cannot support handing over the link by transferring the link data from the first base station to the second base station, *the mobile station transmits* the link data to the second base station;
>
> in response to the second base station receiving the link data, *the link is handed over from the first base station to the second base station*;
>
> in response to a successful completion of handing over the link, *the link data stored in the first base station is deleted and the link resource reserved in the first base station is released*; and
>
> in response to an unsuccessful completion of handing over the link, *the link between the mobile station and the first base station is re-established* using the stored link data and the reserved link resource in the first base station for the link.

['830, 9:54-10:12 (emphasis added)]

Claim 12 recites a "mobile station" comprising "an arrangement for transmitting" and also "an arrangement for establishing," which are purported structural elements within a mobile station. However, as in claims 1 and 18, the claim further recites a series of steps, including "the first base station stores," "the first base station reserves," "the mobile station transmits," "the link is handed over," "the link data … is deleted and the link resource … is released," and the "link … is re-established." Once again, it cannot be discerned whether the claim's scope of coverage pertains to an apparatus or the performance of a method. [Rose Decl. ¶ 19]

Unlike in claims 1 and 18, at least some of the method steps in claim 12 expressly indicate which device performs the step. However, this, too, is inconsistent, because certain steps in the method are to be performed by the first base station and at least one is to be performed by the mobile station. Reciting steps that a "base station" must perform in an apparatus claim for a "mobile station" is insolubly ambiguous.

### c.      The Structure of Claims 1, 12, and 18 Renders Them Invalid As Indefinite

Patent claims that recite both an apparatus and method steps are indefinite under 35 U.S.C. § 112, ¶ 2. *IPXL, Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); USPTO, *Manual of Patent Examination Procedure* § 2173.05(p)(II) (1999) [Declaration of Michael A. Oblon ("Oblon Decl.") Ex. A]. Such claims are indefinite because a potential infringer would not know from the language of the claim what constitutes infringement; for

example, infringement might result from manufacturing the recited apparatus or from carrying out the recited method steps. *See IPXL*, 430 F.3d at 1384. This ambiguity is fatal to the claim because it fails to particularly point out and distinctly claim the subject matter the applicant regards as his invention as required by 35 U.S.C. § 112, ¶ 2.

The Federal Circuit analyzed a claim reciting both an apparatus and a method step in *IPXL*, where claim 25 recited the following:

> The **system of claim 2** [ ] wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and **the user uses the input means** to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

*IPXL*, 430 F.3d at 1384. The court found claim 25 invalid for indefiniteness because it recited both a system—"[t]he system of claim 2"—and a method step—the use by the user of the input means. Key to the court's reasoning was that the language of claim 25 resulted in confusion as to whether infringement occurred "when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction" or "when the user actually uses the input means to change transaction information or uses the input means to accept a displayed transaction." *Id.*

District courts have since applied the holding in *IPXL* to invalidate claims that cover both an apparatus and method steps. In *Ariba, Inc. v. Emptoris, Inc.*, No. CIV. A. 9:07-CV-90, 2008 WL 3482521, at *6-*7 (E.D. Tex. Aug. 7, 2008), claim 31 purported to cover an apparatus—"[a] bidding device" operated by a potential seller—and also included a method step—"wherein a bid submitted by the potential seller operating the bidding device *is compared* to the corresponding bid ceiling of the potential seller operating the bidding device" (emphasis added). The court found claim 31 invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2 because it recited both an apparatus and a method step. *Ariba*, at *8. It made no difference that the claimed method step was performed by a computer operated by a potential buyer or the buyer's auctioneer and, therefore, was a different device from the claimed device, which was operated by a potential seller. *Id.*

More recently, in *Rembrandt Data Techs., LP v. AOL, LLC*, No. 1:08 CV 1009 (GBL), 2009 U.S. Dist. LEXIS 79610 (E.D. Va. Aug. 21, 2009), the patent holder conceded that claim 3, which purported to cover an apparatus—"[a] data transmitting device"—and a method step— "transmitting the trellis encoded frames"—was forbidden by the principles of patent law. *Rembrandt*, at *14-*15 n.3.   The patent holder argued that the inclusion of the method step was an obvious typographical error and requested a correction:   replacing "transmitting the trellis encoded frames" with the phrase "a transmitter section for transmitting the trellis encoded frames." *Id.* at *15.   The court declined, finding correction improper because the error was not "minor, obvious, free from reasonable debate or evident from the prosecution history." *Id.* at *19.   Accordingly, because claim 3 covered both an apparatus and a method step, the court granted summary judgment that the claim was invalid. *Id.* at *18-*19.

Similar to the claims invalidated in *IPXL*, *Ariba* and *Rembrandt*, claims 1, 12 and 18 of the '830 patent are indefinite because the language of the claims fails to put a potential infringer on notice regarding what constitutes infringement.   Claims 1, 12 and 18 purport to cover an apparatus, but also recite a list of steps for achieving handover from one base station to another base station in a telecommunications network.   The claim language does not clearly demarcate the invention, and a mobile station manufacturer is left to wonder whether infringement occurs when the mobile station is manufactured or when the mobile station performs the steps recited in claims 1, 12 and 18.   The resulting ambiguity is left unresolved and dooms the claims. Accordingly, claims 1, 12 and 18 of the '830 patent are invalid for indefiniteness for failing to comport with 35 U.S.C. § 112, ¶ 2 by particularly pointing out and distinctly claiming the invention.

        **2.**      **Limitations with "Arrangement for" Language Recited In Claims 1, 12, and 18 Are Means-Plus-Function Elements That Are Indefinite for Failure to Disclose Any Supporting Structure in the '830 Specification**

Each of claims 1, 12 and 18 is directed to a mobile station that comprises "an arrangement for" performing a function.   IPCom concedes that notwithstanding that the claims do not recite the typical "means for" language, they are to be construed as means-plus-function

limitations pursuant to 35 U.S.C. § 112, ¶ 6.   Each of these recited means-plus-function limitations is indefinite for failure to disclose in the specification the corresponding structure that is linked with the functional language recited in the claims.   Specifically, nowhere in the '830 patent is there any disclosure of any circuitry, structure, components or schematics of a mobile phone for performing the recited functions.   [Rose Decl. ¶ 22]   As set forth in the Abstract, the '830 patent pertains to a method:

> A *method* for handing over a link between a mobile station and a network from a first base station to a second base station of the network. . . .   Furthermore, a *method* is used in which in the case of a handover the mobile station sends the network a query as to whether the network can support the handover by transferring the link data from the first mobile station to the second mobile station. If the mobile station is informed that the network cannot support the handover the mobile station makes the link data available to the second base station.

['830, Abstract (emphasis added)]   Similarly, the Summary of the Invention section describes only a method:

> *New methods* that solve some of the existing problems relating to forward HO *are proposed*. *The first method* allows network-supported and non-network-supported handover. *The second method* allows base-station-initiated and forward HO to be combined.

[*Id.*, 2:24-28 (emphasis added)]   Furthermore, the '830 patent figures are primarily flow diagrams that disclose steps of a method:

> FIG. 1 shows a network linked to a mobile station in accordance with the present invention.

> FIG. 2 is a first illustration of a first handover *method* according to the present invention.

> FIG. 3 is a second illustration of the first handover *method* according to the present invention.

> FIG. 4 is a first illustration of a second handover *method* according to the present invention.

> FIG. 5 is a second illustration of the second handover *method* according to the present invention.

FIG. 6 is a third illustration of the second handover *method* according to the present invention.

[*Id.*, 2:44-56 (emphasis added)]  Figure 1 simply discloses (via four boxes labeled "1" – "4") that a mobile phone (MS 3) exists in a network, without illustrating any components of a phone whatsoever.



Accordingly, no linking structure for the "mobile station" is provided in the '830 specification for performing the recited functions for "reactivating the link" (claims 1 and 18), "reestablishing the link"[3] (claim 12), or "transmitting link data for a link"[4] (claim 12).  [Rose Decl. ¶ 22]

---

[3] The only possibly relevant disclosure in the specification is a protocol in which the MS receives a message from BS2 indicating that the MS handover query to BS2 has been rejected, and in response to receiving this message from BS2, the MS transmits a message request to BS1 to reestablish the link and then resumes communications with BS1 upon receiving a simple acknowledgement message.  ['830, 6:28-40]  If this were considered to be an "arrangement," it is one for a system, co-extensive between the mobile station, the first base station and the second base station.  There are no schematics, no disclosure of any components or circuitry, or any other information providing structure within the mobile station itself for accomplishing the recited function.

[4] Once again, the only relevant disclosure in the specification is a protocol.  The mobile station queries BS2 whether there is network support for the handover.  If it determines that there is network support, then BS1 transmits the link data to BS2.  If it determines that there is no network support, then the MS must send its link data and link options to BS2 itself.  [*Id.*, 5:16-26]  There is no disclosure as to what structure is provided in the mobile station for obtaining this "link data" or for transmitting it to BS2.

This deficiency in the '830 patent disclosure is palpable, as the patent itself recognizes that known configurations for mobile phones *cannot* accomplish functions described in the flow diagrams:

> *In contrast with* the known methods, *the known mobile stations* and the known base stations, the present invention has the advantage …

['830, 1:66-2:1 (emphasis added)]   A whole new network, with differently-configured mobile stations[5] and base stations, would be required to achieve the claimed functionality, but none of it is disclosed.[6]

Since one of ordinary skill in the art at the time of the invention could not find structure disclosed in the '830 specification for performing the functions recited in the means-plus-function limitations, the claims are indefinite.   *See, e.g., Biomedino*, 490 F.3d at 952-53 (invalidating claim as indefinite for failure to disclose structure corresponding to means-plus-function limitation); *Aristocrat Techs. Austl. Pty Ltd.*, 521 F.3d at 1338 (same); *Finisar Corp.*, 523 F.3d at 1340-41 (same).

### 3.   The Steps For "Holding In Reserve" and "Initially Causing . . . To Remain Held In Reserve" In Claims 1 and 18 Are Indefinite

Pursuant to 35 U.S.C. § 112, ¶ 2, each method step recited in a patent claim must be capable of being construed as having a meaning distinct from every previous or subsequent step recited in the method.   *See Application of Hammack*, 427 F.2d 1384, 1389-90 (C.C.P.A. 1970) (finding claim indefinite where it failed "to set out certain of the process steps and their relationship to the other steps with sufficient particularity to provide reasonably clear definitions of [the claimed] processes.").   Claims 1 and 18 are indefinite because the separately-recited steps

---

[5]  For example, to accomplish the "forward" and "non-network supported" handover, the mobile phone must include various structure that was not present in mobile phones at the time of the invention (and still does not exist).   [Rose Decl. ¶ 18]

[6]  Tellingly, '830 patent co-inventor, Mr. Radimirsch, testified at his deposition that the inventors were not involved in product development and were instead focused on establishing protocols that may be relevant for future standardization.   [Deposition of Markus Radimirsch ("Radimirsch Depo."), Oct. 15, 2009, 46:10-48:5 (Oblon Decl. Ex. B)]

of "holding in reserve" and "initially causing ... to remain held in reserve" are indistinguishable in the '830 specification and therefore cannot be separately interpreted.

Claims 1 and 18 are directed to a handover technique in which the first base station will "hold in reserve" a "link resource" while a mobile phone searches for a target base station for a handover.  Accordingly, the claims recite:

> A mobile station for use with a network including a first base station and a second base station that achieves a handover from the first base station to the second base station by:
>
> …
>
> holding in reserve for the link resources of the first base station….

['830, 8:12-18; 10:61-67]

As disclosed in the '830 specification, in response to receiving a "handover notice" from the mobile phone, the first base station stops sending data via the radio interface.  [*Id.*, 3:29-36; 5:51-60]  Since the base station has stopped communicating with BS 1, but still maintains the resources of that link, the link resources are being "held in reserve" for the mobile phone.  In the meantime, the mobile phone looks for a new base station (BS 2), synchronizes with that base station, and "prepares itself for communication with new BS 2."  [*Id.*, 3:35-44]

Since the first base station cannot "hold" the resource in reserve indefinitely, it sets a timer that provides a deadline by which the mobile phone must attempt to return if the handover is unsuccessful.  If the timer expires before the mobile phone attempts to return, the link resource is freed up for use.  [*Id.*, 7:5-32]  Accordingly, pursuant to the disclosed handover method, the first base station performs the step of "holding in reserve for the link resources of the first base station" by setting a timer to provide a fixed period of time during which the "link resource" is held for a potential future use by the mobile station.[7]

In addition to the "holding in reserve" step, claims 1 and 18 also recite another step directed to the reservation of the resources:

---

[7]  Accordingly, if any definition could be provided for the phrase "holding in reserve," it should mean that the base station sets aside channel resources for potential future use.

*when the link is to be handed over to the second base station:*

. . .

*initially causing the resources of the first base station to remain held in reserve . . .*

[*Id.*, 8:19-24; 11:1-6]

Significantly, the claim does not recite that the "holding in reserve" step further comprises a substep of "initially causing . . . to remain held in reserve." Instead, these are recited as separately occurring steps.

Since the claims recite two separate steps – the claim must be construed as such. However, the '830 specification does not disclose separate steps for "holding the resource" and "initially causing the resource to remain held." In each instance, the specification solely discloses a single step of "initially" not reassigning the resources:

> BS 1 then stops transmitting data via the radio interface. However, the data required for the link initially remain stored in BS 1, and *initially BS 1 does not reassign the resources* (e.g., radio frequencies or similar) required to maintain the link with the MS. . . .

[*Id.*, 5:60-64 (emphasis added)]

> Of course the link data are not stored forever, nor are the resources held in reserve in BS 1 forever. Fig. 6 shows a further option in which function blocks or messages 500 to 504 correspond to function blocks or messages 300 to 304 in Fig. 4. However, in this case *BS 1 starts a timer*, timepoint 507 being marked on the time axis assigned to BS 1 based on when the time runs out.

[*Id.*, 7:5-11 (emphasis added)]

> It is therefore proposed that in the case of a handover the base station *initially continue to hold the data and resources*. To accomplish this a timer, for example, is started when the old base station asks the mobile station to look for a new base station (or when the mobile station confirms this). *The base station holds the resources of the mobile station in reserve until it receives the request to redirect the links or until the timer runs out*.

[*Id.*, 7:41-48 (emphasis added)]

There is no disclosure of the mobile station "holding the resources in reserve" *separately from* "initially causing the resources to remain held."

Simply parsing the claim language according to its plain and ordinary meaning, the base station *first* puts into place measures for "holding in reserve" the link resources, and *then*, at some other time period, it causes the resources that already were being held in reserve for some indefinite period of time to somehow remain held in reserve for just the "initial" time period. Such a construction is inconsistent with the disclosure in the '830 specification, however. Accordingly, these recited phrases render the claims indefinite.[8]

    **D.**    **To The Extent That The '830 Patent Can Be Understood, It Should Be Construed In Context With The Invention Disclosed In The Specification**

        **1.**    **"Link data"**

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
| --- | --- |
| link data (claims 1, 12, and 18) | the data required for a link that both the first base station and the mobile station are capable of sending to a second base station to achieve a handover |

The term "link data" is recited repeatedly throughout the asserted claims. According to claims 1 and 18, the link data is stored in the first base station but subsequently deleted from the first base station at some "later timepoint" after the beginning of a handover. Claim 12 additionally recites that the link data contain the "current parameters of the link" and that "the mobile station transmits the link data to the second base station" if the network cannot support the handover.

One of ordinary skill in the art at the time of the invention would not consider "link data" to be a term of art. [Rose Decl. ¶ 23] Significantly, the discussion in the Background Information section of the '830 patent about the "various sub-categories of handover" makes no mention of "link data," indicating that the patentee coined the term in connection with the purported invention. Accordingly, the term does not have a plain and ordinary meaning, and

---

[8] Similarly, claims 1 and 18 fail to adequately define the distinction between "storing link data in a first base station" and "initially maintaining a storage of the link data in the first base station." Presumably, the link data was somehow stored in the first base station during the data call, prior to the beginning of the handover process. However, there is no disclosure of this step anywhere in the '830 specification. The sole disclosure of the "storage" concerns "initially maintaining it" by setting a clock at the beginning of the handover process. ['830, 7:41-54]

should be construed in accordance with the discussion in the specification which serves to define the term. *Phillips*, 415 F.3d at 1314 (when the meaning of a claim term as understood by a person of skill in the art is not "immediately apparent," courts look to intrinsic evidence); *Network Appliance Inc. v. Sun Microsystems Inc.*, No. C-07-06053 EDL, 2008 WL 4193049, at *12 (N.D. Cal. Sept. 10, 2008) (finding claim term "completing a write operation" not clear on its face and using intrinsic evidence to construe how a person of ordinary skill in the art would understand the term).

The '830 specification fails to explicitly define the term "link data" or otherwise to provide any examples of the data that are to be included. Instead, the term is referenced in the context of how it is to be transmitted to the second base station in connection with a handover. The gist of the purported invention appears to be that the "link data" are transmitted between base stations over fixed lines when a handover is network supported, but are transmitted by the mobile station if the handover is not network supported. [Rose Decl. ¶ 24] The capability of the second base station to receive the link data from the mobile station is therefore a key attribute of the method for facilitating both network-supported and non-network-supported handover.

Accordingly, the "link data" is the data required for a link that both the first base station and the mobile station are capable of sending to a second base station to achieve a handover.

IPCom's proposed construction does not find support in the intrinsic evidence of record. There is no mention of "data describing the identity and features of the mobile station" anywhere in the '830 specification or file history. If anything, if one of ordinary skill in the art were to define "link data" in terms of the types of information that hypothetically might be included, there could be many additional categories of information to incorporate into the definition. [*Id.*, ¶ 23] However, IPCom's definition does not have any bearing on the key attribute of the data – that it can be transmitted by the mobile station if the handover is not network-supported. Accordingly, IPCom's definition should not be adopted.

2.      **"When the link is to be handed over"/"at a later timepoint…"**

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
|---|---|
| when the link is to be handed over (claims 1 and 18) | the time at which the mobile station begins searching to identify a new base station to which the link could be handed over |
| at a later timepoint determined by a fixed period of time predefined at a beginning of the handover (claim 1) | the base station deleting the link data and freeing up the link resources if a predetermined time passes after the mobile station began searching for a new base station |

Claims 1 and 18 both recite as a temporal limitation that certain steps in the claim are to be performed "when the link is to be handed over." Specifically, the steps that are to be performed at this time are for "initially maintaining a storage of the link data" and "initially causing the resources … to remain held in reserve." Claim 1 further recites the step of "deleting the link data … and freeing up the resources" at a later timepoint after the beginning of the handover. Claim 18 recites that the link data/resources are deleted/freed up based on a message regarding a successful completion of handover.

According to the plain and ordinary meaning of the phrase, the additional steps would be performed at the moment that the handover is achieved. Such a definition, however, is wholly inconsistent with the '830 specification. As described *supra*, the '830 patent discloses a method whereby, upon receiving a "handover notify" message from the mobile station, the first base station (i) stops communicating with the mobile station and (ii) sets a timer to temporarily hold the resources of the link in reserve, while the mobile station (i) searches for a new base station, (ii) prepares to communicate with the new base station, and (iii) sends the new base station a "query" as to whether there is network support for the handover. ['830, 3:27-52; 5:55-6:6]

To the extent that the claim can be interpreted, the phrase "when the link is to be handed over" must correspond to the beginning of the handover process, when it is first determined that a handover is required and the mobile station begins searching to identify a new base station to which the link could be handed over. [Rose Decl. ¶ 25]

Such a construction is consistent with the recited phrase in claim 1 concerning steps to be performed "at a later timepoint determined by a fixed period of time predefined at a beginning of

the handover."  Once more, the '830 specification describes the "beginning of the handover" as the time when it is determined that a handover is necessary and the mobile station searches for a new base station.  This is the time that the timer is set, "initially causing the resources of the first base station to remain held in reserve."  When that timer expires at a fixed time after it was set at the beginning of the handover, the resources are no longer held in reserve.  Accordingly, the "at a later timepoint…" phrase should be construed to mean that "the base station deleting the link data and freeing up the link resources if a predetermined time passes after the mobile station began searching for a new base station."

### 3. "If the network cannot support handing over the link" (claim 12)

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
|---|---|
| if the network cannot support handing over the link…. (claim 12) | If, in response to a query from the mobile station, the second base station indicates that it cannot receive the link data through the network |

Claims 12 recites a step whereby, "if the network cannot support handing over the link by transferring the link data from the first base station to the second base station, the mobile station transmits the link data to the second base station."  The phrase "network support" in connection with a handover is not a term of art to one of ordinary skill in the art at the time of the invention. [Rose Decl. ¶ 26]  However, this phrase can be construed when taken in the context of the '830 specification.

As explained in the '830 specification, a determination is made as to whether the network can support handing over the link in response to a "query" from a mobile station seeking a handover with a target base station.  In Figure 3, for example, the "query" is referred to as a "Net Support Question," in response to which the target base station responds with a message indicating either "No Net Support" or "Net Support Possible."

Accordingly, if the network cannot support the handover, then the target base station sends a message to the mobile station indicating as such.  In turn, the mobile station then sends

the "link data" to the target base station itself, rather than having the first base station and target base station communicate directly with the information.

### 4.    "Deleting … and freeing up"/"deleted … released" (claims 1 and 18)

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
|---|---|
| "deleting … and freeing up" (claims 1 and 18)/"deleted … released" (claim 12) | The base station writing over a memory location and purging a communication that had been set aside by reassigning the resources |

Claims 1 and 18 recite similar steps to be performed when either (i) the timer that was set in the base station has expired or (ii) the handover has been completed successfully.  In either event, the "link data" in the first base station is "deleted" and the "link resource" is "freed up" or "released."

In the context of the '830 patent, "deleted" means "written over" and the "release" of a link resource is to purge a communication by reassigning the resources.  [Rose Decl. ¶ 27]  The patent specifies that, when information is no longer required, the first base station "deletes the MS from its lists" ['830, 7:52-54] and the "resources that were held in reserve can be assigned elsewhere" [*Id.*, 6:7-20].  The link data and resources must be completely written-over and purged, because, if the base station timer expires before the MS requests to reacquire the link, the link is "lost," requiring a "whole new register procedure."  [*Id.*, 7:16-22]

## VI.    UNITED STATES PATENT NO. 7,043,751

### A.    Technical Overview

The '751 patent, titled "Method Of Allocating Access Rights To A Telecommunications Channel To Subscriber Stations Of A Telecommunications Network And Subscriber Station" [Ex. 3 to Appendix to Exhibits to Opening Claim Construction Briefs (hereinafter "'751")], is generally directed to an algorithm by which a mobile phone can determine whether it has permission to make a phone call, send an email, surf the web, etc.  At any point in time, a base station in a wireless network can handle only some maximum number of phone calls or data transfers to/from mobile phones that are operating in its vicinity.  Accordingly, conventional

wireless networks implement techniques for controlling the number of phones that can communicate at the same time.

The '751 patent specification provides that the disclosed access authorization technique "can be achieved" in GSM, UMTS, or other mobile radio wireless networks.  A mobile phone operating in these networks must transmit a request to ask permission before attempting to make/answer a phone call or otherwise send/receive data on the network.  The base station that operates in the vicinity of the mobile phone "listens" during a certain "timeslot" – called the "random access channel" or "RACH" – allocated specifically for such requests.  If too many phones were to try to transmit their requests on the RACH at the same time, the base station could become overloaded and unable to interpret any of them.  To prevent an overload, GSM, UMTS and other conventional networks establish protocols such that, in an unusual situation when users of many mobile phones seek access at the same moment, the network can control access by granting access to some phones and denying access to other phones.

**B.      The Access Authorization Algorithm Disclosed In The '751 Patent**

As described in the '751 patent, a base station in a network broadcasts "information signals" to all mobile phones operating in its vicinity.  The information signal may include "access authorization data," which is a bit stream encoded with information for mobile phones to use to determine whether they are permitted to request access to the network.  A mobile phone, referred to in the specification as either a "mobile station" or "subscriber station," that is operating in a network, receives the information signal and, if the user desires network access, it acts upon the access authorization data to determine whether it can request access or must wait for the next transmission of access authorization data.

The only structure disclosed in the '751 patent for the mobile phone is found in Figure 2, which is referred to as "a block circuit diagram of a subscriber station of the invention":



['751, 2:64-65]  This figure simply illustrates a "transmitting/receiving antenna 70" connected to a "transceiver unit 65," which, in turn, is connected to an "evaluation unit 60," which, in turn, is additionally connected to an "access authorization card 75."  [*Id.*, 5:5-9]  According to the patent, the mobile phone receives the information signals "by means of its transceiver unit 65." [*Id.*, 5:16-17]

The "access authorization data 45, 50, 55" are "transmitted along with the information signals" [*Id.*, 5:39-41], as either a 10 bit or 13 bit pattern, as shown in Figures 3a, 3b and 3c:



If a 10 bit stream is transmitted (as in Figures 3a and 3b), the first bit, "S4," is a flag that, when "0," indicates that the next three bits correspond to the "access threshold value bits S3, S2, S1, S0" [*Id.*, 5:52],  as shown in bit stream 45.[9]  When "S4" is a "1," as in bit stream 50 illustrated in Figure 3b, then there is no access threshold value provided in the 10 bit stream.  If the access authorization data are transmitted as a pattern 13 bits in length, then the resulting 13 bit stream always contains the "access threshold value," as in bit stream 55 shown in Figure 3c.  [*Id.*, 8:6-12]

In determining whether the mobile phone has access authorization, the mobile phone must determine whether the "access authorization data 45, 50, 55" transmitted with the information signals includes the access threshold value (S).  There is no description provided in

---

[9]  The remaining bits in the bit stream correspond to other data relating to whether a mobile phone can request access.

the '751 patent as to how the mobile phone separates the access authorization data from information signals or what components in the mobile phone perform this step. However this step is accomplished, the access threshold data is transmitted to the "evaluation unit 60" to determine whether the access authorization data includes an access threshold value (S). As shown in the flow diagram in Figures 4a, 4b and 4c, the evaluation unit 60 then "asks the question" whether the received bit stream is 10 bits or 13 bits, and if it is 10 bits, whether the flag bit "S4" is a "0" or "1." There is also no disclosure in the '751 patent as to what an "evaluation unit" is, or how it "asks the question." Nevertheless, upon determining an answer to this "question," the mobile phone determines that the access authorization data includes an access threshold value (S) if the bit stream is 13 bits or otherwise if the flag bit "S4" is a "0."

Upon determining that an access threshold value (S) was provided, the evaluation unit 60 draws a random number (R) and then compares it directly with the decoded access threshold value (S). If (R) is not greater than (S), then access is barred, and it must sit out and wait until the next control signal with access authorization data is transmitted to repeat the process. If (R) is greater than (S), then the algorithm proceeds to perform additional steps to determine whether access can be granted.

### C.   Claim 13 Of The '751 Patent Is Invalid Under 35 U.S.C. § 112, ¶ 2 As Indefinite

Claim 13 of the '751 patent recites:

13. A subscriber station to which an access to at least one telecommunication channel usable by a plurality of subscriber stations in common can be granted, comprising *means for receiving information signals*; *an evaluation unit (60) for asking when information signals with access authorization data means (65) as authorization data (45, 50, 55) are received, whether the access authorization data (45, 50, 55) include an access threshold value (S)* for comparison of the access threshold value (S) with a random number or a pseudo-random number I, *and for ascertaining*, as a function of an outcome of a comparison whether an access of the at least one subscriber station (5, 10, 15, 20) to the at least one telecommunications channel is enabled.

[Emphasis added]  This claim is invalid under 35 U.S.C. § 112, ¶ 2 for several reasons. First, there is no corresponding structure disclosed in the specification for the two recited means-plus-

function elements—"means for receiving" and "evaluation unit for asking . . . and ascertaining."

Second, the term "access authorization data means (65)" is insolubly ambiguous and incapable of

construction.

>    1.    **There Is Not Adequate Corresponding Structure For The "Means For Receiving" or "Evaluation Unit For Asking . . . and Ascertaining"**
>
>        a.    **"Means for receiving"**

| CLAIM TERM | HTC'S CONSTRUED FUNCTION | CORRESPONDING STRUCTURE? |
|---|---|---|
| Means for receiving information signals | digitizing a received signal (25) and parsing out access authorization data (45, 50, 55) to pass to the evaluation unit (60) | None. The structure provided and linked in the specification is insufficient to achieve the claimed function. |

Because the claimed "means for receiving information signals" is written in a "means

for" format, it is presumptively a means-plus-function claim element that is to be construed

pursuant to § 112, ¶ 6.  *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352,

1361 (Fed. Cir. 2004) ("[A] claim limitation that employs the language 'means . . . for' invokes a

rebuttable presumption that § 112, ¶ 6 applies.").  Though IPCom asserts that that this claim

element is not a "means-plus-function" element, there cannot be any serious dispute that this

claim element is written in purely functional language in that the phrase "for receiving . . ." does

not connote any physical structure.  Accordingly, the Court must attempt to determine the

claimed function and what, if any, corresponding structure is disclosed in the specification for

carrying out the claimed function. As explained below, however, the recited function is

ambiguous, and there is no corresponding structure for the function disclosed in the

specification.

For this element, the claim recites that the mobile phone includes a means for "receiving

information signals."  Thus, at issue are the respective meanings of the terms "receiving" and

"information signals" to one of ordinary skill in the art, informed by the surrounding claim

language and the '751 patent specification as intrinsic evidence.  The claim further recites that, at

least sometimes, what is received are "information signals with access authorization data means

(65) as authorization data (45, 50, 55)." This is ambiguous (as argued below), but at the least, it indicates that the information signals must themselves be distinct from access authorization data.

Adding to this confusion, the '751 patent specification refers to "information signals" inconsistently, stating that the information signals: (i) *"include* the access threshold value S" ['751, 5:17-18 (emphasis added)] but (ii) are transmitted *"along with"* the access authorization data [*Id.*, 7:47-48; 8:7-8 (emphasis added)]. The specification fails to provide any explicit definition for "information signals," nor does it disclose any technical details, such as the format of the signals, how often they are to be broadcast by the base station, what data are provided in the signals in addition to "access authorization data," or how the mobile phone determines that information signals have been transmitted.

Since the '751 patent is ambiguous as to what "information signals" are, how they are "received" is also unclear. Referring to Figure 2, the '751 patent discloses that the information signals are "receive[d]" by the transceiver unit 65, and from this, the access threshold value (S) is then "delivered to the evaluation unit 60." [*Id.*, 5:16-20] From this, one of ordinary skill in the art could deduce that part of the "receiving" function would include (i) determining when "information signals" are being broadcasted, (ii) digitizing the "information signals," and (iii) segregating the access authorization data that might contain the access threshold value (S) from the rest of the "information signals." [Rose Decl. ¶ 29] In the context of wireless communications, the term "receiving" must mean more than just energizing an antenna to "listen," it also requires processing the signal in a form such that it can be received. [*Id.*, ¶ 29]

Thus, the recited function is ambiguous. To the extent that it can be construed, however, it must mean digitizing a received signal (25) and parsing out access authorization data (45, 50, 55) to pass to the evaluation unit (60).

Yet, there is no structure explicitly disclosed in the '751 patent for accomplishing this function. The patent specification merely discloses a "transceiver unit 65" connected to an "antenna 70" ['751, 5:5-7], which, even combined, are insufficient to perform the functions of digitizing and parsing. [Rose Decl. ¶ 30] Instead, one of ordinary skill in the art would

understand Figure 2 and the accompanying description to disclose a system in which an analog signal is detected.  There is no disclosure that the "transceiver unit 65" contains digital circuitry in addition to a conventional analog transmitter and receiver.

Accordingly, the '751 patent's failure to provide adequate structure for performing the function recited in this means-plus-function element renders the claim invalid as indefinite. *Biomedino*, 490 F.3d at 952 (finding claim indefinite where there was "nothing to suggest a structure for the claimed control means"); *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298-1304 (Fed. Cir. 2005) (finding claim indefinite where the specification did not contain corresponding structure for "means for dispensing").

### b.       "Evaluation unit for asking … and ascertaining"

| CLAIM TERM | CONSTRUED FUNCTION? | CORRESPONDING STRUCTURE? |
|---|---|---|
| Evaluation unit for asking when …, whether …, and for ascertaining …. | Ambiguous as being subject to multiple potential interpretations due to grammatical errors | None. The "evaluation unit 65" disclosed in the '751 specification provides no more information than a "means for evaluating." |

Although the "evaluation unit for asking when …, whether …, and for ascertaining" is not written in a "means for" format, it is nevertheless a means-plus-function element because the limitation simply recites functional language instead of setting forth any particular structural element.  Claim elements without express means-plus-function language must be construed as means-plus-function elements if the element invokes purely functional terms, without the additional recital of specific structure or material for performing the function.  *See Mas-Hamilton Group v. La Gard, Inc.*, 156 F.3d 1206, 1213 (Fed. Cir. 1998) (finding the claim limitation "a substantially non-resilient lever moving element for moving the lever …" to be a means-plus-function element).  One of ordinary skill in the art would *not* find that "evaluation unit" has a generally understood structural meaning.  [Rose Decl. ¶ 31]  To the contrary, the term describes the "unit" by stating what it does (i.e., evaluate), rather than what it is.  Courts have routinely found such "[     ] unit" claim elements to be subject to § 112, ¶ 6.  *See, e.g., LG Elecs., Inc. v. Quanta Computer Inc.*, No. 07CV361bbc, 2008 WL 4613054, at *2 (W.D. Wis. Mar. 4, 2008)

("input unit receiving," "recording unit…recording," and "reproducing unit reproducing" should be construed under Section 112, ¶ 6 because they simply restate function); *Nova Measuring Instruments Ltd. v. Nanometrics Inc.*, No. C05-0986MMC, 2006 WL 3491010, at *2 (N.D. Cal. Dec. 1, 2006) (holding "unit for receiving and holding the wafer in a measuring position during measurements" subject to means-plus-function construction).

Because the "evaluation unit" claim element is subject to § 112, ¶ 6, the Court must determine the claimed function and the corresponding structure (if any) disclosed in the specification for carrying out that function. Here, the recited function for the "evaluation unit" is ambiguous because, due to grammatical errors in the claim, there are multiple possible interpretations, and none of which is clearly set forth in the specification as the single true meaning. In particular, the claimed phrase could be interpreted at least the following two ways:

- a unit *for asking when* "information signals with access authorization data means"[10] are received, *for also asking whether* the access authorization data include an access threshold value (S), and *for ascertaining whether, based on comparing (S) to I, an access is enabled*

- a unit for waiting until after "information signals with access authorization data means" are received before *asking whether* the access authorization data include an access threshold value (S), and *for ascertaining whether, based on comparing (S) to I, an access is enabled*

In other words, the recited language is ambiguous as to whether the "evaluation unit" is asking two questions or just one. This ambiguity affects what the required structure is because, interpreted one way, the "evaluation unit" must be structured to determine when the "information signals" have "access authorization data means" (whatever that means). Interpreted another way, the "evaluation unit" is sent only the "access authorization data," such that the "means for receiving" makes the determination as to the contents of the information signals. For at least this reason, the claim is insolubly ambiguous and therefore indefinite.

Notwithstanding the irresolvable ambiguity regarding the function of the "evaluation unit," there is no corresponding structure in the specification for the claimed "evaluation unit."

---

[10]  The ambiguity of "access authorization data means" is addressed *infra*.

As described above with reference to Figure 2, the '751 specification nowhere describes what this "black box" "evaluation unit" is, but instead merely refers to it using the same functional language as in claim 13.  ['751, 14:5-9; 21-24]  Indeed, during his deposition, Martin Hans, a co-inventor on the '751 patent, admitted that the "evaluation unit" was disclosed only through functional language and that there is no actual structure disclosed anywhere in the patent for performing this function.  [Oblon Decl. Ex. C (Deposition of Martin Hans ("Hans Depo."), Oct. 17, 2009, 88:9-19)]

One of ordinary skill in the art would find that there is no corresponding structure in the '751 patent for the "evaluation unit."  [Rose Decl. ¶ 31]  Indeed, one cannot discern from the '751 specification whether the inventors intended to accomplish the recited function (whatever it means) via a processor, hard-wired logic, a field programmable gate array, a hybrid of these options, or something else altogether.  [*Id.*, ¶ 31]  IPCom asserts that the "evaluation unit" is a "microprocessor," yet, nowhere does the specification identify the "evaluation unit" as a microprocessor or anything else.  It is not incumbent upon the person of ordinary skill in the art to imagine a possible structural arrangement for accomplishing a recited function.  *Biomedino*, 490 F.3d at 953 (proper corresponding structure inquiry is "whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether [one of skill in the art] would be capable of implementing a structure"); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003) (correct inquiry looks at whether one of skill in the art would have understood the patent disclosure to encompass corresponding structure, not whether one of skill in the art would have been able to devise such structure).  Furthermore, under these circumstances, one cannot determine the reasonable scope of equivalents as required under 35 U.S.C. § 112, ¶ 6.

Accordingly, for this second basis, claim 13 is invalid.

### 2.    The Term "Access Authorization Data Means" Is Ambiguous

| CLAIM TERM | CAPABLE OF CONSTRUCTION? |
|---|---|
| An evaluation unit (60) for asking when information signals with access authorization data means (65) as authorization data (45, 50, 55) are received…. | None.    The term "authorization data means (65)" cannot be construed, rendering the claimed phrase as a whole indefinite. |

As referenced above, claim 13 recites "an evaluation unit (60) for asking when information signals with <u>access authorization data</u> means (65) as authorization data (45, 50, 55) are received…."  The term "access authorization data means (65)" is ambiguous and the phrase in which it is recited cannot be parsed, rendering claim 13 invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2.

The term "access authorization data means (65)" is inherently ambiguous.[11]  The term refers to reference number (65), which corresponds to the "transceiver unit." ['751, 5:5-15]  But, there is no "access authorization data means" disclosed in the '751 specification, and in particular, the specification fails to provide any disclosure as to how the mobile phone determines whether information signals that are detected include access authorization data (45, 50, 55).  [Rose Decl. ¶ 32]  Further, the claim recites "access authorization data means (65) *as authorization data (45, 50, 55)*," which appears to indicate that the "access authorization data means" might not be a structural component at all, but rather, it might be a data format.  [*Id.*, ¶ 33]  Simply stated, this term could only leave one of ordinary skill in the art to speculate as to its intended meaning and scope.  [*Id.*, ¶ 33]  It is accordingly invalid for indefiniteness.  *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250-51 (Fed. Cir. 2008) (finding claim term "fragile gel" indefinite because one of skill in the art could not translate the term into meaningfully precise claim scope); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) ("A claim is indefinite if, when read in light of the specification, it does

---

[11]  The inclusion of the word "means" in the term "access authorization data means (65)" raises ambiguity as to whether the patentee intended to invoke 35 U.S.C. § 112, ¶ 6 as a means-plus-function element.  *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000) ("Use of the term 'means' in a claim limitation creates a presumption that section 112, paragraph 6 has been invoked.").  If this is a means-plus-function element, it is indefinite, since it would not be possible to discern the corresponding structure in the '751 specification.

not reasonably apprise those skilled in the art of the scope of the invention."); *Girafa.com, Inc. v. IAC Search & Media, Inc.*, No. CIV07-787SLR, 2009 WL 3074712, at *2 (D. Del. Sept. 25, 2009) (finding term "the home page" indefinite because it was undefined in the specification and lacked an objective anchor).

Secondly, attempting to reconcile this term in context with the surrounding claimed phrase fares no better.  It is unclear if the phrase requires that the evaluation unit determine whether the time has arrived when (i) information signals *containing* "access authorization data means" are received or (ii) information signals *transmitted alongside* "access authorization data" are received.  This ambiguity is similarly found in the '751 specification, as discussed *supra*. Additionally, it is also unclear whether the "evaluation unit" must itself determine if access authorization data are with the information signals, or whether that responsibility is borne by the "means for receiving information signals" or some other structure – such as the "access authorization data means."

Because the term and the surrounding phrase are wholly indefinite and the '751 specification fails to cure the ambiguity, claim 13 is rendered indefinite for indefiniteness under 35 U.S.C. § 112, ¶ 2.

> **D.  To The Extent That Claim 13 Can Be Understood, It Should Be Construed In Context With The Invention Disclosed In The Specification**

> **1.  "Access threshold value (S)"**

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
|---|---|
| Access threshold value (S) | A numerical value optionally included in access authorization data that is transmitted at periodic intervals for controlling network access.  If a mobile phone determines that the numerical value was transmitted, it will directly compare the value with a random/pseudo-random numerical value generated within the mobile phone to determine whether it can gain access rights or must wait until access authorization data are transmitted again. |

In construing a claim term, one should start with the claim language itself in context with the surrounding terms and phrases so as to understand how the term is relevant to the claimed

invention.  *Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").   The term "access threshold value (S)" is recited several times in claim 13.  One recited function of the "evaluation unit (60)" is for "asking … whether the access authorization data (45, 50, 55) include an *access threshold value (S)*."  The claim further recites that, if this value is present, it was provided "for comparison of the *access threshold value (S)* with a random number or a pseudo-random number (R)."  Another recited function is for "ascertaining, as a function of an outcome of a comparison whether an access … is enabled."   Accordingly, claim 13 provides that the access threshold value:  (i) may or may not be included in the access authorization data; (ii) if it is included,  the access threshold value (S) is compared with the random number (R); and (iii) that comparison of (S) and (R) is performed for the purposes of determining whether the mobile phone can obtain network access or must wait until the next threshold value (S) is broadcast.

The specification for the '751 patent defines the term "access threshold value" and describes its purpose and how it is used within the mobile phones to control the number of mobile phones that request network access during some given period of time:

> Depending on the current incidence of message traffic in the telecommunications network, the access threshold value S can be set higher or lower, that is, can be changed or adapted.

> Before each access to the RACH 30 by the first mobile station 5, the evaluation unit 60 draws a random or pseudo-random number R and asks whether the random or pseudo-random number R is at least as great as the access threshold value S.  Only then is an access to the r30 allowed.

['751, 5:20-25, 56-59]  If access is not allowed, then the mobile phone must wait for the next bit pattern to be transmitted over the network to test for permission to request network access:

> After the end of the program, the mobile station informs the user that the access to the r30 was not possible, and waits for further inputs from the user.  Alternatively, by means of a waiting loop embodied in the mobile station, the program is executed over again, so there is a wait for the next information signal with the

next bit pattern, and the information signal is then evaluated to ascertain the ab to the r30.

[*Id.*, 10:3-10]

The specification further describes that the "access authorization data" are broadcast at predetermined times, but depending upon network traffic, the access threshold value (S) may be changed or otherwise might not be included at all in the access authorization data:

> The information signals are transmitted from the base station 100 to the mobile station 5, 10, 15, 20 are predetermined times, preferably at regular intervals. The network operator can, by the method described, either permit or block access to the RACH as a function of the incidence of message traffic in the telecommunications network and thus as a function of an expected utilization of the r30 for the individual mobile stations 5, 10, 15, 20. Since the incidence of message traffic in the telecommunications network varies over time, the expected utilization of the r30 also varies over time, so that by means of the correspondingly changed bit pattern allocation, access to the RACH is as a rule allocated to the various mobile stations 5, 10, 15, 20 at different times.

[*Id.*, 10:11-23]

Accordingly, HTC's proposed construction is in proper context with its surrounding claim language – to the extent that it can be interpreted. Furthermore, it is consistent with the description in the specification, which defines the term. In contrast, IPCom's proposed construction omits key attributes of the "access threshold value." Namely, IPCom's proposed definition fails to describe that an access threshold value is (i) selectively included in access authorization data, (ii) broadcasted over the network, and (iii) compared with random number (R), and that (iv) the mobile phone has to make a determination as to whether the access threshold value is included in the access authorization data. These parameters are necessary for defining the term in proper context.

2.    **"Access authorization data (45, 50, 55)"**

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
|---|---|
| Access authorization data (45, 50, 55) | Bit patterns (45, 50, 55) which may include an access threshold value or alternatively different information from which the mobile station can determine whether it has access rights or must wait until access authorization data are transmitted again. |

The term "access authorization data (45, 50, 55)" is recited twice[12] in claim 13.  The first instance – "asking when information signals with access authorization data means (65) as authorization data (45, 50, 55) are received" – is insolubly ambiguous, as discussed *supra*.  The second instance – "asking…whether the access authorization data (45, 50, 55) include an access threshold value (S)" – indicates two critical attributes of access authorization data.  First, it may or may not include an access threshold value (S).  Second, the mobile phone includes a component for asking whether, on any given instance when access authorization data were received, the access authorization data include the access threshold value.

The "access authorization data (45, 50, 55)" is not a term of art that would otherwise be generally known to one of ordinary skill in the art at the time of the invention.  [Rose Decl. ¶ 35]  Instead, the specification defines the term by describing three bit streams 45, 50, 55 with reference to Figures 3a, 3b, 3c.  The '751 specification defines each of the bits, but the key attribute in the context of the claimed invention is that the bit stream may include the access threshold value (shown in bit streams 45 and 55) or may not (as evidenced in bit stream 50), and an algorithm is devised for determining whether or not the access authorization data include the access threshold value (S).  ['751, 8:64-9:67; Figs. 4a, 4b, 4c]

As described above, the '751 specification discloses that the access authorization data are transmitted periodically.  If, as a result of the algorithm for determining whether access to the RACH is granted, the mobile station is barred from accessing the network, it must wait until the next instance when the access authorization data is transmitted.  [*Id.*, 10:3-10]

---

[12]  In one instance, the term is recited as "authorization data (45, 50, 55)."

Once again, HTC's proposed construction is in proper context with the surrounding claim language and is consistent with the description in the specification that serves to define the term. IPCom's proposed construction is far more detailed and limiting in some aspects, but it is glaringly inconsistent with both the claim language and the specification concerning the key attribute upon which the claimed invention is based. Specifically, IPCom's construction states that the access threshold value *is always included in the access authorization data.* But, the claim and specification both provide that the access authorization data *may* include an access threshold value (S) or alternatively, different information from which the mobile phone can determine whether it has access rights. [*Id.*, claim 13 ("an evaluation unit for asking . . . whether the access authorization data . . . includes an access threshold value"); 14:20-32] As HTC's definition is the only one that is consistent with the intrinsic evidence, it should be adopted. *Phillips*, 415 F.3d at 1316.

3. **"Ascertaining, as a function of an outcome of a comparison whether an access of the at least one subscriber station (5, 10, 15, 20) to the at least one telecommunications channel is enabled"**

| CLAIM TERM | HTC'S PROPOSED CONSTRUCTION |
|---|---|
| "Ascertaining, as a function of an outcome of a comparison whether an access of the at least one subscriber station (5, 10, 15, 20) to the at least one telecommunications channel is enabled" | Comparing (S) to (R) to determine whether access to the common channel is allowed, or whether the subscriber station must wait for and check the next transmission of access authorization data. |

The claimed phrase for "ascertaining" is the recited function for the "evaluation unit" means-plus-function element that explains the overall purpose for asking whether the access threshold value (S) was transmitted and for performing the comparison with the random number (R). As set forth *supra*, if a mobile phone desires to request network access, it waits for the next time that access authorization data are detected and performs a test to determine whether it can gain access now or must otherwise wait and try again when the access authorization data are transmitted again.

HTC's proposed construction properly comports with the claim language itself, in proper context with the relevant disclosure in the '751 specification. IPCom's proposed construction,

improperly injects that a "microprocessor" performs the recited function.[13]   As co-inventor Martin Hans admitted, there is no support at all in the specification for a microprocessor.  [Oblon Decl. Ex. C (Hans Depo., 88:9-19)]  One of ordinary skill in the art would not assume that there must be a microprocessor in the mobile phone to perform this function.

## VII.   UNITED STATES PATENT NO. 5,390,216

### A.   Technical Overview

To operate on the wireless telephone (cellular) network, mobile phones must "synchronize" to the "frequency" and "frame timing" of the control signals transmitted by the cellular tower.  [Ex. 2 to Appendix to Exhibits to Opening Claim Construction Briefs (hereinafter "'216")].  Much like tuning a radio, a mobile phone tunes its receiver to the frequency of the transmitted signal.  A mobile phone must also adjust according to the timing of the cellular tower (or "base station") in order to decode the signals being transmitted over the air.

The GSM standard is one of the two wireless telecommunications technologies used in wireless telephone networks operating in the United States (presently, AT&T Wireless and T-Mobile operate on third-generation GSM technology).   Among many other details, the GSM standard sets forth a protocol for what control signals are to be transmitted by the base station (and when) for mobile phones to use for synchronizing with the base station.  Pre-release GSM standards documents were published before the priority date for the '216 patent in 1991, and some of these documents are explained in the background section of the '216 specification.  The '216 patent pertains to a method to be utilized by a mobile phone operating in a GSM network.

The purported invention of the '216 patent is directed to a particular method for using the control signal transmitted by a cell tower in a GSM network to perform synchronization. Because a mobile phone's computing capabilities were fairly primitive in the late 1980's/early

---

[13]  IPCom also improperly injects a microprocessor into the definition of the "random number or a pseudo-random number (R)."  Accordingly, HTC also asserts that IPCom's proposed definition for this term is disfavored as well.

1990's, the '216 patent particularly concerns a technique for a mobile phone to synchronize in a GSM without requiring circuitry for complex computations.  [*See* Rose Decl. ¶ 39]

### 1.    Synchronization Under the GSM Standard

GSM technology enables multiple users to transmit and receive information on a same "frequency channel" via a system known as "time division multiple access" or "TDMA."  Under a TDMA system, all signals are transmitted as "frames" of information, with each frame subdivided into 8 "timeslots."  To send data over the wireless connection, a transmitting device (i.e., a base station or a mobile device) uses an assigned timeslot to transmit a "burst."  That is, a "burst" is a transmission of information that lasts for an entire timeslot within a frame.

In the GSM standard, "bursts" that are sent by base stations may contain information that a mobile phone can use for synchronization.  Particularly, there are "frequency correction bursts," "synchronization bursts" and "normal bursts."  Each of these bursts contains a different bit pattern that a mobile phone can use for adjusting its internal clocks to synchronize with the base station.  A "frequency correction burst" does not contain any data – it is a control signal that the base station transmits solely for purposes of synchronization.  On the other hand, the "synchronization bursts" and "normal bursts," however, combine encrypted data with "training sequences" in the middle of the "bursts," which a mobile phone might use for synchronization.

Figure 1 of the '216 patent illustrates the relationship between a "frame" and a "timeslot," as well as the makeup of three different bursts that can be used for synchronization:



Fig.1

The GSM standard additionally defines a number of counters, namely "QN," "BN," "TN," and "FN" that can be used in the mobile phone for making timing adjustments between the mobile phone and the base station. Like a stopwatch that tracks elapsed time by the hour, minute, second, and the hundredth of a second, the counters each increment at a different interval. These timing adjustments are for enabling the mobile phone to detect the base station's frame timing – that is, when each new frame begins and when each timeslot begins within a frame. The GSM specification contemplates that the base station and the mobile station will both maintain these counters and use them to synchronize the bit timing of their communications by using the transmitted "bursts." [*See* Rose Decl. ¶ 38]

**2.      Phase Angle-Based Synchronization Method Of The '216 Patent**

The object of the '216 invention was to provide a method to synchronize "with the least possible technical complication and expense," *without* having to include in the mobile phone the counters that had been specified in the GSM standard. ['216, 3:5-8] The '216 patent discloses a "more economical" synchronization technique "based on the evaluation of a continuously running phase angle." [*Id.*, 3:9-30] In particular, the '216 explicitly refers to a draft GSM

recommendation document concerning synchronization, known as "GSM rec 05.10," and contrasts it with the '216 invention by explaining that the "phase angle" approach of the '216 patent is a more economical way to synchronize than by maintaining mobile phone time counters described in the GSM recommendation document.  [*Id.*, 8:46-67]

The details of the "phase angle-based" synchronization technique of the '216 patent are difficult to understand, especially from the rather cryptic, incomplete discussion provided in the '216 specification.   Basically, however, the technique can be understood by an analogy.  Consider a spinning wheel having one spoke painted a different color than all other spokes.   If the wheel is spun at one rotation per second, and you attempt to take a picture of the wheel only once per second, then the pictures should show the painted spoke at approximately the same rotational position each time.   However, whenever you are a little early or late in taking the picture, then the rotational position of the painted spoke during the instant that you take the picture will differ.   Based upon that, you can adjust your own timing to attempt to stay consistent.  The patent refers to, for example, a "corrected phase course" by considering a "phase difference of $\pi/2$" in "calculated phase angles in the region from 0 to $2\pi$."   [*Id.*, 6:4-8] Essentially, this pertains to the rotating angle (or phase) of a circle between 0 and 360° ($2\pi$).

The synchronization method disclosed in the '216 patent involves correcting the mobile phone's internal clock frequency and bit timing based on the "continuous evaluation of the phase angle of the received signal at many times per bit interval."   [*See id.*, 3:47-51]  The purported invention applies its "phase angle analysis" during three types of synchronization that are performed using three respective types of bursts defined by the GSM standards.   Each of the three types of synchronization are recited in the claims are described below.

## B.      Construction of '216 Patent Claim Terms

Claim 1, the only independent claim of the '216 patent, reads as follows:

1. A method of synchronizing a mobile radiotelephone in a cellular digital mobile radiotelephone network comprising a plurality of fixed radiotelephone stations and a plurality of mobile radio stations operating in accordance with a GSM standard or its equivalent, in which each communication frequency assignment is

subdivided into interleaved time slots, a plurality of said time slots together comprising a frame, comprising the following steps which are carried out in the mobile radiotelephone:

(1) conducting an initial synchronization by means of a frequency correction burst substantially fully occupying a time slot with an unmodulated wave corresponding to repetition of bits of the same binary logic value;

(2) maintaining normal synchronization during communication by means of interspersed normal synchronization bursts, each normal synchronization burst containing a training sequence occupying less than a third of a time slot, and

(3) performing extended synchronization during communication as a background procedure by means of interspersed frequency synchronization bursts, each frequency synchronization burst containing an extended training sequence occupying less than an entire time slot and more than a third of a time slot, and wherein:

said step of conducting said initial synchronization comprises the substeps of:

   (1.1) conducting a coarse frequency synchronization,

   (1.2) conducting a coarse frame synchronization over a plurality of said time slots which comprise a frame,

   (1.3) conducting a fine frequency synchronization, and

   (1.4) conducting a fine frame synchronization over said plurality of time slots which comprise a frame;

said step of maintaining said normal synchronization comprises the substeps of:

   (2.1) conducting a frame synchronization with fine frequency synchronization, and

   (2.2) carrying out preliminary data signal processing; and

said step of performing said extended synchronization comprises the substeps of:

   (3.1) conducting a coarse frame synchronization, and

   (3.2) conducting a fine frame synchronization with fine frequency synchronization.

### C.      Steps-plus-Function Limitations: (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2)

As a preliminary matter, HTC maintains that substeps (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) of claim 1 should be treated as steps-plus-function limitations under 35 U.S.C. § 112, ¶ 6.

Analogous to a "means-plus-function" limitation in an apparatus claim, pursuant to 35 U.S.C. § 112, ¶ 6, a method claim may include a step for performing a specified function without the recital of acts in support thereof, and such claim shall be construed to cover the corresponding acts described in the specification and equivalents thereof. When a method claim describes a function, but not the acts required to perform that function, § 112, ¶ 6 applies. *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). Acts are defined as "the implementation of" steps. *Id.* The distinction between function and act has been described as follows: "the 'underlying function' of a method claim element corresponds to *what* that element ultimately accomplishes in relationship to what the other elements of the claims and the claim as a whole accomplish. 'Acts,' on the other hand, correspond to *how* the function is accomplished." *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 849-50 (Fed. Cir. 1999).

Here, substeps (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) of claim 1 have the same basic structure and all contain the phrase: "conducting … synchronization." For example, sub step (1.1) claims "conducting a coarse frequency synchronization," which claims a function to be achieved, coarse frequency synchronization, without claiming the acts that implement that function. "Conducting … synchronization" expresses merely the "underlying function" of the substeps of method claim 1. But claim 1 fails to describe how to accomplish the function. In other words, substeps (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) of claim 1 each tells us **what** to accomplish—some variety of synchronization—but fail to claim **how** to accomplish the function. *See Altech Controls Corp. v. E.I.L. Instruments, Inc.*, No. CIV. A. H-92-3189, 1997 WL 579179, at *11 (S.D. Tex. June 6, 1997) ("selectively energizing and deenergizing" discloses function linked to a step and fails to recite acts that achieve the designated function); *see also Cummins-Allison Corp. v. Glory Ltd.*, No. 02 C 7008, 2003 WL 355470, at *12-*14 (N.D. Ill. Feb. 12,

2003) (determining that a step of "automatically denominating" is a steps-plus-function limitation because it would require "multiple acts to achieve the end results").  Accordingly, § 112, ¶ 6 applies, and the proper construction of substeps (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) of claim 1 depends on what acts were disclosed in the '216 specification for accomplishing the recited function.

As a consequence, claim 1 is invalid for failing to meet the requirements of 35 U.S.C. § 112, ¶ 6.  The specification fails to disclose corresponding acts or steps to achieve the functions claimed in substeps (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) of claim 1.  The specification fails to provide any flow diagrams for how to achieve synchronization.  The specification fails to provide details regarding specific acts to be performed to achieve the functions.  Moreover, the specification fails to link any specific acts to each claimed function.  For example, with respect to step (1.1), the specification states that a first frequency estimation result is produced, and carrier frequency is tuned, but fails to disclose *how*.  ['216, 4:30-39]  With respect to step (1.4) for example, the specification fails to disclose any acts for performing fine frame synchronization based on analysis of a frequency correction burst 12.  [*Id.*, 7:19-41 (disclosing fine frame determination based on analysis of frequency synchronization burst 13, rather then frequency correction burst 12, as claimed)]  With respect to step (2.2), for example, the specification discloses a "frequency correction value produced by the central control unit 31," but fails to disclose how this value is produced.  [*Id.*, 7:62-28]  With respect to steps (3.1) and (3.2), for example, the specification discloses that the acts for achieving these functions correspond to those designated 1.2, 1.3, 1.4, and 2.1.  But steps (3.1) and (3.2) analyze a neighbor's synchronization burst, rather than the frequency correction bursts 12 (1.2, 1.3, 1.4) or normal bursts 14 (2.1).  Claim 1, and the claims that depend from it should thus be deemed invalid.

In addition, not even the functions claimed in substeps (1.1), (1.2), (1.3), (1.4), (2.1), (3.1), (3.2) of claim 1 are set forth with particularity.  The claimed function is merely to "conduct coarse/fine frame/frequency synchronization."  But without providing more detail, a person of

ordinary skill can not determine what is meant by "gross" and "fine," or the scope of the claim. These substeps should also be deemed invalid for failing to meet the requirements of § 112, ¶ 6.

### D.   Construction of '216 Patent Claim Terms

The preamble and steps 1-3 of claim 1 define the overall process discussed above.

### 1.   "Synchronizing"

| Term | Proposed Construction |
| --- | --- |
| synchronizing | Tuning the frequency and frame timing of the mobile device to be in line with the base station by evaluating phase angles of a received signal many times per bit interval |

In construing a claim term, one should start with the claim language itself in context with the surrounding terms and phrases so as to understand how the term is relevant to the claimed invention. *Phillips*, 415 F.3d at 1314. The term "synchronizing" is recited in the preamble of claim 1, followed by approximately 10 references to steps and "sub-steps" for performing "synchronization." The claim language itself pertains to a method of synchronization technique for mobile phones operating in a GSM environment, to be performed by means of the three particular kinds of "bursts" transmitted by a base station that are contemplated by the GSM standard for use in synchronization.

The claim is next read in view of the '216 specification to discern whether any particular meaning was ascribed for the term. *Id.*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (citation omitted). Here, the written description uses language that clearly limits the claimed method of "synchronizing" to a process involving the evaluation of phase angles. On several occasions, the '216 specification refers to the evaluation of phase angles for performing synchronization as "the invention":

> "*The synchronization method of the invention* is based on the evaluation of a continuously running phase angle, which is calculated again and again from an in-phase component I and a quadrature component Q."

> "*The method of the invention* is based on evaluation of phase angle many times per bit interval. An evaluation is calculated from each of the individual I, Q value pair samples."

['216, 3:9-12; 3:48-51 (emphasis added)]   Furthermore, there is no indication in the '216 specification that the evaluation of a continuously running phase angle is merely a preferred embodiment. To the contrary, this was the only embodiment disclosed[14] or illustrated. [Rose Decl. ¶ 40]

IPCom's proposed construction fails to clarify the ambiguity or otherwise assign an objective meaning to "synchronization." First, the phrase "bringing . . . in step" is itself ambiguous and does not objectively disclose what particular steps are to be taken. [*Id.*, ¶ 41] Second, the term "operation" is vague and fails to disclose objectively what aspects of operation are being brought into step. IPCom's proposed construction therefore amplifies the ambiguity of the claim term.

Moreover, IPCom's proposed construction improperly seeks to reclaim what was specifically disclaimed by the '216 patent. In particular, the object of the '216 invention is to synchronize with the "least possible technical complication and expense." ['216, 3:5-8] The '216 patent expressly disclaims the more expensive synchronization "by means of maintaining mobile time base counters as recommended by GSM rec 05.10." [*Id.*, 8:38-47] IPCom's proposed construction would recapture this disclaimed method.

Accordingly, the proper construction of the term "synchronizing" is tuning the frequency and frame timing of the mobile device to be in line with the base station by evaluating phase angles of a received signal many times per bit interval. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006) (limiting the scope of the term "fuel injection

---

[14]  To the extent that the Court believes that reference to extrinsic evidence would help to further clarify the meaning of "continuously evaluating phase angles of a received signal," HTC refers the Court to a paper by John Costas, entitled "Synchronous Communications," published in 1956. [Oblon Decl. Ex. D]

component" to a "fuel filter" because that was how the "invention" was described as the sole embodiment in the patent specification).

>    2.    **"Conducting an initial synchronization by means of a frequency correction burst"**

| Term | HTC Construction |
|------|------------------|
| conducting an initial synchronization by means of a frequency correction burst | Having selected a carrier frequency, synchronizing during initial connection by performing the claimed steps (1.1), (1.2), (1.3), and (1.4) on frequency correction burst 12 |

Claim 1 of the '216 patent recites a method for synchronization comprising three steps, with each step having a set of sub-steps. The first recited step is for "conducting an initial synchronization by means of a frequency correction burst . . . ." This step explicitly includes four sub-steps, recited as (1.1), (1.2), (1.3) and (1.4).

The term "initial synchronization" is not a well-established term of art that would have a consistent definition to one of ordinary skill in the art at the time of the invention. [Rose Decl. ¶ 42] The term "initial synchronization" was used in a draft of GSM 05.10, from May 1987 at page 6, to refer to steps that occur *after* the mobile phone has selected a carrier frequency of a base station, but before it can begin data communications via that base station. [GSM 05.10, May 1987, at 6; Oblon Decl. Ex. E] One of ordinary skill in the art at the time of the invention would consider the plain and ordinary meaning of the term "initial synchronization" to concern the steps of synchronizing to a selected[15] frequency of a selected base station before the mobile phone can begin data communications over the network. [Rose Decl. ¶ 42]

Turning to the '216 specification, no definition is provided for this term. [*Id.*, ¶ 42] However, the first sub-step for "initial synchronization" disclosed in the patent occurs "after the detection of a carrier frequency by means of the high frequency reception portion 21 of the radio receiver." ['216, 5:32-36] There is *no* disclosure that the step of "initial synchronization" would include any steps prior to the carrier frequency having been selected.

---

[15] Selecting the carrier frequency is a choice made by the mobile phones, it is not a tuning operation. [Rose Decl. ¶¶ 42, 43]

Additionally, according to the plain and ordinary meaning of the phrase as recited in claim 1, the step of "conducting an initial synchronization" must be performed as a result of a "frequency correction burst."  That is, the claim specifically recites which of the bursts is to be used for performing recited sub-steps (1.1), (1.2), (1.3) and (1.4).  The four sub-steps are also explicitly numbered, with corresponding headers, in the '216 specification as corresponding to the step of initial synchronization.  [*Id.*, 5:25-29]

HTC's proposed construction comports with the plain and ordinary meaning of the phrase, taken in the proper context with the specification.  IPCom's proposed definition, however, omits the explicitly recited substeps and only confuses the issue concerning the meaning of "initial synchronization."

### 3. "(1.1) Conducting a coarse frequency synchronization"

| Term | HTC Construction |
|------|------------------|
| (1.1) conducting a coarse frequency synchronization | using the selected carrier frequency as a starting point, adjusting the mobile device's frequency to within a tolerance of a reference phase angle |

The phrase "conducting a coarse frequency synchronization" is not a term of art that one of ordinary skill in the art at the time of the invention would be aware.  [Rose Decl. ¶ 45]  Claim terms such as "coarse" or "fine" are inherently vague, requiring one of ordinary skill in the art to resort to the specification to evaluate the term in proper context.

The '216 specification discloses that, using a preselected carrier frequency, the step is performed by evaluating whether a estimation lies within or outside of a tolerance region TR of a reference phase angle.  The claim limitation is directed to a "coarse" measurement because a successful result can comprise a phase angle that falls within a desired tolerance.  ['216, 5:30-47]

During prosecution of the European counterpart patent application to the '216 patent, the examiner rejected the claim because "gross" and "fine" were unclear.  In response, the patentee

amended claim step (1.1) to replace "gross" with "whether the frequency of the rendered carrier lies within a band of tolerance."[16]  [*See* Oblon Decl. Exs. F-G]

IPCom's proposed construction is at least as ambiguous as the term being construed, and blurs scope to improperly encompass what was expressly disclaimed.

### 4. "(1.2) Conducting a coarse frame synchronization over a plurality of said time slots which comprise a frame"

| Term | HTC Construction |
|---|---|
| (1.2) conducting a coarse frame synchronization over a plurality of said time slots which comprise a frame | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2. <br><br> In the alternative, using the phase angle of a frame of multiple frequency correction bursts to adjust the mobile device's frame timing to within a coarse precision. |

This claim limitation is incapable of construction for failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2.  In particular, the terms "a plurality," "said time slots," and "a frame" appear earlier in the claim.  It is not possible to determine whether this limitation refers to the same or different plurality, time slots, and frame.

Alternatively, if one were to assume a proper antecedent basis for these terms, HTC's alternative proposed construction follows from the plain language of the claim in proper context with the disclosure in the '216 specification.  As recited in the claim itself, the coarse frame synchronization is to be conducted "over a plurality of said time slots" – that is, utilizing frequency correction bursts 12.  Resorting to the specification for context as to the meaning of "coarse frame synchronization," the '216 patent discloses a method for utilizing the "corrected phase course of the received frequency correction burst 12" for determining the beginning of a transmitted frame.  ['216, Fig. 5; 6:12-14]  With reference to Figure 5, the patent discloses a

---

[16] *See Tanabe Seiyaku, Co. v. Int'l Trade Comm'n*, 109 F.3d 726, 733 (Fed. Cir. 1997) (finding consideration of representations to foreign patent offices relevant in evaluating infringement under the doctrine of equivalents); *Shire Labs., Inc. v. Corepharma, LLC*, No. CIV. A. 06-22666 SRC, 2008 WL 819996, at *8 (D.N.J. Mar. 26, 2008) (considering admissions to the EPO as probative evidence during claim construction); *Infosint, S.A. v. H. Lundbeck A/S*, 603 F. Supp. 2d 748, 758 (S.D. N.Y. 2009) (ruling magistrate did not err in looking to construction of claim term given in an EPO proceeding as confirmatory evidence of claim construction).

technique in which, for successive values, it performs a progressive correction based upon a "steadily rising phase of the burst" to detect when the burst begins.

### 5. "(1.3) Conducting a fine frequency synchronization"

| Term | HTC Construction |
|------|------------------|
| (1.3) conducting a fine frequency synchronization | having determined the frame beginning, adjusting the mobile device's frequency to within a fine precision of the phase angle of the received signal |

The phrase "fine frequency synchronization " is not a term of art that one of ordinary skill in the art at the time of the invention would be aware.  [Rose Decl. ¶ 46]  As with the term "coarse" discussed *supra*, the term "fine" is inherently vague, requiring resort to the specification to evaluate the term in proper context.

The '216 specification discloses that the "fine frequency synchronization step" is to occur "after a successful determination of the beginning of a frame." ['216, 6:60-65]  To perform this step, the mobile phone utilizes the "continual phase course" of a frequency correction burst and determines the difference between a reference phase value and the actual received phase value. [*Id.*, 4:36-42; 6:60 – 7:12]  From this description, one of ordinary skill in the art at the time of the invention would understand the recited step to mean, having already determined the frame beginning, adjusting the mobile device's frequency to within a fine precision of the phase angle of the received signal.

It should be noted that IPCom's proposed construction is improper as inconsistent with the intrinsic record set forth in the '216 specification.  Neither the claim language nor the specification supports the addition of the phrase "such as by producing a frequency offset parameter."

6.    **"(1.4) Conducting a fine frame synchronization over said plurality of time slots which comprise a frame"**

| Term | HTC Construction |
|------|------------------|
| (1.4) conducting a fine frame synchronization over said plurality of time slots which comprise a frame | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, using the phase angle of the frame used in step (1.2) to adjust the mobile device's frame timing to within a fine precision. |

This claim limitation is incapable of construction for failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2.  As discussed *supra* in relation to the "coarse frame synchronization," the terms "said plurality," "time slots," and "a frame" appear in multiple places earlier in the claim.  It is not possible to determine whether this limitation refers to any of the earlier-mentioned plurality, time slots, and frame.

Furthermore, the specification does not describe this step and thus offers no help in construing it.  The specification provides that fine frame determination takes place by the recognition and evaluation of the training sequence in the synchronization burst 13.  But the claim requires that this step be conducted on a frequency correction burst, which does not contain a training sequence.

HTC's alternative proposed construction follows from the plain language of the claim, which calls for synchronizing based on analysis of a frame containing multiple frequency correction bursts.  Step (1.4) refers to the same frame used in step (1.2) because it claims to use "*said* plurality of time slots."  Because the specification fails to provide any guidance, HTC's alternative proposal is that Step (1.4) entails phase angle analysis of a frequency correction burst 12 to attain fine-precision frame synchronization.

7.    **"Maintaining normal synchronization during communication by means of interspersed normal synchronization bursts"**

| Term | HTC Construction |
|------|------------------|
| maintaining normal synchronization during communication by means of interspersed normal synchronization bursts | during a communication in progress, synchronizing by performing the claimed steps (2.1) and (2.2) on normal burst 14 |

The second claimed step is directed to performing "normal synchronization during communication by means interspersed normal synchronization bursts."  The recited burst directly corresponds to "normal bursts" known in the GSM standard.

The term "normal synchronization" itself is not a term of art, but the claim further recites that this occurs "during communication" and that it encompasses sub-steps (2.1) and (2.2).  The '216 specification explicitly defines "normal synchronization" to occur "during operation of the receiver" and similarly recites the names of the two sub-steps.  ['216, 7:43-48]  Accordingly, one of ordinary skill in the art at the time of the invention would understand "normal synchronization" to constitute synchronizing (as that term as been defined *supra*) that occurs during communication, by performing substeps (2.1) and (2.2).

### 8. "(2.1) Conducting a frame synchronization with fine frequency synchronization"

| Term | HTC Construction |
|---|---|
| (2.1) conducting a frame synchronization with fine frequency synchronization | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, using the phase angle of the received signal to simultaneously adjust the mobile device's frame timing and frequency. |

This claim limitation is incapable of construction for failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2.  In particular, it is ambiguous whether the term "frame synchronization" refers to "coarse" or "fine" synchronization.  *See Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1339-40 (Fed. Cir. 2003) (finding term "melting point elevation" insolubly ambiguous where four methods of measuring "melting point elevation" were possible and there was no guidance for determining which method(s) were covered by the claims).  Since the '216 patent ascribed a different meaning to "coarse frame synchronization" and "fine frame synchronization," both in previously-recited claim phrases and in the specification, one of ordinary skill in the art at the time of the invention would not be able to discern what actions are to be performed in connection with this step.  [Rose Decl. ¶ 47]  Furthermore, the section of the '216 specification that specifically addresses "frame synchronization" during "normal

synchronization" provides no indication whether this activity relates to what was disclosed in sub-steps (1.2) and (1.4), or an entirely different procedure.  The specification provides no flow diagram or any illustration at all relevant to this sub-step.

To the extent that the claimed step is intelligible at all, one of ordinary skill in the art at the time of the invention would understand the term "with" in the context of the claim means "simultaneously."   This is consistent with the dictionary definition of "with," meaning "1. . . . accompanying," or "13. At the same time as."  [*See* American Heritage Dictionary 2050 (3d ed. 1992) (Oblon Decl. Ex. H)]  This definition is also consistent with the '216 specification, which addresses "frame synchronization with fine synchronization" as a single step.   Thus, whatever "frame synchronization" is, it occurs simultaneously with fine frequency synchronization.

### 9.    "(2.2) Carrying out preliminary data signal processing"

| Term | HTC Construction |
| --- | --- |
| (2.2) carrying out preliminary data signal processing | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, analyzing the actual (current) frequency to supply a frequency correction value to the synchronization processor that, when applied to the mobile device's internal frequency, eliminates any frequency shifts exceeding 200 Hz. |

This claim limitation is also incapable of construction for failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2.  In particular, the term "carrying out preliminary data signal processing" does not have any known meaning in the industry and is incapable of conveying objective indicia of claim scope.  [Rose Decl. ¶ 48]  The specification fails to clarify the steps to be taken in performing this claimed method step.[17]  The '216 specification simply refers to "this preprocessing of the data signal," without identifying what the pre-processing is.  Reciting essentially the same language in the specification and claim about "preprocessing" without any

---

[17]  As with many of the '216 claim limitations that are incapable of construction or otherwise fail to satisfy the requirements of 35 U.S.C. § 112, ¶ 2, this claim limitation is the subject of HTC's concurrent motion for summary judgment of invalidity of the '216 patent.

accompanying description of what and how such a step is to be performed renders this claimed phrase insolubly ambiguous.

IPCom's proposed construction should be rejected for failing to assign an objective value to this claim limitation.  IPCom's construction is also logically flawed as circular, insofar as the proposed construction repeats part of the term being construed, "preprocessing," without assigning any objective meaning to that word.  Similarly, IPCom's proposed construction says that the preprocessing "accounts for frequency shifts," but fails to claim how or by what algorithm.

> ### 10. "Performing extended synchronization during communication as a background procedure by means of interspersed frequency synchronization bursts"

| Term | HTC Construction |
| --- | --- |
| performing extended synchronization during communication as a background procedure by means of interspersed frequency synchronization bursts | synchronizing with a neighboring cell by performing the claimed steps (3.1) and (3.2) on the neighboring cell's synchronization burst 13 |

The third method step of claim 1 recites that the mobile phone performs extended synchronization "as a background procedure" by means of the frequency synchronization burst.  As the stated language in the claim requires, sub-steps (3.1) and (3.2) are to be performed as part of extended synchronization:

The '216 specification clarifies that extended synchronization "is needed to provide synchronization of a mobile radiotelephone to neighboring cells of a cellular mobile radio communications system as a cell boundary is approached and crossed." ['216, 8:5-11]  HTC's proposed construction thus follows from the plain language of the claim and is consistent with the intrinsic record and does not exclude any of the embodiments disclosed in the specification.

IPCom's proposed construction should be rejected.  By seeking to ignore substeps (3.1) and (3.2), IPCom seeks to improperly vitiate those claimed steps out of claim 1.

**11.    "(3.1) Conducting a coarse frame synchronization"**

| Term | HTC Construction |
|------|------------------|
| (3.1) conducting a coarse frame synchronization | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, using the phase angle of a signal received from a neighboring cell to prepare for adjusting the mobile device's frame timing to within a coarse precision. |

Claim step (3.1) is incapable of construction for failure to meet the requirements of 35 U.S.C. § 112, ¶ 2. As recited in the claim, this step is to be carried out "by means of interspersed frequency synchronization bursts." However, construing the claimed phrase as a step to be performed by frequency synchronization bursts would render it inconsistent with the accompanying disclosure in the '216 specification, which states that this step is to be carried out essentially the same way as steps (1.2), (1.3), (1.4), and (2.1). [*Id.*, 8:34-37] Yet, the coarse frame synchronization of step (1.2) is carried out on a frequency correction burst, 12, which is different than the frequency synchronization burst 13.

IPCom's proposed construction for this sub-step is "controlling a process to bring the mobile station's frame timing into at least approximate step with the frame timing of a base station in one or more neighboring cells …" Such a proposed construction makes clear that this claim limitation is written in steps-plus-function format pursuant to 35 U.S.C. § 112, ¶ 6. Specifically, the recited step of "conducting a coarse frame synchronization . . . by means of interspersed frequency synchronization bursts" specifies only a result to be achieved by carrying out multiple, unrecited acts. *Cummins-Allison*, 2003 WL 355470, at *12-*14.

Turning to the specification, it is unclear which acts are to be performed for achieving the recited function. The '216 specification only refers back to the disclosure for sub-steps 1.2, 1.3, 1.4 and 2.1. ['216, 8:34-37] But there is no disclosure in those sections of the detailed description concerning how to utilize a frequency synchronization burst to achieve "coarse frame synchronization." [Rose Decl. ¶ 49] Moreover, the disclosure that is provided for achieving coarse frame synchronization using a frequency correction burst is not sufficiently specific to

clearly set forth.  Hence, the lack of disclosure to correspond to the steps-plus-function limitation renders the claim invalid under 35 U.S.C. § 112, ¶ 2.

12.      "(3.2) Conducting a fine frame synchronization with fine frequency synchronization"

| Term | HTC Construction |
|---|---|
| (3.2) conducting a fine frame synchronization with fine frequency synchronization | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, using the phase angle of a signal received from a neighboring cell to simultaneously prepare for adjusting the mobile device's frame timing and frequency to within a fine precision. |

This claim limitation similarly is incapable of construction for failure to meet the requirements of 35 U.S.C. § 112, ¶ 2.  Once again, the claimed synchronization step is inconsistent with the disclosure in the specification for conducting "fine frame synchronization" and "fine frequency synchronization."

To the extent that this limitation can be discerned, as with the construction of sub-step 2.1, the phrase should be limited to a single step of conducting "a fine frame synchronization" simultaneously with "fine frequency synchronization."

13.      "Thereafter performing a continuous evaluation"

| Term | HTC Construction |
|---|---|
| thereafter performing a continuous evaluation | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2. |

This claim limitation is incapable of construction for failure to meet the requirements of 35 U.S.C. § 112, ¶ 2.  In particular, the first claimed step requires "continuous" evaluation, and then the second step again requires "continuous" evaluation.  But, the first step, being continuous, does not have an end point that the second step can follow.  This claim limitation is insolubly ambiguous and HTC does not presently propose any alternate construction.

### 14.    "The fine frequency synchronization step comprises evaluating said frequency correction burst (12)"

| Term | HTC Construction |
|---|---|
| the fine frequency synchronization step comprises evaluating said frequency correction burst (12) | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, analyzing the phase angle of the frequency correction burst. |

This claim limitation is invalid for being dependent from invalid independent claim 2. To the extent that the additional language recited in the claim can be discerned, HTC's alternative proposed construction is consistent with the language of the claim and of the intrinsic record, and does not exclude any disclosed embodiments.

### 15.    "The step of evaluating . . ."

| Term | HTC Construction |
|---|---|
| the step of evaluating ... comprises by producing a regulation magnitude proportional to a frequency deviation from phase difference values of neighboring phase values by means of a linear regression | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, using a linear regression to produce a frequency correction value proportional to a difference between neighboring phase angle values. |

This claim limitation is invalid for being dependent from invalid independent claim 2. HTC's alternative proposed construction follows from the plain language of the claim and is consistent with the intrinsic record and does not exclude any of the embodiments disclosed in the specification.  IPCom's proposed construction must be rejected at least because it seeks to vitiate the claim term "by means of a linear regression" out of the claim by replacing it with the more general term "linear operation."

### 16.    "Recognizing and evaluating said extended training sequence"

| Term | HTC Construction |
|---|---|
| recognizing and evaluating said extended training sequence | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, preparing to adjust the mobile device's frame timing based on detection and analysis of an extended training sequence in a neighboring cell's frequency synchronization bursts. |

This claim limitation is incapable of construction because the claim from which it depends fails to meet the requirements of 35 U.S.C. § 112, ¶ 2.

HTC's alternative proposed construction follows from the plain language of the claim and is consistent with the intrinsic record and does not exclude any of the embodiments disclosed in the specification.

### 17.   "Conducting a pattern correlation procedure on said frequency synchronization bursts"

| Term | HTC Construction |
|------|------------------|
| conducting a pattern correlation procedure on said frequency synchronization bursts | calculating a correlation between the extended training sequence of the frequency synchronization burst and a predetermined bit sequence |

HTC's proposed construction follows from the plain language of the claim and is consistent with the intrinsic record and does not exclude any of the embodiments disclosed in the specification.

### 18.   "Recognizing and evaluating said training sequence"

| Term | HTC Construction |
|------|------------------|
| recognizing and evaluating said training sequence | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, adjusting the mobile device's frame timing and frequency based on detection and analysis of a training sequence in the normal synchronization burst 14. |

This claim limitation is incapable of construction because the claim from which it depends fails to meet the requirements of 35 U.S.C. § 112, ¶ 2.  Furthermore, base claim 1 contains two different steps (2.1) and (3.2), which call for frame "synchronization with fine frequency synchronization," and so it cannot be discerned which sub-step dependent claim 9 modifies.

### 19.    "Conducting a pattern correlation procedure . . ."

| Term | HTC Construction |
|---|---|
| conducting a pattern correlation procedure and initial frequency synchronization by evaluating said frequency correction burst by producing a regulation magnitude proportional to frequency deviation for a central control unit from phase difference values of neighboring phase values by means of a linear regression | This limitation is incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.<br><br>In the alternative, calculating a correlation between the extended training sequence of the frequency synchronization burst and a predetermined bit sequence. |

This claim limitation is incapable of construction because the claim from which it depends fails to meet the requirements of 35 U.S.C. § 112, ¶ 2. Furthermore, base claim 1 contains five different steps (1.2), (1.4), (2.1), (3.1), and (3.2), which call for "frame synchronization," and it cannot be discerned which sub-step dependent claim 10 modifies.

HTC's alternative proposed construction follows from the plain language of the claim and is consistent with the intrinsic record and does not exclude any of the embodiments disclosed in the specification.

## VIII.   CONCLUSION

For at least the reasons set forth above, HTC respectfully requests that its motion for summary judgment of invalidity as to indefiniteness be granted as to the patents-in-suit and alternatively, that the Court adopt HTC's proposed claim constructions.

DATED:  November 30, 2009                    PERKINS COIE LLP


  /s/ Michael A. Oblon
John S. Skilton
Perkins Coie LLP
1 East Main Street, Suite 201
Madison, Wisconsin  53703-5118
Telephone:  (608) 663-7460
Facsimile:  (608) 663-7499
JSkilton@perkinscoie.com

Michael A. Oblon
Perkins Coie LLP
607 Fourteenth Street N.W.
Washington, D.C.  20005-2003
Telephone:  (202) 628-6600
Facsimile:  (202) 434-1690
MOblon@perkinscoie.com

Jonathan M. James (Admitted Pro Hac Vice)
Perkins Coie Brown & Bain P.A.
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012
Telephone:  (602) 351-8000
Facsimile:  (602) 648-7000
JJames@perkinscoie.com

Attorneys for Plaintiffs, Counterclaim-Defendants
HTC Corporation and HTC America, Inc.

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 30, 2009 a true copy of the foregoing instrument was filed via the Court's electronic filing system and served on counsel of record via electronic mail.

  /s/ Michael A. Oblon
Attorney for Plaintiffs, Counterclaim-Defendants
HTC Corporation and HTC America, Inc.

62019-0037/LEGAL17366234.1