## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **HTC CORPORATION et al.** | ) | |
| | ) | |
| **Plaintiffs and** | ) | |
| **Counterclaim-Defendants** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:08-cv-01897- RMC** |
| | ) | |
| **IPCOM GMBH & CO., KG,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counterclaim-Plaintiff** | ) | |

## IPCOM'S RESPONSIVE CLAIM CONSTRUCTION BRIEF AND
## OPPOSITION TO HTC'S MOTION FOR SUMMARY JUDGMENT

Stephen E. Baskin
DC Bar Number 456015
Kilpatrick Stockton LLP
Suite 900
607 14th Street, NW
Washington, DC 20005-2018
Telephone: 202.508.5800
Facsimile: 202.508.5858

Mitchell G. Stockwell
Geoffrey K. Gavin
Catherine E. Hart
Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA 30309-4530
Telephone:  404.815.6500
Facsimile:  404.815.6555

*Attorneys for Defendant-Counterclaim
Plaintiff IPCom GmbH & Co., KG*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iv

TABLE OF ABBREVIATIONS .................................................................................. viii

INTRODUCTION .......................................................................................................... 1

RESPONSE TO HTC'S STATEMENT OF "FACTS" ................................................. 2

ARGUMENT AND AUTHORITY ............................................................................... 3

I.     The Synchronization or 216 Patent. ................................................................... 3

     A.     Claim 1 Contains No "Step-Plus-Function" Elements. .......................... 3

     B.     "Synchronizing" Does Not Require Evaluating A Continuously
        Running Phase Angle. ............................................................................. 6

     C.     Step 1: Conducting an Initial Synchronization by means of a
        Frequency Correction Burst. .................................................................. 10

           1.     1.1: Conducting a Coarse Frequency Synchronization .............. 11

           2.     1.2: Conducting a Coarse Frame Synchronization Over
                a Plurality of Said Time Slots Which Comprise a Frame .......... 15

           3.     1.3: Conducting a Fine Frequency Synchronization .................. 16

           4.     1.4: Conducting a Fine Frame Synchronization ........................ 18

     D.     2.1: Conducting a Frame Synchronization with Fine Frequency
        Synchronization ..................................................................................... 19

     E.     2.2: Carrying out Preliminary Data Signal Processing ......................... 21

     F.     Step 3: Performing Extended Synchronization During
        Communication as a Background Procedure by means of
        Interspersed Frequency Synchronization Bursts, and Steps 3.1 and
        3.2. ......................................................................................................... 22

     G.     Dependent Claim 2 is Not Indefinite. ................................................... 24

II.     The Access or 751 Patent. ................................................................................. 25

     A.     Means for Receiving Information Signals. ............................................ 25

     B.     Evaluation Unit ..................................................................................... 26

# TABLE OF CONTENTS
## (continued)

Page

C.   The Evaluation Unit Limitations. ...........................................................33

    1.   [Evaluation Unit for Asking] When Information Signals with Access Authorization Data Means (65) as Authorization Data (45, 50, 55) are Received . . . .....................................33

    2.   "Access Authorization Data Means (65) as Authorization Data (45, 50, 55)" ...............................................35

    3.   Access Authorization Data (45, 50, 55) or Authorization Data (45, 50, 55) ................................................37

    4.   [Evaluation Unit for] Asking ... Whether Access Authorization Data (45, 50, 55) Include an Access Threshold Value (S) for Comparison of the Access Threshold Value (S) with a Random Number or a Pseudo-Random Number (R)........................................................38

    5.   [Evaluation Unit . . .] for Ascertaining as a Function of an Outcome of a Comparison Whether an Access of the at Least One Subscriber Station (5, 10, 15, 20) to the at Least One Telecommunication Channel is Enabled ..................39

D.   Random Number or Pseudo-Random Number (R)...............................40

E.   Access Threshold Value .........................................................................40

III.   The Handover or 830 Patent. ...........................................................................43

A.   Claims 1, 12, and 18 are Valid.............................................................43

    1.   The Apparatus Claims Do Not Improperly Include Method Steps. .......................................................................43

    2.   The 830 Patent Discloses Structure for The Arrangement Terms. ................................................................47

B.   Link Data ..............................................................................................52

C.   1) Holding in Reserve; 2) Initially Causing ... to Remain Held in Reserve....................................................................................................54

D.   Initially Maintaining a Storage ............................................................55

# TABLE OF CONTENTS
## (continued)

Page

E.    1) At a Later Timepoint Determined by a Fixed Period of Time … ;
2) At a Later Timepoint Determined Based on a Message … ;
3) When the Link is to be Handed Over ...............................................................55

F.    1) Deleting … and Freeing Up; 2) Deleted … Released ........................................56

G.    If the Network Cannot Support Handing Over the Link.......................................57

H.    The Link … is Re-established...............................................................................58

I.    Remaining Terms....................................................................................................58

CONCLUSION............................................................................................................................58

## TABLE OF AUTHORITIES

**Cases**

*Acumed LLC v. Stryker Corp.,*
    483 F.3d 800 (Fed. Cir. 2007) ................................................................................................ 7

*Advanced Med. Optics, Inc. v. Alcon Inc.,*
    361 F. Supp. 2d 370 (D. Del. 2005)......................................................................................... 4

*Alcatel USA Resources, Inc. v. Microsoft Corp.,*
    No. 6:06cv500, 2008 WL 2625852 (E.D. Tex. June 27, 2008)............................................. 29

*Allen Eng'g Corp. v. Bartell Indus., Inc.,*
    299 F.3d 1336 (Fed. Cir. 2002) ............................................................................................ 35

*Altech Controls Corp. v. E.I.I. Instruments, Inc.,*
    No. H-92-3189, 1997 WL 579179 (S.D. Tex. June 6, 1997) ................................................... 4

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.,*
    339 F. Supp. 2d 202 (D. Mass. 2004) ................................................................................. 4, 5

*Ariba, Inc. v. Emptoris, Inc.,*
    No. 9:07-CV-90, 2008 WL 3482521 (E.D. Tex. Aug 7, 2008)............................................. 46

*Astra Aktiebolag v. Andrx Pharms., Inc. (In re Omeprazole Litig.),*
    222 F. Supp. 2d 423 (S.D.N.Y. 2002) .................................................................................. 15

*Avocent Redmond Corp. v. Raritan Computer, Inc.,*
    No. 01 Civ. 4435(PKC), 2005 WL 612722 (S.D.N.Y. Mar. 11, 2005)................................... 29

*Biomedino, LLC v. Waters Tech. Corp.,*
    490 F.3d 946 (Fed. Cir. 2007) ........................................................................................ 48, 50

*Budde v. Harley-Davidson, Inc.,*
    250 F.3d 1369 (Fed. Cir. 2001) ........................................................................................ 48, 49

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
    381 F.3d 1371 (Fed. Cir. 2004) .............................................................................................. 3

*Collaboration Props., Inc. v. Tanberg ASA,*
    Case No. 05-1940, 2006 U.S. Dist. LEXIS 42465 (N.D. Cal. June 22, 2006) ........................ 44

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
    460 F.3d 1349 (Fed. Cir. 2006) ........................................................................................ 17, 18

*Cummins-Allison Corp. v. Glory Ltd.,*
    No. 02 C 7008, 2003 WL 355470 (N.D. Ill. Feb. 12, 2003)..................................................... 4

US2008 1009331.2

## TABLE OF AUTHORITIES
### (continued)

Page

*EBS Dealing Res., Inc. v. Intercontinental Exch., Inc.,*
379 F. Supp. 2d 521 (S.D.N.Y. 2005) ................................................................ 4, 5

*Epistar Corp. v. Int'l Trade Comm'n,*
566 F.3d 1321 (Fed. Cir. 2009) .......................................................................... 8

*Exxon Research and Eng'g Co. v. United States,*
265 F.3d 1371 (Fed. Cir. 2001) .......................................................................... 15

*Frank's Casing Crew & Rental Tools v. Weatherford Int'l, Inc.,*
389 F.3d 1370 (Fed. Cir. 2004) .......................................................................... 11

*Freescale Semiconductor, Inc. v. ProMOS Technologies, Inc.,*
561 F. Supp. 2d 732 (E.D. Tex. 2008)................................................................ 33

*Gillette Co. v. Energizer Holdings, Inc.,*
405 F.3d 1367 (Fed. Cir. 2005) .......................................................................... 6, 13

*Halliburton Energy Servs., Inc. v. M-I LLC,*
514 F.3d 1244 (Fed. Cir. 2008) .......................................................................... 27, 34

*Hochstein v. Microsoft Corp.,*
No. 04-73071, 2009 WL 1838975 (E.D. Mich. June 22, 2009) ......................... 36, 37

*In re Dossel,*
115 F.3d 942 (Fed. Cir. 1997) ............................................................................ 51, 52

*Intellect Wireless Inc. v. Kyocera Comm'ns, Inc.,*
No. 08C1350, 2009 WL 3259996 (N.D. Ill. Oct. 8, 2009)............................. 44, 45, 46

*IPXL Holdings v. Amazon.com,*
430 F.3d 1377 (Fed. Cir. 2005) .......................................................................... 43, 44

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
358 F.3d 898 (Fed. Cir. 2004) ...................................................................... 7, 8, 9, 57

*Lighting World, Inc. v. Birchwood Lighting, Inc.,*
382 F.3d 1354 (Fed. Cir. 2004) .................................................................... passim

*Mannatech, Inc. v. Glycobiotics Int'l, Inc.,*
No. 3-060cv-0471, 2007 WL 4386244 (N.D. Tex. Dec. 14, 2007)...................... 34

*Masco Corp. v. United States,*
303 F.3d 1316 (Fed. Cir. 2002) .......................................................................... 3, 5

US2008 1009331.2

# TABLE OF AUTHORITIES
## (continued)

Page

*Mas-Hamilton Group, Inc. v. LaGard, Inc.*,
   156 F.3d 1206 (Fed. Cir. 1998) .................................................................. 27

*Micro Chem. Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999) .................................................................. 25

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
   520 F.3d 1367 (Fed. Cir. 2008) ............................................................ 43, 44

*Microunity Sys. Eng'g, Inc. v. Dell, Inc.*,
   No. 2-04-cv-120(TJW), 2005 WL 2086026 (E.D. Tex. Aug. 29, 2005) ................................ 29

*O.I. Corp. v. Tekmar Co.*,
   115 F.3d 1576 (Fed. Cir. 1997) .............................................................. 4, 5

*Paice LLC v. Toyota Motor Corp.*,
   No. 2:04-cv-211-DF, 2005 WL 6220101 (E.D. Tex. Sept. 28, 2005) ...................................... 29

*Personalized Media Communications, LLC v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998) ........................................................ 27, 28, 30

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .......................................................... passim

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
   318 F.3d 1143 (Fed. Cir. 2003) .................................................................. 11

*Pulse Eng'g, Inc. v. Mascon, Inc.*,
   No. 08cv0595 JM AJB, 2009 WL 755321 (S.D. Cal. Mar. 9, 2009) ...................................... 33

*Rambus Inc. v. Infineon Techs. AG*,
   318 F.3d 1081 (Fed. Cir. 2003) .............................................................. 8, 9

*Rembrandt Data Techs., LP v. AOL, LLC*,
   No. 1:08 CV 1009 (GBL), 2009 U.S. Dist. LEXIS 79610 (E.D. Va. Aug. 21, 2009) .............. 46

*Ricoh Co. v. Katun Corp.*,
   486 F. Supp. 2d 395 (D.N.J. 2007) .......................................................... 45

*Seal-Flex, Inc. v. Athletic Track and Court Constr.*,
   172 F.3d 836 (Fed. Cir. 1999) .................................................................... 3

*Source Search Technologies LLC, v. LendingTree LLC*,
   No. 08-cv-4420, 2009 WL 4546742 (Fed. Cir. Dec. 7, 2009) .................................. 31

vi

## TABLE OF AUTHORITIES
### (continued)

Page

*SRAM Corp. v. Fox Factory, Inc.*,
No. 04C2162, 2005 WL 6266955 (N.D. Ill. Nov. 18, 2005) .................................................... 29

*St. Clair Intellectual Property Consultants, Inc. v. Matsushita Elec. Indus. Co.*,
No. 04-1436-JJF-LPS, 2009 WL 3834541 (D. Del. Nov. 13, 2009) ....................................... 29

*Talbert Fuel Sys. Patents Co. v. Unocal Corp.*,
275 F.3d 1371, 1376 (Fed. Cir.), *vacated on other grounds*, 537 U.S. 802 (2002) ................. 10

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ............................................................................................ 22

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
Nos. 2008-1218, 2009 WL 4349533 (Fed. Cir. Dec. 3, 2009) ................................................ 36

*Wacom Co. v. Hanvon Corp.*,
No. C06-5701RJB, 2007 WL 4561098 (W.D. Wash. Dec. 21, 2007) ....................................... 4

*Yodlee Inc. v. CashEdge Inc.*,
No. C05-01550 SI, 2006 WL 3456610 (N.D. Cal. Nov. 29, 2006) .......................................... 45

**Statutes**

35 U.S.C. § 112 ................................................................................................................ passim

**Rules**

Manual of Patent Examining Procedure
§§ 608.01(m) & 2173.05(g) .......................................................................................... 35, 37, 43

US2008 1009331.2

## TABLE OF ABBREVIATIONS

| ABBREVIATION | MEANING |
|---|---|
| 216 Patent | U.S. Patent No. 5,390,216, Exhibit 2 |
| 751 Patent | U.S. Patent No. 7,043,751, Exhibit 3 |
| 830 Patent | U.S. Patent No. 6,879,820, Exhibit 4 |
| Stark Dec. | Declaration of Dr. Wayne E. Stark, Dkt. No. 131, Exhibit 102 |
| Madisetti Dec. | Declaration of Dr. V. J. Madisetti, Dkt. No. 131, Exhibit 125 |
| Rose Dec. | Declaration of Dr. Christopher Rose, filed as Docket No. 132-12 |
| Rose deposition excerpts | Deposition of Dr. Christopher Rose, Exhibit 160A (first day) and Exhibit 160B (second day) |
| Stark deposition excerpts | Deposition of Dr. Wayne Stark, Exhibit 161 |
| Bjorndahl Dec. | Declaration of Per Björndahl, Exhibit 150 |
| IPCom Br. | IPCom's Opening Claim Construction Brief, filed as Docket No. 131 |
| HTC Br. | HTC's Opening Claim Construction Brief and Motion for Summary Judgment of Invalidity under § 112, ¶2, filed as Docket No. 132 |

US2008 1009331.2

**INTRODUCTION**

As required by the Court's scheduling order and the parties' stipulation, before filing its opening brief, IPCom identified proposed terms, provided HTC preliminary constructions, and then filed a joint claim construction chart setting out its claim constructions. HTC did not do the same. HTC proposed initial constructions, which it then withdrew. It identified new terms for construction hours before filing the joint chart. It then further revised its constructions in its opening brief. Last week, HTC both abandoned positions on the 216 patent that its own expert concluded were technically meritless, but which IPCom was forced to address in its opening brief, and simultaneously substituted radically new constructions for the 216 patent. (Ex. 10.)[1] HTC's incessant waffling on claim construction positions demonstrates neither compliance with the Court's orders and parties' stipulation nor credibility.

HTC has stretched its credibility beyond the breaking point. HTC's ever-morphing positions reflect an abject failure to carefully consider the relevant evidence. Its opening brief never bothered to explain the basis of many of its constructions. It makes boilerplate assertions that almost every claim term is indefinite. It submits conclusory testimony from Dr. Rose, whose admissions and process demonstrate deeply flawed opinions. It neither seeks to meet nor even informs the Court of the legal standards concerning its burden of proof. It repeatedly argues that various claim phrases are means-plus-function phrases, despite controlling presumptions that it neither identifies nor rebuts. Its positions are flatly contradicted both by its statements to the U.S. Patent Office and to IPCom in the claim construction process mandated by the Court's order. For example, HTC argues that the 216 patent embodies step-plus-function elements – even though it abandoned those positions in its preliminary and "final" constructions

---

[1] Exhibits 1-9 and 100-142 were included with IPCom's Opening Claim Construction Brief [Dkt. No. 131]. IPCom files concurrently with this brief additional exhibits numbered 10 and 143-163.

1

and made contradictory representations to the Patent Office. As to the 751 patent, HTC says the "means for receiving" has a new function with no structure, even though its preliminary construction is virtually identical to IPCom's construction. (*See* Ex. 101 at 5.)

This Court, of course, must address the merits of the parties' dispute. But, in so doing, it should not blind itself to the record of HTC's purposefully confusing and, frankly, incredible positions. HTC's ever-changing positions are not thoughtful adjustments of claim constructions in view of evidence and argument, but instead reflect efforts to create or bolster its invalidity arguments rather than grapple with the appropriate evidence. Undertaking the required analysis of the evidence demonstrates two things: First, the claims are not indefinite and HTC's position otherwise reflects an outcome-driven approach that never analyzes the relevant evidence. Second, IPCom's constructions are correct – because they both grapple with the relevant evidence and are fully consistent with the claim language, specification and other evidence.

## RESPONSE TO HTC'S STATEMENT OF "FACTS"

HTC's three statements of "facts" asserting the claims of each patent contain "limitations that are vague, ambiguous and cannot be discerned by one of ordinary skill" are not actually facts. (HTC Br. at 7.) They are legal conclusions. IPCom denies that HTC's conclusions are correct and additionally submits they simply provide no factual basis for HTC's request for summary judgment. Indeed, HTC's submissions do not comply with LCvR 56.1, as no evidence is cited since the "Exhibit A" statement of facts HTC referenced in its brief (at 6) was never provided and instead HTC simply elected to rely on its statement of conclusions and the conclusory testimony of Dr. Rose, which IPCom has moved to strike. In addition, IPCom has provided ample evidence in the form of the patents, intrinsic and extrinsic evidence and appropriate declarations that rebut HTC's assertions.

2

## ARGUMENT AND AUTHORITY

### I.     The Synchronization or 216 Patent.

#### A.     Claim 1 Contains No "Step-Plus-Function" Elements.

HTC originally abandoned its assertion that claim 1 contains various "step-plus-function" elements. (*Compare* Ex. 1 at 1-6 *with* Ex. 100 at 6-7.) HTC's abrupt about face ignores the contrary presumption. Judge Rader, in *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 849 (Fed. Cir. 1999), first proposed that "the phrase 'step for' in a method claim raises a presumption that § 112, ¶ 6 applies," whereas use of "step of" presumptively indicates § 112, ¶ 6 does not apply. Since *Seal-Flex*, the Federal Circuit has adopted and expanded this principle. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 381 F.3d 1371, 1382 (Fed. Cir. 2004) ("Nor does [using] 'steps of' create[s] a presumption that each ensuing step is in step-plus-function form ... the absence of the signal 'step for' creates the contrary presumption."); *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002) ("Where the claim drafter has not signaled his intent to invoke § 112, paragraph 6 by using the 'step[s] for' language, we are unwilling to resort to that provision ... without a showing that the limitation contains nothing that can be construed as an act.").

The established presumption is particularly apt and controlling here. The steps HTC identifies do not recite "step for" language and thus are presumptively outside the reach of § 112, ¶6. To the contrary, the claim references the principal steps via the "step of" signal and indicates those steps further "comprise[] the substeps of." This latter language is what Judge Rader in *Seal-Flex* and *Cardiac Pacemakers* identified as presumptively removing the claim language from the ambit of § 112, ¶6. HTC neither identifies nor seeks to rebut this controlling presumption. All HTC does is cite a cropped quote of a step and assert that there is no "act" disclosed therein. (HTC Br. at 46.) Far more is needed – both because the Federal Circuit has

3

cautioned that the line between act and function is especially blurry, and because it has repeatedly found error when courts cross that line. *See supra.*

Setting aside HTC's failure to inform the Court of, or grapple with, the governing presumption, its claim that § 112, ¶6 governs is wrong. HTC never explains why the relevant steps supposedly recite no acts, but rather merely recites two inapposite district court cases. *Altech Controls Corp. v. E.I.I. Instruments, Inc.,* No. H-92-3189, 1997 WL 579179, at *11 (S.D. Tex. June 6, 1997), issued before *Seal-Flex* and did not discuss or apply the presumption that the "step of" claim language rendered § 112, ¶6 inapplicable. To the contrary, the *Altech* court seemed to rely on the fact that the method claim closely paralleled an apparatus claim that recited a "means for" performing the recited step. *Id.* at *11. The Federal Circuit has rejected this approach. *See O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1583-84 (Fed. Cir. 1997). *Cummins-Allison Corp. v. Glory Ltd.,* No. 02 C 7008, 2003 WL 355470 (N.D. Ill. Feb. 12, 2003), similarly failed to discuss the presumption but, more importantly, the court there was faced with a situation where the patentee had defined the "denominating" language at issue to cover multiple functions. By contrast, numerous district courts have applied the presumption to repeatedly reject efforts to construe "steps of" limitations as "step-plus-function" claim elements. *See Wacom Co. v. Hanvon Corp.,* No. C06-5701RJB, 2007 WL 4561098 (W.D. Wash. Dec. 21, 2007); *EBS Dealing Res., Inc. v. Intercontinental Exch., Inc.*, 379 F. Supp. 2d 521, 528-29 (S.D.N.Y. 2005); *Advanced Med. Optics, Inc. v. Alcon Inc.*, 361 F. Supp. 2d 370, 398 (D. Del. 2005); *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 339 F. Supp. 2d 202, 257 (D. Mass. 2004).

The additional problem with HTC's mere assertion that the challenged steps simply recite "functions" is that HTC never identifies a "function" linked to those steps. As the Federal Circuit held in *O.I. Corp.*, 115 F.3d at 1583, "[m]erely claiming a step without recital of a

4

function is not analogous to a means plus a function" and, given the legislative history of § 112, ¶6, "[i]f we were to construe every process claim containing steps described by an "ing" verb, such as passing, heating, reacting, transferring, etc. into a step-plus-function limitation, we would be limiting process claims in a manner never intended by Congress." *O.I. Corp.* further explained that a "preamble statement of the purpose of the overall process does not constitute an associated function for ... two 'passing' steps .... Performing a series of steps inherently produces a result ... but a statement in a preamble of a result that necessarily follows from performing a series of steps does not convert each of those steps into step-plus-function clauses." *Id.* at 1583. The same analysis applies here, albeit more forcefully.

HTC, without explanation, asserts steps 1.1-1.4, 2.1, 3.1 and 3.2 merely identify functions. But as *O.I. Corp.* and other cases make clear, one cannot simply point to the step itself as the function – one must point to specific claim language that represents the "step *plus function*." *See EBS Dealing Res.*, 379 F. Supp. 2d at 529 ("as in both ... *O.I. Corp.* and *Masco*, the disputed terms in Claim 17 are steps without functions."). This HTC does not do. Further, while HTC asserts that functions identify "what" is being accomplished and acts identify "how" functions are accomplished, it never explains why the steps, to a skilled person, identify "what" as opposed to "how." *See Amgen*, 339 F. Supp. 2d at 257 (finding party "cannot merely assert that there is 'no act' ... without producing some evidence that there is not" an act and concluding § 112, ¶6 did not apply to method step).

While no evidence supports HTC's assertion, there is contrary evidence that the challenged steps recite acts. Specifically, steps 1.1 through 1.4 are the acts by which one achieves initial synchronization, while step 2.1 and steps 3.1 and 3.2 are acts that, respectively, "maintain" normal synchronization and perform "extended synchronization." This point is not

5

debatable – HTC, in discussing step 1.1 in its (rejected) reexamination request for the 216 patent, told the Patent Office that "this step and the following three *are directed to how* the mobile device implements the initial synchronization." (Ex. 143 at 27 (emphasis added).); *see Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (relying on defendant's "admission" in EPO proceedings as support for how skilled persons would construe claims).

HTC's own admission demonstrates that there is neither clear nor convincing evidence for an essential predicate to HTC's indefiniteness argument – that the relevant elements are "step plus function" elements. The Court should dismiss HTC's "step plus function" assertion for the same reasons HTC originally abandoned that position – it is neither credible nor applicable here.[2]

### B.     "Synchronizing" Does Not Require Evaluating A Continuously Running Phase Angle.

**IPCOM CONSTRUCTION: Bringing the mobile station's operation in step with the corresponding operation of a base station.**

**HTC New Construction (Ex. 10): Bringing a mobile station's operation in step with the corresponding operation of a base station by performing processes that evaluate a continuously running phase angle calculated from burst signals received from the base station.**

HTC now concedes that synchronizing involves bringing the mobile station's operation in step with the base station's operation.   Indeed, HTC's own expert declares that "'synchronization' suggests the adjustment of frame and frequency such that the mobile station and the base station can effectively communicate." (Rose Dec., ¶40).   HTC and its expert's concession should end the dispute because claim terms "'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted).   Where a claim term has a clear meaning, it cannot be limited based on

---

[2] Ample support in the specification has been discussed in IPCom's opening brief and *infra* for each of the substeps. If the Court concludes that the challenged steps invoke § 112, ¶6, IPCom will provide an appropriate summary of the specification support for those steps.

particular implementations noted in the specification. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805-06 (Fed. Cir. 2007) (refusing to limit ordinary meaning of curved "based on a particular manner of implanting the nail disclosed and touted by the written description.").

HTC nonetheless ignores the ordinary meaning of the unambiguous term "synchronizing" by requiring a particular technique of "evaluat[ing] a continuously running phase angle." As explained in IPCom's opening, HTC simply packs too much into the simple term synchronizing – which appears only in the preamble and which has a demonstrated, and now conceded, ordinary meaning. (*See* Rose Dec., ¶40.) Indeed, HTC's own amended construction abandoned its earlier contention that "phase angle" analysis was required in steps 2.1 and 3.1, thereby confirming it is improper to limit the overall claim – such as through construction of "synchronizing" – to utilize phase angles.

In addition, HTC's construction directly contradicts the doctrine of claim differentiation, which holds that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). Here, dependent claim 2 recites the continuous evaluation of the phase angles that the synchronization method is based upon. As is apparent from HTC's various constructions, HTC seeks to construe claim 1 to have the same scope as claim 2. (Ex. 1 at 1.) HTC's brief (at 48) deleted "continuously," but replaced that term in favor of a synonymous phrase – "many times per bit interval" – a phrase it believes means the same thing as is apparent from its footnote 14. HTC's new construction makes this even more apparent, and its expert conceded claim 2 covers the "phase calculations" it seeks to read into claim 1. (Ex. 160B at 45:10-48:9.) HTC's construction thus advocates that claim 1 is limited to the "continuously evaluating" subject

7

matter of claim 2. In *Liebel-Flarsheim* (358 F.3d at 910)*,* the Federal Circuit rejected a similar effort to narrow an independent claim, explaining that:

> The juxtaposition of independent claims lacking any reference to a pressure jacket with dependent claims that add a pressure jacket limitation provides strong support for [the patentee's] argument that the independent claims were not intended to require the presence of a pressure jacket. As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.

Claim differentiation is not undercut by the specification statements HTC cites to try to show "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316. To prevail on such a claim, HTC must show "the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906; *accord Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). No clear disavowal exists here.

HTC cites two statements, shown below:

> The *synchronization method of the invention* ***is based on*** the evaluation of a continuously running phase angle, which is calculated again and again from an in-phase component I and a quadrature component Q.

> The *method of the invention* ***is based on*** evaluation of phase angle many times per bit interval. An evaluation is calculated from each of the individual I,Q value pair samples. By such means the synchronous condition is very rapidly reached.

(Ex. 2 at 3:9-12, 3:47-62 (emphasis added).) HTC emphasizes the reference to the "method of the invention," but of course the overall statement is that such method is "based on" phase angle evaluation. *See Liebel-Flarsheim*, 358 F.3d at 909 ("the reference to the 'principles of the present invention' as providing for ... a syringe that can be 'loaded into and removed from the injector pressure jacket,' does not limit the invention to devices that have pressure jackets ..."); *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1094 (Fed. Cir. 2003) (claim to "bus" not

8

limited to "multiplexed bus" despite specification's statement that "[t]he present invention is designed to provide a high speed, multiplexed bus ....").

The specification here identified the synchronization method itself at 3:25-43, and claimed that method in claim 1. The statement that the disclosed method was "based on" phase angle evaluation does not operate as a clear disclaimer – especially given existence of claim 2 and the other portions of the specification that show the ordinary meaning of "synchronizing" applies. HTC nowhere addresses those statements, cited in IPCom's opening brief (at 5-6). *Compare Rambus*, 318 F.3d at 1094. The fact that no clear disavowal exists here is reinforced by the fact that several steps do not rely on phase angle evaluation – including coarse frequency synchronization, preliminary data processing and the others HTC conceded. Indeed, HTC's citations are referencing not every method step, but merely the initial synchronization that must be done before one can maintain normal synchronization or perform extended synchronization. Initial synchronization is what "reaches" the synchronous condition. And, even as to initial synchronization, the specification immediately says that "[i]t is *also useful* for the course frame synchronization to take place by evaluation of a [FCB] *and, also*, to perform that evaluation from phase difference values...." (Ex. 2 at 3:63-68 (emphasis added).) If, as HTC theorizes, the inventors clearly disavowed methods that did not evaluate phase difference values, the patent would not point out that it would "also" be useful to examine the FCB through such a technique.

Finally, HTC makes a muddled argument that the 216 patent aims to achieve synchronization more efficiently and also argues that it disclaims using mobile time base counters. These arguments are irrelevant. Claims are not construed to capture every objective stated by the patentee. *Liebel-Flarsheim*, 358 F.3d at 908. But even if that were so, the specification is clear that the procedure that "realize[s] synchronization of higher precision with

9

a relatively small complication and expense" (Ex. 2 at 3:44-46) is the overall method set out at 3:30-43, not the use of phase evaluation. Finally, there was no disclaimer of using mobile time base counters, a point Dr. Stark explained in detailing why mobile phones cannot work without a counter given GSM's frame structure and explaining that the statement HTC cites merely identifies a better way of maintaining accurate counting. (Ex. 161 at 172:21-179:11.) But, in any event, the statement that counters can be maintained more efficiently than prior methods has no bearing on how to construe "synchronizing," whose ordinary meaning is clear.

C.    **Step 1: Conducting an Initial Synchronization by means of a Frequency Correction Burst.**

**IPCOM CONSTRUCTION: Controlling a process to achieve an initial, synchronized connection between a mobile station and a base station through use of one or more frequency correction bursts.**

**HTC Construction: Having selected a carrier frequency, synchronizing during initial connection by performing the claimed steps (1.1), (1.2), (1.3), and (1.4) on frequency correction burst 12.**

IPCom has already pointed out that HTC's construction that every "substep" must use the frequency correction burst ("FCB") flatly contradicts the specification and thus requires "highly persuasive" evidentiary support. (IPCom Br. at 10.) HTC cites no such evidence here. To the contrary, Dr. Rose admits that the specification discloses use of the synchronization burst to perform step 1.4. (Ex. 160A at 173:16-23.) Dr. Stark agrees, and the specification is clear on that point. (*See* Ex. 2 at 7:20-23; Ex. 161 at 203:21-204:6.) But, additionally, both experts agree that fine frame synchronization *cannot* reliably be performed by using a FCB. (Ex. 160A at 171:11-173:23; Ex. 161 at 137-140.) HTC's construction thus also seeks to "render[] the claimed invention inoperable" and "should be viewed with extreme skepticism." *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir.), *vacated on other grounds*,

10

537 U.S. 802 (2002); *accord Frank's Casing Crew & Rental Tools v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).

Nor is there any reason to limit the claim term to the "frequency correction burst 12." While that is the burst shown in the drawing and it is the burst described in the contemporaneous GSM specification, claim 1 covers synchronization in a network "operating in accordance with the GSM standard or its equivalent." Nor does the Federal Circuit approve of reading drawing material into claims. *See Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003) ("the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration").

Finally, HTC's assertion (repeated below, as well) that one selects the carrier frequency before synchronizing during initial connection is entirely incorrect. As IPCom previously pointed out, the specification teaches: "The initial synchronization ... serves to provide the initial connection between a mobile radiotelephone and a fixed station...." (Ex. 2 at 5:22-24.) Before the "initial connection" the phone is not communicating to the network and is, for example, off. When one turns the phone on, it must synchronize. To synchronize, it must locate the "BCCH" carrier because that control channel contains the bursts needed for synchronization. (*See* Ex. 160A at 100:3-9, 103:10-104:14, 113:5-13; Ex. 161 at 122:9-123:11; Ex. 2 at 1:56-59, 2:7-13; Ex. 147 at § 6.2.) To find the BCCH, it scans the channels, measures the power readings of the various frequencies and selects and tunes to a frequency with a high power reading. (*See* Ex. 160A at 102:5-103:9; Ex. 161 at 122:9-123:11.)

### 1.    1.1: Conducting a Coarse Frequency Synchronization

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frequency into at least approximate step with the base station frequency, such as by selecting and tuning to a carrier frequency.**

**HTC New Construction:** ~~Using the selected carrier frequency as a starting point, adjusting the mobile device's frequency to within a tolerance of a reference phase angle[3]~~ **Having already tuned (selected) a carrier frequency, controlling a first frequency synchronizing process that estimates and refines the mobile station's frequency to within a tolerance region so as to be in approximate step with the base station's frequency**

Thus, the first step in "initial synchronization" is necessarily the selection and tuning to a carrier frequency. (*Id.*) The specification makes that clear in discussing the role of the BCCH in carrying the bursts (Ex. 2 at 1:55-61), disclosing the receiver and control unit for tuning same (*id.* at Fig. 2), and explaining that only "after detection of a carrier frequency by means of the ... reception portion 21 of the radio receiver" is the second process of coarse determination performed. (*Id.* at 5:34-37.) Where "carrier frequency tuning" is sufficiently precise, "the synchronization steps designated 1.2, 1.3 and 1.4 ... ***then*** suffice for the initial synchronization." (*Id.* at 5:48-53 (emphasis added).) Simply put, once the carrier has been properly tuned, step 1.1 is finished and the other steps are then performed. (*See* Ex. 161 at 193:18-195:4 (explaining "then" indicates "after you've selected, of course, the carrier frequency which is part of 1.1").)

HTC's now-abandoned construction reflects this point by admitting the selected carrier frequency is the "starting point" for initiating synchronization. That was appropriate because the close relation between initial synchronization and selecting the correct carrier frequency was well-known to skilled persons. HTC itself admitted this point – and confirmed the correctness of IPCom's construction – in arguing to the Patent Office that a prior publication to "Canosi disclosed that the first step in initial synchronization [i.e., step 1.1] was to examine available radio carriers and to evaluate the average power. The system then tuned in to the highest power carrier and proceeded to the remaining steps...." (Ex. 143 at 31; *see also id.* at 27 (representing that Frank performed coarse frequency synchronization through "detect[ing] the BCCh ..."); Ex.

---

[3] HTC abandoned this construction because Dr. Rose, who it hired to ensure the correct "technical gist" of its constructions, belatedly advised that the reference to adjusting frequency to within a tolerance of a phase angle was technically unsound. (Ex. 160B at 36:13-38:4.)

12

146 (Canosi article).)    The Frank article HTC cited (*see* Ex. 145) is entitled "Initial Synchronization of a Mobile Station in the D Net," which is another name for a GSM system. (Ex. 2 at 1:24-27.) Under "Tasks of Initial Synchronization," Frank explains (Ex. 145 at 43):

> A mobile station wishing to contact the network ... must first search for and detect the organisation channel. *** A mobile station which has changed its radio cell while switched off does not initially know the frequency of its associated organization channel. It must therefore receive on a number of frequencies in succession and search for the organisation channel, which must be clearly distinguishable from all the other channels by features that are simple to detect.

Thus, Frank summarizes initial synchronization as first involving the task of "finding the organization channel" because absent selection and tuning to a BCCH carrier, no burst can be detected and synchronization cannot be achieved. (*Id.*); *see Gillette*, *supra*.

The intrinsic evidence of the GSM standard likewise supports IPCom's construction. Skilled persons reviewing the 216 patent would have understood the then extant GSM standards, which were referenced in the patent and file history. (Ex. 160A at 67:2-14.)    Those standards require a phone, in initially synchronizing, to scan the various channels and tune to the highest power frequency and, if no FCB is detected, to retune to the next highest carrier. (Ex. 147 at § 6.2.) These points were, after much evasion, grudgingly admitted by Dr. Rose. (Ex. 160A at 92:19-103:20.) But they have been understood for a long time by major manufacturers of GSM equipment whose patents reflect that initial synchronization requires tuning to the BCCH. Thus Ericsson's Patent No. 5,537,434 explains that "[f]or initial synchronization, the mobile station selects any of the carriers (or any of some predefined carriers) and starts looking for the special synchronization burst."    (Ex. 148 at 11:4-9.)    Qualcomm's Patent No. 5,841,806 similarly explains that "Upon acquisition of the strongest pilot signal, i.e. initial synchronization of the mobile unit with the strongest pilot signal, the mobile unit searches for ... the synchronization channel [that] transmits ... system information for use by the mobiles." (Ex. 149 at 6:5-8.)

13

Against this evidence, HTC marshals merely ever-morphing constructions and nonsensical arguments. HTC generically summarizes part of the specification with the statement that the step "is directed to a 'coarse' measurement because a successful result can comprise a phase angle that falls within a desired tolerance. ['216, 5:30-47]." (HTC Br. at 51.) This is technical gibberish as Dr. Rose belatedly advised HTC. (Ex. 160B at 36:13-38:4.)

HTC is plainly attempting to read into this claim limitation the optional process that involves determining if the carrier tuned to falls within a tolerance region. IPCom's opening explained that this is an optional step. (IPCom Br. at 12.)[4] Skilled persons would understand exactly this point, as Dr. Rose has now admitted (Ex. 160A at 186:15-20) and Dr. Stark testified. (Stark Dec. (Ex. 102), ¶68; Ex. 161 at 194:2-8.) Both the specification and other evidence of record support this conclusion. For example, the 1987 GSM draft document HTC cited states the "MS may use a relatively cheap frequency standard of up to 10 ppm accuracy (e.g., an uncompensated crystal oscillator)." (HTC Br., Ex. E at 2.) But by the time the GSM standards were frozen in 1990, the specification required an oscillator with 0.1 ppm accuracy. (Ex. 5 at HTC1324.) While better oscillators were available, they were more expensive (Ex. 160A at 179:18-180:12), and skilled persons would understand that having an optional check on the oscillator tuning would be useful in those phones using a cheaper, less precise oscillator.

While these facts render HTC's effort to restrict step 1.1 to an optional process improper, HTC goes even further. It proposes step 1.1 "*refines* the mobile station's frequency." Its opening brief provides no basis for this concept and Dr. Rose's admission that the specification does not disclose making adjustments using the optional tolerance region destroys the viability of

---

[4] The EPO counterpart confirms the optional nature of this step as well. The amendment resulted in claiming "gross frequency synch. at least occurring during insufficient accuracy of the carrying frequency." (HTC Br., Ex. G at 1.) Thus, the EPO patent claim expressly omits use of the optional coarse frequency determination where the initial tuning is sufficiently precise – exactly as the specification teaches here.

14

this construction. (Ex. 160A at 180:18-182:9.) To the contrary, as Dr. Stark explained, the tolerance region process provides only a check on whether the tuning is accurate, but describes neither calculating nor using an adjustment. (Stark Dec., ¶¶70-72.) Thus, we here have an instance where HTC seeks to read into the claim a limitation created from whole cloth that its own expert admits is not even taught in the specification.

Finally, HTC's opening brief criticizes as ambiguous terms like "coarse" and "fine" and points to an almost incomprehensible translation of EPO correspondence to argue the EPO's assertion of ambiguity led to claim amendments. Evidence of prosecution of counterpart applications is, at best, weak evidence for claim construction. *See Astra Aktiebolag v. Andrx Pharms., Inc. (In re Omeprazole Litig.)*, 222 F. Supp. 2d 423, 466 (S.D.N.Y. 2002). That is especially true where the amendment dealt with use of the "gross" and "fine" terms. By contrast, it is settled law that such terms of degree are not automatically indefinite in this country. *See Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1378-80 (Fed. Cir. 2001). Indeed, Dr. Rose's assertions that "initial synchronization" and "coarse frequency synchronization" are ambiguous are entirely conclusory. Those statements were based on his pontification, not any effort to analyze the relevant evidence. (Ex. 160A at 197:17-198:12.)

## 2.    1.2: Conducting a Coarse Frame Synchronization Over a Plurality of Said Time Slots Which Comprise a Frame

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frame timing into at least approximate step with the base station's frame timing, such as by identifying a range within which the beginning of a frame falls.**

**HTC New Construction:** ~~using the phase angle of a frame of multiple frequency correction bursts to adjust the mobile device's frame timing to within a coarse precision.~~ **Controlling a first frame synchronizing process that utilizes a corrected phase course of a detected frequency correction burst to identify a range within which the beginning of a frame falls**

HTC abandoned its original nonsensical construction that confirms it misstated, or failed to grasp, the technology underlying the 216 patent. Dr. Rose, hired to assess the "technical gist"

15

of HTC's construction, admitted the construction was nonsensical; he testified that "phase angle of a frame, I'm not sure what to make of that." (Ex. 160B at 38:13-14.)

HTC's retreat deserves no praise. It now adopts a different tactic – accept some aspects of IPCom's construction while simultaneously trying to dramatically narrow the claim. For this "response" brief, IPCom does not have an explanation of HTC's new construction to which it can respond, but, there are serious facial flaws in this new construction. First, the specification plainly associates coarse frame synchronization to a process that "detect[s] approximately the frame beginning for a particular channel." (Ex. 2 at 5:55-58.) But the claim language is plainly broader and thus IPCom's construction that identifies the technique as exemplary is appropriate.

Second, IPCom already addressed the absence of grounds to read "phase course" techniques into the claim, but now HTC advocates an even narrower, improper construction of this step to require use of "a corrected phase course of a detected [FCB]." Again, HTC still does not grasp the "technical gist" of even the specification. The point of coarse frame synchronization step is *not* to correct a phase course of the FCB, but to identify the burst and use it to roughly figure out the frame timing. The specification says to use the known phase progression of the FCB as a "simple criterion for the search algorithm," showing it is not necessary to correct for poor synchronism. (*Id.* at 6:8-11.) This is reinforced because Figure 5 shows only minor changes, indicating one can use the same technique on an uncorrected FCB. As IPCom explained (IPCom Br. at 16-17), the order of steps 1.2 and 1.3 in the specification is not mandated and the processes are interwoven – here, the correction of the poor synchronism is a process used for the fine frequency synchronization. (*See also* Ex. 161 at 207:25-210:19.)

### 3.    1.3: Conducting a Fine Frequency Synchronization

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frequency in step within a desired operating accuracy with the base station frequency, such as by producing a frequency offset parameter.**

16

**HTC New Construction:** ~~having determined the frame beginning, adjusting the mobile device's frequency to within a fine precision of the phase angle of the received signal.~~ **Controlling a second frequency synchronizing process that minimizes the difference between actual and reference phase courses to bring the mobile station's frequency into precise step—within 0.1 ppm—with the base station frequency.**

HTC makes a sweeping condemnation of IPCom's addition of the phrase "such as by producing a frequency offset parameter," but our opening brief explained the specification support for that construction.    (IPCom's Br. at 16.)   HTC's complete change of claim constructions makes it hard to "respond" to its new position, but again, serious errors are immediately apparent.

In addition to incorrectly continuing the "first" and "second" themes unsupported by the specification, HTC now seeks to import into the step specific techniques described in the specification. But the specification is clear that the fine frequency synchronization is the process that allows "the oscillator frequency ... to be brought more precisely (0.1 ppm) into step with the frequency of the base station."   (Ex. 2 at 6:63-65.)   This explanation alone refutes HTC's construction, which has the additional flaw of importing a slightly more general limitation from what is set out in dependent claim 6.

Moreover, HTC improperly advocates limiting the step to a specific numerical range – 0.1 ppm. In its opening brief, IPCom pointed out the legal error in similarly attempting to limit preliminary data signal processing to frequency shifts exceeding 200 Hz. HTC abandoned that position, but now seeks to replicate its error elsewhere. That it is legal error is indisputable. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1358 (Fed. Cir. 2006) explained that "'[W]hen a claim term is expressed in general descriptive words, [the court] will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims.'" The *Conoco* court went on to explain that the language at issue "inherently recognizes that the numerical range should not limit the claim by noting that the amount of alcohol 'may

17

vary widely' and 'usually' falls within a numerical range." *Id.* Here, the specification does the same by noting that frequency must be brought "more precisely" into step and providing, via the parenthetical, what is plainly an example.

### 4.    1.4: Conducting a Fine Frame Synchronization

**IPCOM CONSTRUCTION: Controlling a process to bring the mobile station's frame timing into step within a desired operating accuracy with the base station's frame timing, such as by producing bit synchronization setting parameters.**

**HTC New Construction:** ~~using the phase angle of the frame used in step (1.2) to adjust the mobile device's frame timing to within a fine precision.~~ **Controlling a second frame synchronizing process that conducts a pattern correlation of a measured phase course relative to a reference phase course to achieve a bit-accurate determination of the frame beginning.**

As above, "responding" to HTC's completely new construction is difficult, but also just as above, its new approach is replete with errors. HTC again refers to a "second" frame synchronizing process with no basis for such a characterization. Also, as with step 1.3, HTC again improperly seeks to limit the claim scope to a specific technique described in the specification. That is legally improper, but HTC's construction is also technically incorrect.

The specification teaches first that "bit-precision synchronization takes place by the recognition and evaluation of the training sequence in the synchronization burst 13 (FIG. 1 and GSM 05.02 p. 11)." (Ex. 2 at 7:20-23.) The training sequence, as stated in the specification as well as the cited GSM specification, is a specific "bit pattern." Accordingly, skilled persons in the art would know that the specification teaches applying pattern matching to the received bits, which are fully described by I/Q data but only *partially* described by phase data alone. The specification says exactly this by explaining that one uses the pattern correlation procedure identified in several well-known texts (Ex. 2 at 7:20-30), which procedures Dr. Stark explained uses the I/Q values themselves. (Ex. 161 at 182:22-184:4.) All Figures 4A and 4B show is a *visual* representation of the bit pattern that is being correlated. But such a "cartoon," in Dr.

18

Rose's words, is not sufficient alone to allow for bit-level pattern matching. Instead, the specification is quite clear that the way in which the pattern correlation occurs is via the correlation of the I/Q values as indicated. This point is further reinforced by the specification's statement that one examine a "capture region" that "lies in a range of about plus or minus 40 sample pulses." (Ex. 2 at 7:29-31.) As Dr. Stark explains, that is about 80 pulses, or bits. (Ex. 161 at 230:2-10.) The training sequence has 64 bits and there are an additional 16 bits within the capture region to account for the uncertainty from not knowing, as a result of coarse frame synchronization, exactly where the pattern begins. (Ex. 161 at 228:15-230:21.)

Thus, technically, HTC's construction is flawed in two respects. First, it insists on using phase course analysis, even though that is not the exclusive mechanism taught in the patent. Second, it expressly ignores the patent's teaching that one correlate the bits through use of the I/Q. In short, this is another construction that goes too far, and in the wrong direction as well.

### D.    2.1: Conducting a Frame Synchronization with Fine Frequency Synchronization

**IPCOM CONSTRUCTION: Controlling a process to monitor and maintain the mobile station and base station's frame timing in step while having the mobile station and base station's frequency in step within a desired operating accuracy, such as by producing frame shift and frequency correction parameters.**

**HTC New Construction:** ~~using the phase angle of the received signal to simultaneously adjust the mobile device's frame timing and frequency.~~ **Controlling a process that, by evaluating each normal burst, produces both frame and frequency shift synchronization parameters for that burst to bring the frame timing and frequency of the mobile station in step with the base station**

Both parties now agree that "with" typically means "accompanying." (*See* IPCom Br. at 21; HTC Br. at 56.) HTC asserts "with" as used in the patent means "simultaneous," but IPCom has demonstrated that the specification does not support that understanding. (IPCom Br. at 22.) IPCom's construction appropriately reflects the principle that, during normal communication, the method maintains frame timing in step while also maintaining frequency in step.

19

HTC also claims that this phrase is incapable of construction because it is unclear whether it references a "coarse" or "fine" frame synchronization. That is incorrect. There is no need for the claim to reference a particular type of frame synchronization. Indeed, the context of the claim is that one is maintaining frame synchronization during normal communication. The specification is quite clear that to decode the data being received, one must be able to discriminate the bits. (*See* Ex. 2 at 7:55-58 ("The value produced (timing pulse shift) is a necessary parameter in order to mark the pattern sequence with bit-accuracy within the data packet or sentence.").) IPCom's construction reflects this level of precision by noting that the step requires monitoring and maintaining "frame timing in step" – without referencing the "coarse" or approximate timing required in step 1.2. HTC understands this point as its own "alternative" construction merely requires adjusting "frame timing."

As to the new aspects of HTC's construction, once again obvious flaws abound. Step 2, of which step 2.1 is a substep, recites "maintaining normal synchronization ... by means of interspersed normal synchronization bursts...." Both the structure and the plain language of the claim make clear that, after initial synchronization, the mobile station is already synchronized with the base station and that the normal bursts are evaluated to maintain synchronization. HTC conveniently overlooks this language to assert a new argument that "each" normal burst must be evaluated to produce synchronization parameters that "bring" the mobile station into synchronization. The ordinary meaning of "maintain" suggests that action is only taken when necessary, and therefore evaluating and acting upon "each" normal burst is neither dictated by the claim language nor necessary operationally given that at any particular time the phone may already be synchronized without further action. And, even if the mobile station were to evaluate the training sequence of each normal burst, the claim does not require resulting action. It simply

20

requires that interspersed normal burst be used to maintain normal synchronization. IPCom's construction is consistent with this claim language.

### E.     2.2: Carrying Out Preliminary Data Signal Processing

**IPCOM CONSTRUCTION: Preprocessing data signals to account for frequency shifts during communication.**

**HTC New Construction:** ~~analyzing the actual (current) frequency to supply a frequency correction value to the synchronization processor that, when applied to the mobile device's internal frequency, eliminates any frequency shifts exceeding 200 Hz.~~ **Preprocessing a data signal to generate a frequency correction value to be used in further signal processing of that data signal.**

HTC made a wholesale retreat from its untenable construction, yet simultaneously criticized IPCom's construction as failing to say "how" or "when" the preliminary data signal processing occurs. That is incorrect. The claim itself says that such processing occurs "during communication," which is effectively real time. This makes sense as movement of the mobile or oscillator drift may cause frequency shifts while the receiver is in operation. And, IPCom's construction explains the "how" of the preliminary data signal processing by identifying that data signals are "preprocessed."

HTC's new construction engrafts new limitations and misstates the point of preprocessing. Step 2.2 does not recite any of the new limitations. Nor does even the specification say that preprocessing is "to generate a frequency correction value." Instead, the specification says the frequency correction value has already been generated and then is supplied to the synchronization processor. It is apparent that it is supplied to the I/Q samples to correct them (Ex. 161 at 214:6-216:1) – as dependent claim 13 states. HTC nonetheless once again seeks to violate claim differentiation and read additional, unsupported elements into step 2.2.

US2008 1009331.2

F.    **Step 3: Performing Extended Synchronization During Communication as a Background Procedure by means of Interspersed Frequency Synchronization Bursts, and Steps 3.1 and 3.2.**

**IPCOM CONSTRUCTION: Preparing for synchronization with one or more neighboring cells during communication with the base station through use of interspersed frequency synchronization bursts.**

**HTC New Construction:** ~~Synchronizing with a neighboring cell by performing the claimed steps (3.1) and (3.2) on the neighboring cell's synchronization burst 13.~~ **Preparing for synchronization with one or more neighboring cells by performing claimed substep (3.1) and (3.2) on neighboring cells' interspersed synchronization bursts 13**

HTC now concedes that IPCom's proposal that this phrase means "preparing" for synchronization is correct. HTC did criticize IPCom's construction for failing to recite that this step involves using steps 3.1 and 3.2 and using only the synchronization burst. As explained above, however, there is no claim language that requires each of the substeps to be performed on the synchronization burst. Claim construction "is not an obligatory exercise in redundancy," and there is no need to reiterate what is plain on the face of the claim: to establish infringement IPCom will necessarily have to show that steps 3.1 and 3.2 are performed. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

In another retreat, HTC has yet again jettisoned much of its original constructions and attempts to use aspects of IPCom's construction to overly narrow steps 3.1 and 3.2 to particular implementations. We will address those arguments in more detail when we see them, but note for now that HTC's revised construction still sows confusion and ambiguity where none exists.

HTC contends that step 3.1 must be performed on the synchronization burst. That is incorrect as the claim language does not recite that the substep itself must use the synchronization burst – it only requires that the overall extended synchronization procedure use such a burst. HTC's own, confused, arguments demonstrate this point – it argues that the specification actually teaches use of the frequency correction burst for this step. (HTC Br. at

22

58.) That is correct – the specification says "the synchronization procedure during normal operation performs a coarse frame synchronization (frequency burst beginning)" (Ex. 2 at 8:27-30), and then continues on to say that for the "fine frame synchronization with fine frequency synchronization ... the synchronization burst 13 is used.... " (*Id.* at 8:30-32.) HTC's effort to require each substep to use the synchronization burst thus flatly contradicts the specification, and no "highly persuasive" evidence is identified to support such a result.

Indeed, we now see that, while each of the main steps recites use of a particular burst, the specification uniformly teaches that the recited bursts are *not* used in *every* substep. While step 1 recites using the FCB during initial synchronization, substeps 1.1 and 1.4 plainly do not use the FCB. Substep 1.1 instead selects and tunes to the carrier containing the desired bursts, while substep 1.4 uses the synchronization burst. Step 2 recites using the normal burst for normal synchronization – which the specification shows is used for substep 2.1, but not for the preliminary data signal processing step 2.2. And, finally, while step 3 recites using the synchronization burst for extended synchronization, the specification expressly teaches using the frequency burst for substep 3.1 and the synchronization burst for substep 3.2. In short, the 216 patent's disclosure consistently refutes HTC's efforts to require the specified bursts to be performed in each substep. That disclosure is further reinforced by the dependent claims specific recitation of particular bursts used in the various substeps. (*See, e.g.,* claims 5-6 (FCB used for fine frequency synchronization (step 1.3)); claims 7-8 (synchronization burst used for fine frame synchronization (step 1.4)); claim 9 (normal burst used for frame and fine frequency synchronization (step 2.1)); claim 11 (synchronization burst used for fine frame and fine frequency synchronization (step 3.2)).) Against the weight of this evidence, HTC offers merely conclusory statements. That is insufficient under the controlling law.

23

## G.     Dependent Claim 2 is Not Indefinite.

The full text of dependent claim 2 is set forth below:

> 2. The synchronization method of claim 1, wherein there is performed in the mobile radiotelephone the further steps of: calculating (continuous evaluation of) a phase angle from sequences of pairs of values each including an in-phase value (I) and a quadrature value (Q); and thereafter performing a continuous evaluation of said calculated phase angle.

HTC argues that the second reference to "continuous evaluation" renders the claim term indefinite because there is no "end point" specified that the second step can follow. (HTC Br. at 60.) As a preliminary matter, HTC did not explain its construction of the first clause of claim 2. This Court should, accordingly, deem HTC's construction waived and simply adopt IPCom's construction for that clause.

HTC's assertion is fundamentally flawed because there are two evaluations with two different subject matters occurring. The first involves, as even Dr. Rose agreed, calculating a particular phase point based on an I/Q sample pair. (Ex. 160B at 46:2-48:9.) The second involves evaluating the various phase points that are calculated based on the various paired samples. The second continuous evaluation thus encompasses a different subject matter – the overall phase changes plotted in time. Finally, and more simply, claim 2 recites further steps and, by statute, incorporates all the other subject matter of claim 1. Given that claim 1 recites particular conditions that must be realized (initial synchronization, etc.), the assertion that claim 2's second evaluation has no endpoint is meritless because the second evaluation ends when the relevant steps are accomplished.

## II.     The Access or 751 Patent.

### A.     Means for Receiving Information Signals.

**IPCOM CONSTRUCTION: A transceiver, or its equivalents, for receiving information signals.**

**HTC Construction: Construed function: digitizing a received signal (25) and parsing out access authorization data (45, 50, 55) to pass to the evaluation unit (60);  Corresponding structure: the structure provided and linked in the specification is insufficient to achieve the claimed function.**

HTC incorrectly states "IPCom asserts that this claim element is not a 'means-plus-function' element." (HTC Br. at 30; *compare* IPCom Br. at 33.)  IPCom plainly stated its agreement that § 112, ¶6 governed this phrase in its October 2, 2009 preliminary list. (Ex. 163 at 2.)  While IPCom's positions have remained clear and consistent, HTC's approach to claim construction is quite different, as demonstrated by its u-turn from its initial proposal that the structure for this "means" term is "transceiver unit 65 with one transmitting/receiving antenna 70" and the function needed no construction. (*See* IPCom Br. at 34, Ex. 101 at 5.)

HTC now asserts that "means for receiving information signals" is indefinite – not because that is true, but simply because it allows HTC to bootstrap itself into an invalidity argument. (HTC Br. at 30.)  This is nonsense; HTC's own brief acknowledges that the specification states the "mobile station 5, by means of its transceiver unit 65, receives the information signals . . . ." (HTC Br. at 31; Ex. 3 at 5:16-19.)  "The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim," and HTC does not explain the basis for its improper, tortured reading of "receiving information signals." *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).  HTC suggests that "receiving" requires "determining" when the signals are broadcast, "digitizing" the signals, and "segregating" data from the signals – but it offers no evidentiary support other than citing Dr. Rose's declaration. (HTC Br. at 31.)

25

Dr. Rose's declaration does not explain the basis for his opinion, other than by vague, unsourced references to the "patent disclosure." In any event, Dr. Rose has since admitted that nothing in the claim language "means for receiving information signals" requires parsing or segregating data. (Ex. 160A at 206:25-207:14.) Dr. Rose also admits to redefining the function based on what a transceiver could possibly do in his view, not what the claim language actually recites. (*Id.* at 208:12-210:4.) But whether a mobile phone may perform some or all of the additional functions he identifies, none are claimed in the phrase "receiving information signals." HTC's construction should be rejected.

### B.   Evaluation Unit

**IPCOM CONSTRUCTION: A microprocessor.**

**HTC Construction: Function:** ~~asking and ascertaining (defined below)~~ **Ambiguous as being subject to multiple potential interpretations due to grammatical errors; Corresponding Structure: No linking structure pursuant to 35 U.S.C. § 112 (1st, 2nd, and 6th), the "evaluation unit 65" [sic, 60] disclosed in the '751 patent specification provides no more information than a "means for evaluating."**

The revisions to HTC's construction of this phrase are largely incomprehensible and not explained in its brief. What is clear is that HTC is again concocting another invalidity defense – this time by asserting that "evaluation unit" is indefinite. With scant explanation, HTC jumps right to its desired conclusion that "evaluation unit" is a means-plus-function term – a conclusion on which HTC's indefiniteness argument entirely depends. (*See* HTC Br. at 32-33.)

The short shrift HTC gives its argument is insufficient to overcome the ***strong presumption*** that "evaluation unit" is not a means-plus function term as HTC claims. *See, e.g., Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("a claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply . . . the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome.") (citations omitted). Indeed, *Lighting World* explained that the *Mas-*

*Hamilton Group, Inc. v. LaGard, Inc.*, 156 F.3d 1206 (Fed. Cir. 1998), case HTC cites was "exceptional" and "provides a useful illustration of ***how unusual the circumstances must be to overcome the presumption*** that a limitation lacking the word 'means' is not in means-plus-function form." 382 F.3d at 1362 (emphasis added) (noting the patentee in *Mas-Hamilton* used "the terms 'member,' 'element,' and 'means' interchangeably" and characterized all the terms as means elements in prosecution).

Notably, HTC's brief never explains this presumption, or the other applicable legal authority on indefiniteness, to the Court. For example, HTC cites the *Halliburton* case in explaining indefiniteness (HTC Br. at 5), but omits the rather important detail that HTC's standard of proof here is ***clear and convincing evidence***:

> If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. Proof of indefiniteness requires such an exacting standard because claim construction often poses a difficult task over which expert witnesses, trial courts, and even the judges of this court may disagree. Nevertheless, this standard is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area.

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (internal citations and quotation marks omitted).

Thus, before addressing HTC's arguments, we shall pause and describe the relevant authority a bit more. "Determining whether a claim is definite requires an analysis of whether one skilled in the art would understand the bounds of the claim when read in light of the specification. If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998). *Personalized*

27

*Media* is instructive because the court also explained that "neither the fact that a 'detector' is defined in terms of its function, nor the fact that the term 'detector' does not connote a precise physical structure in the minds of those of skill in the art detracts from the definiteness of structure." 161 F.3d at 705 (citation omitted).

*Lighting World* is also instructive because the accused infringer introduced an expert declaration stating that the term "'connector' encompasses 'at least a single infinity of possible devices' and that the term 'would not provide [him] or others of ordinary skill in the lighting fixture art with sufficient structural information to put [him] on notice as to what device or component would read on the claim element.'" 382 F.3d at 1359. But this did not address the "central issue in determining whether § 112 ¶6 applies," because it relied on an "[i]mplicit ... premise that in order to be regarded as structural for purposes of § 112 ¶6, a claim limitation must identify a specific structure and not use a generic term that includes a wide variety of structures." *Id.* The Federal Circuit rejected this approach as "unduly restrictive" because:

> In considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function. . . .
>
> Thus, while it is true that the term "connector assembly" does not bring to mind a particular structure, that point is not dispositive. What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term "means for."

*Id.* at 1359-60 (internal citations omitted).

These authorities demonstrate that HTC has not met its burden of rebutting the presumption. HTC argues that the claim phrase simply references a function. (HTC Br. at 32-33.) But *Personalized Media* holds that is irrelevant to the "structure" inquiry. HTC argues that

28

"[c]ourts have routinely found such '[ ] unit' claim elements" subject to the statute and cites two cases – in both of which the terms generally modified "unit" with an adjective identical to the verb in the recited function (e.g., "reproducing unit reproducing"). (*Id.*) By contrast, there is no such corresponding "evaluating unit for evaluating" language here. Indeed, contrary to HTC's representation, courts almost invariably ***decline*** to hold "[adjective] unit" terms to be means-plus-function terms. *See, e.g., St. Clair Intellectual Property Consultants, Inc. v. Matsushita Elec. Indus. Co.*, No. 04-1436-JJF-LPS, 2009 WL 3834541, *15 (D. Del. Nov. 13, 2009) ("image pick-up unit"); *Alcatel USA Resources, Inc. v. Microsoft Corp.*, No. 6:06cv500, 2008 WL 2625852, *17-18 (E.D. Tex. June 27, 2008) ("input unit"); *SRAM Corp. v. Fox Factory, Inc.*, No. 04C2162, 2005 WL 6266955, *4 (N.D. Ill. Nov. 18, 2005) ("fluid circulation control unit"); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-cv-211-DF, 2005 WL 6220101, *10 (E.D. Tex. Sept. 28, 2005) ("controllable torque transfer unit"); *Microunity Sys. Eng'g, Inc. v. Dell, Inc.*, No. 2-04-cv-120(TJW), 2005 WL 2086026, *12 (E.D. Tex. Aug. 29, 2005) ("throughput maximizing unit"); *Avocent Redmond Corp. v. Raritan Computer, Inc.*, No. 01 Civ. 4435(PKC), 2005 WL 612722, *4 (S.D.N.Y. Mar. 11, 2005) ("signal conditioning unit" is not governed by § 112, ¶6 following remand from Federal Circuit).

To bolster its argument, HTC cites ¶31 of Dr. Rose's declaration. (HTC Br. at 33.) But his testimony unequivocally destroys HTC's argument when viewed through the lens of the proper legal standard. Dr. Rose's declaration articulates "the function of an evaluation unit, which is to receive an input and provide a decision in response" and list five structures he believes are capable of being an evaluation unit (including a microprocessor). (Rose Dec., ¶31.) In his deposition, Dr. Rose testified that he had used the term "evaluation unit" in past practice to indicate various structures (Ex. 160A at 212:16-213:3) and further testified as follows:

29

Q. As I understand it, your problem with the term evaluation unit is it doesn't suggest, to your mind, a particular structure but suggests a broad set of categories of structures which you identify -- some of which you identify here, associative memory, read only memory, logic, FPGA or even a microprocessor. Is that fair?

A. What you read, yes. (Ex. 160A at 211:13-20.)

A. *** The evaluation unit is something that does a couple of different things but the term itself, evaluation unit, I wouldn't know to do the things that -- if you told me evaluation unit, didn't show me the patent, so a nice example that we both like maybe is VCO, voltage controlled oscillator. If you say VCO, that structure immediately pops into mind for both of us at some level. There is more details down below.  Evaluation unit is generic, okay?  Did I answer your question?

Q. So just the phrase evaluation unit in your field is generic.  It could refer to anything from a comparator or to an FPGA?

A. To a program. I mean – (*Id.* at 214:6-19.)

Q. I'm sorry.  I'm keying to this point – I thought we had established, and correct me if I'm wrong, that you said evaluation unit calls into mind all these different structures for you including associative memory, read only memory, hard wire logic, FPGA or microprocessor.  Am I incorrect?

A. That's correct.  (*Id.* at 216:18-24.)

In short, Dr. Rose confirmed that skilled persons use "evaluation unit" to connote structure – albeit several classes of structures like associative memory, read-only memory, hard wired logic (i.e., a state machine), an FPGA (field programmable gate array), and a microprocessor.

Under *Lighting World* and *Personalized Media*, these admissions confirm IPCom's position and demonstrate HTC cannot rebut the presumption.  But Dr. Rose's further testimony confirms IPCom's construction as well.  Dr. Rose proceeded to acknowledge that, of the five structures identified in his declaration, only the microprocessor would have been both used in mobile phones in 1999 and also capable of performing the tasks of the evaluation unit described in the patent specification, such as generating pseudo-random numbers and carrying out program points.  He admitted that (1) "FPGAs" were not typically used in mobile phones due to their size and expense (Ex. 160A at 221:14-224:2); (2) it would not be typical to use read-only memory or

30

associative memory to generate pseudo-random numbers (as claimed) (Ex. 160A at 225:4-18);

and (3) only the FPGA and microprocessor could implement that "program points" the

specification describes the evaluation unit performing.  (*Id.* at 228:10-229:9.)  Ultimately, Dr.

Rose thus testified (*id.* at 234:20-235:4):

> Q.  Would it be reasonable to view a microprocessor as being one possible
> structure among these range of structures that an evaluation unit calls to mind?
> A.    Let's see.    The microprocessor could run the show.    Certainly the
> microprocessor could be programmed to do the various flow diagrams there, so
> that's a possibility.
> Q.  Is it a reasonable possibility?
> A.  I think so.

These admissions are significant because the phrase "evaluation unit" is not assessed for

"structure" in a vacuum devoid of the surrounding claim language and specification.  *See, e.g.*,

*Lighting World*, 382 F.3d at 1360-61 (analyzing definitions of "connector and "connect" and

portions of patent specification in holding "connector assembly" is not a means-plus-function

claim term); *Personalized Media*, 161 F.3d at 704-05 (analyzing definitions of "detector" and

specification in holding "digital detector" is not a means-plus-function claim term).  Nor are

claim terms or the specification assessed "according to … subjective impressions," but rather

their scope and definiteness are assessed via the required "objective measure that recognizes

artisans of ordinary skill are not mindless 'automatons.'"  *Source Search Technologies LLC, v.*

*LendingTree LLC*, No. 08-cv-4420, 2009 WL 4546742, at \*12 (Fed. Cir. Dec. 7, 2009).

Here, the person of ordinary skill would see the patent applicants used "evaluation unit"

almost 40 times in the 751 patent to describe a structure, not as a "verbal construct" or merely a

"substitute" or synonym for the word "means" or "mechanism." *See Lighting World*, 382 F.3d at

1360.  Indeed, when the inventors wished to recite means-plus-function claim terms, such as the

"means for receiving information signals" also in claim 13, they knew how to do so and used the

triggering word "means" followed by a function.  And, the 751 patent specification explains to

31

skilled persons that the evaluation unit has memory (which is structure), communicates with the transceiver, accesses the SIM card to obtain data, and carries out numerous "program points," including identifying the access threshold value within a larger data stream, drawing a pseudo-random number, and enabling access of the subscriber station. (IPCom Br. at 35.)

Technical dictionary definitions of the word "unit" and the definition of the modifying adjective "evaluation" further demonstrate that the phrase "evaluation unit" recites sufficient structure. (*See id.* at 35-36; Exs. 113-115.) IPCom's opening brief also identified several patents where the term "evaluation unit" or "evaluator" is used by persons skilled in various electrical arts to connote structure. (*See* IPCom Br. at 37-38; Exs. 118-120.) Additionally, with this brief, IPCom submits the expert declaration of Mr. Per Bjorndahl, an expert who actually participated in development of the relevant standards. Mr. Bjorndahl's testimony and analysis further confirms that "evaluation unit" connotes sufficient structure to a person of ordinary skill in this art. (*See generally* Bjorndahl Dec. (Ex. 150), ¶¶7-36.) Mr. Bjorndahl's declaration addresses the term itself and the specification (*id.*, ¶¶15-26), as well as other extrinsic evidence including additional patents that are in the wireless communications or electronics field, that use "evaluation unit" or a similar term to describe computer-related structures. (*Id.*, ¶¶28-36 (discussing relevant portions of patents attached as Exs. 151-156 hereto).)

While the evidence overwhelmingly demonstrates that evaluation unit connotes sufficient structure to one skilled in the art, HTC is itself on record in the Patent Office on this issue. When HTC requested reexamination of the 751 patent, it told the Patent Office that an "evaluation unit" was inherently described in two alleged prior art references, though HTC did not identify any explicit disclosure in those references of the precise structure of the "evaluation unit." (*See* Ex. 157 at Ex. G, p. 21 and Ex. H, p. 20.) When it suits, HTC has no trouble

32

understanding what an "evaluation unit" is. Regardless, under the proper legal standard, it is clear that HTC has not carried its heavy burden and IPCom's construction is correct.

     C.    **The Evaluation Unit Limitations.**

          1.    **[Evaluation Unit for Asking] When Information Signals with Access Authorization Data Means (65) as Authorization Data (45, 50, 55) are Received . . .**

**IPCOM CONSTRUCTION: The microprocessor is programmed to examine, after information signals having access authorization data have been received by the transceiver....**

**HTC New Construction:** ~~Only construable if re-written as:   Upon the evaluation unit's receipt of the access authorization data (45, 50, 55) from the means for receiving information signals (65), asking whether ....~~ **Ambiguous as being subject to multiple potential interpretations due to grammatical errors.**

HTC, perhaps recognizing the fundamental inconsistency in arguing indefiniteness and proposing claim constructions, once again shifted its position in its opening brief from what it proposed in the Joint Claim Construction Chart. (Ex. 1 at 9.) HTC's position that this phrase is incapable of construction is untenable given that HTC initially managed to craft a proposed construction very similar to IPCom's and its opening brief now offers two possible constructions for this phrase. (*See* HTC Br. at 33.) Indeed, numerous courts have held that a claim term cannot be indefinite where the accused infringer is able to propose a construction for the term. *See, e.g., Pulse Eng'g, Inc. v. Mascon, Inc.*, No. 08cv0595 JM AJB, 2009 WL 755321, at *5-6 (S.D. Cal. Mar. 9, 2009) (claim term held not indefinite where accused infringer offered two possible constructions in the alternative to its indefiniteness position); *Freescale Semiconductor, Inc. v. ProMOS Technologies, Inc.*, 561 F. Supp. 2d 732, 741-742 (E.D. Tex. 2008) (accused infringer's "alternate proposed construction reveals that there is at least some possible construction that would prevent a finding that this claim term is 'insolubly ambiguous'" and finding the "indefiniteness argument lacks merit"); *Mannatech, Inc. v. Glycobiotics Int'l, Inc.*,

No. 3-060cv-0471, 2007 WL 4386244, at *6 n.4 (N.D. Tex. Dec. 14, 2007) ("the fact that defendant proffered a proposed construction of this claim term undermines its argument that the term is 'insolubly ambiguous' and not amenable to construction") (citations omitted).

In any event, HTC's brief fails to mention the alternative construction it proposed (the language lined through above) and instead states that this claim phrase is ambiguous because it could have one of two meanings. (HTC Br. at 33.) One of the two interpretations, which requires that "the 'evaluation unit' is sent only the 'access authorization data'" by the transceiver, makes no sense and is inconsistent with the specification. (*See id.*) For example, in describing one of the preferred embodiments, the specification states that "[a]t a program point 200, the evaluation unit 60 asks the question whether the information signals received over the BCCH 25 include a bit pattern having the bit length of 10 bits [i.e., one of the bit pattern lengths described for one embodiment of access authorization data]. If so…." (Ex. 3 at 8:64-67.)

Moreover, when read in the context of the entire claim and specification, the language confirms that "when" merely signifies that the evaluation unit "asks" and "ascertains" once it has received information signals with access authorization data and if the user is trying to authorize access to the common channel. (*See, e.g.*, Ex. 3 at 5:20-25, 10:1-6.) This is straightforward and makes logical sense. It would be difficult for the evaluation unit to ask "whether the access authorization data include an access threshold value…" if it had not received access authorization data.

At most, HTC's criticisms amount to asserting the patent applicants could have written this phrase better, but that does not render a claim indefinite, and the similarity in the parties' constructions is telling. *See Halliburton*, 514 F.3d at 1249. The "asking when information signals" phrase is not insolubly ambiguous, and the Court should adopt IPCom's construction.

34

2.    **"Access Authorization Data Means (65) as Authorization Data (45, 50, 55)"**

**IPCOM CONSTRUCTION: Information about the rights of the particular subscriber station to access the telecommunications channel.**

**HTC Construction: None.   The term "access authorization data means (65)" cannot be construed, rendering the claimed phrase as a whole indefinite.**

HTC and its expert admit that IPCom is correct that "access authorization data means as authorization data" is a self-defining term that simply indicates the access authorization data means is the access authorization data itself:

- "Further, the claim recites 'access authorization data means (65) *as authorization data (45, 50, 55),*' which appears to indicate that the 'access authorization data means' might not be a structural component at all, but rather, it might be a data format." (HTC Br. at 35 (emphasis in original); *see also id.* at 39 n.12 (where HTC acknowledges "access authorization data" and "authorization data" are synonymous).)

- "Claim 13 includes the phrase 'access authorization data means (65) as authorization data (45, 50, 55).' This language equates the 'access authorization data means (65)' with 'authorization data (45, 50,55).'" (Rose Dec., ¶33.)

HTC relies on its expert to conjure confusion over this claim term because the word "means" is used. In explaining his confusion, Dr. Rose testified that he was instructed that "when you have means, it has to be a structure, a physical structure." (Ex. 160A at 239:2-10; *see also id.* at 238:2-11.) But it is well established that "a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶6." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002) (citation omitted).

HTC and its expert also point to the reference numeral 65 in the phrase "access authorization data means (65)" to suggest ambiguity.   (HTC Br. at 35; Rose Dec., ¶32.) However, § 608.01(m) of the Manual of Patent Examining Procedure ("MPEP") (Ex. 159) states that reference numerals corresponding to elements in the specification or drawings of the patent may be used in patent claims, but the "use of reference characters is to be considered as having

35

no effect on the scope of claims." *Accord Hochstein v. Microsoft Corp.*, No. 04-73071, 2009 WL 1838975, at *13 (E.D. Mich. June 22, 2009). Indeed, even HTC's expert admits that the appearance of "(65)" does not make sense in the context of the claim and cannot be referring to the transceiver. (*See* Rose Dec., ¶32.) At most, reference number 65 is a typographical error of no consequence here since these numbers do not affect claim scope. *See also Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, Nos. 2008-1218, 2009 WL 4349533, *11 (Fed. Cir. Dec. 3, 2009) (reversing district court for finding claim indefinite due to a typographical error where evidence showed skilled persons understood the meaning of the term).

HTC claims further puzzlement by creating a straw-man argument that it is unclear whether the information signals contain the access authorization data or the information signals are transmitted along with the access authorization data, and as a result it is also unclear whether the evaluation unit must identify access authorization data within the information signals or if some other component does that. (*See* HTC Br. at 36; *see also id.* at 31, 33 (same argument in relation to the "means for receiving information signals" and the "asking when . . ." limitations).). This purported confusion is addressed elsewhere by IPCom (*supra*, discussing "asking when . . ." limitation) and, in any event, does not bear on proper construction of the phrase "access authorization data means as authorization data."

Finally, HTC's attempts to create ambiguities where there are none in an effort to invalidate claim 13 should be rejected. In fact, it is perplexing that HTC understands the overall phrase "when information signals with *access authorization data means (65)* as authorization data (45, 50, 55) are received" sufficiently to formulate proposed constructions (*see supra*), yet HTC claims the emphasized portion is insolubly ambiguous and cannot be construed at all. It is well established that "the claims themselves provide substantial guidance as to the meaning of

particular claim terms" and "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314 (citation omitted). This phrase is not insolubly ambiguous, as reflected by HTC's own admissions that are consistent with IPCom's position. Furthermore, as IPCom previously stated, access authorization data is generally "information about the rights of the particular subscriber station to access the telecommunications channel," and IPCom's separate construction of "access authorization data" more specifically defines the minimum information the access rights must include. (*See* IPCom Br. at 40.)

### 3.     Access Authorization Data (45, 50, 55) or Authorization Data (45, 50, 55)

**IPCOM CONSTRUCTION: Access rights information that must at least include either (1) information indicating whether access is to be authorized based on an access threshold value or access class information, and at least one of an access threshold value or access class information or (2) access threshold value and access class information.**

**HTC Construction: bit patterns (45, 50, 55) which may include an access threshold value or alternatively different information from which the mobile station can determine whether it has access rights <u>or must wait until access authorization data are transmitted again</u>.**

HTC states that the specification defines the term "access authorization data" as three specific bit streams 45, 50, 55, but, contrary to HTC's assertions, it is very clear from the specification that these bit patterns are merely preferred embodiments and that access authorization data is not limited to any specific 10 or 13 bit patterns. (*See* IPCom Br. at 41-44.) Indeed, the specification explicitly describes that several types of information included in these bit streams are optional. (*Id.* at 43-44.) HTC's brief, not surprisingly, points to nothing in the specification or prosecution history to suggest that access authorization data should be limited to these three specific bit patterns. (*See* HTC Br. at 39-40.) Moreover, the use of the reference numerals "(45, 50, 55)" in the claim has no effect on the scope of this term. *See supra*, citing MPEP § 608.01(m) and *Hochstein*, 2009 WL 1838975 at *13.

37

HTC's only complaint about IPCom's construction is that it "states that the access threshold value *is always included in the access authorization data*." (HTC Br. at 40 (emphasis in original).) But this is not true, as IPCom's construction very clearly recites that access rights information "***must at least include either*** (1) information indicating whether access is to be authorized based on an access threshold value or access class information, ***and at least one of an access threshold value or access class information or*** (2) access threshold value and access class information."

Finally, in its opening brief, HTC for the first time added the underlined language to its proposed construction (see above) for "access authorization data." (*Compare* HTC Br. at 39 *with* Ex. 1 at 10-11.) For some reason that remains unclear, HTC seeks to read a "waiting" step into numerous claim terms in this patent. (*See* HTC Br. at 36, 39, 40.) There is simply no reason to read this "must wait . . ." language into the definition of access authorization data, as it does not describe or define what the data is. Furthermore, as IPCom explained in its opening brief with respect to the "ascertaining . . ." claim term, such a limitation is also contrary to the specification. (*See* IPCom Br. at 47.)

> 4.    **[Evaluation Unit for] Asking ... Whether Access Authorization Data (45, 50, 55) Include an Access Threshold Value (S) for Comparison of the Access Threshold Value (S) with a Random Number or a Pseudo-Random Number (R)**

**IPCOM CONSTRUCTION: The microprocessor is programmed to examine ... the access authorization data to identify an access threshold value for comparison of the access threshold value with a random (or pseudo-random) number.**

**HTC Construction:** ~~determining whether the access authorization data (45, 50, 50) includes an access threshold value (S), which is used for comparison with (R), or otherwise includes a different value~~ **Ambiguous as being subject to multiple potential interpretations due to grammatical errors.**

HTC's opening brief does not specifically address this particular claim limitation. (*See* HTC Br. at 27-41.) HTC does, however, assert that the longer phrase "asking when . . . ,

whether access authorization data (45, 50, 55) include . . ." is ambiguous due to grammatical errors and offers two possible interpretations.  (HTC Br. at 33; *see supra* for discussion of "asking when . . ." phrase.)  But each of HTC's two interpretations merely restates the claim language "asking whether the access authorization data include an access threshold value (S)" and does not identify any ambiguity associated with this particular phrase. (*See* HTC Br. at 33.) HTC also previously offered a slightly different construction for this phrase, indicated by the lined-through language above in HTC's construction above.  (*See* Ex. 1 at 10.)  At some point, perhaps HTC will take an actual position.  But given the supporting reasons IPCom explained in its opening brief (at 45-46) and the corresponding absence of explanation from HTC, the Court need not await such a development, but should simply adopt IPCom's construction.

> **5.**     **[Evaluation Unit . . .] for Ascertaining as a Function of an Outcome of a Comparison Whether an Access of the at Least One Subscriber Station (5, 10, 15, 20) to the at Least One Telecommunication Channel is Enabled**

**IPCOM CONSTRUCTION: The microprocessor is programmed ... to determine, based on an outcome of a comparison of the access threshold value and the random (or pseudo-random) number, whether to authorize the particular subscriber station access rights to the common telecommunications channel.**

**HTC Construction: comparing (S) to (R) to determine whether access to the common channel is allowed, or whether the subscriber station must wait for and check the next ~~access threshold value~~ transmission of access authorization data.**

HTC modified its construction in its opening brief, replacing the portion lined through above with the underlined words.  This change does not fix the problem with HTC's construction.  As explained in IPCom's opening brief, HTC's construction grafts new requirements onto the claim language, adding a limitation about "waiting" for which there is no textual basis in the claim and that is disclosed merely as one of two alternatives in the specification.  (*See* IPCom Br. at 46-47.)   In addition, HTC objects to the use of "microprocessor" in IPCom's construction (*see* HTC Br. at 41), but this concern really relates to

the parties' dispute over the construction of "evaluation unit," discussed *supra*. Moreover, HTC

omits a critical portion of co-inventor Mr. Hans' testimony where he testified that the evaluation

unit "would typically be a microcontroller," a term often used interchangeably with

microprocessor. (Ex. 158, at 257:10-260:20.)

### D.    Random Number or Pseudo-Random Number (R)

**IPCOM CONSTRUCTION: A generally random number generated by a microprocessor.**

**HTC Construction: a number drawn with a uniformly distributed probability from an interval of numbers.**

HTC is the party that initially proposed this term for construction (Ex. 100 at 3), but

HTC's opening brief did not address it, except to say that HTC disagreed with IPCom's inclusion

of a microprocessor. (HTC Br. at 41 n. 13.) The specification clearly states the evaluation unit

is the structure that draws the random (or pseudo-random) number, and thus IPCom has merely

substituted microprocessor for evaluation unit based on its construction of "evaluation unit."

(*See* Ex. 3 at 5:20-22, 5:60-65, 6:40-41, 6:46-48, 9:6-8 (explaining the evaluation unit draws the

number).) The Court should adopt IPCom's construction. (*See* IPCom Br. at 48-49.)

### E.    Access Threshold Value

**IPCOM CONSTRUCTION: A value used to determine whether the subscriber station is authorized to access the common telecommunications channel.**

**HTC New Construction: a broadcasted numerical value for comparison with the numerical value (R), generated in the subscriber station, to determine access rights.A numerical value optionally included in access authorization data that is transmitted at periodic intervals for controlling network access. If a mobile phone determines that the numerical value was transmitted, it will directly compare the value with a random/pseudo-random numerical value generated within the mobile phone to determine whether it can gain access rights or must wait until access authorization data are transmitted again.**

HTC radically altered its construction of "access threshold value" in its opening brief.

HTC's over-the-top new construction is unwieldy and fundamentally flawed. It reads limitations

into the term from the specification and repeats limitations that are otherwise explicit elsewhere

40

in claim 13, creating a confusing mishmash. No support exists for these radical limitations. Contrary to HTC's assertion, the specification does not explicitly define the term "access threshold value." (*See id.*) And, even if it did, we do not understand how HTC can square its new construction with the testimony of Dr. Rose, who declared that the specification defines "access threshold value" as "a value that is transmitted for the purpose of being compared with a random number...." (Rose Dec., ¶36.)

As an initial matter, that the access threshold value may be "optionally included in access authorization data" does not explain what the access threshold value is or how it is used, and IPCom's construction of "access authorization data" (discussed above) addresses this issue. Additionally, the access threshold value being "transmitted at periodic intervals for controlling network access" impermissibly reads in a limitation from the specification that is found nowhere in claim 13. HTC's own brief states that "the access threshold value (S) may be changed or otherwise might not be included at all," which is contrary to HTC's contention that it must be transmitted at periodic intervals. (*See* HTC Br. at 38.) If HTC is suggesting the "access authorization data" is what is transmitted at periodic intervals, it makes little sense to include that in the construction of "access threshold value" and HTC is once again impermissibly reading limitations from the specification into the claim.

Next, HTC's construction further states: "If a mobile phone determines that the numerical value was transmitted, it will directly compare the value with a random/pseudo-random numerical value generated within the mobile phone to determine whether it can gain access rights or must wait until access authorization data are transmitted again." There are several problems with this portion of HTC's construction.

US2008 1009331.2

First, other language in claim 13 explicitly recites a comparison of the access threshold value and the random (or pseudo-random) number—as reflected in both parties' proposed constructions for the "ascertaining" limitation (discussed *supra*). There is no reason to add such a limitation again here. Additionally, HTC seeks to sneak in a limitation that the comparison is "direct," but that is not required by the claim, which uses the open-ended "comprising" transition and there is certainly nothing in the phrase "access threshold value" that would require this additional limitation.

Second, HTC errs by asserting that the mobile phone will compare the access threshold value with the random (or pseudo-random) number merely because the phone determines the access threshold value was transmitted. This is contrary to the specification's description of the second preferred embodiment.   (*See* Ex. 3 at 8:6-62.)   In that embodiment, the access authorization data includes both access class information and access threshold value.  (*See* IPCom Br. at 41-43.) The specification explains that: "Mobile stations that belong to a user class for which the associated access channel bit is 0 can access the RACH 30 regardless of the access threshold value S and the priority threshold value P, and thus optionally without their being evaluated in the evaluation unit 60." (Ex. 3 at 8:15-19; *see also id.* at 9:36-67.)

Third, HTC's construction impermissibly requires the "mobile phone" to "determine" certain things.   HTC presumably chose "mobile phone" to avoid admitting that it is the evaluation unit that would have to make the determinations identified in HTC's proposed construction.  In any event, requiring these determinations as part of defining "access threshold value" is also problematic for reasons explained above, as well as that HTC is incorrect that the phone determines "whether it can gain access rights." As IPCom explained in its opening brief, the access threshold value is not used just to see whether the phone has access rights but whether

42

the subscriber station is "authorized to access the common telecommunications channel." (*See* IPCom Br. at 50.) Indeed, in the two instances where the specification uses the word "gain," it states "gain [or gains] ***authorization for access*** to the r30," the r30 being the exemplary common channel. (Ex. 3 at 6:38-39, 6:44-45 (emphasis added).)

Finally, the proposed limitation that the mobile phone "must wait until access authorization data are transmitted again" is HTC's third attempt to read this limitation into claim 13. (*See also* HTC's constructions of "access authorization data" and "ascertaining ....") The Court should reject reading this into the claim for the reasons IPCom previously explained.

## III.    The Handover or 830 Patent.

### A.    Claims 1, 12, and 18 are Valid.

#### 1.    The Apparatus Claims Do Not Improperly Include Method Steps.

HTC's assertion that claims 1, 12, and 18 of the 830 patent are invalid for mixing device and method steps ignores the most relevant legal authority, as well as the MPEP guidelines. *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); MPEP § 2173.05(g) (attached as Ex. 162) ("There is nothing inherently wrong with defining some part of an invention in functional terms."). These authorities confirm it is permissible to use functional language in an apparatus claim when describing the environment in which the device operates. That is what the asserted claims do, and they are thus not invalid.

HTC builds its entire argument on *IPXL Holdings v. Amazon.com*, 430 F.3d 1377 (Fed. Cir. 2005). But *IPXL Holdings* was substantially narrowed by subsequent Federal Circuit authority. In *Microprocessor Enhancement*, the Federal Circuit reaffirmed that "apparatus claims are not necessarily indefinite for using functional language." 520 F.3d at 1375. The court there explained that *IPXL Holdings* "was based on the lack of clarity as to when the mixed subject matter claim would be infringed." In *Microprocessor Enhancement*, the claim at issue

43

was directed toward a method and also recited physical structure of a system in which the claimed method was practiced. Referring to a long recitation of the structural limitations that preceded the claimed method limitations, the Federal Circuit noted that while the "preamble within a preamble" structure was unconventional, it did not render the claim indefinite under the reasoning of *IPXL* because the language did not create ambiguity as to what constituted infringement. *Microprocessor Enhancement*, 520 F.3d at 1374. Other courts have similarly acknowledged the narrow reach of *IPXL Holdings*, which "'stand[s] for the narrow rule that a single claim may not *purport to cover* a system, independent of any use of the system, and simultaneously *purport to cover* a particular use of the system.'" *Intellect Wireless Inc. v. Kyocera Comm'ns, Inc.,* No. 08C1350, 2009 WL 3259996, at *5 (N.D. Ill. Oct. 8, 2009) (emphasis added) (citing *Collaboration Props., Inc. v. Tanberg ASA*, Case No. 05-1940, 2006 U.S. Dist. LEXIS 42465, at *19 (N.D. Cal. June 22, 2006).).

Here, similar to the claims at issue in *Microprocessor Enhancement*, the asserted claims employ a "preamble within a preamble" type structure describing the functionality of the network environment in which the mobile station operates. But the claim does not recite a method requiring performance of those functions by the mobile station. Instead, the claim is explaining that the mobile station is configured *for use with* the described networks. For example, the network environment limitations of claim 1 are shown in italics below:

> 1. A mobile station *for use with* a network including a first base station and a second base station that achieves a handover from the first base station to the second base station by: storing link data for a link in a first base station, holding in reserve for the link resources of the first base station, and when the link is to be handed over to the second base station: initially maintaining a storage of the link data in the first base station, initially causing the resources of the first base station to remain held in reserve, and at a later timepoint determined by a fixed period of time predefined at a beginning of the handover, deleting the link data from the first base station and freeing up the resources of the first base station,

the mobile station comprising: an arrangement for reactivating the link with the first base station if the handover is unsuccessful.

(Ex. 4 at 8:13-30.) The functional language that describes the network in which the phone is "for use with" does not create ambiguity about what is actually being claimed—the mobile station. Accordingly, because claims 1, 12, and 18 do not claim both a mobile station and a method of using the mobile station, or the system in which the mobile station is used, they are not invalid under the reasoning of *IPXL Holdings*.

Indeed, identifying what is being claimed by describing the environment in which a claimed device functions is accepted practice. *Ricoh Co. v. Katun Corp.*, 486 F. Supp. 2d 395, 403 (D.N.J. 2007) ("This Court's claim construction was clear: the preamble gives life and meaning to the lid by describing the function of the lid and the environment in which it is designed to operate."); *see also Yodlee Inc. v. CashEdge Inc.*, No. C05-01550 SI, 2006 WL 3456610, *4 (N.D. Cal. Nov. 29, 2006) (describing as valid claims that "simply use active language to describe the *capability* of the apparatuses; they do not claim the activity itself.") (emphasis in original). Moreover, such environmental claim limitations need not directly relate to the functionality of the claimed apparatus (here, the mobile station). *See Intellect Wireless*, 2009 WL 3259996, at *5 (finding valid claim language that "does not involve a specific function of the claimed device but instead describes an act by a third party...").

In *Intellect Wireless*, the claim at issue recited a wireless portable communication device, but also included language describing an action performed by the message originator—namely, sending the caller ID with the picture to the message center. In addressing whether the inclusion of the method language rendered the device claim indefinite, the court stated:

> Although the claims at issue describe an action ...that action does not involve the operation of the claimed device and, as a result, does not prevent one of ordinary skill in the art from understanding what conduct is necessary to infringe the claims. The plain language of the claims indicates that direct infringement is

45

> limited to a communication device possessing the recited structure and capable of
> receiving a message from the message originator... .

*Intellect Wireless*, 2009 WL 3259996 at *5 (citation omitted). Here, the functional language of

claims 1, 12, and 18 simply describes the intended network environment for the claimed mobile

station just as the functional language in *Intellect Wireless* described the messagin g center

sending the caller ID information to be used by the claimed wireless device.

Although HTC seeks to broaden the rule of *IPXL Holdings* by citing two district court

cases that have relied on its holding, each of these cases is inapposite. (*See* HTC Br. at 15-16.)

In *Ariba, Inc. v. Emptoris, Inc.* No. 9:07-CV-90, 2008 WL 3482521 (E.D. Tex. Aug 7, 2008), the

patent holder asserted the device claims covered "mere use" of a web browser—necessarily

requiring the claims to cover both the device and its use. *Id.* at *7; *see also id.* at *8

(distinguishing the invalid claim from "a case of a method claim preamble reciting physical

structure of a system in which the method is practiced."). IPCom makes no such assertion here.

Second, in *Rembrandt Data Techs., LP v. AOL, LLC*, No. 1:08 CV 1009 (GBL), 2009 U.S. Dist.

LEXIS 79610 (E.D. Va. Aug. 21, 2009), the patent holder conceded that the claim covered an

apparatus and a method step, as forbidden by patent law principles, but argued that the court

should correct this as an obvious typographical error. *Id.* at *14-15; (*see also* HTC Br. at 16.)

No such infringement arguments or concessions exist here because claims 1, 12, and 18 do ***not***

cover both a method and an apparatus.

HTC separately asserts that the claims are confusing because one cannot discern whether

the network, first base station, or second base station "achieves" the handover. (*See* HTC Br. at

12.) This argument misses the mark. Not only is the mobile station what is being claimed, but

there is no ambiguity about how the handover is achieved. HTC tries to parse the network

environment language to say it is unclear whether the network, the first base station, or the

46

second base station performs the handover. But this ignores the simple fact that the operating environment indicates that the mobile is used in a network in which mobile and base stations may be involved in the handover.[5]

HTC further argues the claims are ambiguous because the means (or arrangement) in the claimed mobile station reactivates the link when the handover is ***unsuccessful*** and yet the preamble describes a network that ***achieves*** handover. (*See* HTC Br. at 13.) This is incorrect. The network-related limitations describe the general functionality of the network environment for the claimed mobile station, but what is claimed is the mobile device with the specified arrangement. Infringement thus does not hinge on whether handover is achieved, but instead on whether a mobile station is configured for use in the described network via the "arrangement" recited in the claim.

Claims 1, 12, and 18 do not cover or purport to cover both an apparatus and a method. As such, they are permissible under the applicable legal authority expressly permitting functional claiming. Furthermore, HTC's manufactured confusion over "achieving" the handover dissipates when one understands the claims are directed at a mobile station *for use with* the recited network environment. Because the claims permissibly use functional language and are not insolubly ambiguous, HTC's motion for summary judgment should be denied.

### 2. The 830 Patent Discloses Structure for The Arrangement Terms.

HTC has apparently abandoned its construction of the functions for these phrases. Nowhere does HTC explain why its manufactured language included in the Joint Chart should replace the functional language immediately following the "for." No justification can exist for

---

[5] For example, in claim 12, the first base station stores link data and the second base station informs the mobile station whether the handover can be performed. (Ex. 4 at 9:54-10:12.) This is entirely consistent with the claim language that sets forth a network environment ***including*** a first base station and a second base station that achieve handover by storing link data in the first base station, initially maintaining storage of the link data in the first base station, etc.

47

substituting new, unsupported language where the function is readily identified. Thus, IPCom's constructions that rely on the plain language of the claim should be adopted.

HTC's principal assertion is that no structure exists in the specification for performing these functions. HTC must support such a claim with "clear and convincing evidence that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001). HTC seeks to avoid this burden by reciting the *quid pro quo* involved in using a generic means expression, but "this is not a high bar: 'all one needs to do in order to obtain the benefits of [§112, ¶ 6] is to recite some structure corresponding to the means in the specification... .'" *Biomedino, LLC v. Waters Tech. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). For example, the *Budde* court held that "Harley-Davidson's expert misses the mark in not shedding any light on the significance to, or understanding of, one skilled in the art of the described 'commercially available' vacuum sensor" that was found to be sufficient structure. 250 F.3d at 1382. Thus, conclusory statements that the specification fails to teach one skilled in the art the necessary structure without an explanation of what is taught do not amount to clear and convincing evidence that one would not understand the scope of a disputed means-plus-function term.

HTC nonetheless relies on unexplained conclusions from Dr. Rose to allege the 830 patent fails to disclose sufficient structure, specifically ¶ 22 of his declaration:

> There is no disclosure in the claims or the specification of any structure corresponding with these functions. One or ordinary skill in the art would expect to see some component or circuitry that is tasked with these functions. No such structure is described in the 830 patent.

This does not rebut the evidence IPCom amassed in its opening brief, especially since Dr. Rose does not explain why one skilled in the art would expect to see some component or circuitry

beyond those plainly understood to be present in a mobile station, or why the descriptions in the patent of receiving messages over a radio link (*see, e.g.,* Ex. 4 at Fig. 1; 1:20-21), interpreting the messages (*id.* at Figs. 2-6; 6:34-36), making decisions based on the messages (*id.* at Fig. 5, 6:37-38), formulating messages based on the decisions (*id.* at Fig. 5, 6:37-38), and sending messages back over a radio link (*id.* at Fig. 5, ref. 408; 6:37) would not indicate to one skilled in the art the required transceiver and properly programmed processor. Indeed, Dr. Rose's concessions that a mobile station "has to be able to talk to the network so you've got to have a transceiver" and would be understood to have "some sort of processor. Something has to handle the data" ends this dispute as they establish exactly the same point IPCom made in opening – skilled persons would understand the specification to disclose sufficient structure. (Ex. 160B at 15:25-16:14.)

Dr. Rose's concessions are devastating to HTC's position. However, based on Dr. Rose's deposition, IPCom expects to see yet another new argument from HTC. Specifically, his reasoning now seems to be that while cell phones necessarily contain a transceiver and processor there are multiple "pieces that could be called processors of some sort" and thus it would not be clear exactly which type of processor would be implicated. (Ex. 160B at 16:8-18:4.) But these statements would still "miss the mark" as they fail to show *why* one skilled in the art would not understand the type of processor or why the mere fact that multiple programmable processors may exist in a cell phone prevents one from understanding that the structure is still a programmable processor. *See Budde*, 250 F.3d at 1832. Dr. Madisetti's declaration on the other hand explains why one skilled in the art *would* in fact understand the specification to disclose the use of a programmable processor for carrying out the logical control of the messaging flow in Figures 2-6. (Madisetti Dec., ¶¶26-28.)

49

Indeed, unlike the evidence in *Biomedino* which "suggest[ed] that there were many known ways to operate valves, including pneumatically, hydraulically, mechanically, and electrically" (490 F.3d 951), the new argument Dr. Rose articulated on-the-fly in his deposition does not indicate that there is any way to implement the functions other than through a programmable processor connected to a transceiver. Dr. Rose's point seems to simply be that there could have been a variety of programmable processors connected to different types of transceivers for carrying out the means. (*See, e.g.,* Ex. 160B at 15:25-16:16 ("Some sort of processor. Something has to handle the data. Something has to move it around. Something has to deliver it."); 21:14-18 ("That bothers me a little bit for the reasons that we just talked about. If you take a hammer to a cellphone, then now, whenever, there is different stuff. Different manufacturers do different design trade-offs.").)

This argument splits the hairs far too finely. The reason for requiring a structure is to prevent unbounded functional claiming. Here, the claim is limited to the well-known structures that implement the algorithms – which Dr. Rose did not contest were described at length in the 830 patent. Because the algorithms are the focus of the 830 patent, it understandably focuses on disclosing those algorithms.[6] The 830 patent is not silent as to physical structure however. For example, Figures 2-6 each show that a mobile station is responsible for sending and receiving messages according to the disclosed algorithms by virtue of the MS box at the top of the page with the vertical line underneath and corresponding arrows showing the message flow and

---

[6] HTC argues that the alleged lack of structure in the 830 patent is "palpable, as the patent itself recognizes that known configurations for mobile phones *cannot* accomplish functions described in the flow diagrams." (HTC Br. at 19 (emphasis in original).) HTC's own statements in its opening brief show the flaw in this reasoning. But as HTC points out its brief (at 17-18), the primary novelty in the 830 patent is the unique method – or algorithm – for handling handovers. The reason known mobile phone configurations could not accomplish the described handover techniques was not because they did not possess the basic hardware components for doing so, but because the specific algorithms disclosed in Figures 2-6 were unknown.

50

rectangular boxes showing "[c]onditions of the system as a whole, or internal processing procedures." (Ex. 4 at 3:21-24.) Also, Figure 1 shows that the mobile station (MS) is in radio contact with the rest of the network. To one skilled in the art, the patent's use of MS is a shorthand way of communicating a device inherently including certain components. (Madisetti Dec., ¶22; Ex. 160B at 22:7-10 (Rose explaining, about his own use of "mobile unit" in papers, that "there was no need to describe the details of what was inside the mobile phone.").)

Nor is there any doubt that a skilled artisan would understand the processor and transceiver to be the components the patent links to the algorithms in Figures 2-6. (*See e.g.*, Ex. 4 at 3:21-24 (describing the block portions of the diagrams extending across all three devices as representing "[c]onditions of the system as a whole, or *internal processing procedures*.") (emphasis added); 6:26-44 (describing messages *sent* and *received* by MS) (emphasis added); Figures 2-6 (showing message flow and system conditions and processing procedures carried out by MS and other components); Figure 1 (showing the MS as being in radio communication with the cellular network); 3:62-65 (describing including "key codes and encryption" with the messages, which one would understand is carried out in the processor); 6:58-64 (describing transitions from older standards to newer standards, which one would understand indicates algorithms should be implemented on a programmable component).)

Moreover, simply because the patent does not specifically use the word "transceiver" and "processor" does not mean that skilled persons would fail to understand the specification's disclosure that such components carry out the specified algorithms. *In re Dossel,* 115 F.3d 942, 946 (Fed. Cir. 1997) (holding disclosed structure was a computer even though word "computer" or equivalent was not explicitly stated). The 830 patent omits the actual words "transceiver" and "processor," but makes clear that the relevant structure sends and receives messages (*e.g.*,

51

Figures 1-6; 6:26-44); determines when a handover is desirable (*e.g.,* 3:31-33); interprets received messages (*e.g.,* 5:54-59); formulates response messages (*e.g.,* 6:34-38); performs "processing procedures" (3:21-24); is able to provide key codes and encryption with the messages (3:62-65); accounts for transitions from older to newer standards (6:58-64); and is an understood to be part of a typical mobile station (*e.g.,* Figures 1-6 and accompanying descriptions). Additionally, it is well within the realm of common experience that transceivers and processors are contained within a mobile station and are used to formulate, send, and receive messages according to a prescribed logical flow. (*See* Madisetti Dec., ¶¶23-29.); *see In re Dossel,* 115 F.3d at 947 ("bolstering" its identification of structure by noting it was "well within the realm of common experience that computers are used to generate images for display by mathematically processing digital input"). Thus, just as the *Dossel* patent disclosed to skilled persons use of a computer, without using that word, so too does the 830 patent disclose a programmable processor in connection with a transceiver for carrying out the described algorithms.

Because the 830 patent discloses structure for performing the functions of the means-plus-function terms, claims 1, 12, and 18 are valid.

### B.     Link Data

**IPCOM CONSTRUCTION: Data describing the identify and features of the mobile station and the call in which the mobile station is engaged.**

**HTC Construction: The data required for a link that both the first base station and the mobile station are capable of sending to a second base station to achieve a handover.**

HTC does not address the evidence IPCom provided concerning this phrase. Worse, HTC ignores the import of its own evidence. Dr. Rose says that link data is a "generic term" that would be understood to "describe a number of different types of information, including ... a session link, a fixed link, a data rate or information regarding channelization, timing, timing

offset, frequencies, etc." (Rose Dec., ¶23.)   This information has a common thread: it is information that describes the features of the call in which the mobile station is engaged – exactly per IPCom's construction.   And, as Dr. Rose further admits, it is important to transfer "connection information" as part of handover.   (*Id.*, ¶14.)   That testimony confirms the other aspects of IPComs construction – that the data must describe the identity and features of the mobile station and its related call, otherwise the connection cannot be preserved.   These admissions are further consistent with the part of the patent (that HTC otherwise ignores) explaining it is directed at reducing the risk of a failed handover by creating a situation where a mobile station can quickly reactivate a link with a first base station.   (Ex. 4 at 2:38-41 ("The second part relates to a method in which a forced forward HO is performed for which it is much less likely that the MS will have to clear its link.").)   And, HTC's proposed construction is yet another example of trying to limit the invention to only certain embodiments.

Ignoring these points, HTC seeks to read a network support limitation into claims 1 and 18 by tying the definition of "link data" to how the data is transferred.   That is improper.   Claims 1 and 18 are directed at an embodiment that focuses on the second part of the 830 patent— namely a handover that makes it less likely the MS will have to clear its link, such as when performing a forward handover.   Limitations concerning how the link data is transferred are not recited in the claims and should not be imparted to these claims through HTC's proposed constructions.   The specification indicates that the link data identifies such things as the capabilities of the mobile station (Ex. 4 at 2:12-15 (describing use of different standards and thus implying differing mobile abilities)), the identity of the mobile station (*id.* at 3:3-6 (describing handover)), and the call in which the mobile station is engaged (*id.* at 2:64-68 (describing interaction with telephone network)).   IPCom's construction is consistent with all embodiments,

53

specifying the content of the link data instead of a description of how it is transferred in certain embodiments, and should therefore be adopted.

C.      1) Holding in Reserve; 2) Initially Causing ... to Remain Held in Reserve

**IPCOM CONSTRUCTION: Temporarily keeping back resources of the first base station; At least temporarily maintaining link data in storage at the first base station.**

**HTC Construction:** ~~1) the base station setting channel resources aside for potential future use. (2) the base station holding the channel resources in reserve for a predetermined amount of time T to allow the mobile station time to achieve the handover.~~ **These terms are indefinite for failure to comply with 35 U.S.C. § 112.**

HTC once again ignores the fact that its own earlier proposed construction is similar in scope to IPCom's in favor of a strained indefiniteness argument. While HTC opted instead to spill ink on reciting the terms and statements in the specification, IPCom struggles to grasp how HTC's discussion demonstrates indefiniteness.

Setting that aside, claim 1 recites "holding in reserve for the link..." and then "*when the link is to be handed over* ... initially causing the resources to *remain* held in reserve." (Ex. 4 at 8:16-22 (emphasis added).) In other words, the claim sets out that the first base station holds link data in reserve for a link and then when a handover is to be performed, it initially causes the resources to remain held in reserve as opposed to immediately making those resources available. HTC's argument confuses when these functions occur. As made clear by the language "*when the link is to be handed over*" the second phrase refers to when the link is to be handed over. HTC ignores the "when the link is to be handed over" language to argue both phrases must refer to what happens during the actual handover.

HTC's argument again betrays its refusal to recognize the proper context of the 830 claims. The claims are directed at a mobile station operable on a cellular network that generally functions in a specified way. While the preamble recites how the network performs handover, a relevant part of the description of the network environment includes a description of the network

54

state prior to the handover. Thus, the first phrase indicates that the base station holds resources in reserve prior to a handover and the second phrase indicates that it continues to hold these resources while a handover is being attempted.   No indefiniteness exists, and IPCom's construction should be adopted.

### D.   Initially Maintaining a Storage

**IPCOM CONSTRUCTION: At least temporarily maintaining link data in storage at the first base station.**

**HTC Construction: Incapable of construction. In the alternative: the base station storing the link data for a predetermined amount of time in case the mobile station attempts to reestablish communications on the channel.**

HTC's treatment of this limitation in footnote 8 of its opening brief essentially repeats the same argument addressed above for "holding in reserve" and "Initially causing ... to remain held in reserve." For the reasons stated above, this term should be construed according to its ordinary meaning to mean "at least temporarily maintaining link data in storage at the first base station."

### E.   1) At a Later Timepoint Determined by a Fixed Period of Time ... ; 2) At a Later Timepoint Determined Based on a Message ... ; 3) When the Link is to be Handed Over

**IPCOM CONSTRUCTION: 1) When a timer, which has been preset and initiated before handover, expires; 2) At a later time determined from a message from either the mobile station or second base station indicating that the handover has been successful; 3) No further construction needed.**

**HTC Construction: 1) The base station deleting the link data and freeing up the link resources if a predetermined time passes after the mobile station began searching for a new base station; 2) Incapable of construction; 3) The time at which the mobile station begins searching to identify a new base station to which the link could be handed over.**

Again, HTC seeks to impart to these phrases an additional limitation that the *mobile station* must begin searching to identify a new base station for the handover. While this type of forward handover (one in which the mobile seeks the new target base station) is disclosed as an embodiment in the specification, the claim does not recite that particular limitation.   HTC

55

identifies no principle supporting reading that embodiment into the claim, and similarly identifies no basis to require the timing aspect of the claim to be triggered from when the mobile station begins such a search.

The first phrase simply indicates the period of time during which the handover takes place. HTC's argument that the plain and ordinary meaning of this phrase requires the additional function to be performed *at the moment* that the handover is achieved doesn't make sense. Nothing in the phrase or context of "when the link is to be handed over" suggests something has to be done "at the moment" of handover. In fact, the opposite is true. For example, the first limitation of "initially maintaining a storage…" happens at the beginning of the time period described as "when the link is to be handed over" and the third limitation occurring in this time period—"at a later timepoint determined…" clearly happens later—thus making clear the phrase "when the link is to be handed over" involves an interval of time and not a single moment.

**F.    1) Deleting … and Freeing Up; 2) Deleted … Released**

**IPCOM CONSTRUCTION: Removing the link data from the first base station and releasing the link resource from reserve in the first base station.**

**HTC Construction: The base station writing over a memory location and purging a communication that had been set aside by reassigning the resources.**

HTC's construction would require an extra, unclaimed limitation that is inconsistent with the teaching of the specification—namely that in addition to simply freeing up resources, the resources actually be reassigned to a new communication. This limitation is not found in the specification. In fact, the specification specifically says that the resource *can be* assigned elsewhere, not that they *must be* reassigned as HTC's construction would require. (Ex. 4 at 6:14-20.) HTC's opening brief provides no explanation for why this phrase should be construed to *require* resources to actually be reassigned elsewhere as part of the "deleting," and it is inconsistent with the specification's description that the resources *can be* reassigned—not that

56

they *must* to be.  Resources are freed up when they are made available.  The specification and claims do not require the reassignment of the resources in order to make them available.  Such a requirement would not even make sense because "freeing up" would require the resources to be "reassigned," or in other words, *not free*.  Because HTC's construction is inconsistent with the specification and claim language it should be rejected.  *See, e.g., Phillips*, 415 F.3d at 1315.

>    **G.      If the Network Cannot Support Handing Over the Link**

**IPCOM CONSTRUCTION: Plain meaning.**

**HTC Construction: If, in response to a query from the mobile station, the second base station indicates that it cannot receive the link data through the network.**

Yet again, HTC seeks to impart an additional limitation into claim language that is clear.  Here, HTC attempts to include the dependent claim limitation that the mobile station must send a query to the second base station.  (*See* Ex. 4 at 10:18-23 ("The mobile station …further comprising…an arrangement for transmitting a query to the network as to whether the network is capable of supporting the handover… .").)  "The presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim*, 358 F.3d at 910.  That is the case here and HTC offers no explanation to rebut the presumption that the limitation of sending a query from the mobile station should not be forced into the independent claim.  Nor does it provide any other reason why the plain meaning of this phrase is not sufficiently clear.  The only argument HTC offers in support of its construction for this term is that the phrase "network support" is not a term of art.  As explained in IPCom's motion to strike, the "term of art" instruction HTC provided its witness has no basis in law, so this is a meaningless point.  Regardless of whether this is a term of art, one skilled in the art could readily understand this term when read in light of the specification, and thus no further construction is required.

### H.     The Link ... is Re-established

**IPCOM CONSTRUCTION: The link is established again.**

**HTC Construction: This is a means plus function limitation with no linking structure disclosed in the specification.**

HTC originally proposed this term meant "the link is established again." (Ex. 101 at 5.) IPCom adopted this meaning, but, in the Joint Chart, HTC proposed this was a means-plus-function term lacking sufficient structure. (Ex. 1 at 18.) HTC did not address this term in its opening brief. Because it does not address this term, IPCom's construction should be adopted.

### I.     Remaining Terms

IPCom identified the support for its construction of five terms in its opening brief as to which HTC said nothing and as to which HTC provided no construction. The terms are "base station," "handover," "link," "link resource," and "resources of the first base station." The Court should therefore adopt IPCom's construction for these terms.

### CONCLUSION

IPCom respectfully requests the Court construe the claim terms and phrases identified above consistent with IPCom's proposed constructions.

Dated:  December 23, 2009

<table>
<tr><td>

Stephen E. Baskin
DC Bar Number 456015
Kilpatrick Stockton LLP
Suite 900
607 14th Street, NW
Washington , DC 20005-2018
Telephone: 202.508.5800
Facsimile: 202.508.5858

</td><td>

*/s/ Geoffrey K. Gavin*
Mitchell G. Stockwell
Geoffrey K. Gavin
Catherine E. Hart
Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA 30309-4530
Telephone:  404.815.6500
Facsimile:  404.815.6555

*Attorneys for Defendant-Counterclaim
Plaintiff IPCom GmbH & Co., KG*

</td></tr>
</table>

US2008 1009331.2

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been filed this day using the Court's CM/ECF system, which caused a copy of the same to be electronically mailed to each counsel of record in this case.

/s/ Geoffrey K. Gavin

US2008 1009331.2