**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HTC Corporation and HTC America, Inc.,

    Plaintiffs and
    Counterclaim-Defendants,

  v.

IPCom GMBH & Co., KG,

    Defendant and
    Counterclaim-Plaintiff.

Civil Action No. 1:08-cv-01897 (RMC)

## HTC CORPORATION AND HTC AMERICA, INC.'S REPLY TO IPCOM'S OPPOSITION TO HTC'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   '830 PATENT ...................................................................................................... 1

      A.    Claims 1, 12 And 18 Of The '830 Patent Cover Both An Apparatus
            And A Method Rendering The Claims Insolubly Ambiguous And
            Indefinite ................................................................................................... 1

      B.    The "Arrangement For" Limitations Lack Any Linked
            Corresponding Structure And Are Therefore Indefinite ........................... 4

      C.    The Method Steps Of "Holding In Reserve . . ." And "Initially
            Causing . . . To Remain Held In Reserve" As Recited In Claims 1
            And 18 Are Indistinguishable And Render The Claims Indefinite............ 9

III.  '751 PATENT ...................................................................................................... 10

      A.    The Limitation "Means For Receiving Information Signals" Lacks
            Structure Corresponding To Its Function And Is Therefore
            Indefinite ................................................................................................... 10

      B.    The Term "Evaluation Unit" Does Not Suggest Sufficiently
            Definite Structure To One Of Skill In The Art To Avoid Means-
            Plus-Function Treatment And Is Indefinite For Lack Of
            Corresponding Structure ........................................................................... 12

      C.    The Limitation, "Asking When Information Signals With Access
            Authorization Data Means (65) As Authorization Data (45, 50, 55)
            Are Received, Whether The Access Authorization Data (45, 50,
            55) Include An Access Threshold Value (S)" Is Insolubly
            Ambiguous ................................................................................................. 17

            1.    "Asking when . . . whether" is ambiguous as to whether the
                  evaluation unit must ask one question, or two ............................. 18

            2.    The term "information signals with access authorization
                  data means (65) as authorization data (45, 50, 55)" is
                  insolubly ambiguous ..................................................................... 20

IV.   '216 PATENT ...................................................................................................... 22

      A.    Steps Plus Function................................................................................... 22

      B.    "Conducting [] Over A Plurality Of Timeslots Which Comprise A
            Frame" Limitations Further Obfuscate Substeps (1.2) And (1.4)............ 23

      C.    Substep (2.2) Is Insolubly Ambiguous .................................................... 24

V.    CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*55 Brake, LLC v. Audi of N. Am., Inc.*,
  No. CV-08-177-S-BLW, 2009 WL 2044424 (D. Idaho July 8, 2009) .................................... 14

*Application of Hammack*,
  427 F.2d 1384 (C.C.P.A. 1970) ........................................................................................ 10

*Ariba, Inc. v. Emptoris, Inc.*,
  No. 9:07-CV-90, 2008 WL 3482521 (E.D. Tex. Aug. 7, 2008) ................................................. 4

*ASM Am., Inc. v. Genus, Inc.*,
  260 F. Supp. 2d 827 (N.D. Cal. 2002) ................................................................................. 14

*Atmel Corp. v. Information Storage Devices*,
  198 F.3d 1374 (Fed. Cir. 1999) ............................................................................................ 5

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir. 2007) ..................................................................................... *passim*

*Clinical Innovations, LLC v. Utah Med. Prods., Inc.*,
  No. 2:05-CV-634 TS, 2007 WL 2688246 (D. Utah Sept. 11, 2007) ........................................ 14

*Exxon Research & Eng'g Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001) .......................................................................................... 18

*In re Dossel*,
  115 F.3d 942 (Fed. Cir. 1997) .............................................................................................. 5

*Intellect Wireless, Inc. v. Kyocera Commc'ns, Inc.*,
  No. 08-C-1350, 2009 WL 3259996 (N.D. Ill. Oct. 8, 2009) ............................................... 2, 3

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
  430 F.3d 1377 (Fed. Cir. 2005) ......................................................................................... 2, 4

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) .......................................................................................... 17

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004) ............................................................................... 12, 13, 15

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
  324 F.3d 1308 (Fed. Cir. 2003) .......................................................................................... 11

*Masco Corp. v. United States*,
  303 F.3d 1316 (Fed. Cir. 2002) .......................................................................................... 22

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998) ...................................................................... 13

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ................................................................. *passim*

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir. 2008) ........................................................................ 2

*Nova Measuring Instruments Ltd. v. Nanometrics Inc.*,
    No. C 05-0986 MMC, 2006 WL 3491010 (N.D. Cal. Dec. 1, 2006) ...................... 16

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003) ...................................................................... 20

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998) .................................................................. 12, 13

*Rembrandt Data Techs., LP v. AOL, LLC*,
    No. 1:08cv1009 (GBL), 2009 U.S. Dist. LEXIS 79610 (E.D. Va. Aug. 21, 2009) .................. 4

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
    No. 06-C-611-C, 2007 WL 5614112 (W.D. Wis. Oct. 15, 2007) ........................... 13

*Welker Bearing Co. v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008) .................................................................. 13, 14

**Other Authorities**

35 U.S.C. § 112 ............................................................................................. *passim*

I.      **INTRODUCTION**

What a patent covers is defined by the words of its claims.  To be valid, a patent claim must have discernable metes and bounds so that one can determine whether a particular device is covered by the claim.  A claim term or phrase that is insolubly ambiguous, or a means-plus-function claim limitation without adequate linking structure disclosed in the patent specification, renders the entire claim invalid as being indefinite.

HTC's position on invalidity is the natural outcome from how the patents-in-suit were obtained.  As the inventors for the '751 and '830 patents testified, Bosch would often task engineers to spend time speculating about the nature of upcoming telecommunications protocols to be adopted by standards setting organizations.  Bosch's patent attorneys would then prepare and file German patent applications shortly in advance of meetings relating to standards setting. [Oblon Decl. Ex. A (Radimirsch Depo., 45:11-46:8; 171:14-173:24); Oblon Decl. Ex. B (Hans Depo., 138:17-21)]  Because Bosch's engineers were not designing or actually implementing the inventions and because the telecommunications standards were directed to signaling processes instead of products, it is not surprising that the disclosures in each of the patent specifications are sparse and ambiguous.

To oppose HTC's motion for summary judgment, IPCom disparages HTC's technical expert and even moves to strike his opinions while hiring three experts of its own to opine that one skilled in the art supposedly would not need the missing technical disclosure in the asserted patents.  IPCom's post-hoc rationalizations cannot make up for inadequate disclosure and claimed phrasing that is insolubly ambiguous.  The asserted claims are invalid as indefinite.

II.     **'830 PATENT**

    A.      **Claims 1, 12 And 18 Of The '830 Patent Cover Both An Apparatus And A Method Rendering The Claims Insolubly Ambiguous And Indefinite**

IPCom argues that the litany of method steps recited in apparatus claims 1, 12 and 18 of the '830 patent merely describe the "functional environment" and thus are not claim limitations.  This position is untenable because it flatly contradicts not only the patent applicants'

representations to the Patent Office that these method steps were claim limitations, but also IPCom's infringement contentions in this litigation. The Federal Circuit has clearly held that an apparatus claim that additionally recites method steps as required claim limitations is invalid as being indefinite. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("[R]eciting both an apparatus and a method of using the apparatus renders a claim indefinite under section 112, paragraph 2.").

IPCom argues that *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008) ("*MEC*") and *Intellect Wireless, Inc. v. Kyocera Commc'ns, Inc.*, No. 08-C-1350, 2009 WL 3259996 (N.D. Ill. Oct. 8, 2009) support its argument that the recited method steps in apparatus claims simply can be ignored as being part of the "environment" or "context" for the claim. Not so. In *MEC*, the Federal Circuit upheld the validity of the asserted apparatus claim because the functional language in the claim clearly was intended to further define and limit *the recited structure*, much like the functional language that necessarily accompanies a means-plus-function claim element. *Id.* at 1375. But, the format of the asserted '830 apparatus claims is radically different from the claims at issue in *MEC*. The six steps recited in asserted claims 1 and 18 for achieving a handover do not further limit the recited structure—the "arrangement for reactivating" means-plus-function element. Instead, the steps recite actions that the "first base station" undertakes. In fact, the "functional language" that actually limits the structural "arrangement"[1] of the mobile station—"reactivating the link with the first base station"—is recited separately from the method steps.[2] Therefore, the *MEC* case is simply not on point regarding the asserted apparatus claims in the '830 patent.

*Intellect Wireless* is similarly distinguishable. There, the claim at issue recited an apparatus that received a message transmitted from a "message originator" to a "wireless

---

[1] As set forth in the next subsection, the claims are additionally invalid because the means-plus-function limitation is indefinite for failure to set forth any corresponding structure in the specification.

[2] For the same reasons, the "arrangement for transmitting" and "arrangement for reestablishing" limitations of claim 12 are also hybrid in nature and invalid as indefinite.

portable communications device" where "the message originator [sends] the caller ID with the picture to the message center."  2009 WL 3259996, at *4.  The district court held that the functional language was not a limitation because, to prove infringement, the patentee need not show that the third party "message originator [sent] the caller ID with the picture to the [third party] message center," just that the apparatus received it.  *Id.* at *5.  Thus, in *Intellect Wireless*, the functional language merely added context, as opposed to patentable weight.

The key and dispositive difference between the claim in at issue in *Intellect Wireless* and the asserted claims of the '830 patent is that, during prosecution of the '830 patent, the applicants repeatedly relied upon the language in the six recited method steps to distinguish the cited prior art, arguing that the prior art failed to disclose the "claimed process":

> With respect to claims 5 and 23 [renumbered as claims 1 and 18 in the issued '830 patent], the Examiner once again cites col. 4, l. 60 – col. 5, l. 36 of [the prior art reference] for teaching "a handover from the first base station to the second base station."  However, the cited section of [the prior art reference] clearly describes a process that is completely different from the ***claimed process***: [The prior art reference] describes a so-called "semi-hard handoff," which occurs within one and the same base station.

[Oblon Decl. Ex. C (January 30, 2004 Response to Office Action, at 8 (emphasis added and removed))]  IPCom cannot walk away from the inventors' representations to the Patent Office in order to avoid the improper hybrid nature of claims 1, 12 and 18.  Tellingly, IPCom fails to address the inventors' statements to the Patent Office in its Opposition.

This case is also different from *Intellect Wireless* because, according to IPCom's infringement contentions, for HTC to infringe the patent, the recited method steps must be performed by a third party "base station" that HTC neither makes, sells nor controls.  [*See, e.g.*, Oblon Decl. Ex. D (IPCom's Resp. to HTC's First Set of Interrogs., Ex. C.1, at 3, 4 (asserting that the "holding in reserve" method step is performed by some unidentified base station which "reserves a link resource for the link"))]  Thus, to defend against IPCom's infringement claims would require HTC to secure detailed, highly confidential information, cooperation,

documentation and witnesses from base station manufacturers and other companies in order to demonstrate that the recited steps are not performed by these third party entities.

This is precisely the reason the Federal Circuit found an apparatus claim reciting method steps to be invalid. *IPXL*, 430 F.3d at 1384 ("[A]s a result of the combination of two separate statutory classes of invention, a manufacturer or seller of the claimed apparatus would not know from the claim whether it might also be liable for contributory infringement because a buyer or user of the apparatus later performs the claimed method of using the apparatus."); *accord Rembrandt Data Techs., LP v. AOL, LLC*, No. 1:08cv1009 (GBL), 2009 U.S. Dist. LEXIS 79610, at *13-*19 (E.D. Va. Aug. 21, 2009) (finding apparatus claim containing method step invalid); *Ariba, Inc. v. Emptoris, Inc.*, No. 9:07-CV-90, 2008 WL 3482521, at *8 (E.D. Tex. Aug. 7, 2008) (holding claim invalid as indefinite because the claim included a claimed method step performed by a third party unrelated to the claimed apparatus).[3] Accordingly, just like the claims at issue in *IPXL*, claims 1, 12 and 18 of the '830 patent are invalid hybrid "apparatus and method" claims.

**B.    The "Arrangement For" Limitations Lack Any Linked Corresponding Structure And Are Therefore Indefinite**

Since the '830 patent never discloses any schematics, components, or any other structure for a mobile phone, IPCom resorts to arguing that there is an "implicit" or "inherent" structure for the "arrangement for" limitations in the '830 patent and mischaracterizing HTC's expert's testimony (while simultaneously having its own experts testify about mobile phone components disclosed in other, *unrelated* patents).[4] But, the case law interpreting the requirements of § 112,

---

[3] Further, although IPCom claims that the phrase "for use with" in the asserted claims only serves to flag the functional language that follows, this is a self serving conclusion for which IPCom cites no support. Indeed, the "for use with" language from the preamble of claims 1 and 18 does more than just set out the intended use or purpose of the invention; the claims recite steps containing actions to be performed, which the inventors intended to claim.

[4] Since IPCom became aware of HTC's intent to argue indefiniteness when the parties exchanged claim construction positions, IPCom addressed indefiniteness issues in its Opening Brief and submitted an expert declaration relating to indefiniteness concerning the '830 patent together with its Opening Brief. In HTC's Responsive Brief [at 4-10], HTC responded to the arguments that IPCom raised in its Opening Brief. In this Reply, HTC concentrates on

¶ 6 is unmistakable.  Where, as here, absolutely no corresponding disclosure is disclosed in the patent specification, a means-plus-function element is indefinite.

The *Biomedino* case, to which IPCom cites, is instructive on the issue of corresponding structure for means-plus-function limitations.  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946 (Fed. Cir. 2007).  In *Biomedino*, the court ruled that the patent at issue failed to disclose corresponding structure for a "control means" where the patent contained a figure with a box labeled "Control" and stated that the relevant process may be "controlled automatically by known differential pressure, valving and control equipment."  490 F.3d at 950.  While the patent holder in *Biomedino* argued that the disclosures in the patent would suggest that there were many known ways to operate valves, including pneumatically, hydraulically, mechanically, and electrically, the Federal Circuit dismissed these suggested, potential structures and, turning to the minimal disclosures in the patent-in-suit, found that there was "nothing to suggest a structure for the claimed control means."  *Id.* at 952.

*Biomedino* dictates the result here where the '830 patent contains no disclosure of the corresponding structure for the "arrangement for" means-plus-function limitations.  Whereas, in *Biomedino*, the patent holder at least could point to a figure labeled "Control" and a statement in the patent regarding "known" equipment, the '830 patent contains absolutely no disclosure of structure at all – not even a "black box" in a diagram or any suggestion that there were known structures for carrying out the functions of the "arrangement for" limitations.  *Biomedino*, 490 F.3d at 950.

*Biomedino* applies legal principles described in another Federal Circuit opinion, *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003).[5]  In *Medical*

responding to the arguments against indefiniteness that IPCom raised for the first time in its Opposition Brief.

[5]  The Federal Circuit decided *Biomedino* and *Medical Instrumentation* several years after *Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374 (Fed. Cir. 1999) and *In re Dossel*, 115 F.3d 942 (Fed. Cir. 1997), on which IPCom relies.  The distinctions between the "arrangement for" limitations and the limitations from *Atmel* and *In re Dossel* were discussed in HTC's Responsive Brief [at 9-10].

*Instrumentation*, the Federal Circuit held that the district court erred in identifying software as corresponding structure for "means for converting" from the patent-in-suit because there was "nothing in the specification or prosecution history that clearly links or associates software with the function of converting images into a selected format." 344 F.3d at 1211-20.  In gauging the adequacy of the disclosure, the court found that, at a minimum:

> There must be ***something*** in the disclosure to indicate to the public that the patentee intends for a ***particular*** structure to correspond to a claimed function.

*Id.* at 1218 (emphasis added).  Because the '830 patent describes no structure corresponding to the functions performed by the "arrangement for" limitations, claims 1, 12 and 18 are invalid as indefinite.

Since the '830 patent never refers to any structure for the "arrangement for" limitations, IPCom invents "implicit" or "inherent" structure to serve as the corresponding structure for the "arrangement for" limitations in the '830 patent.  In fact, IPCom cobbles together two structures—a "processor" and a "transceiver"—neither of which is disclosed in the patent.  But the identification of a generic "processor" and "transceiver" does not identify specific physical structure.  Rather, these generic terms identify entire classes of structures, which might take the form of various configurations.  IPCom's own expert, Dr. Madisetti, admitted that there is a wide variety of possible layouts that might potentially perform the functions of the "arrangement for" limitations.  [*See, e.g.*, Oblon Decl. Ex. E (Madisetti Depo., 98:20-99:3; 103:9-104:8; 109:20-110:2; 111:14-22; 132:18-133:14; 135:23-136:9; 138:19-139:24)]  The identification of such generic structure is not sufficient to satisfy the corresponding structure requirement.  *See Med. Instrumentation*, 344 F.3d at 1218 (finding "particular structure" corresponding to function recited by means-plus-function limitation must be disclosed).

IPCom's attempt to reap the benefit of means-plus-function language that extends to each and every "processor" and "transceiver" violates the quid pro quo bargain that patent applicants make when they employ means-plus-function language.  *Med. Instrumentation*, 344 F.3d at 1211 ("The duty of a patentee to clearly link or associate structure with the claimed function is the

quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6.").   As IPCom admits, "[t]he reason for requiring a structure is to prevent unbounded functional claiming."  [IPCom Opp'n at 50]  But it ignores this very principle by using the inventors' failure to include any structure in the '830 patent specification to argue that the claim covers any "processor" or "transceiver" regardless of specific structure or configuration.  This is precisely the type of "unbounded functional claiming" the corresponding structure requirement is designed to prevent.  *Med. Instrumentation*, 344 F.3d at 1211 ("If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification.")]

Showing its own lack of faith in the "implicit" or "inherent" structure argument, IPCom also claims that the '830 patent is not silent as to physical structure, arguing that the flow diagrams in Figures 2-6 of the '830 patent show an "MS" box that corresponds to the mobile station and boxes that show the conditions of the system or internal processing procedures. [IPCom Opp'n at 50]   None of this, however, discloses any physical structure, much less anything resembling a particular "processor" or "transceiver."

To distract from the '830 patent's failure to disclose any structure corresponding to the "arrangement for" limitations, IPCom attacks HTC's expert, Dr. Rose, claiming that his testimony is insufficient to meet the clear and convincing evidence standard.  IPCom's argument lacks merit.  First, IPCom seems to expect Dr. Rose to provide a detailed explanation for what is *not* contained in the '830 patent.  But all Dr. Rose can do is search for the physical structure corresponding to the "arrangement for" limitations and state the results of his search.   The support for his opinion is simply that there is no specific structure.  In Dr. Rose's declaration made in response to the declaration by IPCom's expert, he explains, in detail, that a person of ordinary skill in the art would not understand that a generic "processor" and "transceiver," as proposed by IPCom's expert, would suggest any specific physical structure corresponding to the functions of the "arrangement for" limitations.  [Rose Resp. Decl. ¶¶ 11-20]

In addition, IPCom mischaracterizes Dr. Rose's deposition testimony.  For example, IPCom states that Dr. Rose supposedly admitted that "skilled persons would understand the ['830] specification to disclose sufficient structure."  [IPCom Opp'n at 49]  Dr. Rose never made this statement.  He only said that cell phones at the time of the invention contained a "processor" and a "transceiver."  While these terms connote structural categories, Dr. Rose never identified specific structure required by the '830 patent or said that a generic "processor" and a "transceiver" were sufficient.  Similarly, IPCom asserts that Dr. Rose testified that "there was no **need** to describe the details of what was inside the mobile phone."  [*Id.* at 51 (emphasis added)]  Not true.  When asked if he described "different stuff that was inside the mobile unit" when writing papers, Dr. Rose replied that "[f]or the stuff that I was doing, which was paging and registration, there was no **reason** to describe the details of what was inside the mobile phone."  [Oblon Decl. Ex. F (Rose Depo., 273:6-12 (emphasis added))]  This testimony in no way supports IPCom's arguments.

HTC explained at length in its Responsive Brief that the arguments in IPCom's Opening Brief regarding "implicit" generic corresponding structures for the "arrangement for" limitations have no basis.  First, both the '830 patent and one of its inventors make clear that the protocol described in the '830 patent could not have been implemented on "known" mobile stations at the time of the invention and would require a new design, rendering IPCom's reliance on "implicit" or known structure nugatory.  [HTC Resp. Br. at 4-6]  Further, testimony and other evidence submitted by IPCom's expert, Dr. Madisetti, not only fail to establish that a generic "processor" and "transceiver" can accomplish the functions relating to the "arrangement for" means-plus-function limitations, but also illustrate that there is a wide array of particular structural configurations that might carry out these functions.  [*Id.* at 6-9]  Dr. Madisetti never identifies any specific structure that must carry out the recited functions.  Accordingly, the claims are invalid for failure to disclose particular corresponding structure.

While the disclosure in the '830 patent of a proposed signaling protocol may be sufficient for method claims, the Bosch inventors were tasked with setting forth at least some basic

structure to avail themselves of means-plus-function claim elements. Based on the lack of disclosure in the '830 patent and the testimony of Dr. Rose, claims 1, 12 and 18 are indefinite for failure to disclose corresponding structure for the "arrangement for" limitations.

        **C.**    **The Method Steps Of "Holding In Reserve . . ." And "Initially Causing . . . To Remain Held In Reserve" As Recited In Claims 1 And 18 Are Indistinguishable And Render The Claims Indefinite**

IPCom attempts to sever the recited method steps for "holding in reserve" and "initially causing . . . to remain held in reserve," by arguing that the method steps supposedly occur at different times – the "holding in reserve" step allegedly occurring "prior to handover" and the "initially causing" step occurring at some undefined time thereafter. [IPCom Opp'n at 54-55] But not only is IPCom's argument unsupported by the claim language itself and the patent specification, it directly contradicts IPCom's remarks to the Patent Office made during reexamination to distinguish a prior art reference:

> [The prior art] *McDonald* [reference] also fails to disclose deactivating a link at the original site **or reserving link resources at the beginning of a handover.**

[Oblon Resp. Decl. Ex. A (IPCom's '830 reexam resp. at 13 (emphasis added))] In the context of the '830 patent, it would make no sense to "hold the resources in reserve" prior to the beginning of a handover, because the reserves would still be in use.

Moreover, IPCom's proposed construction fails to provide a reasonably clear definition of the handover process and definitely point out the differences between these method steps. IPCom seeks to construe these separate steps together, adding the words "at least" to the "initially causing . . . to remain held" step. IPCom never explains the basis for the addition of "at least" to the definition of the "initially causing . . ." step. The specification does not support IPCom's definition or shed any light on IPCom's supposed distinction. And, although IPCom submitted three expert witness declarations, none of its witnesses provided any opinions concerning these terms at all, let alone any rebuttal to HTC's expert concerning this issue. Accordingly, the unrebutted evidence shows that there is absolutely no discernable difference between the two terms, which renders them indefinite. *Application of Hammack*, 427 F.2d 1384,

1389-90 (C.C.P.A. 1970) (finding a claim indefinite for failing to "set out certain of the process steps and their relationship to the other steps with sufficient particularity to provide reasonably clear definitions of [the claimed] process.").[6]

Finally, IPCom misdirects the Court with a futile argument that the method steps are supposedly "functional language" and mere context, and so the court can simply ignore the insoluble ambiguities.  As described above, IPCom's argument is inconsistent with the patent prosecution history, in which the inventors specifically described the enumerated method steps as the "claimed process" and as part of the claimed invention.

The indistinguishable nature of the "holding in reserve . . ." and "initially causing . . ." steps fails to pass the standard laid out in *Application of Hammack*.  As such, at least for the reasons stated above, as well as in HTC's Opening Brief and at pages 16-18 of HTC's Responsive Brief, the inventors have failed to give a "reasonably clear definition" of the processes in claims 1 and 18 and are invalid as indefinite.

## III.   '751 PATENT

### A.    The Limitation "Means For Receiving Information Signals" Lacks Structure Corresponding To Its Function And Is Therefore Indefinite

IPCom argues that the function for the "means for receiving information signals" is simply "receiving information signals," that the corresponding structure for that function is simply any transceiver, and that HTC's construction improperly inserts additional functional requirements into the claim limitation.[7]  But IPCom ignores that, upon identifying the function of a means-plus-function claim limitation, the court "next construe[s] the meaning of the words used to describe the claimed function, using ordinary principles of claim construction."

---

[6] HTC cited *Application of Hammack* in its Opening Brief (at 19).  IPCom has not rebutted or even addressed this statement of law and cites no case law in support of its arguments.

[7] IPCom criticizes HTC for changing its claim construction positions regarding this limitation, but, in fact, HTC's position has remained consistent since the parties submitted their joint claim construction chart to the Court on November 13, 2009.  HTC was fully entitled to change any of its preliminary initial proposed claim constructions, which, per the Court's Scheduling Order, were exchanged between the parties on October 23, 2009.

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).  This is precisely what HTC has done.

In the context of the '751 patent, "receiving" the "information signals" requires a much more complicated set of actions than merely hoisting an antenna and waiting for a data stream to arrive.  [*See* HTC Op. Br. at 30-32]  IPCom argues that HTC's proposed construction for "receiving" – which requires both (i) digitizing the "information signals" and then (ii) parsing the "access authorization data" from the rest of the "information signals" – supposedly lacks evidentiary support aside from Dr. Rose's expert declaration.  Yet, IPCom's own expert similarly understands the '751 patent to require digitizing and parsing as part of "receiving" information signals:

> But *for the purpose of the patent*, *the receiver* needs to be not only a demodulator and so -- of the radio signal, but it *also needs to be able to analyze the received digitalized information and sort out what information is relevant* for this mobile station at this situation in the state where -- in which it is at this point in time.

[Oblon Decl. Ex. G (Bjorndahl Depo., 49:24-50:8 (emphasis added); *see also id.* 49:2-12; 50:14-17 (Q. "[T]he receiver must include analog to digital converters to digitize the incoming signal, right?" A.  "Yes."); 50:18-21 (Q. "[T]he receiver must include some intelligence so as to pass on the appropriate information where it's supposed to go"?  A.  "Yes"); 60:19-61:3)]

Contrary to IPCom's assertions, HTC's Opening Brief offers ample "evidentiary support" for its position [at 30-32 (identifying specific patent citations)], and, in his deposition, Dr. Rose identified specific portions of the patent specification supporting his opinion [Oblon Decl. Ex. F (Rose Depo., 207:7-208:14)].   Further, IPCom's assertion about Dr. Rose's supposed "admission" mischaracterizes his testimony.  All Dr. Rose "admits" in the testimony cited by IPCom is that the wording of the claim limitation recites "means for receiving information signals."  Moreover, Dr. Rose did not assert that the function of "receiving information signals" must include every function that a transceiver "could possibly do."   In fact, the deposition testimony cited by IPCom says no such thing.

IPCom does not appear to propose any alternative construction for "receiving," nor does it contest that the '751 patent fails to disclose corresponding structure for digitizing and parsing the data. The '751 patent discloses nothing other than a generic "black box" in Figure 2 labeled with the reference number that corresponds to the "transceiver." IPCom's own expert admits that a "transceiver" is a complex device that might constitute a combination of several devices. [Oblon Decl. Ex. G (Bjorndahl Depo., 45:14-23)] As neither IPCom nor its expert can point to any disclosure in the patent of any "transceiver" that is capable of performing the digitizing and parsing functions, the means-plus-function term is indefinite for lack of corresponding structure that is clearly linked to the function of the means-plus-function limitation. *See Biomedino*, 490 F.3d at 950-52 (finding patent claim invalid for failure to disclose corresponding structure for "control means" where the patent contained a box labeled "Control" and a statement that the relevant process may be "controlled automatically by known differential pressure, valving and control equipment").

> **B.** **The Term "Evaluation Unit" Does Not Suggest Sufficiently Definite Structure To One Of Skill In The Art To Avoid Means-Plus-Function Treatment And Is Indefinite For Lack Of Corresponding Structure**

"The presumption that a limitation lacking the term 'means' is not subject to section 112 ¶ 6 can be overcome if it is demonstrated that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (citations and internal quotations omitted). In its attempt to stretch the holdings of the *Lighting World* and *Personalized Media Communications, LLC v. International Trade Commission*, 161 F.3d 696 (Fed. Cir. 1998) decisions well beyond their facts, IPCom tries to equate the term "evaluation unit" with a "microprocessor" – which appears nowhere in the patent. IPCom's own expert witness admitted in deposition, however, that the term "evaluation unit" is merely a "black box," that is "generic" like the nonce term "evaluation device," and is the type of terminology that one of skill in the art in the relevant industry would use only if one wanted to *avoid* setting forth any specific structure. [Oblon Decl. Ex. G (Bjorndahl Depo.,

32:17-33:11; 43:10-12; 57:17-18)]  Similarly, one of the inventors of the '751 patent admitted at his deposition that the patent sets forth only functional language instead of providing any structure.  [Oblon Decl. Ex. B (Hans Depo., 88:1-89:6)]

As described in *Lighting World*, the test for whether a term that lacks the word "means" is subject to means-plus-function treatment is whether the limitation "is used in common parlance or by persons of skill in the pertinent art to designate structure."  382 F.3d at 1359-60. The term "unit" is a vague and generic word that fails to suggest any sufficiently definite structure; rather, it is a nonce term or pure "verbal construct," like the terms "mechanism," "element," "device," or "means."  *See, e.g.*, *Personalized Media*, 161 F.3d at 704 (distinguishing "detector" from generic structural term like "means," "element," or "device" and terms lacking a clear meaning such as "widget" and "ram-a-fram"); *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1096 (Fed. Cir. 2008) (holding "mechanism" was merely a "nonce word" not recognized as the name of structure); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213-14 (Fed. Cir. 1998) (finding "lever moving element" lacks a "reasonably well understood meaning" in the relevant art).  IPCom's own expert on the '751 patent acknowledged that "unit" is simply a generic term that is a replacement for the non-descript term "device."  [Oblon Decl. Ex. G (Bjorndahl Depo., 32:17-33:11; 43:10-12; 57:17-18 ("evaluation unit" is synonymous with "device"))]

IPCom does not cite a single definition for the term "evaluation unit." In fact, Mr. Bjorndahl testified that the only definition that he found for "evaluation unit" was in an English-Swedish dictionary but he "didn't feel it was relevant" because it "was related to more general terms than [the] electronics industry."  [*Id.* at 73:12-22]  In the absence of any definition for "evaluation unit," IPCom combines the most favorable definitions it can find for the terms "unit" and "evaluation."  But even IPCom's cited definitions of "unit" confirm that the term is purely a nonce term that lacks structure, because it is merely some non-specific "device" that "functions" or "operates."  *See Silicon Graphics, Inc. v. ATI Techs., Inc.*, No. 06-C-611-C, 2007 WL 5614112, at *20 (W.D. Wis. Oct. 15, 2007) ("On its face, the term 'transmission medium' is

similar to indefinite terms such as 'element' and 'device' that could mean practically anything."); *ASM Am., Inc. v. Genus, Inc.*, 260 F. Supp. 2d 827, 856-57 (N.D. Cal. 2002) (finding the term "apparatus for introducing a purge gas" was subject to 35 U.S.C. § 112, ¶ 6 because the term "apparatus" is just a synonym for "device").  Under 35 U.S.C. § 112, ¶ 6, a patentee is allowed to use such generic terminology in its claims, but as a quid pro quo, the scope is then defined according to the accompanying and corresponding disclosure in the specification for performing the recited function.  *Med. Instrumentation*, 344 F.3d at 1211.

HTC has searched dictionaries and other relevant publications and found none that defines the term "evaluation unit," let alone identifies any structure suggested by the term. [Oblon Decl. Ex. H (compilation of excerpts of publications lacking definition of term "evaluation unit")]  The cherry-picked patents relied upon by IPCom and Mr. Bjorndahl serve only to show that others have found it necessary to further qualify the term by adding some additional adjectives so that the term has some relevant meaning and to explain what physical structure corresponds to the term for the purposes of that respective patent.  [IPCom Opp'n Br. Ex. 151 (U.S. Patent Nos. 5,117,504 ("*signal* evaluation unit")); *id.*, Ex. 152 (5,835,849 ("*special* evaluation unit")); and *id.*, Ex. 153 (6,137,262 ("*central* evaluation unit"))]

The addition of the word "evaluation" in front of "unit" describes a result and does not add any physical or structural meaning to the recited term.  *See, e.g.*, *Clinical Innovations, LLC v. Utah Med. Prods., Inc.*, No. 2:05-CV-634 TS, 2007 WL 2688246, at *7 (D. Utah Sept. 11, 2007) (finding "pressure detecting device" was a means-plus-function element because "device" is a "generic structural term" and "pressure detecting" added no structure).[8]  In fact, this point is proven by the dictionary definition for "evaluation" cited by IPCom—"the act of considering or

---

[8]  *See also Welker Bearing Co.*, 550 F.3d at 1096 (finding "mechanism for moving said finger" was subject to 35 U.S.C. § 112, ¶ 6 in part because "[n]o adjective endows the claimed 'mechanism' with a physical or structural component"); *55 Brake, LLC v. Audi of N. Am., Inc.*, No. CV-08-177-S-BLW, 2009 WL 2044424, at *3 (D. Idaho July 8, 2009) (finding "management mechanism" did not connote sufficiently definite structure in part because "management" is "exceedingly broad and does little to contribute to the structure of the term").

examining something in order to judge its value, quality, importance, extent, or condition"—
which adds no structure to the generic term "unit."  [IPCom Op. Br. at 36]  In contrast, the
*Lighting World* court found that the term "connector," the modifier in the limitation "connector
assembly," by itself, connoted structure.  382 F.3d at 1359-61.  By all accounts, the word
"evaluation" standing alone connotes no structure at all.

IPCom also claims that the specification supports its argument, but the only real reference
to "structure" is a "black box" in Figure 2 that is labeled with the reference number
corresponding to "evaluation unit."[9]  Then, without citing any portion of the specification,
IPCom simply asserts that the "evaluation unit" has a "memory" that is structural and that the
other functions the "evaluation unit" performs suggest that it has a structure.[10]  If this were true,
then there never would be means-plus-function limitations that lack the word "means" since the
language of the limitation, even if purely functional, must correspond to "a structure" at some
level.

IPCom also misconstrues Dr. Rose's testimony, arguing that "Dr. Rose testified that he
had used the term 'evaluation unit' in past practice to indicate various structures."  [IPCom
Opp'n at 29]  But the testimony cited in support for this statement relates to a "transceiver," not
an "evaluation unit."   [Oblon Decl. Ex. F (Rose Depo., 212:16-213:3)]   Other deposition
excerpts cited by IPCom illustrate only that the term "evaluation unit" *could* refer to broad
categories of structures and might suggest numerous structural possibilities, not that the term
suggests "sufficiently definite structure."  Further, while Dr. Rose states that a microprocessor
could perform the functions described in the '751 patent for the "evaluation unit," IPCom
misapplies this testimony.  The test for determining whether 35 U.S.C. § 112, ¶ 6 applies in the

---

[9]  At his deposition, IPCom's own expert referred to this figure as "simplistic."  [Oblon Decl.
Ex. G (Bjorndahl Depo., 48:8-15)]

[10]  It is not even clear which "evaluation unit" IPCom is referencing.  The '751 patent refers to an
"applicable evaluation unit," suggesting that there are multiple "evaluation units" in the mobile
station.  [IPCom Op. Br. Ex. 3 ('751 patent, 5:65)]  But none of these is identified in the patent
with any level of structural specificity.

absence of the word "means" is whether the term in the limitation at issue is used in common parlance or by persons skilled in the art to designate structure.  Dr. Rose never testified that the "evaluation unit" was used as such.  Thus, Dr. Rose's testimony does not support IPCom's argument.

While IPCom cites some cases where courts found terms taking the form "[      ] unit" not subject to means-plus-function treatment, the cited opinions give little if any explanation for their holdings.[11]  All that is shown is that the determination is fact-specific.

IPCom grasps at straws by arguing that HTC somehow admitted that the "evaluation unit" is structural when it asserted that the '751 patent is invalidated by prior art in a request for patent reexamination with the Patent Office.  As set forth in the Manual of Patent Examination Procedure, HTC could not raise indefiniteness as a basis for reexamination.  [Oblon Decl. Ex. I (MPEP § 2217 (matters relating to 35 U.S.C. § 112 are not considered when making a determination on a reexamination request))]  As IPCom would have it, HTC somehow should face a Hobson's choice of exclusively asserting indefiniteness or challenging validity based on prior art.  While the patentees' remarks made to overcome prior art rejections in reexamination may result in prosecution history disclaimer, a third party requestor's remarks are not so construed.

Finally, not only does 35 U.S.C. § 112, ¶ 6 apply to the term "evaluation unit," but the '751 specification fails to disclose any linked corresponding structure for this means-plus-function element.  The term by itself as described by IPCom's expert is a "black box" that does not suggest any specific structure and, further, there could be multiple "evaluation units" in a mobile phone that relate to different evaluations.  [Oblon Decl. Ex. G (Bjorndahl Depo., 23:4-10; 24:10-17; 54:10-14)]  An "evaluation unit" might even appear inside the transceiver.  [*Id.* at

---

[11] IPCom misstates the claim limitation in *Nova Measuring Instruments Ltd. v. Nanometrics Inc.*, No. C 05-0986 MMC, 2006 WL 3491010, at *2 (N.D. Cal. Dec. 1, 2006) as having an adjectival modifier that was the same as the verb in the function clause.  The limitation actually recites a "holding unit for *receiving* and holding the wafer in a measuring position during measurements."  *Id.*  (emphasis added).

55:10-17]  Because the term "evaluation unit" fails to suggest particular structure to one of skill in the art, the limitation is indefinite and claim 13 is therefore invalid.[12]  *See Biomedino*, 490 F.3d at 950-52.

### C.   The Limitation, "Asking When Information Signals With Access Authorization Data Means (65) As Authorization Data (45, 50, 55) Are Received, Whether The Access Authorization Data (45, 50, 55) Include An Access Threshold Value (S)" Is Insolubly Ambiguous

If there is one point upon which HTC and IPCom might agree, it is that "the patent applicants could have written the ["asking when . . ."] phrase better.  [IPCom Opp'n at 34]  The disclosure in the '751 patent specification relating to this functional language is inconsistent, and the wording in the claim itself is, at best, confusing.  But, of the multiple, equally plausible meanings that HTC has identified for this insolubly ambiguous phrase, IPCom picks one and simply announces that the others "make no sense."  [*Id.*]  Closer scrutiny reveals that the claim language is incapable of a reliable construction, rendering the claim invalid as indefinite.

IPCom makes much hay of the fact that in the parties' joint claim construction chart, HTC identified one way that the language *could be re-written* to cure the insoluble ambiguity in the recited phrase.  What IPCom neglects to mention, however, is that HTC specifically stated in the chart that the phrase is "incapable of construction" and that it was "only construable if rewritten."  To be clear, HTC had not offered a "proposed construction," but rather, it provided language to demonstrate that one of ordinary skill would need to impermissibly edit the language itself – including the incomprehensible "access authorization data means (65)" – in order to make some sense of the phrase.  Such a re-write is not a construction, however, because "[c]ourts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee."  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).  Since the intrinsic record and testimony from both HTC and IPCom's expert witnesses reveal an inability to discern the invention, one of

---

[12]  The prosecution file history of the '751 patent suggests that the examiner never examined asserted claim 13.  [*See* Oblon Decl. Ex. J ('751 File History cover pages to correspondence from the patent examiner, indicating that only claims 12-21 were "at issue" and therefore failing to mention claim 24, which corresponds to issued claim 13)]

ordinary skill could not give effect to claim 13 as written.  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

>    1.    **"Asking when . . . whether" is ambiguous as to whether the evaluation unit must ask one question, or two**

The relevant portions of the "asking when . . ." phrase are:

> an evaluation unit (60) for *asking when* information signals with access authorization data means (65) as authorization data (45, 50, 55) are received, *whether* the access authorization data (45, 50, 55) include an access threshold value (S)

[IPCom Op. Br. Ex. 3 ('751, claim 13 (emphasis added))]   As explained in HTC's Opening Brief, it is ambiguous whether the evaluation unit is "asking" two questions – that is, "*asking when*" and also "*asking whether*" – or just one ("*asking whether*").[13]

IPCom hopes to divert the focus from the particular issue by its simplistic theory that "[i]t would be difficult for the evaluation unit to ask 'whether . . .' if it had not received access authorization data."  [IPCom Opp'n at 34]  But this fails to address the real ambiguity and its two equally plausible implications – (i) must the evaluation unit be capable of determining when "information signals" have "access authorization data means" (whatever that means) or (ii) does the claimed "means for receiving" include structure for communicating this information to the evaluation unit?

Although IPCom does not directly address the ambiguity, it appears to support one interpretation while its own expert supports the other.  That is, IPCom's Opposition emphatically

---

[13]  IPCom's Opposition asserts that HTC failed to address the "asking . . . whether" term in its Opening Brief and that the Court should consequently adopt IPCom's proposed construction. [*See* IPCom Opp'n at 38-39]  HTC already addressed the serious flaws in IPCom's proposed construction for this phrase, in which IPCom seeks to improperly replace the phrase "asking . . . whether" wholesale with "examining . . . to identify" – a new phrase invented out of whole cloth. As addressed in HTC's Responsive Brief at 20-22, IPCom's proposed construction excludes the embodiment of Fig. 3b and Figure 4, and should be rejected on that basis.  If anything, IPCom's Opposition attempts to inject ambiguity at the only place where none otherwise exists.  The "asking whether" part of the clause – requiring the evaluation unit to ask whether the access authorization data (45, 50, 55) include an access threshold value (S) for comparison of the access threshold value (S) with a random number or pseudo-random number (R), is understandable on its face.

concludes that the evaluation unit is sent not only the "access authorization data," which presumably means that the evaluation unit receives the "information signals" and makes its own determination as to whether the information signals include access authorization data. [*See* IPCom Opp'n at 34]  Yet, as described above, IPCom's own expert interprets the '751 patent to disclose that the transceiver sorts out the authorization data from the received information signals and passes it on to the evaluation unit. [*See* Oblon Decl. Ex. G (Bjorndahl Depo., 60:23-61:3)]

It is understandable that IPCom and its expert would disagree, because the disclosure in the '751 patent specification is unclear.  IPCom cites to one passage in the '751 patent specification stating that "the evaluation unit 60 asks the question whether the information signals received over the BCCH 25 include a bit pattern . . . ."  [IPCom Opp'n at 34 (citing '751, 8:64-67)]  But, in other places, the '751 patent discloses that the "transceiver unit 65, receives the information signals," and "[t]he access threshold value S is delivered to the evaluation unit 60."  [IPCom Op. Br. Ex. 3 ('751, 5:16-20)]  Also, the Summary of the Invention provides that "with the information signals, access authorization data are transmitted to the at least one subscriber station; that upon reception of the access authorization data in an evaluation unit of the at least one subscriber station, the question is asked . . . ."  [*Id.* at 1:22-28]  Thus, it is far from clear whether the "evaluation unit" must first "ask when" it received information signals with access authorization data, or whether it begins operation after the transceiver already parsed out and sent it the access authorization data.

In fact, IPCom's own expert witness expressed his frustration with the sparse disclosure in the '751 patent, which provides only a "very simplistic figure" and fails to describe how to identify what information is in the received bit streams:

> But -- and that's the whole thing where you need to specify things in detail, in standards, so that people really can read out which bits are what.  And *in this patent, they haven't gone into any of those details, how to identify*.  They've just described that there are this bit streams, as I call them, which are shown in figures 3A, B, and C.

[Oblon Decl. Ex. G (Bjorndahl Depo., 63:7-13, *see also* 48:9-15)]

There could have been multiple ways to rewrite the claim to correct this ambiguity, all of which would require substantial, non-obvious rewriting of the claim:

- Add a comma between "asking' and "whether," which would clarify that the "when phrase" is meant to be adverbial, and that the evaluation unit must ask just one question: "whether."

- remove the "when" clause altogether, after which the limitation, would become "asking whether the authorization data . . ." and would be understandable.

- rewrite the "asking when . . ." phrase altogether to "upon the evaluation unit's receipt of the access authorization data (45, 50, 55) from the means for receiving information signals (65)."

- rewrite the claim as in the original German patent to which the '751 patent claims priority, rewriting the limitation to require the evaluation unit to receive ***both*** the information signals and the authorization data.  [*See* Oblon Decl. Ex. K (Translation of claim 11 of the German counterpart to the '751 patent)]

Such rewriting is impermissible, however, since it effects substantial alterations to the substance of the claim, the specification does not support any one chosen rewrite as the single, correct one, and the Court's task is to construe the claims as written.  *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357-58 (Fed. Cir. 2003) (refusing to correct an error because none of the suggested corrections were clearly supported by the specification and the prosecution history suggested that the error in the claim language was not merely cosmetic but had substantive significance).

> **2.     The term "information signals with access authorization data means (65) as authorization data (45, 50, 55)" is insolubly ambiguous**

The ambiguity about the "asking when . . ." clause is compounded by the recitation of "access authorization data means (65)" in the phrase, which is nowhere disclosed in the '751 patent specification.  IPCom argues that the term "access authorization data means" is simply "self-defining" and mischaracterizes HTC's briefing and its expert's opinion as supposedly agreeing with its proposed definition.  [*See* IPCom Opp'n at 35-37 (citing HTC Op. Br. at 35)] To be clear, in its Opening Brief HTC juxtaposed the structural limitation, "data means (65),"

with a data format, "authorization data," in order to expose the inherent flaw of such an apples-to-oranges comparison of one term to another.  Likewise, in his declaration, HTC's expert witness points out the fallacy of trying to equate the structural element with data itself.  Thus, the evidence to which IPCom points shows *the exact opposite* of IPCom's position.  [*See* HTC Op. Br. at 35; *see also* Rose Op. Br. Decl. ¶ 33]

Simply stated, there is no evidentiary support for the position that "access authorization data means" is just data.  At his deposition, IPCom's expert testified that one of ordinary skill in the art understands that the technical term "means" to refer to a *tool* used in order to accomplish something and would refer to *physical structure, logic or both*.  [Oblon Decl. Ex. G (Bjorndahl Depo., 77:5-23)]  Mere data is not a tool and it certainly is not physical structure or logic.  In the context of the '751 patent, the "access authorization data" is information that can be transmitted or received and typically, stored in memory.  In fact, the term "data means" commonly has been recited in claims of other U.S. patents to refer to a memory device.  [*See* Oblon Decl. Ex. L (U.S. Patent No. 5,883,582 at claim 2 (claiming a "configurable" static random access memory (SRAM) including the structure "data means . . . for selectively coupling said first and second data inputs")); Oblon Decl. Ex. M (U.S. Patent No. 5,664,162 at claim 27 (claiming "data means" for coupling first and second memories to the data portion of first and second buses)); Oblon Decl. Ex. N (U.S. Patent No. 4,443,864 at claim 13 (claiming a memory system with "data means" for interfacing the memory to a bus))]  There is absolutely no evidentiary support, however, for the principle that "access authorization data means" is just data.[14]

IPCom's expert also testified that a bit stream of data can be placed into "shift registers" to perform operations for determining what information is in the bit stream.  [Oblon Decl. Ex. G (Bjorndahl Depo., 61:25-62:2)]  Thus, in accordance with the testimony of IPCom's expert

---

[14] Although IPCom retained Per Bjorndahl as its expert witness for the '751 patent and submitted a declaration from Mr. Bjorndahl opining that an "evaluation unit" is supposedly just a "microprocessor," IPCom did not task Mr. Bjorndahl with responding to Dr. Rose's opinion that, to one of ordinary skill in the art, the term "access authorization data (65)" recited in the '751 patent, is ambiguous.  Thus, Dr. Rose's opinion is unrebutted by any contrary expert testimony.

witness, it is conceivable that the "access authorization data means" is a shift register or some logic for determining when the information signals include "access authorization data." But without any disclosure in the specification, one is left to speculate as to the meaning of the term.

Reading the term "access authorization data means (65)" in context with the discussion above, as well as the "asking when . . ." phrase in which it is recited, sheds some light on what mistake may have been made when the claim was drafted. Conceivably, there must have been some reason to include the reference "(65)" – which corresponds to the "transceiver" – to describe the "means." The patentee may have intended to claim a circuit or similar structural part that is connected to or a part of, or otherwise in communication with, the transceiver (65) through which information signals "are received." This theory lends credence that the phrase should have been written to recite "upon the evaluation unit's receipt of the access authorization data (45, 50, 55) from the means for receiving information signals (65)" as described above. But, because the specification and file history do not describe or define any "data means" structure at all, the claim must be found insolubly ambiguous.

## IV.    '216 PATENT

### A.    Steps Plus Function

IPCom's Opposition does not seriously respond to HTC's argument that the steps of claim 1 of the '216 patent are step-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. [*See* IPCom Opp'n at 3-6] Indeed, rather than refute HTC's assertions that the recited substeps ((1.1), (1.2), etc.) claim a function to be achieved, without claiming the acts that implement that function—IPCom just focuses on the presumptions to overcome. But, even the *Masco* authority that IPCom cites in its Opposition establishes that IPCom cannot hide behind a presumption when a "limitation contains nothing that can be construed as an act." [*Id.* (citing *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002))]

It would have been much simpler for IPCom to state what acts implement each of the claimed functions – *but it could not do so*. In fact, even the constructions proposed by IPCom are themselves stated in purely functional terms, without defining what acts implement the

functions.     For   example,   for   substep   (1.1)   which   claims   "conducting   an   initial synchronization . . .," IPCom proposes the construction "controlling a process to achieve an initial,   synchronized   connection."     IPCom's   proposed   constructions,   like   the   substeps themselves, merely declare a result to be achieved, without stating the acts to implement those functions.

As HTC explained in its Opening Brief, the consequence of the step-plus-function treatment is that claim 1 of the '216 patent is invalid for failing to meet the requirements of 35 U.S.C. § 112, ¶¶ 2, 6.

## B.     "Conducting [] Over A Plurality Of Timeslots Which Comprise A Frame" Limitations Further Obfuscate Substeps (1.2) And (1.4)[15]

The difficulty of discerning the acts claimed in substeps (1.2) and (1.4) is particularly acute  because  these  substeps  add  that  the  recited  functions  are  to  be  performed  over, respectively, "a plurality of said timeslots which comprise a frame" and "said plurality of time slots  which  comprise  a  frame."[16]    The  specification,  however,  consistently  discusses  the synchronization functions with reference to a *single* time slot.   The discussion under the heading "Coarse Frame Determination and Frame Synchronization (1.2)" in the patent concerns use of "*the* frequency correction burst 12."   [IPCom Op. Br. Ex. 2 ('216; 5:58-60)]   There is no indication that multiple frequency correction bursts – occupying a "plurality of time slots" – are provided in a single frame.   Similarly, with regard to "Fine Frame Determination and Frame Synchronization (1.4)," there is no indication that more than one burst or more than one time slot is used.   Thus, it is impossible to discern what acts are to be performed over the course of a plurality of time slots.

---

[15] HTC's Opening Brief [at 52-54] described the ambiguity associated with the recitations of "plurality" and "said" in claim 1 of the '216 patent.   Despite suggestions otherwise in the IPCom Opposition, HTC has never abandoned its contention that substeps (1.2) and (1.4) are incapable of construction for failure to comply with 35 U.S.C. § 112, ¶ 2.

[16] A TDMA "frame" consists of 8 time slots.   [*See* IPCom Op. Br. Ex. 2 ('216, Figure 1)]   Each time slot comprises 156.26 bits or symbols, and carries a burst of data.   [*See id.* at 2:13-18]

Moreover, as part of the functions to be achieved in claim 1, the '216 patent uses the word "said" to claim ambiguous dependencies among the substeps.  In particular, step (1.2) is claimed to be a function operating on "a plurality of said time slots," presumably referring to the "plurality of time slots" recited in the preamble.  Substep (1.4), in turn, claims a function to be performed on "said plurality of time slots."  Substep (1.4) could be referencing the "plurality" cited in substep (1.2), the "plurality" cited in the preamble, or both.  Neither the claim nor the specification suggests or discloses how substeps (1.2) and (1.4) are to coordinate so as to operate on the "same" plurality.  The IPCom Opposition does not shed any light on this ambiguity.  [*See* IPCom Opp'n at 15-19]

### C.    Substep (2.2) Is Insolubly Ambiguous

IPCom's Opposition [at 21] regarding substep (2.2) chooses to deflect the spotlight from the substance of the argument and onto the fact that HTC has changed its position on substep (2.2).  But HTC's change in position only reflects the fact that there is no disclosure at all in the '216 patent concerning what is meant by "carrying out preliminary data signal processing."  The specification merely discloses that "this preprocessing" results in "[a] frequency correction value produced by the central control unit 31."   [IPCom Op. Br. Ex. 2 ('216, 7:63-8:2)]   The specification further discloses that, as a result of this *unknown* "processing," the frequency correction value "completely eliminates . . . any impairment of error-free decoding in the case of frequency shifts exceeding 200 Hz."   [*Id*.]   Thus, the '216 patent only describes the goal of substep (2.2)—an ambitious goal at that.  But neither the '216 patent nor the claims specifies what acts implement that goal.  Notwithstanding that HTC's proposed construction on the term has changed, the fact remains that the acts claimed by substep (2.2) are impossible to discern.

## V.    CONCLUSION

For the reasons stated above, the court should find the asserted claims in the '830 patent, the '751 patent and the '216 patent invalid for indefiniteness.

DATED:  January 11, 2010                    PERKINS COIE LLP


                                            /s/ Michael A. Oblon
                                            John S. Skilton
                                            Perkins Coie LLP
                                            1 East Main Street, Suite 201
                                            Madison, Wisconsin  53703-5118
                                            Telephone:  (608) 663-7460
                                            Facsimile:  (608) 663-7499
                                            JSkilton@perkinscoie.com

                                            Michael A. Oblon
                                            Perkins Coie LLP
                                            607 Fourteenth Street N.W.
                                            Washington, D.C.  20005-2003
                                            Telephone:  (202) 628-6600
                                            Facsimile:  (202) 434-1690
                                            MOblon@perkinscoie.com

                                            Jonathan M. James (Admitted Pro Hac Vice)
                                            Perkins Coie Brown & Bain P.A.
                                            2901 North Central Avenue, Suite 2000
                                            Phoenix, Arizona  85012
                                            Telephone:  (602) 351-8000
                                            Facsimile:  (602) 648-7000
                                            JJames@perkinscoie.com

                                            Attorneys for Plaintiffs, Counterclaim-Defendants
                                            HTC Corporation and HTC America, Inc.