## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HTC CORPORATION et al. | ) | |
| | ) | |
| **Plaintiffs and** | ) | |
| **Counterclaim-Defendants** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:08-cv-01897- RMC** |
| | ) | |
| **IPCOM GMBH & CO., KG,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counterclaim-Plaintiff** | ) | |

### IPCOM'S RESPONSE IN OPPOSITION TO HTC'S MOTION FOR RECONSIDERATION AND
### REPLY IN SUPPORT OF IPCOM'S MOTION FOR RECONSIDERATION

Stephen E. Baskin
DC Bar Number 456015
Kilpatrick Stockton LLP
Suite 900
607 14th Street, NW
Washington , DC 20005-2018
Telephone: 202.508.5800
Facsimile: 202.508.5858

Mitchell G. Stockwell
Geoffrey K. Gavin
Catherine E. Hart
Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA  30309-4530
Telephone:  404.815.6500
Facsimile:  404.815.6555

*Attorneys for Defendant-Counterclaim Plaintiff IPCom GmbH & Co., KG*

## **INTRODUCTION**

HTC did not respond to IPCom's motion for reconsideration on the "ascertaining …" term of the '751 patent.  IPCom's motion for reconsideration should thus be granted for the reasons set forth therein.  (*See* Dkt. No. 203.)

IPCom's motion addressed a claim term that the parties barely touched on in the briefs and spent no time discussing at the *Markman* hearings.  By contrast, HTC admitted at the recent discovery hearing that it was only going to file a motion for reconsideration because IPCom had filed one.  And, the terms and issues it raises were thoroughly debated.  The parties extensively discussed step 1.1 of the '216 patent, "conducting a coarse frequency synchronization," at the January 26, 2010 technology tutorial and the February 16, 2010 *Markman* hearing.  (*See, e.g.*, Ex. A (2/16/10 *Markman* Hearing Tr.) at 61-94.)   On this term, HTC does not challenge the Court's factual findings with new evidence or legal authority; nor does HTC cite any law suggesting legal error.  HTC simply tries to justify yet another never-revealed construction[1] by re-plowing the same ground and arguments HTC already made and this Court correctly rejected.

On the "asking when …" limitation of the '751 patent, HTC's motion takes a sentence in the Court's opinion and attempts to create ambiguity fatal to the patent where none exists.  Contrary to HTC's assertion, the Court did not construe the phrase "access authorization data

---

[1] The Court previously observed that IPCom was too vigorous in criticizing HTC's repeated changes to its claim constructions.  However, the Court's scheduling order provided a schedule that set a deliberate pace with appropriate discovery for the parties to flesh out the evidence concerning proposed constructions.  Both parties took advantage of that schedule, utilizing experts, exploring extrinsic evidence, and conducting various depositions to thoroughly test each other's constructions and the relevant evidence.  HTC's new construction denies IPCom the benefit of that process, and frustrates the entire purpose of the scheduling order.  *See generally Rambus Inc. v. Hynix Semiconductor Inc.*, 569 F. Supp. 2d 946, 980 (N.D. Cal. 2008); *see also Highway Equip. Co., Inc. v. Cives Corp.*, 476 F. Supp. 2d 1079, 1085 n.8 (N.D. Iowa 2007) (awarding fees for defendant's failure timely to propose claim constructions); *Northbrook Digital, LLC v. Vendio Servs., Inc.*, No. 07-CV-2250 (PJS/JJG), 2009 WL 5214491, at *1 (D. Minn. Dec. 28, 2009) (ordering fees as sanctions where party offered "changed or new claim-construction positions").  Respectfully, reconsideration should be deemed too late under the Court's scheduling order for HTC to propose a new construction on a heavily-debated term.

means (65)" in a vacuum and suggest a definition of it be inserted into the claim as HTC does to manufacture support for its position.   Moreover, HTC's remaining arguments, and the legal authority cited, are the same arguments and authority the Court already considered and rejected.

Accordingly, HTC's motion for reconsideration, and issuance of a summary judgment that the '751 patent is invalid as indefinite, should be denied.

## ARGUMENT AND AUTHORITY

I.     **THE COURT'S CONSTRUCTION OF STEP 1.1 IS CORRECT AND CONSISTENT WITH BOTH CLAIM LANGUAGE AND THE SPECIFICATION.**

The Court reached the correct result with its construction of step 1.1.   Critically, HTC does not challenge the Court's conclusion that "'determining' and 'synchronizing' … convey different actions." (Dkt. No. 187 at 17; *compare* Dkt. No. 210 (HTC's Motion for Reconsideration) at 7.)   Understanding that determining and synchronizing are different actions inevitably leads to rejection of HTC's new construction that coarse frequency synchronization actually entails "performing a burst independent process to **_determine_**" sufficiency of carrier tuning.   HTC seeks to rewrite the claim to require step 1.1 to be "conducting a coarse frequency **_determination_**."   But the action of "determination" is not what was claimed; instead, step 1.1 claims only the action of "synchronization."   Nor is there is any question that the Court was correct in equating tuning to coarse frequency synchronization.   The Court's finding that determination and synchronization convey different actions and its correct recognition of the use of tuning in synchronization is accordingly fatal to HTC's motion.

A.     **HTC's Motion Fails to Demonstrate Any Error in the Court's Construction of Step 1.1, Much Less Error Warranting Reconsideration.**

As pointed out in IPCom's motion, it is clear that the Court may reconsider its interlocutory claim construction.   But, in doing so, the Court has the discretion to consider the circumstances of a motion for reconsideration.   *See Hamilton v. Geithner*, 616 F. Supp. 2d 49,

US2008 1677520.1

54-55 (D.D.C. 2009) (describing considerations for reconsidering an interlocutory order). IPCom's motion pointed to specific, and clear, legal error – the fact that a small portion of the Court's adopted construction was untethered to the claim language and, thus, contradicted controlling legal standards.  HTC identifies no such clear error, but instead presents arguments already considered and rejected.  Setting aside this procedural defect, however, HTC is also simply wrong, as shown below.

### 1. The Court Correctly Found Synchronization Brings the Mobile and Base Station's Frequencies into Approximate Step.

HTC incorrectly argues that "Coarse Frequency Synchronization Does Not 'Bring' the Mobile Phone into Step."  (Dkt. No. 210 at 3.)  The claim language itself refutes HTC's argument.  (*See* Dkt. No. 187 at 4-5 (noting criticality of claim language to construction).)  The claim references "frequency synchronization" that is "coarse" or approximate.  The "synchronization" term appears in many places throughout the claim and the Court agreed that the essential element of "synchronization" required the mobile and base station to be in step – either in terms of frequency or frame alignment.  (*See, e.g., Id.* at 14, 21, 27.)

Even HTC conceded this was the essential meaning of "synchronization."  (*See* Dkt. No. 159, Ex. A at 1 (proposing a construction for synchronization that includes "[b]ringing a mobile station's operation in step…"); Dkt. No. 134 at 48 (proposing a construction for synchronization that includes "[t]uning the frequency and frame timing of the mobile device…").)  The Court is, of course, entirely justified in relying on these concessions and rejecting HTC's about-face.  S*ee Exigent Tech., Inc. v. Atrana Solutions, Inc*., 442 F.3d 1301, 1306-07 n.5 (Fed. Cir. 2006) (rejecting party's challenge to lower court's claim construction where the party had "itself suggested that 'payment authority' represented a monetary value" and the lower court construed the disputed terms consistent with the challenging parties' claim charts); *F & G Research, Inc. v.*

3

*Google Inc.*, No. 06-60905-CIV, 2007 WL 2774031, at *10 (S.D. Fla. Sept. 21, 2007) ("F & G proposed a claim construction for Claim 12, and the Court accepted it.  F & G cannot now ask the Court to revisit the construction of Claim 12 simply because it is displeased with the result."); *Stairmaster Sports/Medical Prods., Inc. v. Groupe Procycle, Inc.*, 25 F. Supp. 2d 270, 281 (D. Del. 1998) (adopting construction "supported by previous claim construction charts submitted by StairMaster itself in this litigation.").  Indeed, construing synchronization in this claim phrase to require frequencies to be brought in step is even more appropriate given the well-settled rule that similar claim terms bear the same construction absent compelling contrary evidence.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) (noting presumption "that the same claim term in the same patent or related patents carries the same construed meaning.").

HTC has no such contrary evidence.  It claims that "bringing into approximate step" is unsupported by the specification, but IPCom previously pointed out places in the specification that support so construing the "synchronization" claim term.  (*See, e.g.,* '216 patent (Dkt. No. 131, Ex. 2) at 6:62-65, 2:7-11.)  HTC nonetheless attacks the Court's rationale, asserting it is inconsistent with the Court's (admittedly proper) rejection of HTC's "refining" construction.  But here too, HTC's analysis fails.  It implies that the Court found that "the disclosure in the '216 specification about 'coarse frequency synchronization' is limited to a process by which the cell phone performs a check as to ***whether*** the mobile station's frequency is in approximate step." (Dkt No. 210 at 5 (original emphasis).)  But in rejecting HTC's construction, the Court absolutely made no such finding; it instead simply explained that the ***combination*** of "coarse frequency determination and synchronization do not entail 'refining' the mobile station's

4

US2008 1677520.1

frequency" and then went on to explain the aspects of these two different actions.  (Dkt. No. 187 at 17.)

> ### 2.    The Court Correctly Identified and Applied the Distinctions Between Determination and Synchronization.

Unable to challenge the true meaning of synchronization, HTC has resorted to a blatant effort of seeking to rewrite the claim to require determination.   But in addressing the determination and synchronization processes, the Court correctly concluded that "determining" and "synchronizing" convey different actions.  (*Id*.)  HTC ignores this distinction and proposes a new construction that asks the Court to rewrite claim 1's recitation of "coarse frequency synchronization" to instead claim the optional "coarse frequency *determination*."   This is apparent from HTC's construction, which requires "performing a burst independent process *to determine* whether the carrier frequency had been tuned…." (Dkt. No. 210 at 10 (emphasis added).)

While HTC never challenges the Court's finding that determination and synchronization are different actions, HTC tries to minimize the impact of the Court's finding by asserting that "the patent defines 'coarse frequency synchronization' as a technique for performing a 'burst-independent' process that evaluates *whether* the detected carrier frequency had been tuned with sufficient precision to proceed to the remaining designated initial synchronization steps (1.2, 1.3, and 1.4)."  (Dkt. No. 210 at 4 (original emphasis).)  But that is not true; the "burst independent" operation HTC now seeks to read into "coarse synchronization" is clearly described in the specification as belonging to the action of determination.  ('216 patent at 5:33-35 ("The coarse frequency *determination* has a burst-independent operation …." ) (emphasis added).)

HTC similarly seeks to divert attention from the Court's finding by asserting that "the patentee also disclosed that the step [of 1.1] may be unnecessary, but nonetheless elected to

5

recite it in the independent claim."[2]   (Dkt. No. 210 at 1.)   That is incorrect; what the patent actually teaches is that "the coarse frequency **determination**, which is burst-independent, can be dispensed with."   ('216 patent at 5:49-50 (emphasis added).)   Thus, the patent makes clear it is only the action of determination – not the action of synchronization – that can be dispensed with. HTC's construction is wrong because it would require this optional step to be a part of Claim One.   *See, e.g., Synthon IP, Inc. v. Pfizer, Inc.*, 446 F. Supp. 2d 497, 510 (E.D. Va. 2006) (recognizing claim could not be narrowed where "[t]he specification is explicit that purification is an optional step that can be performed following isolation, and not a result achieved during or as part of isolation.").

As previously explained, the entire passage describing the optional portion of step 1.1 states "the coarse frequency determination which is burst independent can be dispensed with; in consequence the synchronization steps designated 1.2, 1.3, and 1.4 above **then** suffice **for the initial synchronization**."   (*Id.* at 5:49-52 (emphasis added).)   The reason 1.2, 1.3, and 1.4 **then** suffice for the larger process of reaching initial synchronization is that that the coarse frequency synchronization has already occurred precisely because there was "sufficient precision of carrier frequency tuning."   The "then" plainly refers to the sufficient precision of carrier frequency tuning.   Once such tuning, i.e., coarse synchronization, has occurred there is no need for the optional step of a coarse frequency determination and the method can proceed with steps 1.2, 1.3, and 1.4 to reach initial synchronization.

As IPCom pointed out at the *Markman* hearing, neither the claims nor the specification are written for lawyers or judges.  They are written for skilled persons.  (*See* Dkt. No. 187 at 4.) Skilled persons understand exactly the point IPCom has made, as Dr. Stark confirmed:

---

[2] This argument was raised by HTC at the *Markman* hearing (Ex. A at 69-71) and thoroughly addressed by IPCom (*id.* at 79-89).

> A.   It says, "With sufficient precision of carrier frequency tuning, the coarse frequency determination, which is burst independent, can be dispensed with."  So the coarse frequency determination part of the -- of Step 1.1 can be dispensed with.
>
> Q.  But remnants of Step 1.1 would still remain?
>
> A.  Yes.
>
> Q.  But at line 51 of Column 5, it says that the -- if Step 1.1 is omitted or if the option is taken to skip it, then the synchronization steps would only be -- 1.2, 1.3, and 1.4 would suffice for initial synchronization; right?
>
> A.   It's -- I could read it, but it says,   'With sufficient precision of carrier frequency tuning, the coarse frequency determination, which is burst independent, can be dispensed with.  In consequence, the synchroniza- -- synchronization steps designated 1.2, 1.3, and 1.4 above then suffice for initial synchronization," "then" meaning after you've selected, of course, the carrier frequency, which is part of 1.1.

(Dkt. No. 150, Ex. 161 (Stark Depo.) at 194:2-195:4.)  Dr. Rose likewise agreed that the "coarse frequency determination process" "has been stated in the patent as an optional step."  (Ex. B (Rose Depo.) at 192:13-14.)  Determination is optional for a simple reason.  At the time of the invention, tuning oscillators varied in precision and, if the phone had a good enough oscillator, the determination process was simply not needed.  (Dkt. No. 150 at 14 (citing draft GSM standards and testimony of Dr. Stark).)

The Court's construction correctly reflected these points.  HTC studiously ignores this, as well as the Court's appropriate reliance on the disclosure of the high frequency reception portion 21 of the cell phone that "'determines' whether the signal it detects is sufficient and then, if need be, 'tunes' or synchronizes, to that signal."  (Dkt. No. 187 at 4.)  Even though both parties' tutorials and experts agreed that the receiver scanned the various channels to detect carrier frequencies and measure their power before tuning to the carrier of interest (Ex. G (HTC technology tutorial slides for '216 patent) at 29-32; Ex. F (IPCom technology tutorial slides for

US2008 1677520.1

'216 patent) at 15; Ex. B at 72:23-73:19), HTC nonetheless criticizes the Court's reasoning that tracks this evidence.  HTC's critique does not challenge the abundant evidence showing that scanning (or detection) occurs before tuning; it instead cites Dr. Stark's testimony to argue that the Court's construction must be incorrect because nothing in the specification discloses what happens if the determination process shows that the estimated frequency is outside the tolerance range.  But HTC's arguments concerning what happens after (or even during) the determination process are entirely irrelevant given the Court's **unchallenged** finding that determination and synchronization convey different actions.

> **3.     The Court Correctly Recognized that Tuning is Intricately Interwoven into Coarse Frequency Synchronization.**

The Court's conclusion that tuning is part of coarse frequency synchronization is correct. HTC flatly disagrees, but its lead argument for disagreement is its analogy to tuning by pushing buttons on a car radio.  That hardly justifies reconsideration[3] and, in any event, the '216 patent plainly teaches the overlap between tuning and coarse frequency synchronization.

The patent shows this overlap by declaring that "[a] base station sends signals on a broadcast control channel to enable a mobile station to synchronize itself to the base station and if necessary correct its frequency standard so as to put it in line with that of the base station." ('216 patent at 2:7-11.)  The first way in which the mobile station utilizes those broadcast signals "to synchronize itself to the base station" is to tune to them.  The very definition of "tuning"

---

[3] HTC's grossly oversimplified description of tuning is contradicted repeatedly by the patent – much of which is devoted to the process needed to achieve a state where the "tuning is of a received signal that is in synchronism with a transmitted signal." ('216 patent at 4:28-29.)  Tuning can be an iterative process using both digital and analog settings to impact a number of physical components involved in the "tuning" process.  Indeed, Dr. Rose described tuning as an iterative process.  (Ex. B (Rose Depo.) at 142:20-143:18.)  These complexities explain why the patent ignores what happens if tuning is imprecise and the optional determination shows a serious frequency error outside the tolerance range.  In that case, the tuning does not actually reach the desired channel and, under HTC's oversimplified analogy, the receiver is detecting lots of "static" that would require huge resources to cut through to find the various bursts of interest.  (*Compare* Dkt. No. 131, Ex. 102 (Stark Dec.) at ¶¶ 71-72.)

US2008 1677520.1

confirms this – it is "[a]djusting the parameters and components of a circuit so that it resonates at a particular frequency."  (Ex. C at 936; *see also* Ex. D at 1303 ("[a]djustment of a receiver or circuit for maximum response to a given signal or frequency"); Ex. E at 1150 ("[t]he adjustment in relation to frequency of a circuit or system to secure optimum performance").)  "Frequency synchronization" is the process of bringing mobile and base station frequencies into step, and tuning is the manner by which the patent reveals coarse frequency synchronization may occur.

Second, the way in which the mobile station can then "if necessary correct its frequency standard" to be in line with the base station's is to utilize the frequency correction burst as described in the fine frequency synchronization step.  (*See* '216 patent at 6:59-7:16.)  The patent also reveals that the ultimate synchronization that is needed is based on "very strict requirements" set by standard.  (*Id*. at 2:65-3:2.)   To meet those standards, the patent teaches various components that "convert[t] the received signal in the high frequency receiving portion 21."  (*Id*. at  4:68-5:1.)  The conversion allows assessing whether there is a known rate of phase angle change that will occur when "the tuning is of a received signal that is in synchronism with a transmitted signal."  (*Id*. at 4:28-29; *see also* 6:62-65 (noting that "oscillator frequency … needs to be brought more precisely in step … with the frequency of the base station").)  Although the phase angle analysis is part of the fine frequency synchronization process, the patent here plainly discloses the interwoven relationship between "tuning" (or adjusting an oscillator) and achieving synchronism.

Far from teaching that tuning is separate and independent from frequency synchronization, the patent thus expressly teaches skilled persons that "tuning" is one mechanism of reaching frequency synchronization.  It is the basic first step of tuning that obtains signals whose I/Q components can be further analyzed for fine frequency adjustment through use

9

of the frequency correction burst.   That basic first step is what achieves coarse frequency synchronization, just as adjusting an oscillator based on the parameters provided as part of the fine frequency process is an example of fine frequency synchronization.   HTC's attempt to exclude tuning from the synchronization process is thus contradicted by the specification.   It is likewise contradicted by abundant and reliable additional evidence, including:

- HTC's explanation to the Patent Office in reexamination that an initial "tuning" satisfied relevant and even coarse frequency synchronization.   (*See* Dkt. No. 150, Ex. 143 at 31 (citing portions of the Canosi reference referring to examining radio carriers, evaluating power, and tuning in to the highest power as teaching coarse synchronization step).)   This is "intrinsic" evidence for claim construction.   *See Tesco Corp. v. Weatherford Int'l, Inc.,* No. H-08-2531, 2010 WL 1443540, at *1 (S.D. Tex. Jan. 5, 2010) ("this Court can consider statements and resolutions of ongoing reexamination proceedings in the context of claim construction.") (*citation omitted*); *Creo Prods. Inc. v. Presstek, Inc.*, 166 F. Supp. 2d 944, 963 n. 31 (D. Del. 2001) (stating request for reexamination is part of intrinsic evidence), *aff'd*, 305 F.3d 1337 (Fed. Cir. 2002).

- Extrinsic evidence that shows skilled persons understand tuning is the mechanism by which approximate frequency synchronization is reached.   (*See* Dkt. 150 at 13 (citing prior art patents showing initial synchronization includes tuning)*; see also* Exs. C-E.) Such extrinsic evidence has been declared to be both relevant and reliable for claim construction.   *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) (extrinsic evidence may be considered for the purposes of establishing that a particular term in the patent or prior art has a particular meaning in the relevant field.); *V-Formation, Inc. v. Benetton Group Spa,* 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("'prior art

10

cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'").

Collectively, this Court's construction is, in fact, a correct reflection of how skilled persons would understand the claim language and it should not be reconsidered.

### B.     HTC's Newest Construction Invites Multiple Errors.

The serious flaws in HTC's newest construction actually confirm the accuracy of the Court's ruling.  Many of those flaws were addressed, but HTC also tried to rely on dependent claim 3 in support of its construction.  Analysis of that claim both reinforces the accuracy of the Court's construction and demonstrates legal error in HTC's new construction.

Claim 3 confirms the Court's construction, as can best be seen by comparing claim 3 to similar language in the specification.

| Claim 3 | Specification at 5:48-50 |
|---|---|
| The synchronization method of claim 2, wherein **the precision of _said coarse frequency synchronization step_** is variable by setting a phase tolerance region (TR). | "With sufficient **precision of _carrier frequency tuning_** the coarse frequency determination which is burst-independent can be dispensed with…." |

The language in claim 3 refers to the precision of "**coarse frequency synchronization**," while the specification refers to the precision of "**carrier frequency tuning**."  These parallel phrases are an unequivocal signal that tuning is the mechanism for achieving coarse synchronization – a point confirmed by the fact that the referenced portion of the specification appears under a section titled "Coarse Frequency Determination **and Coarse Frequency Synchronization** (1.1)." ('216 patent at 5:30-31 (emphasis added).)

The very structure of the claims and specification further confirm HTC is incorrect and its new construction legally erroneous.  On the one hand, claim 1 covers the tuning process that achieves CFS.  On the other hand, claims 2 and 3 cover the optional "determination" process that

11

can estimate the precision of the tuning achieved.  Structurally, claim 3 refers back not to claim 1, but to "[t]he method of claim 2."  Claim 2, in turn, further narrowed claim 1 by requiring "the ***further steps*** of" calculation of a phase angle from I/Q values and evaluation of the calculated phase angle.  Those "further," and thus additional to claim 1, steps of calculation and evaluation are the processes used in the optional coarse frequency determination.  The specification explains how I/Q values are calculated from the detected carrier and describes the Figure 3 that is used in the determination process as "a graph showing the course of opposite extreme phase values, plotted against a digital bit sequence at the sampling rate rhythm."  ('216 patent at 4:12-14.)  The very fact that claim 2 recites the phase angle calculation and evaluation processes only used for the determination action demonstrates why HTC is incorrect.  Indeed, the Court has already held as much, ruling that "[g]iven the specificity of Claim Two's disclosed method and the generality of Claim One, HTC's proposed construction erroneously conflates the two."  (Dkt. No. 187 at 12.)

HTC's newest construction is thus another effort – dressed up in different words – to advance an argument already rejected based on a rationale HTC does not even challenge.  This is confirmed by reviewing the remaining language of claim 3 that further restricts claim 2 to determining how precise the tuning was by "setting a phase tolerance region."  Thus, claim 3 specifies that the "continuous evaluation of phase angle" in claim 2 can evaluate the level of precision tuning by comparing the phase angles received against a variably set tolerance region.  Doing so results in the coarse determination action whose purpose is to provide a "first frequency estimation" ('216 patent at 5:32-35), rather than a coarse frequency synchronization.

Of course, the introduction of the concepts of evaluating phase angles against variable tolerance regions only in dependent claims 2 and 3 unequivocally confirms that HTC's newest

12

construction of step 1.1 appearing in claim 1 is incorrect.  (*Compare* Dkt. No. 187 at 8, 13 (discussing and applying claim differentiation doctrine).)  The burst-independent operation, as HTC admits, is only used to determine the precision of carrier tuning.  It is, thus, only an operation contemplated by claim 3 and has no place in construing claim 1.

Indeed, HTC's entire approach to its new construction is yet another attempt to impart to claim 1 limitations concerning specific techniques for how the various substeps may be carried out.  As the Court correctly noted, "the understanding of the Patent and Trademark Office was that the invented method resided in the multiple steps, not in the 'phase course' analysis." (*Id*. at 12.)  HTC's "burst independent" construction is really just another attempt to impose a phase angle analysis into independent claim 1.  Yet, the Court correctly concluded that: "The focus of Claim One is the method of sequential steps and substeps, not the precise contours of how one practices the invention." (Dkt. No. 187 at 13.)  HTC ignores these appropriate rulings and argues once again for importing statements in the specification into the claims – a result that simply invites error.

Finally, HTC insists that because the specification references the coarse determination as a "burst independent operation" that operation "is a requirement that must be incorporated into the claim construction."  (Dkt. No. 210 at 9.)  But as extensively discussed during claim construction, to so import something from the specification into the claims, the patentee would have had to use "'words or expressions of manifest exclusion or restriction.'"  (Dkt. No. 187 at 13 (citation omitted).)  HTC identifies no such words, and the Court's reasoning rejecting HTC's "phase angle" constructions thus likewise suffices to reject HTC's "burst-independent operation" construction.  IPCom respectfully asks that the Court reject HTC's newest construction and deny its motion for reconsideration.

US2008 1677520.1

II.     **THE "ASKING WHEN …" LIMITATION OF CLAIM 13 IS NOT INSOLUBLY AMBIGUOUS, AND THE COURT HAS NOT IMPERMISSIBLY REWRITTEN THE CLAIM.**

In its motion, HTC attempts to use the Court's one-sentence statement about "access authorization data means" as a "new" basis to make the same old indefiniteness arguments about the "evaluation unit (60) for asking when information signals with access authorization data means (65) as authorization data (45, 50, 55) are received, whether the access authorization data …" limitation of claim 13.  HTC ignores that the Court construed the entire "asking when …" limitation and in doing so did not merely insert the words "means to analyze access authorization data" into that construction as HTC suggests.  HTC's position is nothing more than a straw-man argument concocted because HTC is looking for an easy way out of its infringement of the '751 patent by asking the Court to take the draconian action of invalidating claim 13.  The Court correctly declined to invalidate claim 13 its *Markman* order and should deny HTC's motion for reconsideration on the "asking when …" claim limitation.

A.     **HTC's Burden to Prove Claim 13 is Invalid is High, and Claims Are Not Invalid as Indefinite Merely Because Their Drafting Was Less Than Ideal.**

HTC's motion, similar to HTC's earlier claim construction briefs, conspicuously omits the relevant legal authority requiring that HTC must prove a claim limitation is "insolubly ambiguous" and thus invalid as indefinite by ***clear and convincing evidence***.  *See, e.g.*, *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).  "[I]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."  *Id.* at 1249 (citation omitted).  "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity, and we protect the inventive contribution of

14

patentees, ***even when the drafting of their patents has been less than ideal***." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (emphasis added and internal citation omitted).

**B.      The Court and the Parties Can Understand the "Asking When …" Limitation.**

While the "asking when …" limitation may be "clumsy" as the Court suggests, claim 13 is not that complicated to understand as the Court recognized at the *Markman* hearing:

> THE COURT:  Although I have to say on the last patent, maybe this is going to shock you all, but it seems to me that it's in English.  I mean, when you read the entire specification and then you get to the claims, then you get down to that claim, I will tell you what I think it means in English.  I have too much paper.  I don't want to disappoint anybody, so let me tell you where I'm coming from and that might help inform your argument.
>
> Okay.  This is before I read everything.  I just read the patent a few times and all the claims.  And I said what we have here is a cell phone with access to a channel to which other cell phones have access.
>
> The cell phone has a way to receive information signals.  The cell phone also has an evaluation unit which asks whether access authorization data received by the phone contains an access threshold value to compare with a random number.  And then ascertains after the comparison whether access is enabled.
>
> What do you think?
>
> MR. JAMES:  Pretty good, Your Honor.
>
> THE COURT:  Yeah, seems to me it's pretty much English. …

(Ex.  A  at  169:10-170:5.)    Not  surprisingly,  IPCom  and  HTC's  initial  proposed  claim constructions for the "asking when …" limitation were quite similar.  (*See* Joint Chart [Dkt. No. 125] at 9.)  The timeline below (which is slide 16 of the IPCom's *Markman* slides for the '751 patent) shows how HTC's position morphed over time.



Without being overly critical of HTC's right to change its position, it is telling that the parties started out more or less in the same place with respect to construing the "asking when …" limitation.  The reason for this is that the surrounding claim language and specification lead to only one reasonable construction of the "asking when …" limitation, which is that reached by the Court.  As briefing started, however, HTC shifted gears to argue that an ever-increasing number of possible constructions that HTC could conjure up meant that the claim limitation was so ambiguous that it was beyond construction and thus rendered claim 13 invalid.  Now, HTC seeks to create ambiguity by expanding the possibilities further using the Court's statement about the "access authorization data means."  (*See* Dkt. No. 210 at 11-14.)

16

HTC says that the Court cannot rewrite claims or correct errors in the claims, but the Court's construction of the "asking when …" limitation does neither.  Moreover, even the most cursory review of the Federal Circuit cases HTC cites shows that they are inapposite.  In *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373-74 (Fed. Cir. 2004), the Federal Circuit declined a patent owner's request to rewrite a claim to require heating dough in an oven at an oven temperature of 400-850 degrees when the claim language (and the specification) clearly and unambiguously recited heating the dough itself to a temperature of 400-850 degrees. In *Allen Eng'g Corp. v. Bartell Indus., Inc*., 299 F.3d 1336, 1349 (Fed. Cir. 2002), the Federal Circuit declined the patent owner's request to rewrite the word "perpendicular" in a claim to mean "parallel."  The Court's construction does not rewrite "black" to mean "white" or attempt to change the clear meaning of an invention as described in the specification and claim.

HTC also cites *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1352-57 (Fed. Cir. 2003), to assert that the Court is impermissibly "fixing" an error in claim 13. However, HTC ignores that ***the patent owner*** in *Novo* "argued that the claim included an obvious typographical error that could be corrected by construction in one of two ways." *Id.* at 1352.  Ultimately, the Federal Circuit declined to correct the error at the patent owner's request because the proper correction was subject to reasonable debate. *Id.* at 1357.  Here, IPCom never asked the Court to correct an error in claim 13.  Instead, the parties in this case identified the "asking when …" limitation as one in need of construction by the Court, and the Court has construed the limitation.

### C.   HTC's Remaining Arguments Were Made, and Refuted, During Initial Claim Construction Briefing or Are Irrelevant.

HTC devotes the bulk of its motion on the "asking when …" term to old and irrelevant arguments.  (*See* Dkt. No. 210 at 13-18.)  First, as mentioned above, HTC continues to beat the

US2008 1677520.1

drum that because HTC can formulate multiple constructions for the "asking when …" limitation, then the limitation must be invalid as indefinite.  This is the same position that HTC raised throughout claim construction briefing, which IPCom addressed and the Court rejected.  (*See* HTC Briefs (Dkt. No. 134 at 33-36; Dkt. No. 151 at 28-31; Dkt. No. 156 at 17-22); IPCom Briefs (Dkt. No. 150 at 33-37; Dkt. No. 154 at 16-17).)

Second, the reference number "(65)" in the claim was also briefed by the parties.  (*See* HTC Briefs (Dkt. No. 134 at 35; Dkt. No. 151 at 28-29; Dkt. No. 156 at 22); IPCom Briefs (Dkt. No. 150 at 35-36; Dkt. No. 154 at 16-17).)  HTC cites no authority (*see* Dkt. No. 210 at 15-16) that contradicts the MPEP's guidance that reference numbers have "no effect on the scope of claims" – a position courts adopt.  *See, e.g., Hochstein v. Microsoft Corp.*, No. 04-73071, 2009 WL 1838975, at *13 (E.D. Mich. June 22, 2009).

Finally, HTC's wild speculation about the prosecution history of the '751 patent and the lack of filing of a certificate of correction or reissue in the Patent Office is irrelevant.  The Patent Office is presumed to have done its job, which would of course include reading and approving of the submitted claims.  *See, e.g., Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1574 (Fed. Cir. 1992) ("A patent is presumed valid, 35 U.S.C. § 282, and this presumption is based in part on the expertise of patent examiners presumed to have done their job.").  Moreover, the Patent Office clearly reviewed claim 13, contrary to HTC's suggestion otherwise.  (*See* Dkt. No. 131, Ex. 8 at HTC0008065, 8067 (index of claims signed by examiner listing claim 24 to be renumbered as claim 13).)  Indeed, HTC acknowledges that the Examiner proposed to correct a typo in claim 23, changing "east" to "least," and this fact suggests the Examiner closely read the claims and would have notified the applicants for the '751 patent if he believed claim 13 contained a similar (or worse) typographical error.  HTC's speculation about

how IPCom or Bosch could or should have gone back to the Patent Office about claim 13 is irrelevant to the issue before the Court, which is to consider and construe the "asking when …" limitation.

**D.    The Evidence Supports That "Access Authorization Data Means as Authorization Data" is a Self-Defining Term.**

IPCom does not believe the phrase "access authorization data means" needs to be construed separately from the "evaluation unit (60) for asking when information signals with access authorization data means (65) as authorization data (45, 50, 55) are received, whether …" limitation of claim 13.  If, however, the Court disagrees, IPCom has previously explained that "access authorization data means as authorization data" is a self-defining term indicating that the access authorization data means is the access authorization data itself.  (*See* IPCom Briefs (Dkt. No. 150 at 33-37; Dkt. No. 154 at 16-17).)  HTC cannot credibly dispute this given its own admissions and those of its expert, Dr. Rose.  (*See* Dkt. No. 150 at 35.)  Moreover, HTC had an opportunity to ask Mr. Hans, co-inventor of the '751 patent, about this particular phrase and the "asking when …" limitation when HTC deposed him in October 2009, but HTC asked no questions about this alleged error in the claim.  Of course, this is consistent with the fact that HTC understood the claim from the time the case was filed until November 2009, when HTC decided to manufacture its indefiniteness argument.

HTC makes a half-hearted attempt to address IPCom's position on "access authorization data means" in a footnote (*see* Dkt. No. 210 at 14-15 n.9) by suggesting "as" could have been "such as" and that there was no reason to use extra words when saying only access authorization data would have sufficed.  Again though, this is nothing more than HTC complaining about a lack of economy in the choice of words to claim the invention.  As this Court recognized in its *Markman* order, "clumsy" does not equate to "insolubly ambiguous," and the Federal Circuit law

US2008 1677520.1

makes clear that "[b]y finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity, and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (internal citation omitted).

For the above reasons, the Court should deny HTC's motion to reconsider the "asking when ..." limitation of claim 13 of the '751 patent.

## III. THE COURT SHOULD GRANT IPCOM'S MOTION FOR RECONSIDERATION OF THE "ASCERTAINING ..." LIMITATION OF CLAIM 13 OF THE '751 PATENT.

As noted above, HTC did not respond to IPCom's motion for reconsideration on the "ascertaining ..." term of the '751 patent. Following the September 23, 2010 hearing on pending discovery motions, the Court entered a minute order setting the briefing schedule for motions for reconsideration related to claim construction. The Court's September 24, 2010 minute order (reproduced below with emphasis added) clearly required HTC to respond to IPCom's motion, if HTC chose to do so, by October 8:

| 09/24/2010 | MINUTE ORDER setting briefing schedule on motions to reconsider the Markman Opinion 187 and Order 188 . ***HTC shall file its motion to reconsider combined with a response to 203 IPCom's motion for reconsideration no later than October 8, 2010***; IPCom shall file a response to HTC's motion for reconsider combined with a reply to 203 no later than October 22, 2010. HTC shall file a reply no later than October 29, 2010. Fact discovery shall be completed no later than January 31, 2010. Deadlines for expert reports and discovery and dispositive motions are suspended until further Court order. Signed by Judge Rosemary M. Collyer on 9/24/10. (KD) (Entered: 09/24/2010) |
|---|---|

HTC elected not to respond. IPCom's motion for reconsideration should be granted for the reasons set forth therein. (*See* Dkt. No. 203; *see also* LCvR 7(b) ("Within 14 days of the date of service or at such other time as the Court may direct, an opposing party shall serve and file a

memorandum of points and authorities in opposition to the motion.  If such a memorandum is
not filed within the prescribed time, the Court may treat the motion as conceded.").)

## CONCLUSION

For the reasons stated above, IPCom requests that the Court deny HTC's motion for
reconsideration of step 1.1 of claim 1 of the '216 patent and the "asking when …" limitation of
claim 13 of the '751 patent.  For the reasons set forth in its motion for reconsideration and
herein, IPCom requests that the Court modify its construction for the "ascertaining …" term of
claim 13 of the '751 patent as follows:

> The phrase "ascertaining as a function of an outcome of a comparison whether an
> access of the at least one subscriber station (5, 10, 15, 20) to the at least one
> telecommunication channel is enabled" is construed to mean "comparing an
> access threshold value to a random or pseudo-random number to determine
> whether access to the common telecommunications channel is allowed ~~or whether
> the subscriber station (cell phone) must wait for and check the next transmission~~."

Dated:  October 22, 2010

Stephen E. Baskin
DC Bar Number 456015
Kilpatrick Stockton LLP
Suite 900
607 14th Street, NW
Washington, DC 20005-2018
Telephone: 202.508.5800
Facsimile: 202.508.5858

*/s/ Geoffrey K. Gavin*
Mitchell G. Stockwell
Geoffrey K. Gavin
Catherine E. Hart
Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA 30309-4530
Telephone:  404.815.6500
Facsimile:  404.815.6555

*Attorneys for Defendant-Counterclaim
Plaintiff IPCom GmbH & Co., KG*

21

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed this day using the Court's CM/ECF system, which caused a copy of the same to be electronically mailed to each counsel of record in this case.

*/s/ Geoffrey K. Gavin*

22